IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| TAMMY WHEELER, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:22-CV-129 |
| | § | |
| BOARD OF REGENTS OF STEPHEN | § | |
| F. AUSTIN STATE UNIVERSITY, | § | |
| STEVE WESTBROOK, ED.D., | § | |
| INTERIM PRESIDENT | § | |
| OF STEPHEN F. AUSTIN | § | |
| STATE UNIVERSITY, AND | § | |
| STEPHEN F. AUSTIN | § | |
| STATE UNIVERSITY | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff, Tammy Wheeler ("Plaintiff" or "Ms. Wheeler"), files this Complaint against The Board of Regents of Stephen F. Austin State University ("The Board"),[1] Steve Westbrook, Ed.D. as Interim President of Stephen F. Austin State University ("President Westbrook"), and Stephen F. Austin State University.

## NATURE OF THE CASE

1. This is yet another case about a violation of constitutional rights, employment discrimination, and unlawful retaliation at Stephen F. Austin State University ("SFA"), a public university.

---

[1] While collectively referred to as "The Board of Regents of Stephen F. Austin State University," each Board member is sued individually in their official capacity.

2. Plaintiff, an SFA staff member, was retaliated against for reporting racist activity by her supervisor and for requesting disability accommodations.

3. SFA also discriminated against Plaintiff by denying her reasonable accommodations.

## PARTIES

4. Plaintiff, Tammy Wheeler, is an individual and Citizen of Texas.

5. Defendants, members of the Board of Regents of Stephen F. Austin State University are appointed by the Governor of the State of Texas to control and manage Stephen F. Austin State University, which is a public educational institution established under Chapter 101 of the *Texas Education Code*.  The Board of Regents of Stephen F. Austin State University are:  Karen Gantt (Chair); M. Thomas Mason (Vice Chair); Jennifer Wade Winston (Secretary); David Alders; Robert A. Flores; Brigette Carnes Henderson; Judy Larson Olson; Lauren Rectenwald; and Nancy Windham.[2]  At this time, the Board Members are only being sued in their official capacities.  The Board of Regents of Stephen F. Austin State University may be served with process at 1936 North Street, Nacogdoches, Texas 75962.

6. Defendant, Steve Westbrook, Ed.D., is the Interim President of Stephen F. Austin State University ("President Westbrook").  President Westbrook was appointed by the Board.  President Westbrook may be served with process at 1936 North Street, Nacogdoches, Texas 75962.  President Westbrook is only being sued in his official capacity.

7. Defendant, Stephen F. Austin State University, is a public educational institution established under Chapter 101 of the Texas Education Code and is an entity created by the State of Texas under the control and management of its Board of Regents.  As such, it may be served

---

[2] A nonvoting "Student Regent" also sits on the Board of Regents.  She is not named in this suit.

with process on Steve Westbrook, Ed.D., Interim President, 1936 North Street, Nacogdoches, Texas 75962.

## JURISDICTION AND VENUE

8. Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has federal question jurisdiction because the action arises under *Title VII of the Civil Rights Act of 1964* (as amended), 42 U.S.C. §2000e, *et seq*. and the *Americans with Disabilities Act*, 42 U.S.C. § 12101 *et seq*.

9. The Court has supplemental or pendant jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under *Chapter 21 of the Texas Labor Code*.

10. This Court has personal jurisdiction as all parties are Citizens of Texas.

11. Venue is proper in the U.S. District Court for the Eastern District of Texas pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the events giving rise to this action were committed therein.

## CONDITIONS PRECEDENT

12. All conditions precedent have been performed or have occurred.

13. Specifically, on or about April 29, 2021, Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and Texas Workforce Commission Civil Rights Division ("TWC-CRD"), satisfying administrative prerequisites for her claims pursuant to Chapter 21 of the *Texas Labor Code*. Exhibit "A."

14. On September 2, 2022, the EEOC/TWC-CRD issued Plaintiff a Notice of Right to Sue. Exhibit "B."

## BACKGROUND

**A.   Ms. Wheeler's 12 plus year career at SFA**

15. Ms. Wheeler began working at SFA in approximately June of 2009.

16. From June 2009 until July 2019, Ms. Wheeler was the House Coordinator in the SFA President's House.

17. In that role, Ms. Wheeler worked for SFA's then President, Baker Pattillo, Ed.D., and his wife, Janice Pattillo, Ed.D.

