EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 460-2021-02946 |

| Texas Workforce Commission Civil Rights Division | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(Indicate Mr., Ms., Mrs.)*<br>**Tammy Wheeler** | Home Phone *(Incl. Area Code)*<br>⬛ | Date of Birth<br>⬛ |
|---|---|---|

| Street Address                                      City, State and ZIP Code<br>⬛          **Nacogdoches, Texas 75965** |
|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name<br>**Stephen F. Austin State University** | No. Employees, Members<br>**500+** | Phone No. *(Include Area Code)*<br>**(936) 468-3401** |
|---|---|---|

| Street Address                                      City, State and ZIP Code<br>**1936 North Street, Nacogdoches, Texas 75962** |
|---|

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

| Street Address                                      City, State and ZIP Code |
|---|

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br>☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | Earliest: **6/1/2020**   Latest: **Ongoing**<br><br>☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I, Tammy Wheeler, have been employed by Stephen F. Austin State University ("SFA") since June 2009.  I was formally a House Coordinator in the President's House form June 2009 until September 2019, when I was reassigned following the death former SFA President Dr. Baker Pattillo.  In November 2019, I was returned to the House Coordinator position.  The home was now occupied by new SFA President Scott Gordon and his wife, Sherri Schweizer-Gordon.

During the reassignment period, I was assigned to SFA's Physical Plant Department doing general custodial work.  While I was there, SFA's Director of the Physical Plant made numerous racist and racially charged statements to me about minority co-workers and the "hierarchy" at SFA.  Mr. Watson also fueled racial tensions between me and my new co-workers.  I also notified SFA's Interim Human Resources Director about Mr. Watson's conduct and racist statements on September 26, 2019.

I have several disabilities and health conditions including fibromyalgia, osteoarthritis, Hashimoto's disease, chronic fatigue, migraines, and a lack of strength in my hands due to osteoarthritis.  Consequently, I have had weight limits for lifting between 5 and 15 pounds.  While I was able to perform my duties as House Coordinator, I have had difficulty preforming general custodial duties due to my disabilities.

In January 2020, I received a written evaluation from my former supervisor while I was temporarily assigned to the Physical Plant Department, Veronica Herrera.  Ms. Herrera rated my performance as "Exemplary," the highest overall rating.  My previous supervisor in the President's home, Dr. Janice Pattillo, had given high recommendations in the past and consistently praised my work and performance.

In June 2020, I was removed from the President's home again and permanently reassigned to a custodial position.  This resulted in me seeking accommodations for disabilities from SFA Human Resources, although SFA Human Resources was already aware of my disabilities.

Because I was denied reasonable accommodations and other issues that I had witnessed over the past year, including racist behavior from SFA's Director of Physical Plant, Ron Watson; abusive and demeaning behavior by First Lady Sherri Schweitzer-Gordon; and misuse of SFA resources by President Gordon ad his wife.  *See* Exhibit "A," *Charging Party's Formal Complaint* dated October 12, 2020.

Afterwards, SFA retained the well-known employment defense firm Littler Mendelson, P.C. to review my complaints.

During Littler Mendelson's investigation, I was retaliated against by my supervisor, Veronica Herrera.  In November 2020, she threatened to change my hours.  Ms. Herrera also reassigned me additional work following my complaint.  Note, this was less than 1 month after I filed my complaint in which Veronica Herrera was specifically named.

On January 14, 2021, I was provided with a copy of Littler Mendelson's Report.  Unsurprisingly, Littler Mendelson largely cleared SFA of any wrongdoing.  *See* Exhibit "B," *Littler Mendelson, P.C.'s Report*.  Notably, the Littler Mendelson investigators failed to address my complaints concerning Dr. Scott Gordon and Sherri Schweitzer-Gordon.  Indeed, Dr. Gordon and his wife were not even listed as "Respondents."  *See id.*  The Littler Mendelson investigators did, however, find that Ron Watson made numerous racist comments that were confirmed by several other employees.  Another fact that was left out of the Littler Mendelson Report was that I told Sherri Schweitzer-Gordon about the racist statements by Ron Watson and his efforts to stoke racial tension within the physical plant.  I even mentioned to Sherri Schweitzer-Gordon that I thought about suing Ron Watson for his behavior.  I also mentioned to Dr. Scott Gordon that Ron Watson had made several racist statements and caused trouble between me and my coworkers.  Admittedly, I told Sherri Schweitzer-Gordon more details than Dr. Gordon.

On January 20, 2021, I filed a formal appeal of the investigators' findings and recommendations.  *See Exhibit "C," Charging Party's Appeal.*

On February 3, 2021, I received my 2020 evaluation from Veronica Herrera.  *See Exhibit "D."*  Ms. Herrera rated my work as "Improvement Needed" in 8 of 13 categories, "Acceptable" in 4 categories, and "Exemplary" in 1 category.  As previously noted, my prior evaluations have all been exceedingly higher than the one issued to me by Ms. Herrera following my complaint and formal request for accommodation.  Note, the evaluation was signed by Ms. Herrera and Ron Watson on January 25, 2021—9 days after the Littler Mendelson report was issued and 5 days after I filed my appeal.

Accordingly, I was and am being retaliated against by SFA for filing a formal complaint of discrimination and harassment in October 2020, as well as requesting disability accommodations beginning in July 2020.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| 4-29-21 | SIGNATURE OF COMPLAINANT |
| *Date*   *Charging Party Signature* | SUBSCRIBED AND SWORN *(month, day, year)* 4/2... |

MELANIE ARNOLD
Notary Public, State of Texas
Comm. Expires 01-07-2024
Notary ID 12605726-5

EXHIBIT  A



# FRANKLIN LAW FIRM
PLLC

October 12, 2020

**LETTER OF REPRESENTATION, REQUEST TO PRESERVE EVIDENCE,**
**FORMAL COMPLAINT OF DISABILITY DISCRIMINATION AND HARASSMENT,**
**AND FORMAL COMPLAINT FOR MISUSE OF UNIVERSITY/STATE RESOURCES**

| | |
|---|---|
| Stephen F. Austin State University | via Regular Mail |
| Damon Derrick, General Counsel | via email at derrickdc@sfasu.edu |
| Ms. Gina Ogelsbee, Chief Audit Executive | via email at ogelsbeegs@sfasu.edu |
| 1936 North Street | |
| Nacogdoches, Texas 75962 | |

RE:     *Tammy Wheeler—An SFASU Employee in the Physical Plant*

Dear Mr. Derrick and Ms. Ogelsbee:

Please be advised that Franklin Law Firm, PLLC has been retained by Tammy Wheeler, a current SFA employee working in the Physical Plant with respect to claims that she has against Stephen F. Austin State University for violations of Chapter 21 of the *Texas Labor Code*, *The Americans with Disabilities Act*, and the *Age Discrimination in Employment Act* for failure to provide reasonable accommodations and unlawful retaliation. Ms. Wheeler is currently working for the Physical Plant as a custodian in the School of Nursing; however, she was previously the President's House Coordinator under former SFA President Baker Pattillo for a number of years and then under current SFA President Scott Gordon from approximately November 2019 until June 2020.

### Background Information

Ms. Wheeler has worked for SFA since approximately 2009. Currently, she is 50 years old. Unfortunately, Ms. Wheeler suffers from fibromyalgia, arthritis, migraines, and asthma. SFA is aware that Ms. Wheeler suffers from these conditions. Ms. Wheeler has also submitted FMLA forms related to these issues.

During most of her employment with SFA—up until June 2020, Ms. Wheeler was assigned to the President's home as a coordinator. Ms. Wheeler had few issues with her disabilities in this role, other than her ability to work outside in the heat was limited. In fact, in January 2020, Ms. Wheeler received an excellent evaluation for performing "Exemplary Work."

RECEIVED
29 APR 2021
Houston District Office
Sub Field Office

After former President Pattillo died in December 2018, Ms. Wheeler remained in the President's home for several months.  Shortly after the home became vacant, in the late Summer of 2019, Ms. Wheeler was reassigned to the Physical Plant as a custodian.  Bear in mind, Ms. Wheeler was being paid $24 per hour as a Custodian—other custodial employees were making far less than that.  When Ms. Wheeler arrived in Physical Plant, issues began to arise immediately.  Due to her disabilities, Ms. Wheeler was unable to do a lot of the work typically done by custodial staff.  Specifically, Ms. Wheeler struggled because the strong chemicals caused issues with her migraines and asthma and with heavy lifting that was required.

Compounding the problem, Ron Watson, SFA's Director of the Physical Plant, undertook a plan to stoke racial tension between Ms. Wheeler, who is White, and Ms. Wheeler's co-workers, who were mostly Hispanic or African-American.

Mr. Watson made several racially inappropriate comments to Ms. Wheeler about the other custodial employees—who are primary racial minorities—including stating that the other employees viewed Ms. Wheeler and the Pattillos as "coming out of a Southern Antebellum Plantation," analogized the other workers to "field hands" and himself to a "field boss" sitting on a horse with a big straw hat and a whip, and commented that the whole dynamic was like the movie *Roots*.  Mr. Watson also referred to the other employees as having a "weird ass culture."

Apparently, Mr. Watson also made numerous comments to the minority employees about Ms. Wheeler as well.  Indeed, one of Ms. Wheeler's supervisors told her, "Ron wants you gone."  Other employees also told Ms. Wheeler that Mr. Watson would never let Ms. Wheeler return back to the President's home.

At the same time, Mr. Watson told Ms. Wheeler that the other custodial staff "could not wait for Ms. Wheeler to leave."  Mr. Watson told Ms. Wheeler that the supervisor called her "white-privileged."

In the Fall of 2019, new SFA President Scott Gordon and his wife Sherri Schweizer-Gordon moved into the President's home.  Ms. Wheeler was then reassigned to the President's home as Coordinator.  While Ms. Wheeler was glad to be back in this role, her happiness was short lived.

After a few months, Ms. Gordon began asking Ms. Wheeler to do personal tasks, including giving Ms. Gordon manicures and pedicures (Ms. Wheeler did this 3-4 times) doing the Gordon's personal laundry; making beds; organizing the Gordon's personal property; doing personal shopping for the Gordons; and cooking President Gordon's daily breakfast.  At one point, Ms. Wheeler had to go to six different stores to find a certain snack cookie that President Gordon liked.

Ms. Gordon also asked Ms. Wheeler to paint her toenails; put a wig piece in her hair; soak her nails off; and put her makeup on.  These requests made Ms. Wheeler uncomfortable and Ms. Wheeler refused to do them.  When Ms. Gordon asked Ms. Wheeler to put on her makeup, Ms. Wheeler politely said, "You don't want me to do your make up because I'm not good it at."  Ms. Gordon replied, "Well I don't feel like putting my makeup on today."

When Ms. Wheeler was hired initially as the President's House Coordinator, she was specifically told that she worked for SFA, not the President; she was not a personal assistant to the President and his family.  Ms. Wheeler was instructed that her duties were only related to "official"

tasks, such as public functions and activities, and to maintain, manage, and clean the house.

Ms. Gordon was also verbally abusive and demeaning to Ms. Wheeler and other SFA staff, including being extremely critical of staff and threatening Ms. Wheeler's job. Ms. Gordon was also prone to violent outbursts and would stomp her feet when she did not get her way or was upset, would yell, and would slam objects.

For example, Ms. Gordon broke the refrigerator door because she slammed it so hard in anger.

Ms. Gordon also demanded a tile worker, who was doing working on the President's home, be fired because he spilled water on "her driveway" and she had to walk through it.

On another occasion, after the President's house was pressure washed, Ms. Gordon became irate that the outside windowsills were dirty. Ms. Gordon climbed up on a ladder and filmed herself cleaning a window ledge that she said she "was going to send to the Board of Regents." Ms. Gordon wanted to give the impression that she cleaned the whole front of the house. She cleaned one, maybe two windows.

After the Gordon's numerous personal requests and dealing with Ms. Gordon's behavior, Ms. Wheeler verbally expressed concerns to her supervisors, including Hillary Parrish, that she was being abused and mistreated by the Gordons.

Ms. Gordon then asked for Ms. Wheeler to be removed from her role as Coordinator in June 2020. Ms. Wheeler was then sent back to the Physical Plant.

Almost immediately, upon her return to the Physical Plant, Ms. Wheeler was ridiculed and harassed by her direct supervisor, Veronica Herrera, and Elizabeth Huerta, her "lead", because she told them that she was unable to perform certain tasks due to her disabilities. Indeed, Ms. Wheeler has filed numerous reports with SFA's Department of Human Resources, specifically with John Wyatt, about not receiving reasonable accommodations and being harassed and retaliated against by her supervisors, but no action has been taken.

Ms. Wheeler provided written, medical documentation of her disabilities and limitations in July 2020, that HR insisted upon, despite already knowing of Ms. Wheeler's disabilities for some years. Over the summer Ms. Wheeler's numerous requests for accommodations were ignored by her supervisors and HR.