18. President Pattillo died in December 2018.

19. In the summer of 2019, the Board hired Scott Gordon, Ph.D. as SFA's President.

20. Around August or September 2019, President Gordon and his wife, Sherri Schweizer-Gordon moved into the SFA President's House.

21. Prior to the Gordons' arrival, Ms. Wheeler was reassigned to SFA's Physical Plant.

**B.     Ms. Wheeler's first stint in SFA's Physical Plant**

22. In the Physical Plant, Ms. Wheeler was assigned to basic custodial/janitorial work.

23. At the time, Ron Watson was the Director of SFA's Physical Plant.

24. Mr. Watson is a white male, believed to be in his 50s or 60s.

25. Mr. Watson deliberately flamed racial tensions between Ms. Wheeler, who is white, and the other employees in the Physical Plant, who were predominately Hispanic and African American.

26. Mr. Watson also made numerous racist and racially charged statements to Ms. Wheeler and in her presence about SFA's Physical Plant employees.

27. For example, Mr. Watson compared SFA to the movie *Roots* and stated that there were "field hands" and "house hands" working for him.

28. Mr. Watson also likened himself to an overseer sitting on a horse with a big straw hat and a whip, overseeing the "hands."  Mr. Watson even referred to himself as "the field boss."

29.     Mr. Watson also referred to the SFA President's House as the "big house," the "White House," and the "Antebellum House."

30.     Mr. Watson essentially told Ms. Wheeler that the other workers were not going to like her because she was a "house hand" coming out of the "the White House" to work with the "field hands."

31.     Mr. Watson also told Ms. Wheeler how the other workers saw her a being "white privileged" and that the other workers—who were predominantly Hispanic or African American—have a "weird ass culture."

32.     On or about September 26, 2019, Ms. Wheeler notified SFA's Interim Human Resources Director, John Wyatt, about Mr. Watson's conduct and racist statements.

33.     Mr. Wyatt and SFA did nothing.

34.     While working in Physical Plant, Ms. Wheeler also began to have trouble performing her custodial duties.

35.     Ms. Wheeler suffers from several disabilities, including fibromyalgia, osteoarthritis, Hashimoto's disease, chronic fatigue, migraines, and lack of strength in her hands.

36.     As House Coordinator, Ms. Wheeler was generally able to perform her duties and received excellent evaluations.[3]

37.     As a general custodial employee in the Physical Plant, however, Ms. Wheeler had great difficulty performing her job duties.  Her disabilities caused the work to be extremely difficult to virtually impossible.

38.     Nonetheless, Ms. Wheeler persevered.

---

[3] Ms. Wheeler did take FMLA leave for a period during the Summer of 2018 because of her migraines.

39. In fact, in her January 2020 job evaluation for 2019, Ms. Wheeler's direct supervisor, Veronica Herrera, rated Ms. Wheeler's job performance as "Exemplary."

**C.      Ms. Wheeler's Return to the SFA President's Home**

40. In or around November 2019, Ms. Wheeler was then reassigned back to the SFA President's Home.

41. Initially, Ms. Wheeler resumed her typical duties as House Coordinator.

42. After a couple months back in the home, Mrs. Gordon began asking Ms. Wheeler to do personal tasks, including giving Mrs. Gordon manicures; doing the Gordons' personal laundry; making beds; organizing the Gordons' personal property; doing personal shopping for the Gordons; and cooking President Gordon's daily breakfast.

43. At one point, Ms. Wheeler had to go to six different stores to find a certain snack cookie that President Gordon liked—Snackwell Devil's Food Cookie Cakes.

44. Mrs. Gordon also asked Ms. Wheeler to paint her toenails; put a wig piece in her hair; soak her nails off; and put her makeup on.

45. Many of the Gordons' requests made Ms. Wheeler uncomfortable and Ms. Wheeler refused to do some of them.

46. These highly personal tasks were not tasks that the Pattillos had ever had Ms. Wheeler perform.

47. When Ms. Wheeler was hired initially as the President's House Coordinator, she was specifically told that she worked for SFA, not the President; she was not a personal assistant to the President and his family. Ms. Wheeler was instructed that her duties were only related to "official" tasks, such as public functions and activities, and to maintain, manage, and clean the house.