On October 8, 2020, HR sent Ms. Wheeler an email detailing what it demeaned to be reasonable accommodation. The next day, Ms. Wheeler spoke to Ms. Herrera about her responsibilities. Ms. Herrera essentially told her that her responsibility was to clean three large buildings, by herself, including lifting buckets of water and dragging vacuums weighing more than the weight restrictions given by her doctor. In other words, Ms. Herrera had no intention of following the directions from HR and accommodating Ms. Wheeler.

**Request to Preserve Evidence**

By this letter, I formally request that all documents, emails, and communications concerning Tammy Wheeler in the possession of SFA be preserved. This request includes communications sent or received by Ms. Sherri Schweizer-Gordon concerning Ms. Wheeler. I

further request that Ms. Wheeler's entire personnel file be preserved.

**Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Non-Discrimination Policy Concerning Mr. Watson, Ms. Herrera, and Ms. Huerta**

In accordance with SFA's Nondiscrimination Policy, Policy Number 2.11, please consider this a formal complaint against Ron Watson, Veronica Herrera, and Elizabeth Huerta for disability discrimination and harassment. My client demands that SFA begin an immediate investigation concerning Mr. Watson and Ms. Herrera for disability discrimination in violations of Chapter 21 of the *Texas Labor Code, The Americans with Disabilities Act of 1990* (and its Amendments), Section 504 of the *Rehabilitation Act of 1974* and SFA's Non-Discrimination Policies. My client also files a formal complaint against Ron Watson based on his racist comments and statements and demands an investigation be initiated.

Per Policy 2.11, a copy of this letter is being sent to Tiffany Rivers, SFA's Director of Disability Services and ADA Coordinator, and John Wyatt, SFA's Interim Human Resources Director.

**Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Ethics Policy Concerning Misuse of University/State Resources by President Scott Gordon and Ms. Sherri Schweizer-Gordon**

In accordance with SFA's Ethic's Policy, Policy Number 2.6, please consider this a formal complaint against Scott Gordon and Sherri Schweizer-Gordon for misuse of state funds, in possible violation of Chapter 572 of the *Texas Government Code*; Section 2203.004 of the *Texas Government Code*; and other applicable laws. My client demands that SFA begin an immediate investigation concerning President Gordon and his wife for misuse of state (university) resources.

A copy of this letter is being sent to Gina Oglesbee, SFA's Chief Audit Executive.

Please provide written acknowledgement of receipt this letter and that a 2.11 Discrimination Complaint has been recorded against Mr. Watson, Ms. Herrera, and Ms. Huerta, and that an Ethics Complaint has been recorded against President Scott Gordon and Ms. Sherri Gordon.

Respectfully,

/s/ *Tanner G. M. Franklin*
Tanner G. M. Franklin

**CC:**

Ms. Tiffany Rivers                                    via email at trivers@sfasu.edu
Director of Disability Services/ADA Coordinator

Mr. John Wyatt                                         via email at wyattjohn@sfasu.edu
Interim Human Resources Director

P.O. Box 274   *   Etoile, TX 75944
(936) 854-3213 – Telephone
(888) 430-2559 – Facsimile
tfranklin@tfranklinlawfirm.com

EXHIBIT B

PRIVILEGED & CONFIDENTIAL

STEPHEN F. AUSTIN STATE UNIVERSITY

**Report of Investigation Relating to**
**Discrimination Complaint by Tammy Wheeler**

**Authors:**

**Darren G. Gibson, Shareholder, Littler Mendelson, P.C.**

**Erin A. McNamara, Associate, Littler Mendelson, P.C.**

**January 11, 2021**



PRIVILEGED & CONFIDENTIAL

# Table of Contents

I.     INTRODUCTION ................................................................................................. 3

II.    EXECUTIVE SUMMARY OF ALLEGATIONS, FINDINGS, AND
       CONCLUSIONS ................................................................................................. 3

III.   APPLICABLE SFA POLICIES ......................................................................... 5

IV.    SUMMARY OF THE INVESTIGATION: PERSONS INTERVIEWED AND
       EVIDENCE REVIEWED .................................................................................. 7

V.     SUMMARY OF RELEVANT FACTS .............................................................. 8

       A.    Complainant's Age and Health Conditions .......................................... 8

       B.    Complainant Began Working for the University as the House Coordinator
             for the Former President (the Pattillos) in June 2009. ......................... 8

       C.    After President Pattillo's Death, Complainant Was Temporarily
             Reassigned from Approximately September 2019 to November 2019. ...... 9

       D.    In September 2019, Tensions Arose Between Complainant,
             Respondent #1, and Respondent #2, Stemming From a Facebook Post
             Made By Respondent #2. ..................................................................... 11

       E.    Complainant Returned to PPD and Was Assigned to Work with
             Respondent #3 ..................................................................................... 14

       F.    Complainant submits her Complaint. ................................................. 21

VI.    FINDINGS REGARDING ALLEGATIONS OF AGE DISCRIMINATION,
       RACIST COMMENTS, DISABILITY DISCRIMINATION AND
       HARASSMENT, AND RETALIATION ........................................................... 22

VII.   CONCLUSION ................................................................................................ 30

VIII.  EXHIBIT LIST ................................................................................................ 31

PRIVILEGED & CONFIDENTIAL

To:      Dr. Danny Gallant, Vice President for Finance & Administration, Stephen F. Austin State University

Cc:      Damon Derrick, General Counsel, Stephen F. Austin State University

From:   Darren Gibson, Littler Mendelson, P.C.
         Erin McNamara, Littler Mendelson, P.C.

Date:    January 11, 2021

Re:      Report of Investigation Relating to Discrimination Complaint by Tammy Wheeler

---

## I.      Introduction

On October 12, 2020, Stephen F. Austin State University ("SFA" or the "University") received a written complaint from legal counsel for **Tammy Wheeler** ("Complainant"),[1] a custodial employee in the Physical Plant Department ("PPD").[2] Complainant raised additional allegations via emails from her counsel on November 2, 2020 and November 10, 2020.[3] These communications will be referred to collectively as Complainant's "Complaint." The Complaint asserts allegations against **Ron Watson** ("Respondent #1"), **Veronica Herrera** ("Respondent #2"), and **Elizabeth Huerta** ("Respondent #3") (collectively, "Respondents"). Specifically, the Complaint alleges that she was subjected to age discrimination, that Respondent #1 made racist comments in front of her, that the three Respondents subjected Complainant to disability discrimination and harassment, and that Respondent #2 retaliated against Complainant during the investigation.

SFA retained Darren Gibson, a shareholder with the law firm Littler Mendelson, P.C., to conduct an independent investigation of the discrimination allegations asserted in the Complaint pursuant to SFA's Nondiscrimination Policy (Policy 2.11).[4] Erin McNamara, an associate with Littler Mendelson, assisted Mr. Gibson in the investigation.

## II.     Executive Summary of Allegations, Findings, and Conclusions

Complainant's allegations against Respondents focus on three areas of discrimination and harassment. First, Complainant alleges that she was subjected to age discrimination when she was temporarily removed from her assignment as the House Coordinator at the Juanita Curry Boynton

---

[1] In this Report, the names of the Complainant, Respondents, and Witnesses are bolded and defined to ease the process of redacting names, if necessary.

[2] Ex. 1, 10.12.2020 Letter of Representation. Complainant asserted other allegations in her Complaint unrelated to her allegations against the three Respondents. Those allegations are subject to a separate investigation and are redacted from Exhibit 1. A complete list of exhibits to this Report is attached hereto.

[3] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[4] Ex. 4, Nondiscrimination Policy.

3

PRIVILEGED & CONFIDENTIAL

House ("JCB House") and replaced by younger student workers while the home was being renovated before the arrival of the new president in 2019.

Second, Complainant also alleges that after she was reassigned from the JCB House to custodial work in PPD in 2019, Respondent #1 made racist comments in her presence and stoked racial tension between Complainant, who is White, and her co-workers, who were mostly Hispanic or African American. In particular, Complainant alleges that in late September/early October 2019, Respondent #1 told Complainant that Respondent #2 posted a comment on Facebook referring to Complainant as "white-privileged." Complainant further alleges that Respondent #1 made several racially inappropriate comments to Complainant about the other custodial employees, who are primarily racial minorities. In particular, Complainant alleges Respondent #1 stated that the other employees viewed Complainant as "coming out of a Southern Antebellum Plantation," he analogized the other workers to "field hands" and himself to a "field boss" sitting on a horse with a big straw hat and a whip, and he commented that the whole dynamic was like the movie *Roots*. She further alleged that Respondent #1 said the other custodial employees have a "weird ass culture."

Third, Complainant alleges that when she was reassigned to PPD in June 2020, the three Respondents subjected her to disability discrimination and harassment based on the following allegations: (i) she was ridiculed and harassed by Respondent #3 because Complainant said she was unable to perform certain tasks due to her disabilities; (ii) her numerous requests for accommodations were ignored by her supervisors and Human Resources; and (iii) Respondent #2 had no intention of following the directions from Human Resources and accommodating Complainant.[6]

For the reasons set forth below, we find the allegations that Complainant was subjected to discrimination and harassment on the basis of her age and disabilities to be **unsubstantiated.** The weight of the evidence does not support the majority of Complainant's allegations of age or disability discrimination or harassment. To the extent the alleged conduct did occur, we further find insufficient evidence to establish Respondents took any adverse action against Complainant *because of* her age or disabilities or that any conduct regarding her disabilities rose to the level of harassment, as defined by the Nondiscrimination Policy.

On the other hand, the weight of the evidence supports Complainant's allegations that Respondent #1 made racially inappropriate comments towards Complainant. However, we find that the comments were not "sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with" Complainant's work performance to meet the definition of harassment in the Nondiscrimination Policy. Thus, we find the allegations of race-based harassment against Respondent #1 to be **unsubstantiated**. However, we further find **Respondent #1's conduct constituted "Other Unprofessional/Inappropriate Conduct," in violation of SFA's Nondiscrimination Policy.**[7]

---

[5] Ex. 1, 10.12.2020 Letter of Representation, p. 2.

[6] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[7] Ex. 4, Nondiscrimination Policy, § II.

PRIVILEGED & CONFIDENTIAL

During the course of the investigation, Complainant (through her counsel) made additional allegations of retaliation.[8] On November 2, 2020, Complainant's counsel alleged that Complainant was required to perform work beyond her restrictions at the Student Center.[9] Additionally, on November 11, 2020, Complainant's counsel alleged that Complainant overheard Witness #3 on the phone discussing Complainant from outside his closed office door.[10] In her follow-up interview, Complainant also alleged that another custodial worker told her that Respondent #2 made a comment referring to Complainant by a derogatory term.

We find that Complainant's allegations that she was subjected to retaliation during the investigation to be **unsubstantiated**, as the evidence does not indicate that the alleged retaliatory acts, even if true, were taken because Complainant brought forth her Complaint or otherwise engaged in protected activity.

### III.    Applicable SFA Policies

The investigation of the Complaint was conducted pursuant to SFA's Nondiscrimination Policy.[11] Under the Nondiscrimination Policy, discrimination "means conduct directed at a specific individual or a group of identifiable individuals that subjects the individual or group to treatment that adversely affects their employment or education because of their race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status."[12] In addition, the Nondiscrimination Policy defines harassment as:

> verbal or physical conduct that is directed at an individual or group because of race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status when such conduct is sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with an individual's or group's academic or work performance; or of creating a hostile academic or work environment.[13]

The Nondiscrimination Policy also prohibits retaliation, which "means any attempt to seek retribution against an individual or group of individuals involved in filing a complaint or report under this Policy, filing an external complaint, participating in a disciplinary process, or opposing

---

[8] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[9] Ex. 2, 11.02.2020 Email from Complainant's Counsel.

[10] Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[11] Ex. 4, Nondiscrimination Policy.

[12] Ex. 4, Nondiscrimination Policy, § II.

[13] Ex. 4, Nondiscrimination Policy, § II.

5

in a reasonable manner an action believed to constitute a violation of this Policy."[14] Instances of alleged retaliation are to be investigated pursuant to the procedures of the Discrimination Policy.[15]

In addition, if a respondent is found to have engaged in unprofessional conduct that does not rise to the level of discrimination or harassment based on a protected class, the conduct may nevertheless be prohibited by the Nondiscrimination Policy as "Other Unprofessional/ Inappropriate Conduct."[16] The Nondiscrimination Policy defines "Other Unprofessional/ Inappropriate Conduct" as "behavior or conduct that is unprofessional and/or inappropriate for the educational and/or working environment, but does not rise to the level of Sexual Harassment or other form of Prohibited Conduct outlined above."[17] Therefore, to the extent corroborated factual allegations are found not to rise to the level of discrimination or harassment, this Report will also assess whether the conduct constitutes "Other Unprofessional/Inappropriate Conduct."

The Nondiscrimination Policy contemplates an investigation conducted by an impartial administrator from within the division where the complaint was filed, but not within the unit involved.[18] Due to the nature of this particular Complaint, the University engaged Mr. Gibson as a third-party, independent investigator. Information received during the investigation is to remain confidential, and relevant information is being provided to those persons who need to know via this Report in order to achieve a timely resolution of the Complaint.[19] In addition, the investigation required an extension beyond the 20 business days provided in the policy because of the availability of parties and witnesses for interviews and due to the holiday season. The parties were informed of the investigation status and extension.