48. During this time, Ms. Wheeler also told Mrs. Gordon and Dr. Gordon about Mr. Watson's comments and the situation in SFA's Physical Plant.

49. In the late Spring of 2020, Ms. Wheeler began to verbally express concerns to her supervisors about the Gordons' behavior and what they were asking Ms. Wheeler to do.

50. In June 2020, Mrs. Gordon asked for Ms. Wheeler to be removed as House Coordinator and Ms. Wheeler was sent back to Physical Plant.

**D.   Ms. Wheeler's Second Stint at the Physical Plant**

51. Back in the Physical Plant, Ms. Wheeler was once again assigned to general custodial duties.

52. Almost immediately upon her return to the Physical Plant, Ms. Wheeler was ridiculed and harassed by her direct supervisor, Veronica Herrera, and Elizabeth Huerta, her "lead," because she told them that she was unable to perform certain tasks due to her disabilities.

53. Indeed, Ms. Wheeler filed numerous reports with SFA's Department of Human Resources, specifically with Interim HR Director John Wyatt, about not receiving reasonable accommodations and being harassed and retaliated against by her supervisors.

54. Ms. Wheeler provided written, medical documentation of her disabilities and limitations in July 2020, that HR insisted upon, despite already knowing of Ms. Wheeler's disabilities for some years.

55. Over the summer, Ms. Wheeler's numerous requests for accommodations were ignored by her supervisors and HR.

56. On October 8, 2020, HR sent Ms. Wheeler an email detailing what it demeaned to be reasonable accommodation.

57.	The next day, Ms. Wheeler spoke to Ms. Herrera about her responsibilities.  Ms. Herrera essentially told her that her responsibility was to clean three large buildings, by herself, including lifting buckets of water and dragging vacuums weighing more than the weight restrictions given by her doctor.

58.	In other words, Ms. Herrera had no intention of following the directions from HR and accommodating Ms. Wheeler.

**E.	Ms. Wheeler Files a Formal Complaint on October 12, 2020**

59.	On October 12, 2020, Ms. Wheeler filed a formal complaint of discrimination and harassment with SFA.

60.	In her complaint, Ms. Wheeler referenced Mr. Watson's racist statements, among her complaints of disability discrimination and harassment.

61.	Ms. Wheeler also filed a formal complaint against President Gordon and his wife for misuse of state resources.

**F.	SFA Purportedly "Investigates" Ms. Wheeler's Complaint**

62.	In response to Ms. Wheeler's complaint, SFA hired the well-known employment defense law firm of Littler Mendelson, P.C. ("Littler") to "investigate" Ms. Wheeler's complaint.

63.	To provide some context, Littler is one of the world's <u>largest employment defense law firms</u>.  Littler's business model is based on defending big companies and insurance companies against claims and potential claims by employees or former employees.

64.	Littler states on its website, "[s]ince the first civil rights laws were passed in the 1960s, Littler has <u>counseled employers</u> on complying with equal employment opportunity laws and

<u>defended employers</u> in discrimination, harassment and retaliation lawsuits and regulatory investigations."[4]

65. Littler also publicly states that "[o]ur attorneys' proficiency in handling civil cases brought by the EEOC and other state agencies enables us <u>to develop effective approaches to defending against any EEOC litigation</u>, whether it involves claims brought on behalf of individual claimants or class-wide allegations involving alleged 'pattern or practice' claims and other alleged class-based discriminatory conduct."[5]

66. Littler also "approach[es] an employer's case with the understanding that litigation can be both costly and time consuming, and, therefore, we collaborate with our clients on strategy from the outset."[6]

67. Having Littler investigate Ms. Wheeler's claims is like having a Sam Houston graduate referee the Battle of the Piney Woods.

68. Littler assigned employment defense attorneys Darren Gibson[7] and Erin McNamara[8] to investigate Ms. Wheeler's claims.