Pursuant to the Nondiscrimination Policy, this Report "should describe the investigator's findings and conclusions to each allegation," and include "a brief overview of the investigative process including the category and number of individuals interviewed, timelines, and a summary of each allegation."[20] In addition, "the report should contain the investigator's recommendations for resolution of the matter," and "should be addressed to the appropriate vice President (or President if the complaint concerns a unit reporting directly to the President, or Chair of the Board of Regents if the complaint concerns an employee reporting directly to the Board of Regents or a a member of the Board of Regents)."[21] Furthermore, "[t]he Vice President/President shall review the findings and recommendations of the investigator and take such action deemed appropriate. Such action shall be communicated in a letter to the Complainant and Respondent with copies to the general counsel, Director of Human Resources, and the Title IX or ADA Coordinator, as

---

[14] Ex. 4, Nondiscrimination Policy, § II.

[15] Ex. 4, Nondiscrimination Policy, § X.

[16] Ex. 4, Nondiscrimination Policy, § II.

[17] Ex. 4, Nondiscrimination Policy, § II.

[18] Ex. 4, Nondiscrimination Policy, § IX(B).

[19] Ex. 4, Nondiscrimination Policy, §§ IV (Confidentiality), VII.

[20] Ex. 4, Nondiscrimination Policy, §§ IV (Confidentiality), VII.

[21] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

PRIVILEGED & CONFIDENTIAL

applicable, within five (5) business days of receipt from the investigator."[22] Accordingly, this Report is being provided to the Vice President for Finance and Administration for a final determination and communication of the findings to appropriate managers and administrators.

## IV.     Summary Of The Investigation: Persons Interviewed And Evidence Reviewed

At the outset of the investigation, all parties received notice of the initiation of the investigation and applicable policies and procedures. On October 19, 2020, the investigators notified Complainant of the commencement of the investigation.[23] On October 28, 2020, the investigators notified the Respondents of the investigation and provided them with a copy of the Complaint as it relates to the investigation under the Nondiscrimination Policy.[24]

The investigation included interviews of the following individuals:

- **Tammy Wheeler**, Custodian ("Complainant");
- **Ron Watson**, Director PPD ("Respondent #1");
- **Veronica Herrera**, Custodial Supervisor III ("Respondent #2");
- **Elizabeth Huerta**, Complainant's Coworker ("Respondent #3");[25]
- **John Wyatt**, Human Resources Interim Director ("Witness #1");
- **Hillary Parrish**, PPD Assistant Director ("Witness #2");
- **Erik Green**, Custodial Supervisor II ("Witness #3");
- **Marilyn King**, Nursing Administrative Assistant ("Witness #4");
- **Mary Mallard**, Complainant's Coworker ("Witness #5");
- **Denise Stokes**, Complainant's Coworker ("Witness #6");
- **Lucresha Phillips**, Complainant's Coworker ("Witness #7");
- **Sally Ann Swearingen**, Professor of Interior Design ("Witness #8");
- **Dr. Scott Gordon**, University President ("Witness #9"); and
- **Sherri Schweizer-Gordon**, University President's Wife ("Witness #10).

In addition to interviews, the investigators collected and considered documentation that was provided by Complainant, Respondents, witnesses, and the University. Accordingly, the following evidence was reviewed during this investigation:

Documents provided by SFA:
- Complainant's personnel file, including all documents relating to assignments, performance reviews, salary, transfers, requests for FMLA leave, and requests for

---

[22] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

[23] Ex. 6, 10.19.2020 Notice to Complainant.

[24] Ex. 7, 10.28.2020 Notice to Respondent #1; Ex. 8, 10.28.2020 Notice to Respondent #2 (mistakenly addressed to Respondent #3 although it was emailed to Respondent #2); Ex. 9, 10.28.2020 Notice to Respondent #3. At Respondent #3's request, a copy of the Notice was also provided in Spanish. Ex. 10, 11.13.2020 Spanish Notice to Respondent #3.

[25] At the request of Respondent #3, a Spanish translator was retained to translate during the interview of Respondent #3.

PRIVILEGED & CONFIDENTIAL

disability accommodations, including any separate files containing confidential medical records relating to requests for leave and accommodations.
- Communications from Complainant to Human Resources regarding her assignment to PPD in early 2019, her reassignment to the President's House in 2019, and her return to PPD in 2020, along with her requests for accommodations and FMLA leave.
- Job descriptions for the positions held by Complainant.

Documents provided by Complainant:
- Text messages between Complainant and Respondents.
- Complainant's 2019 annual performance evaluation.

Documents provided by Respondents:
- Text messages and emails between Complainant and Respondents.
- Text messages and emails among Respondents and others at the University regarding Complainant.
- Recordings of meetings and phone calls between Complainant and Respondents.
- Written response to Complaint prepared by Respondent #2.
- Complainant's 2019 annual performance evaluation.

The investigation included review and consideration of all the evidence listed above. The following factual findings refer to portions of this evidence relevant to the facts at issue, including both inculpatory and exculpatory evidence. Where facts are undisputed, the report simply presents a recitation of relevant, undisputed facts. This Report does not seek to summarize every piece of evidence reviewed during the investigation.

V.    **Summary of Relevant Facts**

A.    **Complainant's Age and Health Conditions**

Complainant was fifty years old as of the time she filed her Complaint.[26] In her interview, Complainant explained that her health conditions include fibromyalgia (diagnosed in 2016 or 2017), osteoarthritis, Hashimoto's disease (past five or six years; causes fatigue and achy joints), chronic fatigue (past six years), migraines, and asthma, and a lack of strength in her hands (past four or five years). Complainant explained that her weight limit for lifting has ranged between five and fifteen pounds.

B.    **Complainant Began Working for the University as the House Coordinator for the Former President (the Pattillos) in June 2009.**

Complainant started working at the University approximately eleven years ago, on or about June 8, 2009.[27] She was hired as the House Coordinator for the JCB House, where the University's President resides. At the time of Complainant's hire, President Dr. Baker Pattillo and his wife, Dr. Janice Pattillo, resided in the JCB House. As the House Coordinator, Complainant was

---

[26] Ex. 1, 10.12.2020 Letter of Representation.

[27] Ex. 11, Personnel Action Request for New Appointments.

PRIVILEGED & CONFIDENTIAL

responsible for "ensuring the University President's residence is in proper condition for living and entertaining," specifically by "maintaining the residence in clean, orderly condition through the performance of general housekeeping duties; preparing the house for visitors; and ensuring meetings and entertaining can be provided quickly and professionally."[28]

While working in the JCB House during President Pattillo's tenure, Complainant was supervised by and reported to the President's wife, Dr. Janice Pattillo. Dr. Janice Pattillo completed Complainant's performance evaluations (although it does not appear that Complainant consistently received a performance evaluation each year).[29] While she was working in the JCB House and supervised by Dr. Janice Pattillo, Complainant was technically considered an employee of PPD.[30] Complainant had limited interaction with PPD while she was working with the Pattillos, which primarily concerned reminders for Complainant to complete University-required trainings.

During her time as House Coordinator for the Pattillos, Complainant did not make any request for disability accommodations. In approximately July 2018, Complainant did request intermittent FMLA leave due to migraines. The request was handled by Human Resources, which communicated approval of her intermittent FMLA leave to Respondent #1 and Witness #2 in PPD.[31] There was some confusion as to who would approve and track her leave, as she was reporting to Dr. Janice Pattillo.[32] However, there is no evidence suggesting that Complainant was ever denied intermittent FMLA leave by her supervisors in PPD.

### C. After President Pattillo's Death, Complainant Was Temporarily Reassigned from Approximately September 2019 to November 2019.

Following the death of President Pattillo in December 2018, Complainant remained in the JCB House for several months before she was temporarily reassigned while the new President moved in. Complainant stated that after Dr. Janice Pattillo left the JCB House on or about July 1, 2019, Complainant contacted Respondent #1 to inquire about her work assignment, and Respondent #1 initially instructed Complainant to stay at the JCB House and continue cleaning. Thereafter, Complainant was reassigned to PPD in September 2019 until approximately November 2019.[33] Complainant alleged that she was reassigned because Witness #8 wanted to replace Complainant with younger student workers, which allegedly constituted age discrimination.

Witness #8, who was leading the JCB House renovations, confirmed that she requested student workers to oversee the subcontractors who were working on the JCB House from approximately 7:00 a.m. to 7:00 p.m. Witness #8 explained that they were on a deadline to finish the house before the new President moved in, and the amount of work that the subcontractors could

---

[28] Ex. 12, House Coordinator Job Description Rev. 09/09; Ex. 13, House Coordinator Job Description Rev. 09/11.

[29] Ex. 14, Complainant's Combined Performance Evaluations from Dr. Janice Pattillo.

[30] Ex. 11, Personnel Action Request for New Appointments.

[31] Ex. 15, 08.23.2018 Email Regarding FMLA Approval; Ex. 16, FMLA Accommodation Timeline.

[32] Ex. 17, 08.23.2018 Email Regarding Complainant's FMLA Approval.

[33] Ex. 18, 09.03.2019 Email from Respondent #1 Regarding Reassignment.

PRIVILEGED & CONFIDENTIAL

complete in a day was limited by the fact that Complainant ended work at approximately 3:00 p.m. every day. Witness #8 denied that Complainant was "replaced" by the student workers.

In addition, Respondent #1 said in his interview that he received instruction from the Board of Regents' chairperson that they wanted to provide a "clean slate" for the new President, who may not want a House Coordinator working in the JCB House. Respondent #1, Respondent #2, and Witness #8 further explained that the new President and his wife were given the opportunity to decide whether they wanted a House Coordinator and specifically whether they wanted Complainant to fill the role. Witness #9 and Witness #10 confirmed they did not have a House Coordinator when they first arrived, until Complainant was brought back to work at the JCB House. Accordingly, the evidence does not support that Complainant was replaced as House Coordinator by younger student workers in 2019.

During her reassignment to PPD in the Fall of 2019, Complainant said she was responsible for cleaning University properties with Witness #5, including the music preparatory house, the conservation building, the Tucker House, the second floor of the library, and the safety house. In her Complaint, Complainant alleges that "[d]ue to her disabilities, [Complainant] was unable to do a lot of the work typically done by custodial staff. Specifically, [Complainant] struggled because the strong chemicals caused issues with her migraines and asthma and with heavy lifting that was required."[34]

In her interview, Complainant stated she did not have much difficulty cleaning these buildings, although she said she reported to Respondent #1 and Respondent #3 that the chemicals were triggering her asthma. The investigation did not identify any such written communications, although there is an email from 2020 in which Complainant stated, "I have worked at the Presidents [sic] house, Tucker House, Starr House, Music Prep House, Safety House, Cole Art Center, the Conservation Building, the Field House, and the house that sits on the corner of E. Austin, and Raguet. I did those jobs much easier because there wasn't all the heavy lifting, pushing, pulling of furniture."[35]

Respondent #2 said she was not aware that Complainant had any difficulties at this time other than the chemicals, which Respondent #2 said was confusing because Complainant requested a stronger chemical (bleach) instead of the hydrogen-peroxide based cleaner that is typically diluted. Respondent #1 did not recall any conversation with Complainant about her asthma being triggered by chemicals, and he said any such conversation would have been handled by Respondent #2 and Human Resources. Witness #1 further confirmed that Human Resources was not notified of Complainant's need for ADA accommodations related to her custodial work until the following year (2020) when Complainant was permanently moved to PPD. However, it does appear that Complainant continued to seek intermittent FMLA leave in the fall of 2019 due to migraines.[36] Again, Human Resources reviewed and approved Complainant's request to recertify her FMLA leave for migraines, and the approval was sent to Complainant's supervisors. It appears

---

[34] Ex. 1, 10.12.2020 Letter of Representation.

[35] Ex. 19, 07.08.2020 Email From Complainant Regarding Accommodations.

[36] See Ex. 16, FMLA Accommodation Timeline; Ex. 20, 09.26.2019 Emails Regarding Complainant's FMLA Recertification.

10

PRIVILEGED & CONFIDENTIAL

that Complainant took off various days in the fall of 2019 for migraines.[37] In her interview, Complainant said she was taking FMLA leave for both migraines and fibromyalgia during this time, but the evidence reviewed indicated that Complainant was only approved for intermittent FMLA leave related to her migraines.[38]

Witness #5 said during the three months she worked with Complainant in 2019, there was nothing notable about their work other than the fact that Complainant stated she loved working at the JCB House and did not know if she would be able to go back. During her interview, Complainant said that Witness #5 told her (while Complainant was still working in the University houses with Witness #5) that Respondent #3 was hard to work with, she has a problem with people in her department, and that Complainant would want to quit if she was ever put with Respondent #3. When asked about this during the investigation, Witness #5 acknowledged that Respondent #3 likes to work independently, but Witness #5 did not recall telling Complainant that Respondent #3 is difficult to work with or that Complainant would want to quit if she was assigned to work with Respondent #3.