69. Littler "investigated" from October 2020 to January 2021.

---

[4] https://www.littler.com/practice-areas/discrimination-and-harassment

[5] https://www.littler.com/practice-areas/discrimination-and-harassment

[6] https://www.littler.com/practice-areas/discrimination-and-harassment

[7] According to Littler's own website, "Darren Gibson is a zealous advocate and trusted advisor to private businesses and public-sector employers, including colleges and universities, on a range of employment-related matters." https://www.littler.com/people/darren-gibson. Further, "Darren has a particular focus representing higher education institutions. He serves as co-chair of Littler's Higher Education Industry Group and is an active member of the National Association of College and University Attorneys." https://www.littler.com/people/darren-gibson.

[8] Ms. McNamara "advises businesses and public-sector employers on a range of employment matters, including discrimination, harassment, retaliation, and leave and accommodation matters." https://www.littler.com/people/erin-mcnamara

70. Littler attorneys Gibson and McNamara issued a report dated January 11, 2021.

71. Shockingly, they found Ms. Wheeler's complaints to be "unsubstantiated."

72. Nevertheless, the evidence pertaining to Mr. Watson's racist comments and behavior was so profound and pervasive, that even the Littler attorneys were force to acknowledge it occurred.

73. The Littler attorneys noted:

> Given [Watson's] own admissions, as well as [Erik Green's] and [Veronica Herrera's] confirmation that [Watson] previously made comments about a Black employee by referencing to the movie *Roots*, we find Complainant's allegations against [Watson] are supported by the preponderance of the evidence. Specifically, [Watson] admittedly told Complainant that the other custodial workers saw her as coming from a more privileged position in the President's House, and he referred to the other employees as field workers. While [Watson] did not recall referencing the movie *Roots*, we find it likely that he did since [Erik Green] and [Veronica Herrera] confirmed that [Watson] previously referenced *Roots* while discussing a former Black employee.

74. In their report, the Littler attorneys also omitted or left out key information, such as the fact that Ms. Wheeler told Mrs. Gordon and President Gordon about Watson's racist statements and his effort to stoke racial tensions between Ms. Wheeler and the other Physical Plant employees.

**G.    SFA Retaliates Against Ms. Wheeler**

75. As previously noted, Ms. Wheeler filed her formal complaint on October 12, 2020.

76. SFA's "investigation" began shortly thereafter.

77. In November 2020, after Ms. Wheeler made her formal complaint, Herrera began to retaliate against Ms. Wheeler.

78. Herrera threatened to change Ms. Wheeler's hours.

79. Ms. Wheeler also learned that Herrera made numerous negative remarks to other employees, including calling Ms. Wheeler "a bitch."

80. On February 21, 2021—132 days after Ms. Wheeler's complaint and only 41 days after the Littler report was made official on January 11, 2021—Ms. Herrera gave Ms. Wheeler an extremely negative performance evaluation.

81. The February 2021 evaluation was for the 2020 year.

82. In the 13 available categories, Ms. Herrera rated Ms. Wheeler as "Improvement Needed" in 8 of 13 categories, "Acceptable" in 4 categories, and "Exemplary" in 1 category.

83. Prior to this evaluation, Ms. Wheeler's prior evaluations—including Ms. Wheeler's January 2020 evaluation from Herrera—have all been exceedingly higher than the one issued following Ms. Wheeler's complaint and formal request for accommodation.

84. Notably, most staff employee evaluations are provided in January.

85. In fact, the evaluation was signed by Herrera and Watson on January 25, 2021—nine days after the Littler report was issued and five days after Ms. Wheeler appealed the Littler findings.

86. Further, Denise Stokes, Ms. Wheeler's coworker, told the Littler attorneys that Ms. Wheeler was given too much work to do in cleaning the Student Center by Herrera.

87. Unfortunately, retaliation against those whose speak out is commonplace at SFA.

88. The SFA administration promotes and maintains a culture of fear, intimidation, and retribution.

89. Indeed, during a Special Called Board Meeting on September 6, 2021, Karen Gantt, Chair of SFA's Board of Regents, noted that there exists at SFA a "fear of consequences for speaking out."

90. Gannt also noted that members of the SFA community—factually and staff—frequently described Dr. Gordon as a "bully" and that he acted in an authoritarian manner.