In summary, while Complainant worked in PPD in 2019 and took intermittent FMLA leave due to migraines she did not request any disability accommodations and was not denied any requested accommodations. Moreover, there is no evidence that Complainant was subject to discrimination on the basis of age or disability or to harassment on the basis of any actual or perceived disability during this period.

> **D.    In September 2019, Tensions Arose Between Complainant, Respondent #1, and Respondent #2, Stemming From a Facebook Post Made By Respondent #2.**

While Complainant was temporarily reassigned to PPD in 2019, there was an incident in late September 2019 that stirred racial tensions between Complainant, Respondent #1, and Respondent #2. The event centered around Complainant's compensation compared to others in PPD. As House Coordinator, Complainant made significantly more than other non-managerial custodial staff in PPD, most of whom are Black and Hispanic. When Complainant was temporarily assigned to PPD, her compensation remained the same, and Respondent #2 became aware of Complainant's compensation relative to other custodial employees in PPD.

On September 25, 2019, Respondent #2 published a post on Facebook that read: "Example of systematic racism: There's always money in the budget for white employees to get raises but when minorities ask for one or deserve one the well is dry."[39] Respondent further replied to a comment on her post, stating: "[I]t's bad; when a bilingual, college educated minority with a

---

[37] Ex. 21, 10.01.2019 Email From Complainant to Respondent #2 Regarding Migraine; Ex. 22, 10.02.2019 Note From Complainant Regarding FMLA Leave for Migraine; *see also* Ex. 23, 10.03.2019 Email From Complainant to Human Resources Regarding Doctor's Notes.

[38] *See* Ex. 16, FMLA Accommodation Timeline; Ex. 24, 08.10.2020 Emails Regarding FMLA Certifications (noting Complainant had existing approval for intermittent FMLA related to her migraines but not her fibromyalgia).

[39] Ex. 25, 09.25.2019 Respondent #2's Facebook Post.

11

PRIVILEGED & CONFIDENTIAL

supposed admin position makes literally $1 less than a white employee of theirs. But all other 'admin' with similar positions make significantly more. The system is broken."[40]

During a meeting on September 26, 2019, Respondent #1 informed Complainant of Respondent #2's Facebook post.[41] Complainant explained in her interview that she went to Respondent #1's office to ask him about Witness #8 removing Complainant from the JCB House.[42] According to Complainant, Respondent #1 told her that Respondent #2 put something on her Facebook page about Complainant being white-privileged. Complainant said Respondent #1 "spun off" into racist comments about the other custodial staff being "field hands," himself being a "field boss" sitting on a horse with a big straw hat and a whip, and Complainant being perceived as "coming out of a Southern Antebellum Plantation," which made Complainant uncomfortable. Complainant alleged Respondent #1 further commented that the whole dynamic was like the movie *Roots* and that the other custodial employees have a "weird ass culture." Complainant said that Respondent #1 showed her a screenshot of the Facebook post, and insinuated that he wanted Complainant to confront Respondent #2 because it also implicated Respondent #1, as a manager, potentially treating employees unfairly.

Respondent #1 admitted that he discussed the Facebook post with Complainant during their meeting, but he denies that he did so with the intention of informing Complainant of its existence. Instead, he explained in his interview that Respondent #2 made the Facebook post the night before he met with Complainant. Respondent #1 said Complainant came to his office the following day and asked him, "Why don't they like me?" He assumed that Complainant already knew about the Facebook post and he explained that, as white people, they need to be open to the possibility that others may not see things the same way. Respondent #1 said Complainant was adamant that she is not a racist. During his interview, Respondent #1 stated he likely described the JCB House as the White House (as it is a large white house), and said that Complainant was coming from the house into the field where all the other workers are. He said he encouraged Complainant to have a dialogue with other PPD employees since Respondent #1 felt they could have some resentment because they were supervising Complainant and she was being paid more.

Accordingly, Complainant confronted Respondent #2 about the Facebook post, and they met and discussed their working relationship.[43] The meeting occurred on the same date (September 26), and was attended by Complainant, Respondent #2, Witness #3, and University employee Michelle Miller (as Complainant's witness).[44] In her interview, Complainant said that she began the meeting by asking whether she did something Respondent #2 and Witness #3 did not like, and they responded no. Complainant said in her interview that Respondent #2 and Witness #3 also told her "a lot of slanderous things" that Respondent #1 allegedly said that made it clear he was stoking conflict. For instance, Complainant claimed Respondent #2 and Witness #3 told her that Respondent #1 did not want Complainant to return to the JCB House. In their interviews, Respondent #2 and Witness #3 stated that Complainant asked them if they thought

---

[40] Ex. 25, 09.25.2019 Respondent #2's Facebook Post.

[41] *See* Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[42] *See also* Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[43] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

[44] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

12

PRIVILEGED & CONFIDENTIAL

Complainant was a racist because someone in PPD had said they had called Complainant a racist, which they denied.[45] According to Respondent #2's summary of the meeting, they "finished the meeting on a good note and I believe [Complainant] now knows that we do not have a problem with her and that we certainly do not think she is racist."[46]

On October 3, 2019, Complainant went to Respondent #1's office after requesting another meeting with him (which he did not respond to).[47] The next day, on October 4, 2020, Complainant followed up with a text message to Respondent #1 apologizing for causing him any grief as a result of their prior meeting and acknowledging that Respondent #1 intended to help Complainant. Complainant stated:

> I am sorry that I caused you any grief.
> Seriously.
> I enjoy working for you and [Respondent #2] VERY much.
> Reflecting on the meeting yesterday I know now that you were only trying to help me. I get it. In our first meeting, I was honestly there to ask why [Witness #8] put Mary in charge, then I got defensive because the FB post was brought to my attention and that it was about me, and then the things I heard were the perception of the racism. It was hard to hear that the Custodial Dept. wanted me to go away, and that I was too uppity to associate with them. I sense like they are trying to make me feel at home over there. I also feel as though you were really trying to help me. I apologize for anything I've done to upset you.
> I hope we can all get along, and trust again, I'm willing to do anything.
>
> I am so sorry.[48]

In the Fall of 2019, Complainant and others from PPD went to the JCB House to do a thorough cleaning following the completion of renovations. Complainant stated that around this time, the new President's wife asked her to return to work as House Coordinator at the JCB House. Accordingly, Complainant returned to the JCB House as House Coordinator in approximately November 2019. While Complainant was working in the JCB House, Respondent #2 completed a performance evaluation that was provided to Complainant on or about January 24, 2020.[49] Based on her limited experience working with Complainant in the fall of 2019, as well as Respondent #2's understanding of Complainant's performance in the JCB House, Respondent #2 gave Complainant the highest overall rating (Exemplary).[50]

In summary, there is no evidence that Complainant suffered any adverse employment action on the basis of her race or was subject to any other race-based conduct or comments while

---

[45] *See also* Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

[46] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

[47] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[48] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[49] Ex. 28, Copy of Evaluation Provided by Complainant; Ex. 29, Copy of Evaluation Provided by Respondent #2.

[50] Ex. 28, Copy of Evaluation Provided by Complainant; Ex. 29, Copy of Evaluation Provided by Respondent #2.

she worked in PPD in 2019, other than during the one meeting with Respondent #1 on September 26, 2019.

### E.  Complainant Returned to PPD and Was Assigned to Work with Respondent #3.

On or about June 8, 2020, Complainant was removed from the House Coordinator position and returned to the custodial staff in PPD.[51] Both Witness #9 and Witness #10 noted that while Complainant was working in the JCB House, Complainant stated that she hated Respondent #1, and she wanted to sue him and the University. Prior to Complainant's return to PPD, the only documentation related to requests for leave or accommodation on file related to requests for intermittent FMLA due to migraines, which was granted in August 2018 and recertified in September 2019.[52]

Upon her return to PPD in 2020, Complainant was assigned to work in the nursing buildings with Respondent #3, who was Complainant's "lead." Witness #3 explained that while Respondent #3 had the same general responsibilities as Complainant, Complainant was supposed to go to Respondent #3 regarding any issues and to order supplies and the supervisors would go to Respondent #3 to address any complaints regarding the nursing building maintenance.

Complainant explained in her interview that on her first day working in the nursing buildings, one of her supervisors, Maria Veliz, was showing Complainant around and introduced her to Witness #4, a nursing building staff member. Complainant said Witness #4 told her she was glad Complainant was there and that Respondent #3 needed help cleaning the nursing buildings. According to Complainant, Witness #4 said that Respondent #3 had a problem with Complainant working there. In her interview, Witness #4 said she did not recall what she discussed with Complainant and Ms. Veliz, but it is possible she said something like that because Respondent #3 is very territorial. However, Witness #4 felt her statements were taken out of context by Complainant because Witness #4 was not aware of any personal conflict between Complainant and Respondent #3 when they first started working together.

Witness #3 said that at first Complainant said she was happy cleaning the nursing buildings and working with Respondent #3. That is supported by recordings from approximately late spring/early summer 2020 in which Complainant states she loves working in the nursing buildings and has no problems working with Respondent #3, and that Respondent #3 is "sweet," "kind," and "precious."[53]

Shortly after she returned to PPD, Complainant made a comment disclosing a prior injury to her rotator cuff. As a result, her supervisors referred the matter to Human Resources to send Complainant an informational email about ADA accommodations.[54] In response, Complainant

---

[51] Complainant also asserts allegations regarding her work at the JCB House; because those allegations are not pertinent to her discrimination claims, they are being addressed separate from this Report.

[52] Ex. 15, 08.23.2018 Email Regarding FMLA Approval; Ex. 20, 09.26.2019 Emails Regarding Complainant's FMLA Recertification; *see also* Ex. 16, FMLA Accommodation Timeline.

[53] Ex. 30, Tammy convo 2 Thursday.m4a; Ex. 31, Convo w- Tammy Wheeler.m4a.

[54] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

PRIVILEGED & CONFIDENTIAL

advised Human Resources that she did not need any ADA accommodations, stated that she never asked for accommodations, and sought the identity of the person who perceived Complainant as disabled:

> I am back working today. However, I am still so confused.
> With all due respect, I would like to know who said that I had disabilities? And who is speaking on my behalf using ADA accommodations?
> I never once asked for any accommodations.
> After being told repeatedly by [Respondent #3] at the Nursing Center that the carpet cleaning machine could really hurt me, to be extremely careful, and that it was very hard Machine to manage; that caused me to get a little nervous about using it, and I expressed then in a general conversation that I didn't have a lot of strength in my upper body, and about 6 -7 years ago I had a torn rotator cuff.
> I never once made a formal complaint, or asked for any type of accommodations at all.
> What I had in the past was an OLD injury from 6-7 years ago, and is not considered a disability. I'm not trying to be difficult at all, but I just don't like someone labelling me as a disabled person. Again, I did not ask for any accommodations.
> I am on FMLA, and every year my PCP fills out a proper form with absolutely NO restrictions listed. That FMLA form is current.
> Please let me know if this is not enough.[55]

Thereafter, on or about June 23, 2020, Complainant injured her shoulder while moving a water hose, which resulted in her filing a workers' compensation claim and being placed on work restrictions.[56] PPD management and staff from SFA's Environmental Health, Safety and Risk Management Department then met with Complainant to ensure she understood the workers' compensation process. During the meeting, it was explained to Complainant that due to the level of stated restrictions and risk of injury, she would be unable to perform light duty work.[57] It was also noted that upon being returned to PPD, Complainant had mentioned an injury to her rotator cuff, but that she had further advised Human Resources that she did not need any ADA accommodations.[58]

On July 7, 2020, the day she returned from leave for her shoulder injury, Complainant contacted Human Resources regarding a need for additional accommodations because Complainant was being asked to move chairs that were heavier than recommended by her rheumatologist.[59] This was the first occasion when Complainant indicated she needed accommodations for medical conditions beyond her approved intermittent FMLA for migraines and beyond the restrictions developed for her workers' compensation injury. This new request initiated extensive communications among Human Resources, the Complainant, her medical

---

[55] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

[56] Ex. 33, ADA Accommodation Timeline; Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury.

[57] Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury.

[58] Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury; *see also* Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

[59] Ex. 35, 07.07.2020 Email Regarding Moving Chairs.

PRIVILEGED & CONFIDENTIAL

providers, and PPD over the next few months to develop reasonable accommodations for Complainant's disabilities based on the information provided by her doctors and the duties listed in her job description.[60] Importantly, the accommodations process was controlled by Human Resources, and Respondents had no say over the medical documentation required from Complainant and her medical providers. Complainant's supervisors (including Respondent #2) were involved in establishing Complainant's minimum job requirements based on the House Coordinator position description.