91. Gantt also noted that SFA was "not thriving."

92. After the Littler report, SFA terminated Watson.

93. In April 2020, SFA and President Gordon "mutually agreed to part ways." SFA paid President Gordon over $800,000 in severance.

## LEGAL CLAIMS

### COUNT ONE: *EX PARTE YOUNG* ACTION FOR INJUNCTIVE RELIEF AGAINST THE BOARD AND PRESIDENT WESTBROOK

94. Plaintiff files suit seeking prospective, injunctive relief and declaratory relief from state actors based on ongoing violations of her right under federal law, specifically *Title VII of the Civil Rights Act of 1964* (as amended), 42 U.S.C. §2000e, *et seq*. and the *Americans with Disabilities Act*, 42 U.S.C. § 12101 *et seq*. *See Ex Parte Young*, 209 U.S. 123 (1908); *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013).

95. Plaintiff files suit against The Board and President Westbrook, state officers acting in their official capacities. *See Ex Parte Young*, 209 U.S. 123 (1908); *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013).

96. At this time, Plaintiff sues the Board and President Westbrook in their official capacities only and solely for prospective, injunctive relief.

### *REQUEST FOR PERMANENT INJUNCTIVE RELIEF*

97. Plaintiff seeks a permanent injunction from this Court ordering The Board and President Westbrook to implement and enforce employment policies that ensure employees are not retaliated against for reporting violations of Title VII and the ADA and requesting accommodations under the AD.

98. SFA is an employer under Title VII and the ADA.

99. As an employee, Plaintiff is entitled to the protections afforded by Title VII and the ADA.

100. Plaintiff also seeks a permanent injunction from this Court ordering The Board and President Westbrook to implement and enforce employment policies that their subordinates cease all further violations of Title VII and the ADA

101. Plaintiff seeks a permanent injunction from this Court ordering Defendants to require their subordinates to:

    1. Provide appropriate Title VII and ADA training to former Interim Director of HR John Wyatt—who is now the Director of HR—and the entire HR staff;

    2. Develop and implement **real** employment policies that comply with Title VII and the ADA;

    3. Provide annual training for all SFA employees, including the Board of Regents, with respect to these policies;

    4. Enforce employment policies that comply with Title VII and the ADA;

    5. Cease any and all employment practices—written or unwritten—that violate Title VII and the ADA; and

    6. Remove Plaintiff's negative February 2021 evaluation from her personnel file.

COUNT TWO: UNLAWFUL RETALIATION
IN VIOLATION OF TITLE VII—SFA

102. Plaintiff asserts a claim under Title VII of the Civil Rights Act for retaliation against SFA. *See* 42 U.S.C. §2000e-3(a).

103. Plaintiff is an employee within the meaning of Title VII. *See* 42 U.S.C. §2000e(f).

104. SFA is an employer within the meaning of Title VII. *See* 42 U.S.C. §2000e(b).

105. As outlined above, Ms. Wheeler filed her formal complaint on October 12, 2020.

106. Ms. Wheeler made her complaint in good faith and with the subjective belief that discrimination or discriminatory activity was occurring in her workplace.

107. Ms. Wheeler's complaint was also objectively reasonable.

108. Indeed, the Littler attorneys found that Mr. Watson's "race-based" comments and discussions violated SFA's Nondiscrimination Policy. The Littler attorneys recommended that Watson be issued a written reprimand and undergo diversity training.

109. SFA—and its employees, including Herrera and Watson—retaliated against Plaintiff for filing her complaint by threatening to change her job assignments, threatening to change her hours, and issuing her a negative performance evaluation, among other things.

110. The acts of retaliation created a retaliatory hostile work environment. See *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006); *Haire v. Board of Supervisors of Louisiana State University*, 719 F.3d 356, 367 (5th Cir. 2013).

111. Several of these events occurred while the investigation was ongoing or immediately after the investigation concluded.

112. Thus, Defendant's retaliatory acts occurred in close temporal proximity to both her written complaint and her participation in the Littler investigation.

113. Defendant's retaliatory acts were sufficient to dissuade a reasonable employee from opposing unlawful employment practices, participating in the EEOC process, and engaging in protected activity under Title VII.

114. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.