With respect to her workers' compensation restrictions, Complainant accepted a bona fide offer of light duty employment on July 9, 2020.[61] The restrictions recommended by Complainant's medical provider included a maximum of four hours of reaching, no lifting or carrying objects over 20 pounds, and periodic breaks. The accommodations for Complainant's shoulder injury were detailed line-by-line in the House Coordinator position description and included limited time periods for use of both hands, breaking down trash into bags under 20 pounds, and periodic ten minute breaks.[62]

Witness #3 explained that around this time period, Complainant began to have problems taking direction from Respondent #3 and started complaining about difficulties moving chairs and vacuuming. Witness #3 said Complainant came to the PPD office and asked if she was being punished because she was assigned to work with someone who barely speaks English and Complainant makes three times what Respondent #3 makes. Similarly, Respondent #2 said in her written response that, in approximately July 2020, Complainant made statements about feeling like she was being punished for what happened in the JCB House.[63] These alleged statements were corroborated by a recording in which Complainant told Respondent #2 that felt she was being punished because she was removed from the JCB House and placed under Respondent #3, who made significantly less than Complainant ($8/hour versus $24/hour) and who has worked at the University for only two years.[64]

In her interview, Complainant stated that she believes Respondent #1 told Respondent #2 that he wanted Complainant gone, so Complainant believes she was placed with Respondent #3 as punishment because Respondent #3 is allegedly difficult to work with. Complainant stated that Respondent #3 was critical of every move that Complainant made: while Respondent #3 was very lax about her own work, she had a double standard for Complainant's work compared to her own. Complainant explained that Respondent #3 was constantly on her heels pointing out a smudge or a speck and would change the goalposts, for instance, by instructing Complainant to use two capfuls of cleaning solution but then stating the color did not look right. Complainant also said that Respondent #3 made comments about Complainant having "lazy arms" and questioned why Complainant was going to the doctor and seeing an out-of-town provider. Both Respondent #2 and

---

[60] Ex. 33, ADA Accommodation Timeline.

[61] Ex. 36, Complainant's Accepted Offer for Light Duty Work.

[62] Ex. 36, Complainant's Accepted Offer for Light Duty Work. During her interview, Complainant complained about being required to break down trash; however Witness #3 indicated that breaking down trash was not uncommon for custodial staff.

[63] Ex. 37, Respondent #2 Written Response to Investigation.

[64] Ex. 30, Tammy convo 2 Thursday.m4a.

PRIVILEGED & CONFIDENTIAL

Witness #1 confirmed there was insufficient evidence to corroborate Complainant's allegations that Respondent #3 made such comments.

On July 20, 2020, Respondent #2 messaged Complainant because she was missing 30 minutes of time from the last week and did not communicate that she was changing her lunch time to attend a doctor's appointment.[65] In the text message conversation, Complainant accused Respondent #2 of causing Complainant to have a panic attack by suggesting they have a meeting to address communication and chain of command issues.[66] Complainant stated, "stop harassing me [Respondent #2] … I'm going home because my heart is racing during this panic attack."[67] Respondent #2 did not respond but followed up the next morning stating that she hoped Complainant was feeling better and they still needed to have a meeting.[68]

Additionally, Complainant alleged that Respondent #3 falsely told Respondent #2 that Complainant wanted to switch her schedule to work later into the evenings. On August 11, 2020, Respondent #2 emailed Complainant stating that Respondent #3 told her that Complainant could change her schedule and thus Complainant's hours would be modified when the students returned to campus.[69] Complainant emailed Respondent #2 stating she could not change her schedule at that time and clarifying that "I said to [Respondent #3] once MAYBE when the students return."[70] Complainant also said she did not appreciate Respondent #2 and Respondent #3 making choices about Complainant's life and schedule.[71]

Respondent #2 then called for the group to have a meeting, which they did on August 12, 2020.[72] Respondent #3 was instructed to immediately cease any conversation about Complainant's medical history and to stop making comments about her "lazy arms and lazy hands."[73] Based on the poor working relationship between Complainant and Respondent #3, Respondent #2 decided to separate Complainant and Respondent #3, and that Complainant would be responsible for the Annex and Administration nursing buildings and Respondent #3 would have the Education nursing building (due to her later schedule).[74] Complainant said during her interview that she was fine with that solution and had been asking to be separated from the very beginning. Respondent #2 said Complainant did not make any further complaints about name-calling by Respondent #3 following their meeting.

---

[65] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[66] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[67] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[68] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[69] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[70] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[71] Ex. 40, 08.12.2020 Email from Complainant to Respondent #2 Regarding Concerns.

[72] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[73] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[74] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

PRIVILEGED & CONFIDENTIAL

Despite this separation, there continued to be disagreements between Complainant, Respondent #2, and Respondent #3 about whether Respondent #3 still had supervisory duties as Complainant's lead. Complainant understood after the August 12, 2020 group meeting that Complainant and Respondent #3 would go their separate ways and Respondent #2 would not come to Complainant's building to check up on her, but that Respondent #2 subsequently went back on her word.[75] Accordingly, Complainant explained in her interview that she felt the rules continually changed and that Respondent #2 was using Respondent #3 to be on Complainant's heels all the time. However, Complainant's understanding is not reflected in the contemporaneous summary of the August 12 meeting, which stated Respondent #3 was still her lead and that Complainant would still report to her.[76] Complainant later objected to this summary.[77]

Complainant also said she and Respondent #3 were also given strict orders not to share their emails outside of PPD, i.e., with the nursing building staff. Complainant explained that after she and Respondent #3 were separated, Respondent #2 made a comment like, "I hope no one is gossiping in this department because we don't allow gossiping." This made Complainant think that Respondent #3 had accused Complainant of gossiping about her. However, Complainant's managers were receiving complaints from nursing staff that both Complainant and Respondent #3 were engaged in inappropriate gossip.

On August 13, 2020, Witness #4 called Witness #3 and complained about ongoing issues between Complainant and Respondent #3. Witness #4 followed up this conversation with an email to Witness #3 explaining: "[Complainant] told me that [Respondent #3] had said in the meeting [with PPD] that I had said [Complainant] needed to be out of the Administration Bldg. That was never said and is not true. Yesterday, [Respondent #3] showed both [another nursing employee] and me an email [Complainant] had sent to her. That is none of our business. I nor [the other nursing employee] want to be in the middle of their feud. If they have a problem with each other they need to take it up with their supervisors. This has been an ongoing problem for several weeks now – Both [Complainant] and [Respondent #3] complaining about each other. I hope you can resolve this problem."[78] Witness #4 further explained in her interview that "from the day [Complainant] moved over here there was drama," and at first she had daily conversations with Complainant until Witness #4 started tuning her out. Witness #4 felt working with Complainant was problematic because Complainant wanted to talk during business hours at the nursing building, and Witness #4 had work to do. Witness #4 said she just wanted Complainant to "do her job and leave us alone." Witness #4 said she herself had no issues with Respondent #3 besides the fact that it could be hard to communicate due to a language barrier.

On August 19, 2020, Complainant received a disciplinary write-up as a result of Witness #4's complaint.[79] Specifically, the write-up stated that Complainant shared information from a PPD meeting, complained about Respondent #3 to Witness #4, and that Witness #4's supervisor specifically asked Complainant to cease involving the nursing building employees with

---

[75] Ex. 42, 08.18.2020 Emails Regarding August 12 Meeting Summary.

[76] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[77] Ex. 42, 08.18.2020 Emails Regarding August 12 Meeting Summary.

[78] Ex. 43, 08.13.2020 Email From Witness #4 Regarding Complaints.

[79] Ex. 44, 08.19.2020 Email Approving Complainant's Written Disciplinary Action.

18

PRIVILEGED & CONFIDENTIAL

the dispute between Complainant and Respondent #3.[80] Respondent #2 and Witness #3 both explained in their interviews that Respondent #3 was also disciplined as a result of Witness #4's complaint.[81] However, Respondent #2 explained that Complainant's discipline was escalated to a written action because Witness #4's supervisor, Tamara Harris (the School of Nursing Director), had also instructed Complainant not to involve the nursing building staff in the ongoing dispute. Although Witness #4's email named both Complainant and Respondent #3,[82] Witness #4 said during her interview that Complainant was a great distraction and she did not have the same problem with Respondent #3 (as described above). Additionally, Dr. Harris had previously indicated concerns with the nursing building custodians, specifically noting an issue with Complainant's credibility because Dr. Harris saw Complainant alone in certain areas of the nursing buildings although Complainant denied it to Respondent #2.[83]

On August 31, 2020, Complainant filed a grievance regarding this written disciplinary action, and alleged that the write-up was "out of retaliation, and a little extreme for the offense."[84] The grievance was denied, she appealed the initial outcome, and her appeal was also denied. In her appeal, Complainant alleged the write-up was retaliatory because she was warned Respondent #2 would retaliate against Complainant for continuing to email Human Resources.[85] Complainant further alleged she was not treated the same as Respondent #3 and that it was unfair that Complainant was the only one getting written up.[86] The final decision affirming the disciplinary action was issued on September 17, 2020.[87]

On October 6, 2020, Complainant complained to Respondent #2 that Respondent #3 was gossiping about Complainant with nursing building employee Rebecca Self and that Respondent #3 was "stirring the drama pot."[88] When Respondent #2 asked Complainant to have Ms. Self provide this information in writing, Complainant responded "I'm not getting involved," said she would take it to Human Resources. Complainant alleged Respondent #2 would call Ms. Self and "do it like you did [with Witness #4]" (when Complainant was written up for gossiping).[89] As a result of Respondent #2's investigation, Respondent #3 was written up because it was confirmed that Respondent #3 was talking about Complainant's cleaning capabilities with

---

[80] Ex. 44, 08.19.2020 Email Approving Complainant's Written Disciplinary Action.

[81] *See also* Ex. 45, 09.17.2020 Final Grievance Notification, pp. 8, 25-26.

[82] Ex. 43, 08.13.2020 Email From Witness #4 Regarding Complaints.

[83] Ex. 46, 07.24.2020 Email from Nursing Director Tamara Harris.

[84] Ex. 45, 09.17.2020 Final Grievance Notification, p.5.

[85] Ex. 45, 09.17.2020 Final Grievance Notification, p. 5.

[86] Ex. 45, 09.17.2020 Final Grievance Notification, p. 5.

[87] Ex. 45, 09.17.2020 Final Grievance Notification.

[88] Ex. 47, 10.06.2020 Email From Respondent #2 Regarding Complainant; Ex. 48, 10.06.2020 Text Messages Between Respondent #2 and Complainant.

[89] Ex. 48, 10.06.2020 Text Messages Between Respondent #2 and Complainant.

PRIVILEGED & CONFIDENTIAL

Ms. Self.[90] In her interview, Respondent #3 said she felt that Complainant was only cleaning windows and doorknobs and Respondent #3 needed to address the issue as Complainant's lead.

On or about October 7, 2020, Respondent #2 decided to transfer Respondent #3 in order to completely separate Respondent #3 and Complainant due to their ongoing issues.[91] Respondent #3 was reassigned because she asked to transfer first (although Respondent #3 was not happy to leave the nursing buildings), and the custodial supervisors did not want Complainant to feel she was being moved out as retaliation.[92] Upon learning that Respondent #3 would be transferred, Complainant then emailed Human Resources to request a transfer and complain about her assignment to the three nursing buildings.[93] Complainant stated the situation was "completely unfair" because Complainant had asked to be transferred first and the Nursing buildings were initially Respondent #3's responsibility.[94] She also expressed doubt that Respondent #3 had requested to transfer and believed Respondent #2 lied and was actually setting Complainant up for failure.[95]

Meanwhile, Human Resources continued to communicate with Complainant's medical providers and PPD to develop appropriate ADA accommodations for Complainant's disabilities as she had requested in July. The emails indicate that Respondent #2 was aware that ADA accommodations were forthcoming long before Complainant was presented with an offer of accommodations for her disabilities (in addition to the accommodations provided for her workers' compensation injury and her approved intermittent FMLA for migraines).[96] Human Resources sent a bona fide offer of ADA accommodations to Complainant and her supervisors on October 8, 2020.[97] Complainant did not accept the accommodations and additional communications between Human Resources and Complainant's medical providers ensued to address what Complainant perceived as discrepancies between her doctors' orders and the proposed accommodations.[98] On the same date, in response to complaints to Human Resources about her treatment by PPD employees, Witness #1 provided Complainant with information to submit a complaint under the Nondiscrimination Policy (as he had also previously done on several occasions).[99]

On October 9, 2020, Respondent #2 emailed Human Resources regarding difficulties managing Complainant: "She continuously goes to my superiors and accuses me of being racist.

---

[90] Ex. 49, 10.07.2020 Respondent #3 Written Discipline.

[91] Ex. 37, Respondent #2 Written Response to Investigation; *see also* Ex. 50, 10.07.2020 Respondent #2 Written Statement; Ex. 51, 10.07.2020 Witness #3 Written Statement; Ex. 52, 10.07.2020 Maria Veliz Written Statement.

[92] Ex. 37, Respondent #2 Written Response to Investigation.

[93] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request.

[94] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request.

[95] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request; Ex. 54, 10.09.2020 Email from Complainant to Human Resources.