115. Lastly, any proffered "reasons" for SFA's actions are merely pretext masking retaliation.

### COUNT THREE:  VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE UNLAWFUL DISCRIMINATION BASED ON DISABILITY

116. Plaintiff is an employee within the meaning of Chapter 21 of the *Texas Labor Code*.

117. SFA is an employer within the meaning of Chapter 21 of the *Texas Labor Code*.

118. SFA discriminated against Plaintiff based on her disabilities. Specifically, SFA—through its employees—failed to timely provide Plaintiff with reasonable accommodation and intentionally

assigned Plaintiff to jobs where SFA knew that Plaintiff's disabilities would severely impact her job performance.

119. Plaintiff was qualified for the position of House Coordinator; yet SFA removed her from that position without explanation.

120. Plaintiff was also qualified to work in the Physical Plant but required reasonable accommodations.

121. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.

122. Lastly, any proffered "reasons" for SFA's decisions are merely pretext masking discrimination.

## COUNT FOUR:  VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE UNLAWFUL RETALIATION

123. As previously stated, Plaintiff filed a formal complaint on October 12, 2020.

124. Plaintiff's filing of her complaint was a protected activity under Chapter 21 of the *Texas Labor Code*.

125. Plaintiff's participation in the Littler investigation was also a protected activity under Chapter 21 of the *Texas Labor Code*.

126. SFA—and its employees, including Herrera and Watson—retaliated against Plaintiff for filing her complaint by threatening to change her job assignments, threatening to change her hours, and issuing her a negative performance evaluation, among other things.

127. Several of these events occurred while the investigation was ongoing or immediately after the investigation concluded.

128. Thus, Defendant's retaliatory acts occurred in close temporal proximity to both her written complaint and her participation in the Littler investigation.

129. In short, SFA and its employees retaliated against Ms. Wheeler for filing her complaint and participating in the Littler investigation, in violation of Chapter 21 of the *Texas Labor Code*.

130. The retaliation suffered by Plaintiff is a prime example of SFA's culture workplace culture where, to quote SFA's own Board of Regents Chair, there is "a fear of consequences for speaking out."

131. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.

132. Lastly, any proffered "reasons" for SFA's actions are merely pretext masking retaliation.

## ATTORNEY'S FEES AND COURT COSTS

133. Plaintiff seeks to recover her reasonable and necessary attorney's fees and expenses to protect her constitutional rights. *See Warnock v. Pecos Cnty., Tex.*, 88 F.3d 341, 343 (5th Cir.1996) ("Claims for fees associated with prospective relief and fees that may be awarded as costs are not barred by the Eleventh Amendment.") (citing *Hutto v. Finney*, 437 U.S. 678, 692 (1978)); *accord Jones v. Tex. Juvenile Justice Dep't*, 646 Fed. Appx. 374, 377 (5th Cir. 2016) (noting that claims for costs and attorney's fees in an *Ex Parte Young* action are not barred by the Eleventh Amendment); *see also* 42 U.S.C. § 1988.

134. Plaintiff also seeks to recover her attorneys' fees and costs (including, but not limited to, an award of reasonable expert witness fees), both trial and appellate, under Title VII.

135. Plaintiff also seeks to recover her attorneys' fees and costs (including, but not limited to, an award of reasonable expert witness fees), both trial and appellate, under *Chapter 21 of the Texas Labor Code*.

136. Plaintiff also seeks to recover her Court Costs, as well as prejudgment and post judgment interest.

## **PRAYER**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants for the following:

a. A Permanent Injunction;

b. Actual damages due to her under the law, including but not limited to back pay, front pay, and compensation for past, present and future lost benefits;

c. Compensatory damages;

d. Damages for mental anguish;

e. Reasonable and necessary attorney's fees;

f. Court costs;

g. Prejudgment and post-judgment interest; and

h. Such other and further relief, at law or in equity, to which Plaintiff may show herself justly and lawfully entitled.

Respectfully submitted,

**FRANKLIN LAW FIRM, PLLC**

/s/ *Tanner Franklin*
**Tanner G.M. Franklin**
Texas Bar No. 24082506
tfranklin@tfranklinlawfirm.com
2528 Highway 103
Etoile, Texas 75944
(936) 854-3213 – Telephone
(888) 430-2559 – Fax

**Attorney for Plaintiff**