[96] Ex. 55, 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations.

[97] *See* Ex. 56, 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer.

[98] Ex. 33, ADA Accommodation Timeline.

[99] Ex. 57, 10.08..2020 Email from Witness #1 to Complainant Regarding Nondiscrimination Policy.

20

PRIVILEGED & CONFIDENTIAL

Anytime I try to manage her work performance or train her in our procedures [Complainant] accuses me of harassing her or bullying her."[100]

### F.     Complainant submits her Complaint.

The following week on October 12, 2020, Complainant's counsel submitted a letter detailing Complainant's allegations of discrimination and harassment against Respondents.[101]

In accordance with Complainant's request to be transferred (discussed above), Respondent #2 met with Human Resources and Respondent #1 and developed two options, which were presented to Complainant on October 13, 2020: Complainant could move to (1) the Early Childhood Research Center with a change of shift schedule or (2) the Baker Pattillo Student Center (BPSC) keeping her current work schedule. Her responsibilities in BPSC would include "the entirety of the 3rd floor (under the new covid-19 cleaning guidelines), the back half of the 2nd floor (under the new covid-19 cleaning guidelines) and spot checking the front public areas, and restrooms."[102] The following day, Complainant responded, "I can not change my work time schedule, so the BPSC it is."[103]

On November 2, 2020, Complainant's counsel emailed the investigators to raise a concern about retaliation by Respondent #2 due to the fact that Complainant was moved from the nursing buildings to the Student Center and allegedly assigned responsibility for too much area given her work restrictions.[104] He said that when Complainant and her coworkers complained about the workload during a group meeting, Respondent #2 said, "If y'all cannot get this job done, then I will change your hours." However, Witness #7 said she understood this comment to be directed towards the night crew and not Complainant. Witness #6 similarly said that she felt the comment was directed at the group and not Complainant. Witness #6 also said that she used to work the third floor and she felt the assignment was too much based on what Complainant had said about her health conditions. Respondent #2 denied that she threatened to change Complainant's hours at this meeting.

Similarly, on November 11, 2020, Complainant's counsel reported that Complainant went to turn in a doctor's note to Witness #3's office and overheard him on the phone (behind a closed door) talking about Complainant.[105] He said a group of employees, including Witness #5, were sitting at a table outside Witness #3's office when this occurred.[106] In her interview, Witness #5 said that Witness #3 was in a meeting with his door closed when Complainant came by and grabbed a paper off the back of his door. Later, Complainant told Witness #5 and another individual that she was tired of people in PPD always saying her name. Importantly, Witness #3 was engaged in

---

[100] Ex. 58, 10.09.2020 Email from Respondent #2 to Human Resources.

[101] Ex. 1, 10.12.2020 Letter of Representation.

[102] Ex. 59, 10.13.2020 Email from Respondent #2 Regarding Complainant's Transfer.

[103] Ex. 60, 10.14.2020 Email from Complainant Regarding Transfer to Student Center.

[104] Ex. 2, 11.02.2020 Email from Complainant's Counsel.

[105] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

[106] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

21

PRIVILEGED & CONFIDENTIAL

the interview for this investigation during the time that Complainant alleged she overheard him talking about Complainant.

In her follow-up interview, for the first time Complainant raised a concern that Witness #6 told her that Respondent #2 made a comment referring to Complainant by a derogatory term. According to Complainant, upon learning that Complainant needed additional supplies, Respondent #2 said, "What does the bitch want now?" Witness #6 said the comment was actually overheard by Witness #7. Witness #7 said when she turned in Complainant's supply sheet to Respondent #2, there were three other individuals present and the group was in the parking lot getting out of a car. Witness #7 heard someone say "that bitch," referring to Complainant, but Witness #7 was not sure who made the comment. Respondent #2 denied referring to Complainant in this manner.

## VI.   Findings Regarding Allegations of Age Discrimination, Racist Comments, Disability Discrimination and Harassment, and Retaliation

The investigation examined whether Complainant's factual allegations were true and, if so, was she was subjected to discrimination or harassment on the basis of her age, race, and/or disabilities, and whether she was subjected to retaliation during the course of the investigation. Each of Complainant's allegations are addressed in turn below.

### 1.   Allegation of Age Discrimination

While Complainant alleges that she was subjected to age discrimination,[107] she brought forth very few facts to support an age discrimination claim. Complainant's most relevant allegation is that she was removed from the JCB House after Dr. Janice Pattillo moved out in 2019 and replaced by younger student workers at the direction of Witness #8.

As Complainant acknowledged in her interview, Witness #8 was responsible for decorating the JCB House before the arrival of the new president. Witness #8 explained in her interview that she recommended that student workers be brought in to watch the subcontractors from approximately 7:00 a.m. to 7:00 p.m., since she was on a deadline to finish the house before the new president moved in. Complainant's work ended at approximately 3:00 p.m. every day, which limited the work that could be done by the subcontractors in a day. Witness #8 disagreed with the characterization that student workers were brought in to "replace" Complainant, and none of those student workers fulfilled the role of House Coordinator once President Gordon and Mrs. Schweizer-Gordon moved into the house.

Similarly, Respondent #1 said in his interview that he received instruction from the Board of Regents' chairperson that they wanted to provide a "clean slate" for the new President, who may not want a House Coordinator working in the JCB House. Respondent #1, Respondent #2, and Witness #8 further explained that the new President and his wife were given the opportunity to decide whether they wanted a House Coordinator and specifically whether they wanted

---

[107] Ex. 1, 10.12.2020 Letter of Representation.

PRIVILEGED & CONFIDENTIAL

Complainant to fill the role. Witness #9 and Witness #10 confirmed when they first arrived, they did not have a House Coordinator until Complainant was brought back to work at the JCB House.

Accordingly, Complainant was temporarily reassigned to PPD from approximately September 2019 to November 2019 without any loss in pay or other adverse employment actions. She was not replaced as House Coordinator during this period, as the Gordons did not have anyone in that position the first few months that they lived in the JCB House. In addition, Complainant was returned to the House Coordinator position in November 2019. The reasons for Complainant's reassignment were entirely unrelated to her age, but instead due to the JCB House Committee's efforts to complete the renovations on time and facilitate the transition for the new President. Thus, we find Complainant's allegation that she was subjected to age discrimination to be **unsubstantiated.**

## 2.   Allegation of Racist Comments by Respondent #1

As to Complainant's allegations of racist comments by Respondent #1, he stated in his interview that he spoke with Complainant about how others may see her, given that she was coming from the President's House. He was concerned the other custodial workers might have some resentment because Complainant was being paid more. Respondent #1 explained in his interview that his intention in speaking with Complainant about Respondent #2's Facebook post was to help Complainant understand that the perspective of minorities may be different than that of white people, such as himself and Complainant. When asked during his interview if he said the other employees viewed Complainant as "coming out of a Southern Antebellum Plantation" or analogized the custodial workers to "field hands" and himself as a "field boss," Respondent #1 denied making any such comments. Respondent #1 stated he may have brought up a former employee who used to make comments like that. Respondent #1 also said that in using the term "field" workers he meant frontline workers, not crop workers. Respondent #1 did not recall referring to the movie *Roots* during his conversation with Complainant, although he admitted he has referred to *Shawshank Redemption* in the past as an example of institutional structures. Respondent #1 denied telling Complainant that the other custodial workers have a "weird ass culture."

Following their September 26, 2019 meeting and another meeting in early October 2019, Complainant sent Respondent #1 a text message stating that she understood Respondent #1 was just trying to help Complainant.[108]

Witness #5, who is Black, said that she has never had any problems with Respondent #1 and is not aware of any racist comments made by Respondent #1. Witness #3, who is also Black, said he was not aware of Respondent #1 making any racist comments towards Complainant. However, Witness #3 noted that a few years ago in approximately 2014 or 2015, Respondent #1 said that he liked a former Black supervisor in PPD because "he knows how to play Toby" (referring to the slave name of Kunta Kinte in the movie *Roots*). Notably, Witness #3 brought this up without any inquiry from the investigators about whether Respondent #1 had ever referenced *Roots*. Similarly, Respondent #2 said Respondent #1 previously made comments about the movies

---

[108] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

*Shawshank Redemption* and *Roots* (including a reference to a former Black supervisor playing Toby).

Given Respondent #1's own admissions, as well as Witness #3 and Respondent #2's confirmation that Respondent #1 previously made comments about a Black employee by referencing to the movie *Roots*, we find Complainant's allegations against Respondent #1 are supported by the preponderance of the evidence. Specifically, Respondent #1 admittedly told Complainant that the other custodial workers saw her as coming from a more privileged position in the President's House, and he referred to the other employees as field workers. While Respondent did not recall referencing the movie *Roots*, we find it likely that he did since Witness #3 and Respondent #2 confirmed that Respondent #1 previously referenced *Roots* while discussing a former Black employee.

While we find that Respondent #1 likely made racially inappropriate comments during his conversation with Complainant on September 26, 2019, there is little evidence that Respondent #1 intentionally stoked racial tension between Complainant and the custodial staff or otherwise discriminated against Complainant based on her race. The Nondiscrimination Policy defines discrimination as conduct that subjects an individual to treatment that adversely affects their employment or education because of their race or other protected status. There is not sufficient evidence that Respondent #1 purposefully placed Complainant in an undesirable work assignment or took any adverse employment action against Complainant because of her race.

While Respondent #1's comments to Complainant were inappropriate, the preponderance of the evidence does not reflect that Respondent #1 subjected Complainant any adverse employment action because of her race.

In addition, the Nondiscrimination Policy defines harassment as "verbal or physical conduct that is directed at an individual or group because of race [or other protected status] when such conduct is sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with an individual's or group's academic or work performance; or of creating a hostile academic or work environment."[109] While Respondent #1's conduct was inappropriate, we find that it was not sufficiently severe or pervasive to interfere with Complainant's work performance or create a hostile work environment for Complainant, given the context of the conversation and Complainant's acknowledgment that Respondent #1's comments were intended to help her.

Accordingly, to the extent that Complainant alleges Respondent #1 discriminated against her or subjected Complainant to harassment based on race, we find that allegation to be **unsubstantiated.**

Respondent #1's conduct was also assessed as potentially constituting "Other Unprofessional/Inappropriate Conduct" under SFA's Nondiscrimination Policy. Per the policy, "Other Unprofessional/Inappropriate Conduct" means conduct that is unprofessional and/or inappropriate for the educational and/or working environment, but does not rise to the level of

---

[109] Ex. 4, Nondiscrimination Policy, § II.

PRIVILEGED & CONFIDENTIAL

Sexual Harassment or Prohibited Conduct outlined by the policy.[110] As stated above, we find that Respondent #1's reference to the movie *Roots* and slavery when discussing race in the workplace was inappropriate. Therefore, we further find that Respondent #1's race-based discussion with Complainant **constitutes "Other Unprofessional/Inappropriate Conduct"** in violation of SFA's Nondiscrimination Policy.

### 3. Alleged Disability Discrimination and Harassment by Respondent #1 and Respondent #2

Complainant generally alleges in her Complaint that she was subjected to disability discrimination and harassment by Respondent #1 and Respondent #2.[111] Complainant also specifically alleges that upon her permanent transfer to PPD in June 2020, Respondent #2 ridiculed and harassed Complainant because she was unable to perform certain tasks due to her disabilities.[112] Complainant claims her numerous requests for accommodations were ignored and Respondent #2 had no intention of following the directions from Human Resources and accommodating Complainant.[113]

At the outset, to the extent Complainant may be alleging that she was denied accommodations by the Respondents, the evidence does not support that allegation. The weight of the evidence shows that when Complainant requested accommodations for her workers' compensation injury, her supervisors referred the matter to Human Resources and the accommodations were provided. Further, when Complainant requested additional accommodations for her disabilities, Human Resources engaged Complainant in an interactive process, and Complainant's supervisors worked with Complainant and Human Resources in an appropriate manner. There is no evidence that Respondents denied Complainant's requests for accommodations. The vast amount of email correspondence collected during the investigation indicates there was much dialogue between Complainant, Human Resources, and Respondent #2 regarding the development of appropriate accommodations for Complainant's workers' compensation injury and medical conditions, with Respondent #1 also being kept in the loop. Even before her permanent assignment to PPD, Complainant had historically required intermittent FMLA due to her migraines, and from the correspondence it appears that PPD continued to provide Complainant FMLA leave without any issue.[114] Once she was permanently reassigned to PPD, Complainant communicated directly with Human Resources regarding her medical conditions and requests for accommodations. In June 2020, Human Resources sent Complainant an informational email about ADA accommodations, but Complainant responded that she did not need any ADA accommodations and never asked for accommodations.[115] Complainant suffered a workplace injury on or about June 23, 2020, and then returned to work with restrictions to accommodate her

---

[110] Ex. 4, Nondiscrimination Policy, § II.

[111] Ex. 1, 10.12.2020 Letter of Representation, p. 4.

[112] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[113] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[114] Ex. 16, FMLA Accommodation Timeline.

[115] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

25

shoulder injury.[116] Beginning in July 2020 when Complainant first contacted Human Resources to request ADA accommodations, Human Resources worked with Complainant to obtain necessary documentation to develop accommodations for Complainant's medical conditions.[117] In the following months, there was some confusion regarding appropriate accommodations given conflicting information from medical providers, and Complainant's supervisors continued to work with her regarding her appropriate accommodations.[118] A formal offer of accommodation for Complainant's disabilities was made several months later in the fall of 2020, after Human Resources had continued to reach out to her medical providers to obtain complete information and coordinate with PPD to develop a list of accommodations based on Complainant's job descriptions.[119]

The documentation reviewed reflects that Respondent #1's knowledge of Complainant's medical conditions and involvement with her ADA accommodations was limited. Respondent #1 explained in his interview that Respondent #2 would simply inform Respondent #1 of any issues or concerns regarding Complainant's work assignments. There are some text messages from Respondent #1 regarding Complainant's permanent reassignment to PPD in June 2020 that indicate Respondent #1 did not want to be forced to provide Complainant an office position in PPD.[120] Witness #1 explained in his interview that these text messages reflect the fact that there was no office position available in PPD for Complainant. Respondent #1 indicated that he did not direct PPD where to place Complainant upon her return to PPD, but was simply kept informed of any issues involving Complainant by Respondent #2. Further, additional text messages from August 2020 reflect Respondent #1's attempts to clarify with Human Resources whether Complainant had ADA accommodations in place beyond her workers' compensation restrictions.[121]

Respondent #2's communications with Complainant on the subject of her work restrictions primarily concern the accommodations developed by Human Resources and administrative issues such as properly documenting Complainant's leave. For instance, on July 20, 2020, there was a text message exchange between Complainant and Respondent #2 regarding Complainant leaving for a doctor's appointment.[122] Complainant accused Respondent #2 of causing her to have a panic attack by suggesting they meet to discuss their issues. When Respondent #2 expressed that she felt they "need[ed] to have a meeting to clear up the communication issues and chain of command issues we're having," Complainant responded, "stop harassing me [Respondent #2]" and stated "I'm going home because my heart is racing during this panic attack."[123] Respondent #2 did not

---

[116] Ex. 62, 07.08.2020 Return to Work Information.

[117] Ex. 33, ADA Accommodation Timeline.

[118] *See* Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury; Ex. 42, 08.13.2020 Emails Regarding August 12 Meeting Summary.

[119] Ex. 33, ADA Accommodation Timeline.

[120] Ex. 63, Text Messages Between Respondent #1 and Witness #1, pp. 1-5.

[121] Ex. 63, Text Messages Between Respondent #1 and Witness #1, pp. 5-12.

[122] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2; *see also* Ex. 64, 07.20.2020 Email Summary from Respondent #2.

[123] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

PRIVILEGED & CONFIDENTIAL

respond to Complainant's message, but followed up the next morning stating that she hoped Complainant was feeling better and they still needed to have a meeting.[124]

Similarly, Complainant alleges in her Complaint that on October 8, 2020, Human Resources provided instructions for Complainant's reasonable accommodations, and the next day, Respondent #2 told Complainant that she would be responsible for cleaning the three nursing buildings by herself.[125] Indeed, Human Resources sent an offer of ADA accommodations to Complainant and her supervisors at October 8, 2020,[126] and the emails indicate that on October 7, 2020, Respondent #2 was aware that accommodations were forthcoming.[127] However, Respondent #2 explained the change in Complainant's responsibilities was due to the reassignment of Respondent #3 in order to separate her and Complainant due to the issues they were having.[128] Respondent #3 was reassigned because she asked to transfer first (although Respondent #3 was not happy to leave the nursing buildings), and the custodial supervisors did not want Complainant to feel she was being moved out of retaliation.[129] According to Respondent #2, the supervisors thought Complainant would be satisfied with this change because Complainant had shared that she wanted a similar decision to be made months prior.[130] We find Respondent #2's explanation to be worthy of credence and find that Complainant was assigned to clean the three nursing buildings because she had to be separated from Respondent #3 due to ongoing conflict. Notably, Respondent #3 had been responsible for cleaning all three nursing buildings prior to Complainant returning to PPD in 2020.

Thus, the evidence analyzed indicates that Respondent #2 attempted to balance Complainant's restrictions (as recommended by Human Resources) with the work requirements of Complainant's position and the needs of PPD. Additionally, the weight of the evidence reflects that Respondent #2's actions were well documented and were communicated to (and often approved by) PPD management and Human Resources.

In summary, there is insufficient evidence to establish that Respondent #1 or Respondent #2 discriminated against or harassed Complainant based on her disabilities. Indeed, Complainant never suffered any adverse employment action, other than a single written disciplinary action that was prompted by complaints from nursing staff, and Respondent #3 received a write-up for similar reasons. While Complainant was tasked with completing the nursing buildings on her own, this reassignment was done to address the conflict between Complainant and Respondent #3 and was an assignment that Respondent #3 previously covered on her own. Moreover, the evidence does not reflect that Respondent #1 or Respondent #2 engaged in any verbal or physical harassment of Complainant due to her disabilities.

---

[124] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[125] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[126] *See* Ex. 56, 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer.

[127] Ex. 55, 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations.

[128] Ex. 37, Respondent #2 Written Response to Investigation.

[129] Ex. 37, Respondent #2 Written Response to Investigation.

[130] Ex. 37, Respondent #2 Written Response to Investigation; Ex. 5, 10.08.2020 Email from Complainant.

PRIVILEGED & CONFIDENTIAL

Accordingly, we find the allegation that Respondent #1 and Respondent #2 discriminated against or harassed Complainant based on her disabilities to be **unsubstantiated.**

### 4.   Discrimination and Harassment by Respondent #3

As to Complainant's allegations of disability discrimination and harassment against Respondent #3, the preponderance of the evidence did not support Complainant's allegations. While Complainant said that Witness #5 told her Respondent #3 had a problem working with others, the weight of the evidence does not indicate that Respondent #3 had any animus towards Complainant based on any actual or perceived disability. Witness #5 did not recall telling Complainant that Respondent #3 is difficult to work with or that Complainant would want to quit if she was assigned to work with Respondent #3. Indeed, Complainant confirmed in her follow-up interview that she did not know Respondent #3 before she started working in the nursing buildings and her conversation with Witness #4 simply indicated that Respondent #3 did not want assistance with cleaning the nursing buildings.

Other than Complainant's own statements, there is little to corroborate that Respondent #3 harassed Complainant about her health conditions or doctor's appointments. Recorded conversations reflect that Complainant initially said she enjoyed working with Respondent #3.[131] In her interview, Respondent #3 specifically denied that she called Complainant "lazy arms" or told Complainant that she worked too slowly. Respondent #3 acknowledged that she criticized Complainant's work because that was her job as Complainant's lead, and Complainant had an issue accepting Respondent #3 as her supervisor. A review of the relevant documents did not reflect that Respondent #3 made any comments about Complainant's medical conditions in text messages or emails. However, as of August 12, 2020, Complainant's supervisors and Human Resources were at least notified of the allegation that Respondent #3 had engaged in name-calling against Complainant and they instructed her to stop.[132] Both Witness #1 and Respondent #2 confirmed that the alleged comments were not corroborated, but nevertheless Respondent #3 was instructed to cease such behavior immediately if it was occurring.

Witness #4 was the only witness who observed Complainant and Respondent #3 working together in the nursing buildings. Witness #4 felt there was drama every day from the day that Complainant was assigned to work there. Witness #4 said that Complainant claimed people were sabotaging her, which was not true. Witness #4 also said that Respondent #3 kept the nursing buildings very clean and had a high standard for her work. While Respondent #3 was admittedly critical of Complainant's work, Witness #4 said that is not unexpected because Respondent #3 was Complainant's lead and Complainant was relatively new to the nursing buildings and more industrial cleaning in general (as opposed to the JCB House). Witness #4 felt that Respondent #3's conduct towards Complainant was appropriate and that Complainant frequently misinterpreted things.

Regarding the allegation that Respondent #3 falsely told Respondent #2 that Complainant wanted to change her work schedule on or about August 11, 2020, Complainant's follow-up email

---

[131] Ex. 30, Tammy convo 2 Thursday.m4a; Ex. 31, Convo w- Tammy Wheeler.m4a.

[132] Ex. 40, 08.12.2020 Email From Complainant; Ex. 65, 08.12.2020 Email From Witness #1; Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

PRIVILEGED & CONFIDENTIAL

states: "There must me a language barrier there. I can not change my schedule at this time. I said to [Respondent #3] once MAYBE when the students return."[133] Accordingly, the evidence does not indicate that Respondent #3 falsely said that Complainant would change her schedule, as Complainant admittedly told Respondent #3 that she would consider changing her schedule when the students returned to campus.

Complainant raises other allegations about Respondent #3 gossiping about Complainant and showing Complainant's messages to individuals outside of PPD. However, the evidence indicates that both Complainant and Respondent #3 were written up for public disagreements and disruptive behavior. While there is some indication that Respondent #3 was dissatisfied with the quality of Complainant's work, the preponderance of the evidence does not support the conclusion that these issues between Complainant and Respondent #3 were attributable to animus based on Complainant's medical conditions or disabilities.

Accordingly, we find the allegation that Respondent #3 discriminated against and harassed Complainant on account of her disabilities to be **unsubstantiated.**

5. **Retaliation During the Investigation**

Regarding the allegation that Respondent #2 retaliated against Complainant by assigning her too much work given her restrictions, Complainant acknowledged that she was aware of her proposed responsibilities when she chose to be reassigned from the nursing buildings to the Student Center. Witness #6 opined that Complainant had too much responsibility in the Student Center given her restrictions, but she also noted the team has recently been down a member since one employee had surgery. Moreover, Witness #6 said Respondent #2 told the crew during a group meeting, "If y'all cannot get this job done, then I will change your hours." Witness #6 and Witness #7 confirmed that this comment was directed towards the group, specifically the night crew. Thus, Respondent #2's comment was not directed at Complainant.

Regarding the allegation that Witness #3 was talking about Complainant during the investigation, the incident occurred when Witness #3 was being interviewed via videoconference for this investigation.[134] Based on the content of the conversation as well as the timing, it is apparent that Witness #3 was indeed speaking with the investigators when Complainant overheard him from the outside of his closed office door. Moreover, Witness #3 is one of Complainant's supervisors and was speaking behind closed doors about Complainant, which is wholly appropriate behavior for a supervisor.

Regarding the allegation that Respondent #2 called Complainant a "bitch," Respondent #2 said she did not recall making any such comment. Complainant alleged that Witness #6 told her that Respondent #2 made this statement. However, Witness #6 said in her interview that she did not hear this comment but rather Witness #7 told her about it. When the investigators then interviewed Witness #7, she said that as Respondent #2 was getting out of a car with three other individuals, one of the group members said something about "that bitch" referring to Complainant, and then the group laughed. Witness #7 was not sure who made the comment and could not say

---

[133] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[134] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

29

for certain whether it came from Respondent #2 or someone else. In summary, there is insufficient evidence that Respondent #2 made the alleged comment or that the comment was in any way related to any protected activity by Complainant.

Because there is insufficient evidence to establish that these actions were attempts to seek retribution against Complainant for filing her Complaint or for other protected activity, we find Complainant's allegations of retaliation to be **unsubstantiated.**

## VII.   Conclusion

We find that Complainant's allegations that she was subjected to discrimination and harassment on the basis of age, race, or disability to be **unsubstantiated**. We further find Complainant's allegations that she was subject to retaliation to be **unsubstantiated**. To the extent the alleged conduct occurred, there is insufficient evidence to establish any of Respondents' actions were taken because of Complainant's age, race, or disabilities, or that any alleged act was taken in retaliation for protected activity.

However, we further find Complainant's allegation that Respondent #1 likely made racially inappropriate comments to Complainant on September 26, 2019 to be **substantiated**. While the evidence is insufficient to establish that this conduct constitutes race discrimination or harassment, we find that Respondent #1's conduct was inappropriate and thus **constitutes "Other Unprofessional/ Inappropriate Conduct,"** in violation of SFA's Nondiscrimination Policy. Because the Nondiscrimination Policy suggests the investigators contain a recommendation for resolution of the matter,[135] we recommend resolution of this finding through a written reprimand of Respondent #1, as well as training on managing a diverse workforce.


As stated above, the Nondiscrimination Policy directs the Vice President for Finance and Administration to review the findings and recommendations in this Report and take such action deemed appropriate. Pursuant to Section IX(B)(2) of the Nondiscrimination Policy, such action shall be communicated in a letter to the Complainant and Respondent with copies to the general counsel, Director of Human Resources, and the Title IX or ADA Coordinator, as applicable, within five (5) business days of receipt of this Report.

---

[135] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

PRIVILEGED & CONFIDENTIAL

## VIII.   EXHIBIT LIST

| Ex. | Description |
|-----|-------------|
| 1 | 10.12.2020 Letter of Representation |
| 2 | 11.02.2020 Email from Complainant's Counsel |
| 3 | 11.10.2020 Email from Complainant's Counsel |
| 4 | Nondiscrimination Policy (Policy 2.11) |
| 5 | 10.08.2020 Email from Complainant |
| 6 | 10.19.2020 Notice to Complainant |
| 7 | 10.28.2020 Notice to Respondent #1 |
| 8 | 10.28.2020 Notice to Respondent #2 |
| 9 | 10.28.2020 Notice to Respondent #3 |
| 10 | 11.13.2020 Spanish Notice to Respondent #3 |
| 11 | Personnel Action Request for New Appointments |
| 12 | House Coordinator Job Description Rev. 09/09 |
| 13 | House Coordinator Job Description Rev. 09/11 |
| 14 | Complainant's Combined Performance Evaluations from Dr. Janice Pattillo |
| 15 | 08.23.2018 Email Regarding FMLA Approval |
| 16 | FMLA Accommodation Timeline |
| 17 | 08.23.2018 Email Regarding Complainant's FMLA Approval |
| 18 | 09.03.2019 Email from Respondent #1 Regarding Reassignment |
| 19 | 07.08.2020 Email From Complainant Regarding Accommodations |
| 20 | 09.26.2019 Emails Regarding Complainant's FMLA Recertification |
| 21 | 10.01.2019 Email From Complainant to Respondent #2 Regarding Migraine |
| 22 | 10.02.2019 Note From Complainant Regarding FMLA Leave for Migraine |
| 23 | 10.03.2019 Email From Complainant to Human Resources Regarding Doctor's Notes |
| 24 | 08.10.2020 Emails Regarding FMLA Certifications |
| 25 | 09.25.2019 Respondent #2's Facebook Post |
| 26 | 10.04.2019 Text Between Complainant and Respondent #1 |
| 27 | 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant |
| 28 | Copy of Evaluation Provided by Complainant |

PRIVILEGED & CONFIDENTIAL

| 29 | Copy of Evaluation Provided by Respondent #2 |
|----|---|
| 30 | Tammy convo 2 Thursday.m4a |
| 31 | Convo w- Tammy Wheeler.m4a |
| 32 | 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations |
| 33 | ADA Accommodation Timeline |
| 34 | 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury |
| 35 | 07.07.2020 Email Regarding Moving Chairs |
| 36 | Complainant's Accepted Offer for Light Duty Work |
| 37 | Respondent #2 Written Response to Investigation |
| 38 | 07.20.2020 Text Messages Between Complainant and Respondent #2 |
| 39 | 08.11.2020 Emails Regarding Shift Change |
| 40 | 08.12.2020 Email from Complainant to Respondent #2 Regarding Concerns |
| 41 | 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting |
| 42 | 08.18.2020 Emails Regarding August 12 Meeting Summary |
| 43 | 08.13.2020 Email From Witness #4 Regarding Complaints |
| 44 | 08.19.2020 Email Approving Complainant's Written Disciplinary Action |
| 45 | 09.17.2020 Final Grievance Notification |
| 46 | 07.24.2020 Email from Nursing Director Tamara Harris |
| 47 | 10.06.2020 Email From Respondent #2 Regarding Complainant |
| 48 | 10.06.2020 Text Messages Between Respondent #2 and Complainant |
| 49 | 10.07.2020 Respondent #3 Written Discipline |
| 50 | 10.07.2020 Respondent #2 Written Statement |
| 51 | 10.07.2020 Witness #3 Written Statement |
| 52 | 10.07.2020 Maria Veliz Written Statement |
| 53 | 10.07.2020 Email from Complainant Regarding Transfer Request |
| 54 | 10.09.2020 Email from Complainant to Human Resources |
| 55 | 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations |
| 56 | 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer |
| 57 | 10.08.2020 Email from Witness #1 to Complainant Regarding Nondiscrimination Policy |

32

PRIVILEGED & CONFIDENTIAL

| 58 | 10.09.2020 Email from Respondent #2 to Human Resources |
| 59 | 10.13.2020 Email from Respondent #2 Regarding Complainant's Transfer |
| 60 | 10.14.2020 Email from Complainant Regarding Transfer to Student Center |
| 61 | 11.11.2020 Email from Complainant's Counsel |
| 62 | 07.08.2020 Return to Work Information |
| 63 | Text Messages Between Respondent #1 and Witness #1 |
| 64 | 07.20.2020 Email Summary from Respondent #2 |
| 65 | 08.12.2020 Email From Witness #1 |

**EXHIBIT "C"**

Danny Gallant, Ph.D.                              via email at dgallant@sfasu.edu and Regular Mail
Vice President for Finance
  and Administration
Stephen F. Austin State University
P.O. Box 6108, SFA Station
Nacogdoches, Texas 75962-6108

Date:  January 20, 2021

**Re:  Complainant's Appeal and Request for Discrimination Board Hearing**

Dr. Gallant,

Pursuant to Stephen F. Austin State University's Nondiscrimination Policy 2.11 (Section IX, Part B,3), I, as the initial Complainant in the matter discussed in your January 14, 2021 letter, find your decision to be unsatisfactory.  Therefore, I am appealing your decision by submitting this written request a formal hearing by a discrimination complaint review board of this entire matter.

This written request is being submitted within 5 business days of the submission of your January 14, 2021 decision letter, which was sent by email to my legal counsel.  As your decision letter was transmitted by email, this Appeal and Request for a Discrimination Board Hearing is also being sent to you by email with hard copy to follow by Regular Mail.

Respectfully submitted,

*Tammy Wheeler*
Tammy Wheeler

CC:
Damon Derrick, General Counsel                    via email at derrickdc@sfasu.edu
John Wyatt, Interim Human Resources Director      via email at wyattjohn@sfasu.edu

EXHIBIT "D"

RECEIVED
29 APR 2021
US EEOC
Houston District Office

RECEIVED
FEB 0 3 2021
BY: CS

## Performance Review — Staff Employee

Name: Tammy Wheeler          Campus ID Number: 10682332

Department: Physical Plant Custodial    Title: House Coordinator

Review Year: 2020

### Instructions:

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the necessary knowledge, skills, abilities, and/or commitment required. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed** – Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Successfully demonstrates the required skills, abilities and commitment for this job task.

   **Exceeds Expectations** – Achieves job requirements and occasionally exceeds expectations.

   **Exemplary** – Consistently exceeds expectations. This rating is used as special recognition for extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Unsatisfactory" and "Improvement Needed" in any grouping of performance factors. If applicable, goals for the purpose of development for each grouping of performance factors can also be noted.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required trainings and their Conflict of Interest Survey.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor' should sign the evaluation.

*'A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.*

RECEIVED
29 APR 2021
Houston District Office
US EEOC

Indicate the level of performance by placing the appropriate descriptor.

| Performance Factors | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* |
|---|---|---|---|---|---|
| Quality of Work – Exhibits the required level of job knowledge and/or skills to perform the job. Assignments completed by the employee meet quality standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Completion of Work – Completes tasks as assigned and meets deadlines. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Communication – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Technical Skills – Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Planning/Organizing – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Customer Service– Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☒ | ☐ | ☐ | ☐ |
| University Policy/Procedures – Adheres to all applicable university policy and procedures. | ☐ | ☒ | ☐ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary".

Quality of work: In contrast from Ms. Wheeler's previous evaluation based mainly on her tasks at the JCB house; Ms. Wheeler was able to sufficiently provide PPD with acceptable quality level of work. Perhaps to the newness of how things were done in a more commercial setting and a faster pace environment. Completion of work: The newness also caused a drop in her ability to complete task at the level she was able to last year. Again, Ms. Wheeler completed and had a fair quality of work produced it was just a stark difference in the production of work executed by Ms. Wheeler in years past. Technical Skills: With the move into a more commercial/educational and high demand area Ms. Wheeler still has a lot to accomplish when it comes to learning how to technically clean for the change in the type of cleaning asked of her. Planning/Organizing: Ms. Wheeler was unable to properly schedule her duties in the time frame provided and continuously struggled to plan out her work assigned when she was transfered to work in a more fast pace/demanding environment. For example, Ms. Wheeler would ask repeatedly what her task for the day were. Ms. Wheeler also struggled with applying organizational methods of focusing her detailing projects like dusting on different days of the week. Customer Service: Ms. Wheeler had a written reprimand and several counseling sessions with her supervisors this year due to her unprofessional behavior and unsatisfactory customer service by involving multiple faculty and staff members in various issues that caused issues between PPD and the academic department. University Policy/Procedures: This year it was shown that Ms. Wheeler was not adequately prepared with knowledge of some key university policies and PPD procedures.

Action Plan & Goals: Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory".

Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

Ms. Wheeler has been informed and coached (via written reprimand and numerous meetings documented via email summaries) in what is expected and we hope to see change in Ms. Wheeler's performance this upcoming year as a member of PPD while fulfilling her assigned task at the BPSC.

So far we have received some encouraging words from some of the BPSC customers who are content with Ms. Wheeler's work at the BPSC; we want this type of acknowledgment to continue. Good job Ms. Wheeler!

Houston Dist Clerk
RECEIVED
29 APR 20
US FILED Dist Clerk

Indicate the level of performance by choosing the appropriate descriptor

| **Behavioral Factors** | Unsatisfactory | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary |
|---|---|---|---|---|---|
| Dependability/Accountability – Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instruction and procedures. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Cooperation/Teamwork – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Initiative – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Adaptability – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside his/her normal responsibilities when needed. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Judgment/Problem Solving – Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Attendance/Punctuality – Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with University policy. | ☐ | ☐ | ☐ | ☐ | ☒ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary".

**Dependability/Accountability:** Ms. Wheeler struggled at times this year to trust and understand how her job assignments can be completed in the time alloted to her. Again the level of dependability from last year to this year dropped due to Ms. Wheeler not being able to keep up. **Cooperation/Teamwork:** Ms. Wheeler struggled to be a team player this year and cooperate with assignments and request from her coworkers and supervisors. Ms. Wheeler received a written reprimand addressing this concern and has had meetings with supervisors speaking about this inability. **Initiative:** Ms. Wheeler struggled to get her own regular duties done in the alloted time and preferred to try and out some of those task done instead of seeking more. Ms. Wheeler consistently asked what daily task should be instead of learning and creating a routine. **Adaptability:** This year vs last year Ms. Wheeler was moved permanently to the PPD department in the Nursing bldg for the majority of the year instead of the JCB house. The type of duties were not that different from one area to the other but rather the pace in which the work was done and the demand of how often and organization of when certain task get done that Ms. Wheeler struggled all year to adapt to. Ms. Wheeler kept trying to change her task to more match her preferred work quantity but struggled to accept that her task had changed(as they did for many employees this year due to the pandemic). **Judgment/Problem Solving:** Ms. Wheeler also struggled to solve problems herself. When given some solutions, Ms. Wheeler failed to adhere to these solutions and failed to make suitable judgment calls. This caused small issues to escalate frequently, keeping herself from being able to complete her main assigned tasks (cleanings). **Attendance:** Ms. Wheeler does a great job at coming to work when scheduled to and being on time. Ms. Wheeler does not abuse her time in accordance with university policy.

**Action Plan & Goals:** (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory". Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

This upcoming year we would like Ms. Wheeler to work on being a dependable team member with the BPSC crew and accept her role as a PPD custodial team member and trust others when solutions are given.

## Evaluation Summary Sheet

| | Quality of Work | Compliance of Work | Communication | Technical Skills | Planning | Customer Service | Policy/Procedures | Dependability/Accountability | Cooperation/Teamwork | Initiative | Adaptability | Judgment/Problem Solving | Attendance/Punctuality | Managing Employees | Managing Resources | Communication | Decision Making | Leadership/Employee Development | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unsatisfactory | | | | | | | | | | | | | | | | | | | 0 |
| Improvement Needed | | | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | | | | | | | | | 8 |
| Acceptable | ■ | ■ | ■ | | | | ■ | | | | | | | | | | | | 4 |
| Exceeds Expectations | | | | | | | | | | | | | | | | | | | 0 |
| Exemplary | | | | | | | | | | | | | ■ | | | | | | 1 |

## Supervisory Follow-up

| | | |
|---|---|---|
| Has this employee completed all required trainings for which they have been enrolled? | ✔ Yes | ☐ No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | ☐ No |

## *OVERALL EVALUATION*: (check one)

☐ **Unsatisfactory:** Applies to employees whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time.

✔ **Improvement Needed:** Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized.

☐ **Acceptable:** Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level.

☐ **Exceeds Expectations:** Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job.

☐ **Exemplary:** Performance consistently exceeds expectations in all aspects of the job. This overall rating is reserved for those few individuals whose exceptional performance is obvious in all.

My signature indicates I have reviewed this performance appraisal and have discussed the content with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources

Retaliation

Employee Signature: REFUSE TO SIGN     Date: 1-25-21

Supervisor's Signature: _____     Date: 1-25-21

Reviewing Supervisor's Signature: _____

WITNESS #1 _____  2/3/21

WITNESS #2 _____