## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| TAMMY WHEELER | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 9:22-CV-129 |
| | § | |
| BOARD OF REGENTS OF STEPHEN | § | |
| F. AUSTIN STATE UNIVERSITY, | § | |
| STEVE WESTBROOK, ED.D., | § | |
| INTERIM PRESIDENT OF STEPHEN | § | |
| F. AUSTIN STATE UNIVERSITY, AND | § | |
| STEPHEN F. AUSTIN STATE | § | |
| UNIVERSITY | | |
| *Defendants.* | | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## APPENDIX

---

Tammy Wheeler Deposition excerpts...............................................................................Appx. 001

Ron Watson Deposition excerpts.....................................................................................Appx. 043

Veronica Herrera Deposition excerpts.............................................................................Appx. 067

Herrera Affidavit.............................................................................................................Appx. 072

10.14.2020 Wheeler request for Transfer email (SFA 7059-7060)..................................Appx. 100

09.25.2019 Respondent #2's Facebook Post – (SFA 213-214)........................................Appx. 102

Full disposition - Unresolved (SFA 6744 – 6770)..........................................................Appx. 104

Letter of Rep for Tammy Wheeler and Formal Complaint (WHEELER 47 – 50)..........Appx. 131

Discrimination Report 01.11.2021 (SFA 412 – 444)......................................................Appx. 135

Exhibit G - Email from Dr Gallant 01.14.2021 (SFA 503) ............................................Appx. 140

Exhibit H - Wheeler Appeal 01.20.2021 (SFA 504) ......................................................Appx. 141

4.29.2021 Charge of Discrimination - SFA 512 - 554.....................................................Appx. 142

Complainant's Combined Performance Evals from Dr. Janice Patillo (SFA 169 – 190) .Appx. 186

2019 Performance Evaluation (SFA 558 – 561)..............................................................Appx. 198

2020 Performance Evaluation (SFA 562-565) ....................................................Appx. 202

2021 Performance Evaluation Tammy Wheeler [SFA 07485-07487] ...........................Appx. 206

2022 Performance Evaluation Tammy Wheeler [SFA 07488-07490] ...........................Appx. 209

2020-2021 pay (SFA1280) ...................................................................... Appx. 212

2021-22 salary rate (SFA 7516)................................................................Appx. 213

2022-23 salary rate (SFA 7517)................................................................Appx. 214

2019-2020 pay (SFA 1282) ....................................................................Appx. 215

2018-2019 pay (SFA 1286) ....................................................................Appx. 216

2017-2018 pay (SFA 1290) ....................................................................Appx. 217

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF TEXAS
                       LUFKIN DIVISION

TAMMY WHEELER                *
                             *
VS.                          *CIVIL ACTION NO. 9:22-CV-129
                             *
BOARD OF REGENTS OF STEPHEN*
F. AUSTIN STATE UNIVERSITY,*
ET AL,                       *
```

ORAL AND VIDEO DEPOSITION

OF

TAMMY WHEELER

          ORAL AND VIDEO DEPOSITION OF TAMMY WHEELER,

produced as a witness at the instance of the DEFENDANTS,

and duly sworn, was taken in the above styled and

numbered cause on the 5th day of April, 2023 from

approximately 8:59 a.m. to 2:24 p.m., before Liesa

Kliman, Certified Shorthand Reporter No. 2248 in and for

the State of Texas, reported by machine shorthand, in

Etoile, Texas, pursuant to the Texas Rules of Civil

Procedure, and the provisions stated on the record or

attached hereto.

Tammy Wheeler - 4/5/2023

2

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
             BY: MR. TANNER G.M. FRANKLIN
 3           Franklin Law Firm, PLLC
             2528 Highway 103
 4           Etoile, Texas  75944
             Telephone: 936854.3213
 5           Email: tfranklin@franklinlawfirm.com

 6
     FOR THE DEFENDANTS:
 7           BY: MS. MARY B. QUIMBY
             Assistant Attorney General
 8           General Litigation Division
             P.O. Box 12548, Capitol Station
 9           Austin, Texas   78711-2548
             Telephone: 512.463.2120
10           Email: mary.quimby@oag.tex.gov

11   AND

12           BY: MR. DAMON C. DERRICK
             General Counsel
13           Austin Building, Room 310
             P.O. Box 13065, SFA Station
14           Nacogdoches, Texas 75962-3065

15

16   ALSO PRESENT:
             Mr. Kevin Schaefer, Videographer
17

18

19

20

21

22

23

24

25
```

APPX. 002

1   entertaining, set up tables, worked parties for her,

2   helped her organize, come up with ideas.

3       Q    Okay.  So you said house duties.  What do you

4   mean by that?

5       A    Oh, vacuuming, mopping, sweeping.  Just

6   keeping the house in general.  You know, cleaning

7   toilets.

8       Q    Uh-huh.  Okay.  And how big is the president's

9   house?

10      A    Let's see.  When I very first started, they

11  did not have additions on the house.

12      Q    Uh-huh.

13      A    So there would be three bedrooms upstairs.

14  Only one was used.  There were two bathrooms upstairs,

15  one and-a-half downstairs, and then a kitchen and a

16  living area and a dining room.

17      Q    Okay.  Can you tell me a little bit more about

18  your duties for the parties?  What you did, you know,

19  helping Janice with the parties?

20      A    We would go over menus together, what would be

21  appropriate.  We would sometimes research recipes, look

22  for ideas.  We would flip through magazines for, you

23  know, table ideas.

24             I set tables, I laid out all the China,

25  silver, I, you know, polished some of the silver, put

Tammy Wheeler - 4/5/2023

17

 1  out all the crystal, decorations.  And then I would work

 2  the parties.  During the events, I would be in the back

 3  kind of organizing things in the back so that things

 4  would run smoothly out on the house floor.

 5                 And then at the end of the night, I would

 6  just sort of help break down the party and we would -- I

 7  would also help hand wash dishes at times.  I would

 8  serve some of the guests that she had, replenish food.

 9  There's other things I just may not be remembering.

10     **Q    Okay.  You said helped out in the back, I**

11  **think.  What do you mean by that?  To make sure that**

12  **things go smooth?**

13     A    Okay.  That would be behind the scenes in the

14  kitchen.

15     **Q    Okay.**

16     A    So making sure plates are going out right,

17  making sure the plates, you know, didn't have drips on

18  them.  Just making sure everybody was ready to make

19  their next move out on the floors for serving.

20     **Q    So were there caterers in the kitchen**

21  **cooking --**

22     A    Yes.

23     **Q    -- and serving?**

24     A    Yes.

25     **Q    Okay.  How many hours a week did you work?**

1  until he died in 2018.

2      Q    Until who died?

3      A    Baker Pattillo.

4      Q    Okay.  So throughout that -- you said how many

5  years?  Nine years, 2009 to 2018?

6      A    Well, actually after he died, I stayed and

7  worked with Janice until July, and that would have been

8  '18 or '19.  I can't remember the date.

9      Q    Okay.  So --

10     A    I'm sorry.  I do not remember the date.

11     Q    That's okay.  So approximately nine to ten

12 years you --

13     A    Yes.

14     Q    -- worked for Janice, though, correct?

15     A    Correct.

16     Q    Okay.  And throughout that period, did your

17 job duties change at all or were you doing basically the

18 same thing the whole time?

19     A    Pretty much the same thing the whole time.

20     Q    Okay.  And do you know did Janice report to

21 anyone?

22     A    Not that I know of.

23     Q    Okay.  Did she ever give you or do a

24 performance evaluation of you that you remember?

25     A    I do remember one that she gave me.

1  said, correct?

2      A    Yes.

3      Q    **What does that mean?**

4      A    They were going to begin construction on the

5  house.

6      Q    **Uh-huh.**

7      A    And so I was moved out and put to work with a

8  lady named Mary Mallard.  And I went around with her to

9  clean other houses.  They were buildings but they were

10  really houses.  And so I was moved out so they could

11  start the construction process.

12      Q    **Okay.  So you were moved out.  What do you**

13  **mean by that?**

14      A    I was told you are going to start working with

15  Mary Mallard.

16      Q    **So were you still -- you were not working in**

17  **the president's house; is that what you mean?**

18      A    I was moved from the president's house to work

19  with Mary.

20      Q    **Okay.  And what did you do with Mary?**

21      A    With Mary we went to several buildings that

22  were houses type places.

23              We went to the Tucker home, we went to

24  music prep building, we went to the safety house.  I

25  can't remember all the other places, but I just -- I was

Tammy Wheeler - 4/5/2023

1  on Mary's work schedule.

2       Q    Okay.  And who is Mary?

3       A    Mary Mallard, she is a physical plant

4  custodian.

5       Q    Okay.  And what did you do?  You know, what

6  were your duties as you were going with Mary Mallard?

7       A    Just all custodial duties; bathrooms,

8  sweeping, vacuuming, dusting.

9       Q    Anything else?

10      A    Not that -- taking trash.

11      Q    Okay.  And you said you worked in multiple

12 different buildings and houses on campus, correct?

13      A    Uh-huh.  With Mary, yes.

14      Q    Okay.  So you were always with Mary when you

15 were working at this time?

16      A    There was -- there was one point where I also

17 worked a little bit with Rosa.  And so Rosa is also a

18 custodian and has custodial duties.  And she also has a

19 few houses, and then she also had the STEM building --

20 I'm sorry.  Not the STEM.  She had the Cole Arts

21 building.

22      Q    Okay.  And who is Rosa?  What is her last

23 name?

24      A    I do not know her last name.

25      Q    Okay.  But she is a PPD physical plant

1  lead?

2      A    Vacuuming, mopping, bathrooms.  COVID cleaning

3  was huge.

4      Q    Uh-huh.

5      A    Doing the windows, taking out the trash.  They

6  wanted me to pressure wash the building.  Just normal,

7  you know, custodial-type duties.

8              The difference between what I was doing

9  with Mary versus what I was doing with Elizabeth is my

10  job was easier with Mary and Rosa because the houses

11  that they were working in were small and what I was used

12  to.

13              When I was with Elizabeth, everything was

14  bigger.  The vacuums were heavier, the mops were much

15  heavier.  Big mop buckets versus smaller, you know,

16  buckets.

17      Q    Okay.  And were your hours the same when you

18  started in June 2020?

19      A    Yes.

20      Q    And was your pay the same?

21      A    Yes.

22      Q    Okay.  Was your schedule the same?

23      A    Yes.

24      Q    So that was -- when did you start your day?

25      A    7:00 to 4:00.

Tammy Wheeler - 4/5/2023

53

```
 1       A    So I went to the office to discuss.  My name
 2   was on the board to be the lead person at the
 3   president's house because Ron said I knew the house
 4   better than anybody and that I could, you know, show
 5   people around and tell them what products to use in the
 6   house because they did have marble and stuff they were
 7   not used to.
 8              When I went into his office, I noticed
 9   that my -- I'm sorry.  When I went to physical plant, I
10   noticed my name was erased from the board and Mary's
11   name was put as lead person.  And I thought he told me
12   that I was going to be in charge.  Now why is Mary in
13   charge?  So I went to Ron's office to discuss why Sally
14   Ann or Ron had taken my name off the board.
15              When I went in there to discuss my name
16   being taken off the board and what was going on with
17   Sally Ann trying to move me out of the house -- that's
18   what I felt like at that time, was, hey, they're moving
19   me out of the president's house.  They put Mary in
20   charge.
21              Went in and then he threw this Facebook
22   post to me about me being white privileged and that I
23   was looked at as a racist person.  That I came out of a
24   plantation-style home and that he was a field boss that
25   sat on a horse with a straw hat and a whip overseeing
```

54

```
 1    the field hands.
 2              He made racial comments, you know, saying
 3    something about the movie Roots.  He also said that
 4    the -- I guess the black people or the Hispanic culture
 5    had a crazy-ass culture.
 6              And so when he said those things to me
 7    and he was making me feel -- and he even said they had a
 8    problem with me, I was very rattled by that.  So I did
 9    go and confront the supervisors about it to ask if there
10    were any problems or any concerns or did people complain
11    about me.  And she told me no, nobody has complained.
12        Q    Okay.  So Ron told you the supervisors had
13    complained about you; is that what you're saying?
14        A    He did not give names.  He just said they have
15    a problem with you in physical plant.
16        Q    And who did you understand that to mean at
17    that time?
18        A    Everybody in physical plant.  I mean,
19    everybody at the custodial.
20              Like, he said they are having a hard time
21    working with you.  And I said to Ron, "I can't believe
22    this because Mary and I get along so well."  And that's
23    really the only person at that time I was working for
24    was Mary.
25        Q    Uh-huh.
```

APPX. 010

1    A    Yes.

2    Q    **When did you do that?**

3    A    It was that day.  I went and spoke to John

4  Wyatt.

5    Q    **And what happened?**

6    A    I told John that he made racial comments.  I

7  told him he was playing games, that I had already talked

8  to Veronica and Erik.

9              And I don't think anything was done.  I

10 don't know.  I don't know what was done after I left.

11   Q    **Okay.  Did you tell John Wyatt anything else?**

12   A    I told him about the straw hat and the whip.

13 You know, just the racist stuff.  And that I was in fear

14 of losing my job and I felt there was going to be some

15 retaliation.

16   Q    **What do you mean the racist stuff?**

17   A    He was putting -- he was telling me things

18 about them thinking I was a racist.  He was also feeding

19 Veronica and Erik.  He told Veronica and Erik that I was

20 going to be too good to work in that department and that

21 I was going to be too good to put on a physical plant

22 t-shirt.

23              He painted me as an uppity-type person.

24 And Veronica just said that, you know, he was painting

25 you as a bad person before you ever came over here.

Tammy Wheeler - 4/5/2023

58

1     Q    Okay.  And you said that you told John that

2 that was retaliation?

3     A    Yes.

4     Q    For what?

5     A    Oh, wait.  I told John retaliation later.  But

6 I told him I was in fear of retaliation because I turned

7 Ron in.

8     Q    Okay.  And you told that to John?

9     A    Uh-huh.

10     Q    Okay.  When you reported Ron?

11     A    Yes.

12     Q    Okay.  And then what happened after that?

13     A    Things got worse with Ron.

14     Q    Okay.  So what do you mean by that?  And,

15 again, this is fall of 2019?

16     A    Just the way -- just how short he was.  He was

17 very short with me.  He even told me that -- you know,

18 I'm trying to think of the words that he used.

19           He told me that I was basically a thorn

20 in his side.  His words were I was a big fucking

21 problem.  He -- he was just putting us against each

22 other.

23     Q    When did he say these things to you?

24     A    He said some of them -- I had a meeting

25 probably a week after the racist meeting that we had,

```
 1   in -- it was at one of my evaluations and I think it was

 2   the 2022 evaluation that she told me those things.

 3        Q    Okay.  So this was a while after this was

 4   happening that Veronica told you that --

 5        A    Yes.

 6        Q    -- Ron was coaching her?

 7        A    Yes, she did.

 8        Q    Okay.  And what happened with -- you know,

 9   after you reported Ron to John Wyatt, did anything

10   happen?

11        A    Nothing happened.

12        Q    Okay.  But you say Ron retaliated against you

13   for that?

14        A    Yes.

15        Q    So how did Ron know that you reported him?

16        A    I'm sure John Wyatt talked to him immediately.

17   I'm assuming.  I don't know.

18        Q    But you said nothing happened.

19        A    I'm talking about nothing happened as far as

20   things did not change.

21        Q    Okay.  But you -- how are you sure that John

22   Wyatt talked to him?

23        A    I am not sure if John Wyatt did.

24        Q    Okay.

25        A    I have no way of knowing.  But usually the way
```

```
 1   SFA works is if you make a report, they have to

 2   follow up on it.

 3       Q    So you're assuming that John talked to Ron?

 4       A    Yes.

 5       Q    Do you know that he did?

 6       A    I was not told if he did.

 7       Q    Okay.  Okay.  And so explain to me again how

 8   being placed in the nursing building was retaliation in

 9   your eyes?

10              MR. FRANKLIN:  Object to form.  Go ahead

11   and answer.

12       A    Please repeat what you just said.

13       Q    (BY MS. QUIMBY)  So you said that being placed

14   in the nursing building Ron was retaliating against you,

15   correct?

16       A    Yes.

17       Q    Why was being placed in the nursing building

18   retaliation?

19       A    It was a toxic environment.  It was known to

20   be a very, excuse my words, sort of a bitchy atmosphere.

21   He was trying to put me in a building that I would get

22   complaints because of Marilyn King being a very

23   difficult person.

24              I knew from previously with Mary,

25   speaking to Mary, that that place nobody wanted to work
```

 1  with Elizabeth Huerta or the nursing building.

 2       Q    Okay.  So did your pay change?

 3       A    No.

 4       Q    Did your hours change?

 5       A    No.

 6       Q    What was your day-to-day like in nursing?

 7       A    I was doing tasks that were considered extras.

 8  I did daily tasks but they were making me do very dirty

 9  work that hadn't been done probably the whole time

10  Elizabeth was in that building.

11            They were making me clean out cobwebs

12  that had been there forever.  They were making me get on

13  my hands and knees and scrub the -- there's like a

14  little -- in the doorway, the little metal thing at the

15  bottom that collects dirt or whatever, I had to clean

16  the dirt out of all of those things.  Like that was real

17  important during COVID.  I was told to go and clean

18  behind everybody's desk.  I was doing a lot of heavier

19  extra things.

20       Q    Okay.  Who -- you said they were making you do

21  these things.  Who is "they"?

22       A    Veronica and Elizabeth Huerta.

23       Q    Okay.  And what -- how do you know that they

24  were extra, I guess?

25       A    Because they haven't done -- been done in a

1   Veronica heard about the situation a day or two after it

2   happened.

3           And it's just kind of funny because

4   whenever I sent the email that Elizabeth was gossiping,

5   then it became an issue.  And to me that says that they

6   had a way to write me up.

7       **Q    So when did they write you up and what was the**

8   **reason given?**

9       A    I don't remember the exact date of the

10  writeup, but I'm sure that's in documentation.

11          The writeup was multiple things.  That I

12  was lollygagging, and I was not lollygagging.  I was

13  there on business.  Veronica told me to go to that

14  woman's door.  I did not ask for it.  I didn't ask for

15  all the information she gave me.  I was not there to

16  gossip.

17          Marilyn King laid it all in my lap.  I

18  was there on business.  I went to her door only to ask

19  her when the best time was to pick up trash and the best

20  time to vacuum and to let her know that I was now in

21  that building.  Marilyn King lays it all in my lap.

22          So I had -- I had no knowledge as to what

23  was going on with me getting in trouble over something I

24  did not do.

25          So we were written up.  I think Elizabeth

1   was written up also as a -- in Veronica's words, as a

2   department.  We were written up as a department.  Even

3   though Elizabeth started the drama with the showing of

4   my emails, I was written up for that.  I was not a part

5   of that.

6       **Q    Okay.  So you and Elizabeth were both written**

7   **up for the email issue with Marilyn King?**

8       A    Yes, or I was told it was a department -- a

9   department writeup.  We were going to be written up as a

10  department.  So I don't know if she actually did get

11  written up, but I did.

12      **Q    Okay.  And, again, what did the writeup say?**

13      A    The writeup stated that they had a letter from

14  Marilyn stating that she was tired of the drama and she

15  wanted it to stop.  And then she listed multiple --

16  Veronica listed multiple reasons to write me up.  Like I

17  said, for lollygagging, I guess gossiping.  I don't

18  remember all the things, but there was a large list of

19  things on my writeup.

20      **Q    Okay.  And what happened as a result of that**

21  **writeup?**

22      A    Well, I was written up and I wanted to appeal

23  it.  And I was told that there's no such thing by

24  Veronica.  And I said, "Oh, yes, there is."

25              And I think she said that to me twice

1  like there's not really -- there's nothing really you

2  can do about it.  So then I appealed.  Veronica denied

3  it.

4         Went to Ron Watson, he denied it and said

5  he was going to stick to the writeup just because

6  Marilyn had sent an email.

7         But initially she didn't.  I mean, it was

8  done a day or two later it seems like.  I need to go

9  back and look at that documentation.  But Marilyn King

10 was not upset enough to write an email.  She was asked

11 by Erik to write an email.

12   **Q     Why was she asked by Erik to write an email?**

13   A     Probably so they would have documentation.

14   **Q     And what did the email say?**

15   A     I don't remember.  It basically said that

16 there was problems in the department and maybe that

17 Elizabeth had shared an email or something.  I can't

18 remember what the -- I don't remember.

19   **Q     Okay.  So you appealed it.  How did you appeal**

20 **it?**

21   A     Through John Wyatt at HR.

22   **Q     And you said Veronica denied it.  What do you**

23 **mean by that?**

24   A     When I appealed it and I went before her, she

25 stood by what she said and she would not lift the

1   writeup.  She was going to stick to her guns and keep

2   the writeup.  She was not going to let it go.

3          I said to Veronica that wasn't fair and

4   that it was a little extreme.  It could have been solved

5   just by telling me you can't do those things.  She could

6   have given me a verbal but she wanted to go straight

7   into a writeup.

8          I know there are many cases where people

9   complain about departments and they don't get written up

10  but I got written up.

11  **Q    Okay.  So who else do you know gets complaints**

12  **and is not written up?**

13  A    Well, there's a -- there is a girl that works

14  in one of the buildings, her name is Kizzy.  And I know

15  that they've complained on her not doing good work.  I

16  think it's in the old education building.  I can't

17  remember.  Her name is Kizzy.  She gets complaints a lot

18  and she's not getting written -- she does not get

19  written up.

20  **Q    Complaints about what?**

21  A    Dirty departments, not doing her job.  The

22  employees in that building are having to do cleaning

23  instead of her.

24  **Q    Okay.  And her name is Kizzy.  Do you know her**

25  **last name?**

1   they pinned that on me.

2       Q    But how did Ron do that?

3       A    By having -- I'm sure to have me written up.

4       Q    Why are you sure that Ron had you written up?

5   How are you sure?

6       A    Well, Veronica told me, you know, he didn't

7   want me to go back to certain departments.  He was -- he

8   was wanting to get rid of me.  And Elizabeth Huerta told

9   me that if I didn't quit sending messages, I would lose

10  my job.  I knew they were trying to get rid of me.

11      Q    What is Elizabeth Huerta telling you -- if you

12  don't stop sending messages they are going to fire you,

13  what does that have to do with Ron?

14      A    I felt Ron was the master player in

15  everything.  I didn't have any beef with Veronica or

16  Erik when I first was at physical plant.  We got along

17  very well.  I liked Veronica.  I liked Erik.

18             They turned.  As soon as I came back,

19  they turned like a light switch.  They were aggressive

20  to me, they were rude, they were -- not really so much

21  Erik but it was Veronica, she changed.

22             And the only person that could have

23  changed her -- because I was the same person.  The only

24  way she could have treated me differently is because of

25  Ron Watson.

1     Q    And how could you tell he was playing people
2  against you?
3     A    Well, the instance with Veronica being told
4  one thing about me, portraying me in a way, and then him
5  coming to me and portraying them in a different way.  He
6  was pitting us against each other.  He has been known to
7  do that.
8     Q    Uh-huh.
9     A    So I think he's capable of doing anything like
10 that.
11    Q    Okay.  Anything else that happened that makes
12 you think that Ron was manipulating the situation?
13    A    I can't think of anything at this very second.
14    Q    Okay.
15    A    I may in a moment.  I just --
16    Q    Sure.  If you think of something, just let me
17 know.
18              Okay.  So, again, this writeup was
19 harassment?
20    A    Yes.  Yes.
21    Q    Were you going to say retaliation?
22    A    I do feel it is also retaliation.  I think Ron
23 was -- has never forgiven me for turning him in for the
24 racist stuff.
25    Q    Okay.  So the writeup is still Ron retaliating

1    you're able to do your job?

2        A    Now I'm working in a house where I do not have

3    to use heavy equipment.

4        Q    Uh-huh.

5        A    So the duties are light.  So I wash clothes

6    or -- not clothes.  I'm sorry.  I do wash clothes, I

7    wash student shirts, I wash tablecloths.  I'm cleaning.

8    I have a light vacuum that I can vacuum the floor with

9    versus all that sweeping.

10            It's a slower pace.  The trash is not as

11   heavy.  There are times that the trash does get heavy,

12   but I do have students that can help me lift the heavy

13   trash when it gets too heavy to take out.

14       Q    Uh-huh.

15       A    So it's a different environment.  It's a

16   smaller scale, smaller mops, that kind of thing.

17       Q    Okay.  So you were -- when were you moved or

18   when did you start this position?

19       A    I was moved -- I was moved March of last year

20   and I've been at the culinary cafe since.

21       Q    Okay.  What were you doing before that?

22       A    I was working at the student center.

23       Q    Okay.  So you -- after nursing, what was the

24   progression, I guess?

25       A    I was moved over to the student center.  I

Tammy Wheeler - 4/5/2023

1   was working first (sic) floor by myself and I was

2   working half of second floor in the morning.  Then in

3   the evening those people came into their floor and I had

4   already done their work for them.

5               One of the girls said, "Quit working in

6   my area.  You give me nothing to do."  And I said, "I

7   don't want any trouble.  I've been told I have to do the

8   second floor.  If you have a problem with it, go to

9   Veronica and tell her that I don't need to be in your

10  area because I don't want to have to do it if I don't

11  have to."

12              But I was put on the first (sic) floor

13  and half of second floor.  I questioned Veronica Herrera

14  about it and I said, "This is not fair.  You have given

15  me an entire floor by myself and the second floor you've

16  got two people working it and I'm doing half their work

17  before they even get there."

18              So this is not -- and she goes, "Well,

19  I'm doing it by square footage.  I'm dividing the duties

20  by square footage."  And I said, "Show me the square

21  footage.  I want to see the square footage that is in

22  these buildings.  I want to see how that's divided up."

23  And she would not provide it.

24              She knew that they were packing on extra

25  duties to still try to break me, even though I moved

1  floor and do half of second floor."

2      Q    Okay.  And then you were moved out of that

3  department?  When were you moved?

4      A    I do not remember when I was removed.  I don't

5  have the date on that.

6      Q    Okay.

7      A    But -- but it was -- there was, like I said,

8  there was a problem with LaCresha not wanting me to come

9  on her floor and do her stuff.  So there was something

10  that happened there.  And she said, "Okay.  Just go back

11  to third floor."

12      Q    Okay.

13      A    I think the reason that happened is because

14  there was -- her bathrooms are really disgusting and we

15  were like -- I went to my supervisor and said, "Look, I

16  don't want any complaints."  Because I was threatened if

17  there were any complaints I would get another writeup.

18  I did not want a writeup, so I went to Veronica.  Maybe

19  it was Erik.

20              I went to one of my supervisors.  It was

21  Erik.  And I said, "Look, that floor is disgusting in

22  the bathroom.  You told me that I just needed to monitor

23  that bathroom, make sure it had the toilet paper, paper

24  towels and soap and to clean up the floors.  If the

25  toilets were nasty, to clean the toilets or whatever.

1   And I was not to mop it when students were there.  They

2   were supposed to mop it in the evening."

3               And I said, "But we're going to get

4   complaints on that bathroom because it was nasty."  And

5   I said, "I don't want any problems with LaCresha.  I'm

6   not trying to throw her under the bus."  I didn't even

7   say her name.

8               I said, "I don't want to throw this

9   person under the bus but that bathroom --" It's like

10  honey was on the floor.  It was so much urine that it

11  was like stepping on a sticky trap.  Your shoes stuck to

12  the floor from so much urine.

13              And I said, "I don't want any problems in

14  that bathroom."  That is LaCresha's area.  She's

15  supposed to mop that at night because I'm cleaning it

16  during the day but she's supposed to mop at night.  I

17  don't want any problems.

18              They went back to LaCresha and they

19  caused, you know, tension between LaCresha and I.  Then

20  LaCresha said keep her off my floor.  And so that's when

21  she said, all right, you just go back up to third.

22              Because there was some issues with the

23  way they were not doing -- they were leaving -- they

24  were just letting me do all the work.

25      Q    And who caused issues between you and

1          I knew he was going to be on a roll

2  because of what Elizabeth Huerta told me that he was

3  going to get rid of me.  He was just getting started.

4  And I wanted an outside source to come in and

5  investigate what he was doing.

6      **Q    Okay.  So let's talk about some of the other**

7  **harassment and retaliation you talked about a little bit**

8  **earlier.  Circling back a little bit.  So we talked**

9  **about this writeup.**

10     A    Uh-huh.

11     **Q    About the gossiping issue between you and**

12 **Elizabeth and Marilyn King.**

13     A    Uh-huh.  Yes.

14     **Q    And you also stated that you were given a bad**

15 **review.  What was that?**

16     A    Oh, in the review -- in my evaluation Veronica

17 said, you know, basically I didn't know how to clean, I

18 had poor work ethics, I didn't -- I couldn't problem

19 resolve.

20          I don't know.  It's all in my evaluation.

21 It was -- and it was a poor evaluation.  That was

22 baloney.  And I told her at that time, this is

23 retaliation.  This is baloney.  You know this is not

24 true.  And I told her you have been poisoned.  Ron

25 Watson had poisoned her.

1    Q    Uh-huh.

2    A    Maybe it was in -- maybe it was 2020.  I don't

3  have my dates right.  I really don't know.  But it was

4  the one before the bad review.

5    Q    Okay.

6    A    It was the year before I got the bad review is

7  when it was.  And I may not have that date accurate

8  because I'm just -- can't think of dates real well.

9    Q    Okay.  And, again, what do you think the

10  reason is for the poor review?

11    A    Oh, retaliation.

12    Q    For what?

13    A    For turning Ron Watson in.

14    Q    Who did your evaluation?

15    A    Veronica Herrera.

16    Q    Okay.  And why would she be retaliating

17  against you for Ron?

18    A    Because she told me herself, to my face, she

19  told me that Ron was coaching her.  And I said to her,

20  "Veronica, I know he was behind all the harassment."

21  And she said yeah.

22    Q    When did she say that?

23    A    Whenever I had my last evaluation.

24    Q    So the year before?

25    A    No, it was this past evaluation, which would

Tammy Wheeler - 4/5/2023

```
 1  have been --
 2      Q    So 2022?
 3      A    Uh-huh.  Yes.
 4      Q    Okay.  She told you two years later?
 5      A    Whenever I got -- okay.  When I had the bad
 6  review, okay, that was -- that was one year.  The very
 7  next -- that was the bad review, the year before.
 8      Q    Uh-huh.
 9      A    Then I got this current review.
10      Q    Uh-huh.
11      A    We were discussing.  I said I've been doing --
12  I said, "Thank you for being honest about this
13  evaluation."  I said, "Before -- I've been doing the
14  same work that I've always done."
15              And then she -- and then we, you know,
16  discussed Ron Watson and she told me that she was being
17  coached.  Her words were, "I have been coached.  I was
18  being coached."
19              And I said, "I know Ron Watson was
20  behind -- I know Ron Watson was behind all the
21  harassment."  And she said yeah.
22      Q    So she said I was being coached by Ron Watson?
23      A    Yes, she did.
24      Q    Okay.
25      A    She did.
```

Tammy Wheeler - 4/5/2023

150

1   print in the wax.

2             She was balling me out over, "You didn't

3   mop this floor good.  No, you did not."  I said, "Oh,

4   yes, I did."  "No, you didn't.  Look, there's a

5   footprint."  I said, "You can't get that out.  That's a

6   wax shoe print from in the wax."  It's a shoe print.

7   It's not coming out.  I've tried.

8             You would think that somebody that worked

9   in that building for two to three years would know that

10  a footprint was in the wax.  She doesn't even know her

11  own building.  She was much harder on me and what I was

12  doing versus her standards of what she was doing.

13      Q    And this is the nursing building you're

14  talking about?

15      A    Uh-huh.  Yes.

16      Q    Okay.  And what about Veronica?

17      A    Veronica?

18      Q    You said that she called you names and also

19  ridiculed you.

20      A    Yeah.  She called me a bitch.

21      Q    When did she do that?

22      A    She said that in front of some coworkers

23  because I had asked for supplies and her response to

24  them was, "What does that bitch want?"

25      Q    Were you there?

1    A    No.  "What does that bitch want now?"  They

2    told me.

3    Q    Who told you?

4    A    Denise Stokes.

5    Q    Denise Stokes told you?

6    A    Custodial, uh-huh.  She's a custodian that

7    worked in the student center.

8    Q    Okay.  And she told you that Veronica said

9    that?

10   A    Uh-huh.

11   Q    Okay.

12   A    Yeah.

13   Q    When did -- when did this comment happen and

14   when did you learn about it?

15   A    I don't -- I don't know the details of that.

16   I don't know when it happened because I was not there.

17        When did Denise tell me?  I cannot tell

18   you the date.

19   Q    Okay.

20   A    But it was probably -- if I had to guess, I

21   would say probably the first month or two I was there

22   because I was asking for supplies.

23   Q    Okay.

24   A    I do know I was asking for supplies and she

25   said, "What does that bitch want now?"

1    conversation, but she wanted to put me in the nurse -- I

2    mean, I'm sorry.  She wanted to put me in the student

3    center, which was a happier place.

4         Q    Uh-huh.

5         A    But he told her no, he wanted me to go to the

6    nursing center.  Which everyone knew it was a more toxic

7    environment and more complaints came out of -- you know,

8    because of Marilyn.  She was a difficult person to be

9    around.  You know, complainer and --

10        Q    I see.  Okay.  So that was nursing building

11   again.  And you were there June to October 2020?

12        A    Yes.

13        Q    And then you said the student center was a

14   happier place and that's where you moved after that,

15   correct?

16        A    Correct.

17        Q    Okay.  And how long were you in the student

18   center?

19        A    Let's see.  Okay.  So I moved in October of

20   2020 and then I went to work last year, March.  I went

21   March of last year.  So that would be March 2020.  Is

22   that right?

23        Q    2022?

24        A    2022.  2022, yes.

25        Q    So like a year and-a-half ish --

1      A     Uh-huh.

2      **Q     -- that you were there?**

3      A     The people were wonderful there.  Very, very

4  nice people.

5      **Q     Uh-huh.**

6      A     The work has hard, but I did like the people.

7  I was not ridiculed.  I was praised.

8              Veronica herself on that evaluation told

9  me, even on the bad evaluation, the bad evaluation and

10  the good evaluation that was current, that people were

11  sending her emails and they were -- in the last

12  evaluation she said people were praising me and sending

13  her emails of how happy they were to have me in their

14  building.

15             Okay.  So in the first one when I got the

16  negative review she said, "Yeah, we heard some good

17  things about you, but we're still going to give you the

18  negative review."

19             And I said so you're going to out of --

20  out of the entire year, you're going to base my entire

21  evaluation on just that one instance with the nursing

22  thing where Marilyn had written you a message?

23             And her response was something like this.

24  "I'm only basing this evaluation on emails and meetings

25  that we've had."  That's what she said.  "I'm basing

1    Q    Okay.

2    A    Uh-huh.  She had a meeting with all of the

3  student center custodians and she threatened that if we

4  didn't get our job done, that we were going to be put on

5  a different shift.

6              And I told her at that time, you can't --

7  I can't change my shift.  I have to work this shift.

8  But she did threaten that if the jobs weren't done to

9  her satisfaction, she would move us to second shift.

10   Q    And so this was when you were at the student

11  center?

12   A    Correct.

13   Q    Okay.  Do you remember what month this was?

14   A    No, I do not.

15   Q    Okay.  And was this -- you said this was

16  directed at a group, a group of y'all?

17   A    We were in a meeting, uh-huh.

18   Q    Okay.  And so how many other employees were in

19  that meeting?

20   A    Okay.  Let me count on my hands so I'm not

21  sure.

22   Q    Sure.

23   A    So there was Shep, me, Denise, LaCresha,

24  probably Jorge.  I think five.

25   Q    Okay.  And, again, she was speaking to the

1   group?

2       A   Uh-huh.

3       Q   **Okay.**

4       A   And she threatened us and we all kind of

5   went -- because it would have been third shift.  It

6   would have been during the night to the early morning.

7   And we were all like --

8       Q   **Okay.**

9       A   But she -- she did -- she did threaten that.

10  And I wrote down on the paperwork that we were signing,

11  I put on the paperwork that I cannot work the second --

12  the night shift or whatever that was.

13      Q   **What paperwork that you were signing?**

14      A   She -- when she had that meeting she had us

15  all sign that paperwork.  I think I have a copy of that

16  if you need it.

17      Q   **I guess, what meeting and what was -- yeah,**

18  **what was the subject matter of the meeting?  Because I'm**

19  **not sure what you're talking about.  And the paperwork**

20  **specifically.**

21      A   The paperwork was just a summary of what she

22  was talking about.

23          I can't remember everything about that.

24  I just know it was about work and if you can't get your

25  work done, you know, write you up kind of thing.

Tammy Wheeler - 4/5/2023

179

1           I don't -- I don't know what the meeting

2    was about.  I honestly can't tell you.  It was just

3    about our work and if we couldn't get our work done,

4    then she would move us to a third shift.

5        Q    Okay.  And did y'all end up getting moved to a

6    third shift?

7        A    No, we did not.

8        Q    Okay.  Anything else besides what we've talked

9    about or anything that we've missed today?

10       A    I can't think at this time of anything.

11       Q    Okay.  And so you were at the student center

12   from around or about October 2020 to 2022 at some point.

13   And then what was your next move?

14       A    John Branch moved me to the -- they needed

15   somebody to work at the culinary cafe.  That was more of

16   what I was used to doing when I worked with Janice,

17   which was entertaining and cleaning.  And so John Branch

18   made a move -- moved me over there.

19       Q    And who is John Branch?

20       A    He is now -- I don't know if he's interim or

21   if he's actually the director of physical plant, but he

22   took Ron Watson's job.  He may be interim.  I'm not

23   sure.

24       Q    Okay.  So are you currently experiencing any

25   retaliation or harassment or anything like that in

**APPX. 034**

180

1   your -- at the culinary cafe?

2        A    No, not really.

3        Q    Okay.  And tell me a little bit more about

4   your job duties at the culinary cafe.  You're still at

5   PPD, correct?

6        A    Yes.

7        Q    Okay.  What does your day look like?

8        A    Okay.  So on Tuesdays and Thursdays we are

9   serving, so I help them in the back of the kitchen.  I

10  sort of train the students how to do set up coffee, make

11  tea, that sort of thing.  So I'm just support to

12  Dr. Mary Olle whenever she has class or whenever they're

13  serving.  I'm there as support.  Whatever she needs me

14  to do, I'm there to do.

15            So all day Tuesdays and Thursdays it is

16  restaurant business.  Then on Wednesdays and Fridays I

17  am cleaning up after the parties.  Or not the parties

18  but the day of service.  So that means spotting all the

19  tablecloths with stains, washing seven to eight loads of

20  laundry, folding everything.

21            Let's see.  I'm mopping and sweeping the

22  floor two to three times a week.  Cleaning the

23  bathrooms, just maintaining the house and cleaning those

24  days.

25            Mondays, again, I'm doing detail things,

1   like getting set up for the next day.  Sometimes I might

2   have to iron tablecloths for the -- you know, for the

3   day.  So I spend one day that I'm ironing.  We have

4   students shirts that we're -- may have to press or

5   whatever.

6              Just Mondays are deeper -- not deeper.

7   They're more like washing windows, cleaning out window

8   sills, things that are not getting ready for the

9   students.  So it's a very busy, like a busy restaurant.

10  It's just like working at a restaurant.

11      Q    So is the culinary cafe -- I'm sorry.  I'm not

12  super familiar with campus.  Is it a dining hall?

13      A    No, it's in a house.

14      Q    Okay.

15      A    It's in a house.  It's in a two-story house

16  but we only work on the first floor.  So it's just a

17  little cafe in a house.

18      Q    But it's food service for the students?

19      A    No.  Our culinary students and hospitality

20  students work that facility.

21      Q    I see.

22      A    And the public can come and get a meal.

23      Q    Okay.

24      A    Or -- yeah.

25      Q    So it's not like the freshmen dorm room?

1    Q    Okay.  And 40 hours a week?

2    A    Uh-huh.

3    Q    Approximately?

4    A    Correct.  Yes.

5    Q    Do you ever work extra?

6    A    If there are events in the evening, yes, I

7  would be working extra.

8    Q    Okay.  What's your pay?

9    A    It's the same.

10    Q    Okay.  So is this more similar --

11    A    Yes.

12    Q    -- to what you did in the president's house?

13    A    Yes.

14    Q    Okay.  And do you like it?

15    A    I do.

16    Q    Okay.  So you're not currently experiencing

17  any, you know, retaliation or harassment, correct?

18    A    Not at this time, no.

19    Q    So when was the last, you know, instance of

20  retaliation or harassment that you recall?

21    A    Okay.  Let me think about that.  To be honest,

22  it was probably when I filed the lawsuit.

23    Q    When was that?

24    A    I mean, I'm sorry.  Not filed the lawsuit.

25  Whenever we started the EEOC report or whatever that is,

1    A    Oh, I feel like it was Veronica and Ron.

2    Q    **Still?**

3    A    Uh-huh.

4    Q    **Okay.  And, again, what did that look like?**

5    A    Well, I got the bad review when I was over

6   there.

7    Q    **Okay.**

8    A    They also, you know, were making me do my

9   floor plus somebody else's floor.

10    Q    **Uh-huh.**

11    A    Let's see.  That's all I can think of at this

12   time.

13    Q    **Okay.  Do you currently have any**

14   **accommodations?**

15    A    Yes.

16    Q    **For your job?**

17    A    Uh-huh.

18    Q    **Okay.  And what are they?**

19    A    They're -- I think it's no more than 10 pounds

20   lifting.

21    Q    **Uh-huh.**

22    A    And I'm not supposed to be working outside.

23   Let's see.  I can take breaks if I need to.

24    Q    **Uh-huh.**

25    A    If I get overstressed or whatever.  That's

1   basically it.

2        Q    Okay.  And are you ever asked to do anything

3   outside of your restrictions or, you know, to not

4   account for your accommodations in your current role?

5        A    Now?  No.  Dr. Olle has been good about, you

6   know, not supposed to be lifting tables and things like

7   that, so she doesn't allow me to do that.

8        Q    Okay.  And are there any accommodations that

9   you need that you don't currently have?

10       A    Well, kind of.  I'm happy at the culinary cafe

11  but I will tell you it's very hard on me.  It's very

12  hard on my body.  My feet -- and I'm happy to work with

13  the students and I do like the environment that I'm

14  working in, but I do think that the job itself is still

15  a little -- is still a little hard on my body.

16            My feet swell, my back hurts, my knees

17  hurt.  I still have -- you know, whenever I'm lifting

18  dishes or something, it -- even though it's 10 pounds,

19  it still hurts your back.  So it's just standing on my

20  feet the whole time and -- it's a restaurant.

21       Q    Right.  So --

22       A    So it's still -- it's still -- I mean, lighter

23  duty would be -- lighter than that would be better, but

24  so I would say, yeah, I probably still need some -- some

25  lighter duties.

1      Q    Have you requested lighter duties?

2      A    No.  I'm afraid to move anywhere else because

3  I just don't want to be put into another toxic

4  situation.

5      Q    What do you mean by that?

6      A    Well, I was -- you know, if they had to move

7  me, it may be in a more difficult -- I mean, the people

8  that I like working with, I wouldn't want to risk

9  getting into a situation where the people were not good

10  to work with.  I'm working with Dr. Olle and Chef

11  Barrios, who are nice people.  I just don't want to be

12  risked put into an unfriendly environment.

13      Q    So you think if you requested additional

14  accommodations you'd be moved?

15      A    Probably so.  I don't know.  I don't know.  I

16  think anything is capable.

17      Q    Okay.  But you haven't actually requested

18  anything?

19      A    I have not.

20      Q    Okay.  Okay.  So I just want to talk about

21  President Gordon and his wife Sheree for a minute.  I

22  guess, what is their involvement in this case to you?

23      A    Well, I did have harassment through Sheree

24  Gordon.  Not so much Dr. Gordon.  But Sheree was a very

25  toxic person and I walked on eggshells.

Tammy Wheeler - 4/5/2023

213

```
1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF TEXAS
2                      LUFKIN DIVISION

3  TAMMY WHEELER              *
                              *
4  VS.                        *CIVIL ACTION NO. 9:22-CV-129
                              *
5  BOARD OF REGENTS OF STEPHEN*
   F. AUSTIN STATE UNIVERSITY,*
6  ET AL,                     *

7                  REPORTER'S CERTIFICATION

8           ORAL DEPOSITION OF TAMMY WHEELER

9                     APRIL 5, 2023

10      I, Liesa Kliman, Certified Shorthand Reporter in

11  and for the State of Texas, hereby certify to the

12  following:

13      That the witness, TAMMY WHEELER, was duly sworn by

14  the officer and that the transcript of the oral

15  deposition is a true record of the testimony given by

16  the witness;

17      That the amount of time used by each party at the

18  deposition is as follows:

19          TANNER G.M. FRANKLIN - 00:00(HOURS:MINUTES)

20          MARY B. QUIMBY       - 04:46(HOURS:MINUTES)

21      That pursuant to the information given to the

22  deposition officer at the time said testimony was taken,

23  the following includes counsel for all parties of

24  record:

25          TANNER G.M. FRANKLIN, Attorney for Plaintiff;
```

APPX. 041

214

1         MARY B. QUIMBY, Attorney for Defendants.

2      I further certify that I am neither counsel for,

3  related to, nor employed by any of the parties or

4  attorneys in the action in which this proceeding was

5  taken, and further that I am not financially or

6  otherwise interested in the outcome of the action.

7      Certified to by me this 20th day of April,

8  2023.

9

10  _____

    Liesa Kliman, CSR#2248
11  Integrity Legal Support Solutions
    9901 Brodie Lane, #160-400
12  Austin, Texas 78748
    Telephone:
13  Expiration Date: 2/28/24
    Firm Registration #CRF-528

14

15

16

17

18

19

20

21

22

23

24

25

**APPX. 042**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                       LUFKIN DIVISION

 3    TAMMY WHEELER,                  §
                                      §
 4                 Plaintiff,         §
                                      §
 5    VS.                             §
                                      §
 6    BOARD OF REGENTS OF             § CIVIL ACTION
      STEPHEN F. AUSTIN STATE         §
 7    UNIVERSITY, STEVE               § NO.: 9:22-CV-129
      WESTBROOK, ED.D., INTERIM       §
 8    PRESIDENT OF STEPHEN F.         §
      AUSTIN STATE UNIVERSITY,        §
 9    AND STEPHEN F. AUSTIN           §
      STATE UNIVERSITY,               §
10                                    §
                   Defendants.        §
11

12          ------------------------------------

13                    ORAL DEPOSITION OF

14                       RON WATSON

15                    DECEMBER 21, 2023

16          ------------------------------------

17         ORAL DEPOSITION OF RON WATSON, produced as a witness

18    at the instance of the Plaintiff, and duly sworn, was taken

19    in the above-styled and numbered cause on

20    December 21, 2023, from 9:27 a.m. to 11:38 a.m., before

21    Candace Parke, CSR in and for the State of Texas, reported

22    by machine shorthand, at the offices of Stephen F. Austin

23    State University, Austin Building, pursuant to the Federal

24    Rules of Civil Procedure and the provisions stated on the

25    record or attached hereto.
```

```
1                        A P P E A R A N C E S

2     FOR THE PLAINTIFF:

3             MR. TANNER FRANKLIN
              Hightower, Franklin & James,
4             PLLC
              115 South Street
5             Nacogdoches, Texas  75961
              Phone:  936.560.3300
6             E-Mail: tanner@thegoodlawyer.com

7

8     FOR THE DEFENDANTS BOARD OF REGENTS OF STEPHEN F. AUSTIN
      STATE UNIVERSITY, STEVE WESTBROOK, ED.D, INTERIM PRESIDENT
9     OF STEPHEN F. AUSTIN STATE UNIVERSITY, AND STEPHEN F.
      AUSTIN STATE UNIVERSITY:
10
              MS. MARY QUIMBY
11            Assistant Attorney General
              P. O. Box 12548 Capitol Station
12            Austin, Texas 78711
              Phone:  512.936.1162
13            E-mail: mary.quimby@oag.texas.gov

14
      AND
15
              MR. TANNER BOYD
16            Assistant General Counsel
              Office of General Counsel
17            Austin Building, Room 308
              P. O. Box 13065, SFA Station
18            Nacogdoches, Texas 75962-3065

19

20

21

22

23

24

25
```

1   assistant.

2       **Q.**   After the assistant hall director, what position

3   did you hold?

4       **A.**   Again, there's -- I was -- there was two levels of

5   employment at Stephen F. Austin going on at the same time.

6   Every summer I worked a Youth Opportunities Unlimited

7   At-Risk Program for At-Risk Students, every summer.

8       **Q.**   Okay.

9       **A.**   But -- and I progressed at that job every summer

10  to a promotion.  At the same time I was working in

11  residents' life -- what would that be? -- August through

12  May.  And I went from assistant hall director to hall

13  director.

14      **Q.**   Okay.  Let's -- let's set the summer aside.  Let's

15  just focus on the chain after hall director.

16      **A.**   Hall director.  From hall director to coordinator

17  of residents' life.

18      **Q.**   Approximately when was that?

19      **A.**   Again, right around 1992.  I know all this because

20  that's about the time I got married, and all that happened

21  at the same time.

22      **Q.**   Okay.  And then --

23      **A.**   1992 is the answer.

24          Sorry.  I talk too much.

25      **Q.**   After coordinator of residents' life, what was

```
 1   your next position?

 2        A.   I left the university.

 3        Q.   Okay.  Where did you go?

 4        A.   Taco Bell -- not for Taco Bell but for a

 5   franchisee.

 6        Q.   Okay.  And what was your position there?

 7        A.   Started off as assistant manager.

 8        Q.   Okay.  Was that the Taco Bell franchise here in

 9   Nacogdoches?

10        A.   Yes, sir.

11        Q.   Okay.  How long -- and then what did you --

12        A.   Then promoted to general manager.

13        Q.   Okay.

14        A.   Then promoted to district manager.  Then promoted

15   to regional manager.

16        Q.   When did you return to Stephen F. Austin?

17        A.   2000.

18        Q.   And what was your position when you came back to

19   Stephen F. Austin?

20        A.   Manager of custodial services, October of 2000.

21        Q.   And is that within what's known as the physical

22   plant department?

23        A.   Yes, sir.

24        Q.   Okay.  After -- how long have you been in the

25   manager of custodial services role?
```

1      **A.**   I really don't know.

2      **Q.**   What was your next position after manager of

3   custodial services?

4      **A.**   Assistant to the director of the physical plant.

5      **Q.**   Assistant to the director of the physical plant?

6      **A.**   Yes, sir.

7      **Q.**   And when -- approximately when did you obtain that

8   position?

9      **A.**   (Moving head side to side.)

10     **Q.**   Don't know?

11     **A.**   (Moving head side to side.)  It all seemed pretty

12  fluid to me so...

13     **Q.**   What was your next position after assistant to the

14  director of the physical plant?

15     **A.**   Assistant director to the physical plant.

16     **Q.**   Okay.  After that what's the next position?

17     **A.**   Associate director to the physical plant director.

18     **Q.**   And after that?

19     **A.**   Director of the physical plant.

20     **Q.**   When did you become the director of the physical

21  plant?

22     **A.**   Roughly three years before I left, but I don't

23  even know when I left.

24     **Q.**   Okay.  Was that the last position you held at

25  Stephen F. Austin?

```
 1        A.    Yes, sir.

 2        Q.    When did you leave Stephen F. Austin?

 3        A.    I honestly -- I don't know when that was, maybe

 4   three years ago.

 5        Q.    So it's 2023 now, so 2020 or 2021?

 6        A.    It's been at least three years so... I think.

 7        Q.    Why did you leave Stephen F. Austin?

 8        A.    The vice president called me into his office and

 9   told me that he no longer had confidence in me to run the

10   physical plant.

11        Q.    Who was that vice president?

12        A.    Dr. Danny Gallant.

13        Q.    Did you resign or were you terminated?

14        A.    I was terminated.

15        Q.    Were you given any sort of a severance or buy-out?

16        A.    No, sir.

17        Q.    As a result of your termination, did you file any

18   sort of lawsuit or EEOC charges?

19        A.    No, sir.

20        Q.    Do you have any special training with respect to

21   -- did you have any special training with respect to Title

22   7 of the Civil Rights Act?

23        A.    No, sir.

24        Q.    Do you have any special training with respect to

25   the Americans With Disabilities Act?
```

1    **A.**    Special training?  No, sir.

2    **Q.**    What I'm asking is, you're not -- you haven't

3    taken legal courses on Title 7, legal courses on the

4    Americans With Disabilities Act, that sort of thing?

5    **A.**    No, sir.

6    **Q.**    Have you personally experienced discrimination at

7    Stephen F. Austin?

8    **A.**    No, sir.

9    **Q.**    Have you ever seen what you believed to be racial

10   discrimination occur at Stephen F. Austin?

11   **A.**    No, sir.

12   **Q.**    Have you ever seen what you believed to be

13   disability discrimination occur at Stephen F. Austin?

14   **A.**    No, sir.

15   **Q.**    Have you personally experienced unlawful

16   retaliation at Stephen F. Austin?

17   **A.**    Unlawful?  No, sir.

18   **Q.**    Have you ever experienced retaliation at Stephen

19   F. Austin?

20   **A.**    I don't think I understand what retaliation means

21   in the context of your question.

22   **Q.**    Well, do you believe that you did something and a

23   supervisor retaliated against you for it?

24   **A.**    I don't think I should have been terminated from

25   Stephen F. Austin State University.

1    **Q.**    Okay.  Why not?

2    **A.**    Because I do not believe that I did anything that

3    warranted termination.  I also was written up, and I do not

4    believe that that documentation was an accurate but...

5    **Q.**    Okay.  Anything else?

6    **A.**    No, sir.

7    **Q.**    Why do you believe you were terminated?

8    **A.**    I've asked that question a million times.  I have

9    -- I -- I could not tell you.  You'd have to ask Danny

10   Gallant.

11   **Q.**    I want to focus now on just the physical plant,

12   kind of, structure in 2020.  You were the director of the

13   physical plant in 2020.  Correct?

14   **A.**    It seems as though I was.  I'll be honest, I don't

15   know those dates.  I haven't reviewed them so...

16   **Q.**    Well, I'll represent to you that this suit

17   concerned events that happened in 2020 at SFA in there, and

18   I'm just going to -- so you'll understand and we can move

19   along a little bit -- Stephen F. Austin, in their

20   pleadings, indicated that you were terminated effective

21   April 21st of '21.

22   **A.**    April 20th?

23   **Q.**    No, April of 2021.

24   **A.**    Oh, gosh.  I thought I was gone longer than that.

25   **Q.**    So we're focusing on the time period of 2020.

1    Knowing what I kind of provided to you, would you have been

2    the director of physical plant in 2020?

3        **A.**    Yes, sir.

4        **Q.**    Okay.  Who was your direct supervisor?

5        **A.**    Dr. Danny Gallant.

6        **Q.**    And what was his position at the time?

7        **A.**    Vice president of finance and administration.

8        **Q.**    As the director of the physical plant, did you

9    ever report to anybody other than Dr. Gallant that you can

10   recall?

11       **A.**    No, sir.

12       **Q.**    Now, in general, when you were the director of

13   physical plant, who reported to you -- let me back up.  Who

14   directly reported to you?

15       **A.**    I mean, do I need to name them all because it will

16   take me a minute to kind of recall them?

17       **Q.**    If you can, to the best of your ability.

18       **A.**    All right.  There was the manager of

19   transportation and special services -- do you need a name?

20       **Q.**    If you can?

21       **A.**    The manager of transportation and special services

22   was Mark Scott.

23       **Q.**    Okay.

24       **A.**    There was the manager of grounds, and that was

25   Gary Williams.

1  **Q.**  Okay.

2  **A.**  There was a mechanical maintenance manager -- I

3 think he was -- and that was Allen Singleton.  There was

4 Veronica Herrera, who was over all custodial.  Well, hello.

5 Assistant director of construction, I guess, was Jessica

6 Dewitt.  There was an assistant director of, like, maybe

7 business -- I don't remember the exact title, and that was

8 Hillary Parrish.  And there was an associate director, and

9 that was John Branch.  I feel like that's --

10  **Q.**  Did Eric Green report to you?

11  **A.**  No, sir.

12  **Q.**  Who would he have reported to?

13  **A.**  Veronica Herrera.

14  **Q.**  Within the physical plant, I guess, underneath

15 each of these managers, there would be other employees

16 reporting to them?

17  **A.**  Oh, yeah.

18  **Q.**  Okay.  And how many -- approximately how many

19 employees in 2020 worked in the physical plant?

20  **A.**  Give or take -- well, it was over 200.  I think

21 220 -- which actually -- I apologize -- brings me back to

22 the fact that there was actually another whole group.  I

23 had forgotten about them.  But because of -- we added those

24 people.  I don't even remember why -- there was, like, a

25 housing -- an entire branch or division of the physical

1    plant that was housing/residents life, maintenance.

2         Q.    Okay.

3         A.    And I don't really know what the time frame --

4    dude that was in charge was Jim Radar.

5         Q.    Did Tammy Wheeler ever personally report to you?

6         A.    No, sir.

7         Q.    Who did she report to?

8         A.    When?

9         Q.    Well, let's say in 2020 when she came back to the

10   physical plant.

11        A.    Someone in custodial services.

12        Q.    Okay.  But she never reported to you directly?

13        A.    No, sir.

14        Q.    Within the physical plant -- well, of those

15   200-plus employees, are the majority of those employees

16   white employees?

17        A.    Yes, sir, the majority of the physical plant

18   employees are white.

19        Q.    What about within the custodial group?

20        A.    The exact opposite.

21        Q.    Okay.  And when you say, "the exact opposite," you

22   mean within the custodial group, the majority of the

23   employees are minority?

24        A.    Yes, sir.

25        Q.    I just want to talk about Ms. Wheeler generally

1    **A.**   The reason she left is because there was nobody in

2    the home and there was nothing for her to do.

3    **Q.**   Okay.  Who made the decision for her to -- that

4    she needed to leave the home and there was nothing for her

5    to do?

6    **A.**   All the people in charge of the house.

7    **Q.**   Okay.  Did you have any role in that decision?

8    **A.**   Oh, sure.  I mean, there is some, sort of like,

9    house committee.

10   **Q.**   Okay.  Do you know who all's on the house

11   committee?

12   **A.**   No, sir.

13   **Q.**   Were you on the house committee?

14   **A.**   Yes, sir.  And whomever -- and I don't even know

15   because it wasn't like it was a formal group -- you know,

16   there weren't like -- it was, like, hey, there's nobody in

17   the home; and Ms. Patillo left; Ms. Wheeler's going to have

18   to stay employed.  She's technically a physical plant

19   employee, so she goes to the physical plant.

20   **Q.**   Now, you did quotations when you said

21   "technically."  What -- what do you mean by that?

22   **A.**   Because the entire time that she worked at the

23   president's house under Mrs. Patillo, she was listed as a

24   physical plant employee.

25   **Q.**   Okay.  So even though she was working at the

1    position or something like that, did she?

2        **A.**   I wouldn't think so, no, sir, not that I was aware

3    of.

4        **Q.**   So I guess my question is, if there was no longer

5    a need for Mrs. Wheeler's position, why wasn't she just let

6    go?

7        **A.**   To be honest with you, we just don't have a

8    history of doing that to people.  We -- SFA -- we would

9    never do that.

10       **Q.**   Okay.

11       **A.**   At least not in my world.

12       **Q.**   So she gets reassigned, I guess, back to the

13   physical plant.  Is that correct?

14       **A.**   Oh, and let me say this, too, because the

15   assumption is there would be a president, and she'd go

16   back.  All of -- that little stint was temporary.  You know

17   what I mean?

18       **Q.**   Okay.  Okay.  I understand.  So you're saying that

19   the stint when she was sent to physical plant the first

20   time, we'll say, the Fall of 2019, that was a temporary?

21       **A.**   Yeah.

22       **Q.**   What did she -- where was she working when she was

23   back in physical plant for that short stint?

24       **A.**   It is my recollection that we tried to place her

25   in something that was comparable, and I feel like there was

1    a woman or a team that would go from house to house to

2    house and clean.  But these are house -- residential houses

3    that were converted into university office spaces.  And we

4    placed her with that team.  That's my recollection, I

5    think.

6         Q.   Okay.  And just so we're clear for the record,

7    when you're saying they're houses -- you kind of explained

8    it -- but these are residential houses that the university

9    purchased and uses for office space around town?

10        A.   Uh-huh.  Yes, sir.  Like, I mean, the Randall

11   House.  I mean I can --- I can think the Forestry -- the

12   Tucker House, the Randall house.  There was a Theater

13   House, I think.

14        Q.   And what were her job duties when she was in that

15   role?

16        A.   It would have been custodial related.

17        Q.   Now, relative to the other employees that were

18   doing that work in terms of cleaning the Tucker House, the

19   Randall House, that sort of thing, was Ms. Wheeler's salary

20   comparable to theirs?

21        A.   No, sir.

22        Q.   Okay.

23        A.   But I didn't know that at the time.

24        Q.   Okay.  But you know that now?

25        A.   Yes, sir.

1  **Q.** Okay.  In fact, Ms. Wheeler's salary was quite

2 higher than those other employees?

3  **A.** Yes, sir.

4  **Q.** Do you know who her direct supervisor was at that

5 time?

6  **A.** I would have thought Veronica Herrera, but I don't

7 recall if that's what -- I mean, when somebody's assigned

8 to the custodial department, in my mind they all work for

9 Veronica.  Who she has them report to is really not in my

10 -- does that make sense? -- like, I wouldn't know.

11  **Q.** Okay.

12  **A.** I would just assume Veronica.

13  **Q.** Okay.  So when a custodial employee is assigned to

14 custodial, that's -- Veronica is the head of that

15 department.  And whoever she designates them to report to

16 is who they report to?

17  **A.** Uh-huh.  Yes, sir.

18  **Q.** And just so I'm clear, when Ms. Wheeler left the

19 president's home for that temporary assignment, her salary

20 remained the same?

21  **A.** Yes, sir.

22  **Q.** At some point during that -- that time period when

23 she was temporarily assigned working at the Tucker House

24 and those places, was there an issue between Ms. Wheeler

25 and the other employees concerning a social media post?

1   **A.**   I don't recall that.

2   **Q.**   Okay.  You have no recollection of an issue with

3   Veronica Herrera and posting a social media post about

4   systemic racism at Stephen F. Austin?

5   **A.**   I do, but I don't think it was during that time

6   frame --

7   **Q.**   Okay.

8   **A.**   -- I don't think.

9   **Q.**   Just tell me about that incident, what you

10  remember about it.

11  **A.**   Which?

12  **Q.**   With the posting of the social media post?

13  **A.**   I woke up one morning and saw on Facebook that

14  Veronica had posted this post that led me to believe that

15  she had seen the disparity -- well, not really disparity,

16  the similarity in her salary -- Veronica Herrera's salary

17  -- to Tammy Wheelers' that she seemed pretty upset about,

18  if you were going by the post.

19  **Q.**   Okay.  Was there -- did you ever have a discussion

20  with Ms. Wheeler about that post?

21  **A.**   Yes.

22  **Q.**   Tell me what you recall about that discussion.

23  **A.**   Literally the same day or, you know, the day after

24  I was aware of that post, Tammy Wheeler came to the

25  physical plant unannounced, without an appointment, asking

1    to speak to me.

2         Q.    Okay.

3         A.    I -- hold on just a second -- I gave her some time

4    in my office.

5         Q.    Can you explain what that means, gave her some

6    time in the office?

7         A.    It is not my practice to have people who don't

8    report directly to me come directly to my office without an

9    appointment and spend time with them in a, you know,

10   formal-looking meeting setting.  So I said, you know what,

11   with that post in my mind, quite frankly, I -- I let her

12   come into my office.

13        Q.    Okay.

14        A.    My recollection of her first question to me that

15   started the conversation:  "Why do Veronica and Eric don't

16   like me?  Why do they don't like me?"

17        Q.    What did you respond with?

18        A.    I decided that it would be best of me to try and

19   explain to her what could be going on in the relationship

20   between Tammy and Veronica and Eric.  I, again, with that

21   Facebook post fresh in my mind, assumed that that's why she

22   was there -- since the questions seemed to be spot on to

23   the post.  And so I spent a great deal of time -- my

24   recollection is roughly two hours -- explaining to her why

25   I thought it was possible that there may have been

 1  resentment on their part towards her, towards Tammy.

 2      Q.    Did you believe that that resentment or explain

 3  that that resentment could be racial?

 4      A.    Not racial --

 5      Q.    Okay.

 6      A.    -- necessarily.  I mean -- yeah, I mean, at the

 7  same time that this was all going on, I was also in the

 8  middle of a book study called -- and the book was called

 9  "White Fragility", so I certainly had a lot of ideas about

10  white privilege in my head.  And I do believe that white

11  privilege exists, and I felt like I was doing my best to

12  explain that to Tammy, that she might understand.

13      Q.    Did you ever make comparisons to the movie

14  "Roots"?

15      A.    I do not recall specifically, but certainly have

16  made references to "Roots" in conversations; so, yeah, it's

17  certainly possible.

18      Q.    Did you ever make any references to the "Shawshank

19  Redemption"?

20      A.    Yes, I did.

21      Q.    Did you ever make any comments about there being

22  differences between house hands and field hands?

23      A.    That alliteration was used.

24      Q.    And just for the jury, what's the difference

25  between a house hand and a field hand?

```
 1   had made about race?

 2        A.    No, sir.

 3        Q.    Did the Gordons ever tell you anything about Ms.

 4   Wheeler's saying something about you?

 5        A.    No, I did not -- was not aware -- am unaware.

 6        Q.    Did you have any personal conflicts with Scott and

 7   Sheree Gordon?

 8        A.    No, other than that darn water issue.

 9        Q.    Okay.  It's my understanding that in June of 2020,

10   Ms. Wheeler came back to the physical plant for a second

11   time.  Does that seem accurate to you?

12        A.    Okay.  Yes, sir.

13        Q.    Why did Ms. Wheeler come back to the physical

14   plant to your knowledge?

15        A.    I was called by the vice president, Danny Gallant,

16   and told that she was returning to the physical plant and I

17   was to assign her thusly.

18        Q.    Did he say why she was being returned to the

19   plant?

20        A.    Nope.

21        Q.    So he just called and said, She's coming back; you

22   assign her?

23        A.    That's it.

24        Q.    Okay.  When she returned to the physical plant,

25   what was her initial position?
```

1    **A.**   I mean, I don't know why I feel like we tried that

2    whole, you know, go-around-to-all-the-different-houses

3    thing again; but I don't necessarily recall.

4    **Q.**   And when you say, "go around to the houses," that

5    means the job that she was doing when she was temporarily

6    at the physical plant the first time?

7    **A.**   Yes, sir.

8    **Q.**   All right.  Do you know if that was tried the

9    second time?

10   **A.**   I think it was, but I don't know.  I don't recall.

11   **Q.**   When she returned to the physical plant, was her

12   salary changed?

13   **A.**   No, sir.

14   **Q.**   Who was her supervisor when she returned to the

15   physical plant?

16   **A.**   I mean, again, I'm going to just say Veronica

17   Herrera.  But I can't say that she directly reported to

18   Veronica Herrera.  That's just as far as I know.

19   **Q.**   She was within that division?

20   **A.**   Uh-huh.

21   **Q.**   Okay.  After she returned to the physical plant,

22   was Ms. Wheeler assigned to work at the nursing school at

23   some point?

24   **A.**   Oh, at some point, yes, sir.

25   **Q.**   Did she request to be moved from that location?

1  e-mail?

2       **A.**   I do.

3       **Q.**   And then to rewatson@sfasu.edu?

4       **A.**   I do.

5       **Q.**   Okay.  Was that your SFA --

6       **A.**   It was.

7       **Q.**   -- e-mail address at the time?

8                And the letter's addressed to you?

9       **A.**   Yes -- yes, sir.

10               STENOGRAPHER:  Okay.  Y'all are talking at

11  the same time.

12               MR. FRANKLIN:  Sorry.

13      **Q.**   (BY MR. FRANKLIN)  This first page here references

14  that Mr. Gibson has been retained to complete an allegation

15  -- complete an investigation regarding allegation made

16  against you by a university employee.

17      **A.**   Okay.

18      **Q.**   Okay.  And the date of this letter or this e-mail

19  was October 28th, 2020.  Do you see that up at the top?

20      **A.**   Okay.

21      **Q.**   Do you have any reason to doubt that you received

22  this document at that time?

23      **A.**   No, sir.

24      **Q.**   And on page -- the second page of the document,

25  there's actually a letter on the letterhead to you.

```
 1   signature, do you recognize that signature?

 2        A.   I don't, but I can guess whose signature it is.

 3        Q.   Who do you believe it to be?

 4        A.   Eric Green.

 5        Q.   And the signature below reviewing supervisor's

 6   signature, do you recognize that signature?

 7        A.   Don't recognize it, but I would guess it was

 8   Veronica Herrera.

 9        Q.   Do you know who prepared this evaluation?

10        A.   One of them.

11        Q.   Did you have any role in preparing this

12   evaluation?

13        A.   No, sir.

14        Q.   Did you instruct Veronica Herrera or Eric Green to

15   rate Ms. Wheeler in any certain category?

16        A.   No, sir.

17        Q.   You'll agree with me that Ms. -- Ms. Wheeler was

18   rated as "improvement needed" on this evaluation?

19        A.   Yes, sir.

20        Q.   Before today have you seen this evaluation before?

21        A.   No recollection of it.

22        Q.   To your knowledge was Ms. Wheeler ever given an

23   action plan after -- an improvement action plan after this

24   evaluation was given?

25        A.   I can't recall.
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                       LUFKIN DIVISION

 3    TAMMY WHEELER,                   §
                                       §
 4                 Plaintiff,          § CIVIL ACTION
                                       §
 5    VS.                              § NO. 9:22-CV-129
                                       §
 6    BOARD OF REGENTS OF              §
      STEPHEN F. AUSTIN STATE          §
 7    UNIVERSITY, STEVE                §
      WESTBROOK, ED.D., INTERIM        §
 8    PRESIDENT OF STEPHEN F.          §
      AUSTIN STATE UNIVERSITY,         §
 9    AND STEPHEN F. AUSTIN            §
      STATE UNIVERSITY,                §
10                                     §
                   Defendants.         §
11

12              REPORTER'S CERTIFICATION

13              DEPOSITION OF RON WATSON

14                   DECEMBER 21, 2023

15

16        I, Candace Parke, Certified Shorthand Reporter in

17    and for the State of Texas, hereby certify to the

18    following:

19        That the witness, RON WATSON, was duly sworn by the

20    officer and that the transcript of the oral deposition is a

21    true record of the testimony given by the witness;

22        That the deposition transcript was submitted on

23    December 28, 2023 to the witness or to the attorney for

24    the witness for examination, signature and return to me by

25    January 29, 2023;
```

1      That the amount of time used by each party at the

2  deposition is as follows:

3      MR. TANNER FRANKLIN.....01 HOUR: 51 MINUTES
       MS. MARY QUIMBY.....00 HOUR: 00 MINUTES
4      That pursuant to information given to the deposition

5  officer at the time said testimony was taken, the following

6  includes counsel for all parties of record:

7      MR. TANNER FRANKLIN, attorney for Plaintiff

8      MS. MARY QUIMBY, attorney for Defendants

9      MR. TANNER BOYD, attorney for Defendants

10

11      That $549.75 is the deposition officer's charges

12  to the Plaintiff for preparing the original deposition

13  transcript and any copies of exhibits;

14      I further certify that I am neither counsel for,

15  related to, nor employed by any of the parties or attorneys

16  in the action in which this proceeding was taken, and

17  further that I am not financially or otherwise interested

18  in the outcome of the action.

19      Certified to by me this 26th day of December, 2023.

20

21

22
                         CANDACE PARKE
23                       Texas CSR No. 1699
                         Expiration Date:  08/31/25
24                       MSGLegal
                         503 E. Frank Avenue
25                       Lufkin, Texas  75901
                         Phone:  936.637.7594

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      LUFKIN DIVISION

 3  TAMMY WHEELER                    )
                    Plaintiff       )
 4                                  )
    VS.                             )CIVIL ACTION NO.
 5                                  )   9:22-CV-129
    BOARD OF REGENTS OF STEPHEN     )
 6  F. AUSTIN STATE UNIVERSITY,     )
    STEVE WESTBROOK, ED.D.,         )
 7  INTERIM PRESIDENT OF STEPHEN    )
    F. AUSTIN STATE UNIVERSITY,     )
 8  AND STEPHEN F. AUSTIN STATE     )
    UNIVERSITY                      )
 9                    Defendants    )

10  *********************************************************

11                  ORAL DEPOSITION OF

12                  VERONICA HERRERA

13                  February 8, 2023

14  *********************************************************

15

16

17              ORAL DEPOSITION OF VERONICA HERRERA,

18  produced as a witness at the instance of the Plaintiff,

19  and duly sworn, was taken in the above-styled and

20  numbered cause on the February 8, 2023, from 10:04 a.m.

21  to 11:58 a.m., before Bonnie L. Rodriguez, CSR in and

22  for the State of Texas, reported by machine shorthand,

23  at Stephen F. Austin State University-Austin Building,

24  2102 Alumni Drive, Nacogdoches, Texas 75962 pursuant to

25  the Federal Rules of Civil Procedure.
```

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         MR. TANNER G.M. FRANKLIN
           MR. SEAN HIGHTOWER
 4         Franklin Law Firm, PLLC
           2528 Highway 103
 5         Etoile, Texas 75944
           (936) 854-3213
 6         tfranklin@tfranklinlawfirm.com

 7

 8    FOR THE DEFENDANTS:

 9         MS. MARY QUIMBY
           Attorney-in-Charge
10         Assistant Attorney General
           General Litigation Division
11         Office of the Attorney General
           PO Box 12548, Capital Station
12         Austin, Texas 78711-2548
           (512) 936-1162
13         mary.quimby@oag.texas.gov

14

15         MR. DAMON C. DERRICK
           General Counsel
16         Stephen F. Austin State University
           Austin Building, Room 310
17         PO Box 13065, SFA Station
           Nacogdoches, Texas 75962-3065
18         (936) 468-4305
           derrickdc@sfasu.edu
19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | **A** | Okay. |
| 2 | | (Exhibit 7 marked.) |
| 3 | **A** | (Witness examined document.) Okay. |
| 4 | **Q** | (BY MR. FRANKLIN)  Okay.  Exhibit 7, have you |

5  seen this document before?

6      **A**    Yes.

7      **Q**    Okay.  Is this the e-mail from Darren Gibson

8  to you notifying you of Ms. Wheeler's complaint?

9      **A**    Yes.

10     **Q**    Okay.  And Darren Gibson was the lawyer with

11 Littler Mendelson who was investigating this incident;

12 is that correct?

13     **A**    Yes.

14     **Q**    Okay.  And in this e-mail was sent to you on

15 October 28, 2020; is that right?

16     **A**    That's what it says on there, yes.

17     **Q**    Okay.  And the second page of the letter, it's

18 got the date of October 28, 2020, right?

19     **A**    Oh, yes.

20     **Q**    Okay.  All right.  Now, as part of that

21 investigation, did you -- were you interviewed by

22 Mr. Gibson or Ms. McNamara?

23     **A**    Yes.

24     **Q**    Okay.  When you were interviewed, who all was

25 present?

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    LUFKIN DIVISION

 3   TAMMY WHEELER                    )
                  Plaintiff          )
 4                                    )
     VS.                              )CIVIL ACTION NO.
 5                                    )   9:22-CV-129
     BOARD OF REGENTS OF STEPHEN     )
 6   F. AUSTIN STATE UNIVERSITY,     )
     STEVE WESTBROOK, ED.D.,         )
 7   INTERIM PRESIDENT OF STEPHEN    )
     F. AUSTIN STATE UNIVERSITY,     )
 8   AND STEPHEN F. AUSTIN STATE     )
     UNIVERSITY                      )
 9                  Defendants        )

10   ********************************************************

11              REPORTER'S CERTIFICATE

12        ORAL DEPOSITION OF VERONICA HERRERA

13                February 8, 2023

14        I, Bonnie L. Rodriguez, Certified Shorthand

15   Reporter in and for the State of Texas, hereby certify

16   to the following:

17        That the witness, VERONICA HERRERA, was duly

18   sworn by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21        I further certify that pursuant to the FRCP

22   Rule 30(f)(1) that the signature of the deponent;

23        __X__ was requested by the deponent or a party

24   before the completion of the deposition and returned

25   within 30 days from date of receipt of the transcript.
```

MSGLegal

APPX. 070

936-637-7594

1   If returned, the attached Changes and Signature Page

2   contains any changes and the reasons therefor;

3          _____ was not requested by the deponent or a

4   party before the completion of the deposition.

5          I further certify that I am neither attorney

6   nor counsel for, related to, nor employed by any of the

7   parties to the action in which this testimony was taken.

8          Further, I am not a relative or employee of any

9   attorney of record in this cause, nor do I have a

10  financial interest in the action.

11         Subscribed and sworn to on this 8th day of

12  March, 2023.

13

14  _____
    Bonnie L. Rodriguez, CSR 5495
15  Expiration Date:  4/31/2023
    Firm Registration #CRF-11704
16  MSGLegal
    503 East Frank Avenue
17  Lufkin, Texas
    (936) 637-7594
18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| TAMMY WHEELER | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 9:22-CV-129 |
| | § | |
| BOARD OF REGENTS OF STEPHEN F. | § | |
| AUSTIN STATE UNIVERSITY, STEVE | § | |
| WESTBROOK, ED.D., INTERIM | § | |
| PRESIDENT OF STEPHEN F. AUSTIN | § | |
| STATE UNIVERSITY, AND STEPHEN F. | § | |
| AUSTIN STATE UNIVERSITY | | |
| *Defendants.* | | |

## DECLARATION OF VERONICA HERRERA

1. My name is Veronica Herrera and I am over eighteen (18) years of age, of sound mind, and fully capable of making this statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I am a Custodial Supervisor III within Custodial Services ("Custodial") of Stephen F. Austin State University's ("SFA") Physical Plant Department ("PPD"). I have worked in PPD in some capacity since 2011.

3. Custodial Services is tasked with cleaning various buildings around campus, among other duties.

4. As a Supervisor III, I manage approximately 50 Custodial employees within PPD, including Tammy Wheeler. I have managed Ms. Wheeler since she was assigned to Custodial, temporarily in 2019, and permanently in June 2020. Erik Green and Maria Veliz, both in "Custodial Supervisor II," positions, assist me in managing my employees, including Ms. Wheeler.

5. The "standard" shift of a custodial worker is from 1:00 PM – 10:00 PM, or 11:00 AM – 8:00 PM. When Ms. Wheeler was permanently assigned to Custodial, I was made aware that the only shift she could work was from 7:00 AM – 4:00 PM. Accordingly, Ms. Wheeler's shift dictated where she could be assigned.

6. In general, I assign my custodians based on the square footage of the building or area being cleaned. I also take into consideration the makeup of the area and the relative "traffic." For example, classroom and public spaces are "higher traffic" areas than office spaces. A building (or floor of a building) that is comprised of mostly offices and other non-public areas takes less work to clean than a building (or floor of a building) of the same size but comprised of classrooms and/or public areas.

1

7. Prior to her permanent assignment to Custodial in June of 2020, in the fall of 2019, Ms. Wheeler was temporarily assigned to Custodial in the "mobile" cleaning crew. The "mobile" cleaning crew traveled around SFA's campus, cleaning residential homes that have been converted into office spaces.

8. Custodial is tasked with cleaning the Richard and Lucille DeWitt School of Nursing ("Nursing"). Nursing is comprised of two buildings, the "annex" and the "main building." The main building includes the "education wing" where classrooms are found; the "hospital wing" which simulates a clinical setting, and the "admin wing" where administrative offices are found.

9. In June 2020, I assigned Ms. Wheeler to Nursing. Elizabeth Huerta was also assigned to clean Nursing at the time, and was the lone custodian with that assignment at the time.

10. Prior to 2018, I had assigned two custodians to clean Nursing. Since 2018, due to a loss of staff, I have had to reduce the custodians assigned to Nursing to one.

11. I initially assigned Ms. Wheeler to clean in Nursing because it was an option that worked for her shift. Further, I believed assigning a second custodian to the building could alleviate some of the evolving and additional demands my department was facing as a result of the COVID-19 pandemic. I did not assign her back to the "mobile" cleaning crew because I already had two custodians in that assignment and did not need a third. Exhibit A – Herrera written response to investigation at 265.

12. In general, PPD's custodial duties increased as a result of the COVID-19 pandemic. We were required to wipe down public surfaces, such as desks and other surfaces in a classrooms, more frequently than normal. We were also required to spray disinfectant. Everyone pitched in to help keep things clean during the pandemic – for example, spray bottles and rags were left in classrooms so that professors and lecturers could wipe surfaces themselves between classes.

13. Ms. Wheeler struggled in her assignment in Nursing, and received a "write up" in August 2020. Exhibit B – August 2020 Write Up.

14. I gave Ms. Wheeler a write-up because I received complaints directly from Nursing administrative staff that while Ms. Wheeler and Ms. Huerta were in the building to clean, they gossiped about each other to the Nursing staff. Exhibit C – email from Marilyn King. This gossip continued despite my direction that it stop, and both Ms. Wheeler and Ms. Huerta were written up as a result.

15. At her request, Ms. Wheeler was reassigned from Nursing to the Baker Pattillo Student Center ("BPSC"), effective on or about October 19, 2020. Exhibit D – Wheeler move to BPSC.

16. PPD was charged with cleaning the BPSC from September 2020 – March 2022. Exhibit E – PPD taking on BPSC. Before September 2020, my staff was not responsible for cleaning the building, and it was cleaned by non-PPD custodians. There was already a "division of labor" in place for the custodians, and when I "inherited" the duty of cleaning the BPSC, I modeled my employee's assignments after the existing division of labor.

17. The BPSC is a three-story "student union" on SFA's campus. The first floor is a high-traffic area and includes a food court. The second floor includes a Starbucks, a movie

2

theater, a ballroom, and offices. The third floor is the lowest-traffic area and houses university departments and offices.

18. I assigned Ms. Wheeler to clean the third floor of the BPSC, which included sweeping the stairwell leading to the third floor, and "monitoring" the second floor bathroom – meaning she was required to sweep toilet paper off of the floor, and monitor the toilet paper dispensers to ensure they were full. I asked that Ms. Wheeler monitor the second floor bathroom because it got messy mid-day, before the custodian charged with cleaning the second floor's shift ("LaCresha") began. Because Ms. Wheeler's shift was earlier, she was available to monitor the bathroom before LaCresha was able to address it. Ms. Wheeler's assignment was consistent with the division in labor already in place, and my other employee's assignments in the building.

19. On or before December 2020, I removed Ms. Wheeler from this assignment of monitoring the second-floor bathroom. Despite my instructions that she only needed to monitor the bathroom, Ms. Wheeler started performing duties assigned to LaCresha, such as mopping. As a result, LaCresha perceived that Ms. Wheeler was critical of her work, which created a conflict, and I felt it was best to limit Ms. Wheeler's duties to the third floor. Her duties were otherwise unchanged.

20. On or before March of 2022, the responsibility to clean the BPSC was removed from PPD and my Custodial department. At this time, I assigned Ms. Wheeler to the newly-opened Culinary Café because it worked with her schedule, and the duties in the Culinary Café were similar to Ms. Wheeler's previous duties as the House Coordinator of the JCB House.

21. Since I began supervising Ms. Wheeler in 2019, her performance has been evaluated by a myself, Mr. Green, and/or Ms. Veliz. We normally conduct performance evaluations in the beginning of the year, reviewing the employee's performance from the previous year.

22. In the beginning of 2021, when it came time to review Ms. Wheeler's performance for 2020, I asked Mr. Green to do her performance evaluation because she had a formal complaint pending against me.

23. Mr. Green was responsible for rating Ms. Wheeler's level of performance by checking the box with the appropriate descriptor. (i.e. "quality of work" was rated "acceptable."). Mr. Green also provided the narrative description for each of the performance and behavioral factors. As the "reviewing supervisor" I reviewed Mr. Green's evaluation and provided feedback on the wording used in the narrative descriptions of the ratings. Ms. Veliz also participated in Ms. Wheeler's review for this year and provided feedback to Mr. Green. Exhibit F – Wheeler 2020 performance eval.

24. I evaluated Ms. Wheeler's performance in 2021 and 2022. Mr. Green and Ms. Veliz participated in the review process in those years as well. Exhibit G – Wheeler 21-22, Exhibit H – Wheeler 22-23.

My name is Veronica Herrera and I am executing this declaration as part of my duties and responsibilities for Stephen F. Austin State University as a Custodial Supervisor. I declare under penalty of perjury that all the information stated in this Declaration is true and correct.

Executed in Nacogdoches County, State of Texas, on ___7th___ February, 2024.

Veronica Herrera

4

# EXHIBIT 37



To whom it may concern;

The following statement is to represent my, Veronica Herrera, point of view on the sequence of events that occurred during the allegations of discrimination brought against me. I will have various excerpts from social media accounts, emails, text and voice recordings presented within this statement which all could be found via the attorney's secured information receiving software program.

Following the death of former university president Dr. Patillo, house coordinator, Tammy Wheeler, remained fulfilling her duties in the JCB house until Mrs. Patillo moved out and the new and current President, Dr. Gordon, was hired and scheduled to move into the home. Ms. Wheeler remained in the home during the start of the minor renovations and worked with myself and  members of the custodial department to do minor cleaning behind construction crews. Associate Interior Design Professor, Sally Ann Swearingen was instructing Ms. Wheeler and the custodial department during this point as well as acting as the Gordon's spokesperson as it pertained to the JCB house and its ongoing renovations, and staff.  As the move in date for the new university president approached apparently, it was decided by my superiors and Ms. Swearingen that Ms. Wheeler was to be temporarily moved out of the JCB house and placed to work with custodial while Dr. and Mrs. Gordon moved in and asked to have the JCB house coordinator back in the JCB home. I was made aware of these decisions only days before Ms. Wheeler was told to report to me specifically. (See recording for August 30th)

During this time, many changes were happing in the main physical plant that did upset me and caused me to make a social media post on Facebook in September of 2019. My wife had applied for several job that she was more than qualified for and did not get them. I also had been advocating for one of my employees to get a much needed raise along with coming to the realization that I was not allowed to get my co supervisors access to approving Ms. Wheeler's time because my superiors felt that the discrepancies in pay between them, me and Ms. Wheeler. It wasn't until September of 2019 that I even paid attention to what Ms. Wheeler's hourly pay rate was and when I realized that I a college graduate managing over 60 employees only made $1 less than what my superiors told me was equivalent to a custodial worker I. This was the final straw to a much larger problem that had been brewing within the department and university so I made a post on September 25th stating; "**Example of systematic racism: There's always money in the budget for white employees to get raises but when minorities ask for one or deserve one the well is dry."**  I also posted a comment reply stating; **"it's bad; when a bilingual, college educated minority with a supposed admin position makes literally $1 less than a white employee of theirs. But all other "admin" with similar positions make significantly more. The system is broken."** In neither of these posts did I mention that Ms. Wheeler is "white privilege" as she accused me.

On September 26th I received a text from Tammy Wheeler requesting a meeting with Erik Green and myself.  Ms. Wheeler brought in Michelle Miller, staff services admin, to the meeting to be there with her. Erik and I had no idea what this meeting was about or what brought on Ms. Wheeler wanting to meet with us because we had no prior incidents to bring on a request for a private meeting. Details of

APPX. 077
SFA-00264

this meeting where summarized and sent to my superiors via email. (See attached emails). In this meeting, I told Ms. Wheeler that my director wanted my custodial department to help build a working relationship and a sense of team with Ms. Wheeler so that she could be an advocate or "champion" for the physical plant. I expressed to Ms. Wheeler that the desires of our director was to help create a stronger relationship with our new university president and to show Ms. Wheeler that we are good people to work with and for.

I received no response to my email and was later contacted via email on October 3rd by a Human Resources administrator stating that was asked to attend a mediation on a sensitive topic. (See attached emails).  Physical Plant Director, Ron Watson, requested this mediation and it included Custodial Supervisor II Erik Green, and myself. During the mediation, it was never told to me that I was accused of calling Ms. Wheeler "white privilege." The majority of the mediation was used to clear up the misunderstandings my director, Ron Watson, had with my post. And to discuss what my initial problems were in that I felt my wife was being passed up for positions  she applied for, my employee not receiving a fair raise and me not being paid what I feel I deserve.

After this mediation, Mr. Watson nor Ms. Wheeler expressed any more issues about my social media post or approached me about any further perceived racial issues. In fact, I did not really deal much with Ms. Wheeler due to her returning to the JCB house sometime in late October of 2019 or early November of 2019. Ms. Wheeler and I exchanged emails and text messages about work related subjects such as leave time, absences, evaluations, trainings and supplies.

Around March of 2020, I was asked to provide a quote and had a company go do a walk through with Ms. Wheeler and Ms. Gordon about what was to be pressure washed at the JCB house. Due to certain procedures and the start of the Covid-19 pandemic, the request took longer than Ms. Gordon liked. Ms. Wheeler texted several times, asking about the progress of the work requested and I explained procurement procedures to Ms. Tammy in hopes that Ms. Gordon would understand what was taking so long. I was not directly involved with the contract and final selection of the company doing the work nor was I a part of the actual work being done.

In June 2020, I was told to meet with my director Ron Watson around 3pm and that is when I was told that for some reason I was not privy to, Ms. Wheeler would be coming back to my department indefinitely. I was told that I needed to find an area that would benefit with Ms. Wheeler's work schedule, experience and job description. I was also instructed to come up with a plan to provide custodial services to the JCB house but that Ms. Wheeler was not to be a part of that plan.

I decided to place Ms. Wheeler in the nursing bldg. due to that area being cleaned historically, by a tenured custodian that worked a similar schedule to Ms. Wheeler. I also thought it would help the custodian over there with the added unknown of the demand of Covid-19 cleaning we were facing. Ms. Wheeler was not placed where she previously was placed back in June of 2019 due to me already having other staff in that area.

Upon Ms. Wheeler's arrival back to our department, we were met with hostility from Ms. Wheeler. She began being contentious with several issues citing unwillingness to do task asked and wanting gas

reimbursement for having to report to the main campus. (See email attached from 6/9/2020).  I followed procedure and sent my superiors an email pertaining to a possible ADA comment made by Ms. Wheeler; HR contacted her and Ms. Wheeler stated she did not have any need for accommodations. (See email attached 6/11/2020). To help Ms. Wheeler transition to the role of Custodial Worker I, permanently this time, a custodial duty breakdown sheet was presented to Ms. Wheeler and a subsequent meeting was held to go over the document. In the meeting Ms. Wheeler asked about reimbursement of gas once again; Ms. Wheeler admitted to her seeming difficult and even stated that she was ok with utilizing a pressure washer as she had already used one in the JCB house before to clean the back porch furniture. An email was sent to my superiors summarizing the meeting. (See email attached).

During the month of June 2020, Ms. Wheeler emailed me an attachment of a doctor's note citing some restrictions she had. I informed Ms. Wheeler that proper procedure was for her to take these type of documents to HR and apply for ADA so that we could accommodate her restrictions following proper policy and procedures. While this occurred, Ms. Wheeler sustained a worker's comp injury while moving a water hose. Proper procedures were done once we received word of Ms. Wheeler's injury. A work status report and worker's comp claim was started. However, due to Ms. Wheeler's unwillingness to work with me and my supervisory team to make a decision about her initial light duty it was decided, with Ms. Wheeler included, to just have Ms. Wheeler wait until her next follow up with the Urgent Doc doctor for her to return to work. There are emails stating a summary of these meetings and these decisions.

In July 2020, Ms. Wheeler returned to work with less restrictive restrictions that allowed us to make a verbal agreement of light duties to be done by Ms. Wheeler. Ms. Wheeler verbally agreed to these but once she began doing the work Ms. Wheeler felt like I was not accommodating enough for her.  During a phone conversation about the physical therapy due to her worker's comp claim Ms. Wheeler told me that moving a large amount of chairs was causing her to flare up her injury because they were too heavy and over the 5 lbs. weight limit her doctor set for her. I advised Ms. Wheeler that the chairs were under her weight restriction she received for the doctor handling her worker's comp claim and that I indeed was following her restrictions and finding ways to accommodate for her. Ms. Wheeler then stated that I was not accommodating for her because the doctor's note from her rheumatologist she emailed me cited a lower weight restriction. I then explained to Ms. Wheeler that I was not accommodating based off her rheumatologist's note but rather I was adhering to the restrictions stated on the work status report she received from the Urgent Doc doctor.  I explained to Ms. Wheeler that these were two separate things and if there is not an ADA in place the weight restrictions she is citing from her rheumatologist is not the one I am going to follow. Ms. Wheeler then sent an email stating that she was going to speak to HR about which weight restriction should surpass the other.

From the emails, I received the following morning, and phone conversations to follow the following statements are a matter of assumption on my part. I received an email from Greg Moore, an employee in the Safety office on campus, stating the restrictions for Ms. Wheeler, which were on her most recent work status report that was attached to her worker's comp claim and had already been discussed with Ms. Wheeler previously.  I assumed that Ms. Wheeler went to the Safety office hoping to get another

opinion from either Ms. Sonja Hendry who handles all of our worker's comp claims but did not find her and spoke to Mr. Moore who then sent me the email with the understanding that I did not know what restrictions needed to be accommodated. I responded to Mr. Moore explaining that all the proper procedures were being made. I then received a phone call from my assistant director, Hillary Parrish, asking what was going on and why did Greg Moore send me that email. I explained my speculation to Ms. Parrish and she decided to call Mr. Moore personally to ensure that we were not missing anything and to ensure that we are following correct procedures. I then received an email from Ms. Parrish showing a summarization of her conversation with Mr. Moore. It stated that Ms. Wheeler lied about my capability of understanding and doing my job. (See emails attached). Once I received this information, I called Ms. Wheeler, with Erik Green and Keeler Doss present as witnesses; to clear up this incident and to let her know that I do not run my department like this. I explained that my employees are expected to follow the chain of command and she should have gone to go speak to Staff Services if she had any questions about my capabilities. Ms. Wheeler denied telling Mr. Moore that I did not know how to do my job.  Ms. Wheeler said that she was simply trying to get some help because her arm burned from moving all those chairs. Ms. Wheeler then stated that she is just being punished by having to come work with my department. This comment really did upset me because it felt as if Ms. Wheeler saw the work we do as a punishment. I shared my feelings about her comment by telling her that I apologize she feels like that but now her behavior made sense. She asked what I meant and I told her that, "maybe that's why she's trying to get out of doing work because she doesn't feel like she should do our type of work." Ms. Wheeler quickly tried to take back her comment and began saying things about Dr. Gordon and his wife. I cut her off and told her I was not worried about that I just want her to follow procedures and to trust that I am accommodating for her as I do all my other employees. Ms. Wheeler then sent me an email reiterating the topics of our conversation and she too shared her feelings with me about my last comment to her. (See email attached).

The following day Ms. Wheeler and I met in Ms. Parrish's office to go over Ms. Wheeler's bona fide offer. Ms. Wheeler refused to sign the form at first stating that her husband told her not to sign, and then stating that she was going to go get the weight restriction changed so another offer will have to be made. Ms. Sonja Hendry was called to verify that if Ms. Wheeler did not sign then she would have to go home as per worker's comp guidelines. Once being told this Ms. Wheeler decided to sign the bona fide offer. Ms. Wheeler then wanted to speak further about our phone conversation. As we spoke, Ms. Wheeler once again stated that she was being punished for what happened at the JCB house. That is when Ms. Wheeler made the comment that it is punishment because she [Ms. Wheeler] is sent to my department to work under a woman, Ms. Huerta Huerta, who makes 3 X less that what she [Ms. Wheeler] makes. Ms. Wheeler went on to call Dr. Gordon's wife crazy and psycho. Ms. Parrish and I attempted several times to redirect meeting and after catching a glimpse of the toxicity of Ms. Wheeler's words and actions I explained to her that things would be different now and that I would still be hospitable towards her I was going to "treat her with a long handle spoon."

A week or so went by and I received an email on July 16 about a rocking chair allegedly being rotten from Ms. Wheeler. This would not have escalated to an issue if Ms. Wheeler took my earlier conversation about chain of command seriously. Ms. Wheeler bypassed all of her assistance in the

custodial supervisory chain and CC' d Ms. Sonja Hendry in an email making it appear as if our custodial employee, Ms. Huerta Huerta was incompetent of doing her job. I attempted to explain to Ms. Wheeler were she went wrong and once again explained to her the importance of chain of command. Ms. Wheeler took my constructive criticism negatively so I just left her alone.

I had to contact Ms. Wheeler about some issues in the timeclock system so I texted her and found out that she once again broke chain of command and didn't inform us of a slip she turned in and a day she requested off.  Ms. Wheeler tried to blame our timekeeper staff member Lee Ann. I once again tried to explain to Ms. Wheeler our procedures and explained to her why they are important. Ms. Wheeler once again, took this teachable moment negatively and accused me of harassing her and causing her to have a panic attack. This accusation, compiled with Ms. Wheeler completely ignoring chain of command and her unwillingness to work with her supervisory chain is what prompted me to reach out to my superiors for advice on dealing with Ms. Wheeler. I expressed that I was not okay with Ms. Wheeler trying to get out of following the rules by falsely accusing my department of harassment when things do not go her way. Once I received the ok to continue coaching/teaching Ms. Wheeler I chose to have a meeting on 7/21/20 with Ms. Wheeler once again to explain the importance of chain of command and our expectations of her as a member of our team.

Things were admittedly rocky between Ms. Wheeler and me from this point on. I can only speak on my part of this relationship and state that I was unsure of how to approach Ms. Wheeler because I started getting the deeper sense that her unwillingness to work with us was a more rooted issue and had more to do with her feelings of being "punished." I did not want to be accused of harassing Ms. Wheeler so I asked my other two supervisors Erik Green and Maria Veliz to be more involved in supervising Ms. Wheeler. Both of them were and still are reluctant in conversing with Ms. Wheeler. Even now some of her text go unanswered because neither one of my supervisors want to be attacked by Ms. Wheeler if they say something that she does not agree with.

Around this time, I began realizing a shift in the Nursing staff and faculty towards our custodial department. I began receiving emails from Ms. Marilyn King and her supervisor Dr. Tamara Harris about some inconsistencies in what was historically done, and what was being relayed to them via conversations with Ms. Wheeler. I also began getting phone calls from Ms. Huerta stating that certain task she would leave for Ms. Wheeler were not being completed. I instructed Ms. Huerta to simply reiterate to Ms. Wheeler that they are to work together to complete all the task assigned to the Nursing bldg. and for them to find a common ground. I told Ms. Huerta to try to find a resolution without involving us first so that Ms. Wheeler be more open to request rather than feeling "harassed" by the custodial supervisory team. This conversation took place on July 30th and I heard nothing else until the second week of August when Ms. Ms. Huerta came to the custodial office for unrelated reasons and I asked her how things were going and if Ms. Wheeler and she had found a better routine in working together. Ms. Huerta then told me how Ms. Wheeler and she have been having more conversations about the betterment of the building cleaning and that a change of schedule came up. Ms. Huerta stated that Ms. Wheeler expressed wanting to change her schedule but told Ms. Huerta that it was I who refused to change her schedule. I then cleared that misunderstanding up with Ms. Huerta and stated that I would gladly have Ms. Wheeler change her schedule so that prompted Ms. Huerta to continue to

tell me that the work could be done a lot better if they worked a similar schedule that way Ms. Huerta could help Ms. Wheeler due to her restrictions and vice versa [Ms. Huerta also has worker's comp restrictions]. With the help of Ms. Huerta, who was present during Ms. Wheeler's request to change her schedule, I sent Ms. Wheeler an email about the change of schedule she expressed she wanted and I also cleared up the misconception that she had that I was the one keeping her from changing her schedule. Ms. Wheeler then responded rather upset stating that what Ms. Huerta told me was a lie. Ms. Wheeler then sent several more emails back to back to HR and to me stating that things were not as Ms. Huerta had told me and that they in fact were still having issues working together. (See emails attached).

A meeting was set up immediately to clear the air between everyone. A summarization of the meeting was emailed to all involved. During this week, we also received an email from Ms. King about gossiping and unprofessional behavior from both custodians. After receiving this email, custodial supervisor Erik Green called Ms. King along with another Nursing administrator and from what he summarized to me, he received word that the main culprit was Ms. Wheeler.  According to Mr. Green, both Ms. King and her coworker mentioned that Ms. Huerta only recently began this behavior when she shared a text message that was sent to her by Ms. Wheeler about the shift change incident. Taking this conversation, and email along with the ongoing recurring meetings we have had to have with Ms. Wheeler her counseling form was selected to be a written reprimand instead of an oral reprimand. Ms. Wheeler was upset about this and asked to appeal our decision. The custodial supervisory team have never encountered someone wanting to "appeal" the decision so we gave Ms. Wheeler all the options we knew to be available and instructed her to go speak to either Staff Services or HR about what other options were available. Appeals, per se, is not available for write-ups but rather a grievance category II has to be filed, which Ms. Wheeler did file.

Along with continued hostility from Ms. Wheeler via text and emails, I set up another meeting where my assistant director, Hillary Parrish and staff services manager Ryan Dietrich explained to Ms. Wheeler how ADA accommodations procedures work. Ms. Parrish and Mr. Dietrich both echoed and reiterated what I have been trying to explain to Ms. Wheeler. She stated understood and did not have any further questions. Yet I still received text and emails accusing my department and myself of harassment and failure to accommodate for her.

Throughout the month of August, it was a constant back and forth from Ms. Wheeler constantly accusing us of harassing her or not accommodating her needs. We have several emails and text messages where my custodial supervisory team and I gave Ms. Wheeler various suggestions and recommendations and Ms. Wheeler dismissed us each time. Ms. Wheeler  wants things done her way and has even outright called our recommendations, which the majority of custodians in our department do, "ridiculous". This type of behavior further echoes Ms. Wheeler's initial feelings and root issue of being "punished" and "feeling superior" to the majority of our employees because she makes 3 X more than those of whom she has to report to.  Ms. Wheeler continued to send emails and text attempting to draw me into another cycle of me trying to correct her behavior and her accusing me of harassment. The final straw was when I received a text from Ms. Wheeler stating that Ms. Huerta was talking about her. Ms. Wheeler then demanded I give Ms. Huerta the harshest form of discipline. I tried getting

further information from Ms. Wheeler so I could start thoroughly investigating her claim, and Ms. Wheeler once again directed extremely hostile behavior towards me.  Ms. Huerta was written up and moved to eliminate further problems, due to the faculty in the Nursing bldg. becoming overwhelmed with these type of issues. Ms. Huerta also asked for a transfer when I called to inform her of my findings and her upcoming counseling form. Historically, the nursing building has always been run with one custodial employee. Ms. Wheeler was only added to that building because we needed somewhere to put her that worked well with her schedule. Moving Ms. Huerta puts the nursing building back to its historical one custodial employee. Since Ms. Huerta is the employee that requested to be moved, the custodial supervisory team decided it would be best to move Ms. Huerta and not Ms. Wheeler, lest moving Ms. Wheeler seem like a form of retaliation.

Custodial supervisors, Erik Green and Maria Veliz, met with Ms. Wheeler to inform her about the staffing changes in her assigned area. Ms. Wheeler was told that she would be responsible for the Nursing bldg. herself. The custodial supervisory team was under the impression that this news was to bring a sense of relief to Ms. Wheeler because she had shared that she wanted a similar decision to be made months prior (see email attached). This decision did not please Ms. Wheeler it in fact caused her to lash out and waited until I entered the room from concluding a phone call to unload on me. She accused me of moving Ms. Huerta so that she [Ms. Wheeler] would get complaints. . The staff services manager, Mr. Dietrich, told me that Ms. Wheeler called him and told him I was a racist.

It was at this point that I reached enough of her abuse and contacted HR about the hostility that Ms. Wheeler has created towards me and how I had enough of her abuse and how the act of defaming my character was the last straw.  Coincidently, during this time I was informed that Ms. Wheeler had filed a lawsuit; naming me. I chose not to continue my claim of harassment because I have already been accused of false retaliation.

Back in September when my department merged with BPSC, I had originally wanted to move Ms. Wheeler there. Due to lack of supervision and the unknown of the new area, we waited to move Ms. Wheeler but because of the lawsuit and me no longer feeling safe to supervise her, I was granted permission to move Ms. Wheeler to the BPSC. My two custodial supervisors, Erik Green and Maria Veliz, have taken more initiative in supervising Ms. Wheeler but they still come to me when they need assistance in answering some of her questions, etc.

I apologize for the length of this statement, and I will try to attach all emails, txt pdfs and voice recordings via the Biscom program before our meeting Tuesday November 3.

Thank you,


Veronica Herrera
Stephen F. Austin State University
Physical Plant Department
Custodial Supervisor III

**STEPHEN F. AUSTIN STATE UNIVERSITY**
**STAFF EMPLOYEE COUNSELING RECORD** ·
(For use in recording **Oral Warning** and **Written Reprimands**)

SEP 0 7 2020

HUMAN RESOURCES

**Employee Name**: Tammy Wheeler
**Department**: Physical Plant Custodial
**Title:** House Coordinator

**CID:** 20084068
**Date(s) of Incident(s):** 08/12/20, 08/13/20

**Describe the incident or problem area. Include a narrative of the incident or unsatisfactory performance, names of witnesses, list previous dates of warnings, and include any other pertinent details.**

After a meeting held between Ms. Tammy Wheeler, Ms. Elizabeth Huerta, Ms. Veronica Herrera, Mr. Erik Green, Ms. Maria Veliz, and Mr. Ryan Dietrich, Ms. Wheeler went to the DeWitt School of Nursing building and spoke with the Nursing department administrator, Ms. Marilyn King. Ms. King told custodial supervisor, Mr. Green, via a phone conversation with a follow up email that Ms. Wheeler shared information that had been discussed in the meeting held that day with Ms. King. Ms. King further stated in the email that Ms. Wheeler has been going to Ms. King and Ms. Kassondra Perry-Weaver, another Nursing department administrator, complaining about Ms. Huerta. Ms. King also stated via the phone conversation with Mr. Green that Ms. King's supervisor, Ms. Tamara Harris, got involved to ask Ms. Wheeler to cease involving Ms. Harris' employees with Ms. Wheeler's issues between Ms. Wheeler and Ms. Huerta.

The above stated actions are in violation of minor rules 6. Loafing or other abuse of time during assigned working hours, 7. Interfering with any employee's work performance or duties by talking or by other distractions, 17. Engaging in excessive visiting, personal conversations, or use of the telephone for personal use, and major rule violations 9. Delaying or restricting work, or inciting others to delay or restrict work, and 22. Unprofessional conduct; that is, behavior that a reasonable person in a professional office setting would find inappropriate, rude, disorderly, or offensive, and that is persistent, destructive and/or intimidating.

Ms. Wheeler has been previously counseled for the above rule violations on regarding proper procedures, chain of command and appropriate behavior at work in an email on 7/21/2020.

**Describe the improvements that will be necessary to remedy the unsatisfactory performance and/or disciplinary problem. State the amount of time to be allowed for improvement and include the next step to be taken if improvement does not occur.**

Ms. Wheeler is being counseled to immediately cease involving any person outside of PPD in conflicts between colleagues within the custodial shop or PPD. Ms. Wheeler is being counseled to report through her chain of command at all times. Ms. Wheeler is being counseled that loafing or other abuse of time during assigned working hours is not admissible. Ms. Wheeler is being counseled to not interfere with any employee's work performance or duties by talking or by other distractions. *Ms. Wheeler is also being counseled that any further violations of this nature or future violations of SFA policy and/or departmental procedure may result in disciplinary action, up to & including written reprimand, suspension, disciplinary probation, and/or termination.*

**APPX. 084**

**Required signatures:**
Supervisor: _____   Date: _8/19/20_
Employee: _____   Date: _____
Employee's Remarks*: _I want to appeal this. I feel this was twisted._ ↗

(Use back of form if necessary.)
*Employee signature is not required if this form is used for  oral warning, however a copy of the form **must** be given to the employee.
Signature is **required** when written reprimand is being issued and a copy **must** be given to the employee. The **original** of all signed,
written reprimands must be forwarded to the Director of Human Resources
PER 11 (Revised 04/2011)

EMPLOYEE REFUSE TO SIGN

WITNESS 1

WITNESS 2

EXHIBIT
**B**

SFA-06747

I was pre-warned that if I contacted HR with Continued email messages that Veronica would retaliate against me.
The offenses listed are overly exaggerated, and done out of spite, and retaliation.

The first conversation in question was because I had to let Marilyn King know that Elizabeth and I had new building responsibilities.
I did NOT initiate a reason of conversation to discuss any gossip, I was only there to let them know that our duties have changed per Veronica's request at our meeting.
(I was now over the nursing annex, and nursing administration buildings, per our meeting).
At that time in the conversation when I explained we were separate, Marilyn King told me she glad because she was tired of the drama, and that Elizabeth was showing my emails to Marilyn, and Cass.
This was the first time I knew about emails being distributed. I also discussed at that time that Elizabeth had mentioned in the meeting that "I was not welcomed in the administration building by Marilyn King". I wanted it understood that I never said that, it was not true.

Then second conversation that I am accused of "gossiping" is when I had asked Marilyn King if Elizabeth mentioned to her about the men's restroom light being out in the nursing annex building. Marilyn said why is Elizabeth in my buildings, and why did she come over to her, I said, "Good question, Veronica said she was my still my boss.", I then stated, "For the record you brought up this discussion because I don't want to be written up for being accused of starting any gossip".
Marilyn stated that I wasn't considered a gossip.
I also said to Marilyn that, "I just want to be left alone to do my job without any problems".

I think this write up is out of retaliation, and a little extreme for the offense.

I understand how to handle Marilyn, and others better now when asked questions after our meeting on September 19th, but a written warning and explanation in our meeting would have had the same very achievement.
I was never given official directions of how to handle myself with Marilyn after the first conversation with her, or how to correct my behavior until AFTER the write up yesterday.  I was never given an official "warning". Why wasn't I given the proper tools to deal with her on the first conversation? I feel that's unfair.
I had not been explained what gossip at SFA means, I was not given any copies of our policy on gossiping. I never had a chance to correct myself. I feel as though Veronica sat waiting for a chance to jump on writing me up out of retaliation. She knew she would have to write up Elizabeth the first time which she stated she was going to do for the same thing, but Veronica didn't do that, she waited a week later.
I was never instructed on what was considered "gossip", until I was given a write up.
I think it's unfair that I am the only one getting written up.

page 1 AW

APPX. 085
SFA-06748

**Veronica Herrera**

| | |
|---|---|
| **From:** | Erik Green |
| **Sent:** | Thursday, August 13, 2020 1:46 PM |
| **To:** | Veronica Herrera |
| **Cc:** | Maria Veliz |
| **Subject:** | FW: Hey |

**From:** Marilyn King <miking@sfasu.edu>
**Sent:** Thursday, August 13, 2020 1:43 PM
**To:** Erik Green <greened@sfasu.edu>
**Subject:** Hey

Per our telephone conversation today – I wanted to touch base with you on what was said.

Tammy told me that Elizabeth had said in the meeting that I had said Tammy needed to be out of the Administration Bldg.  That was never said and is not true.

Yesterday, Elizabeth showed both Ms. Kass and me an email Tammy had sent to her.   That is none of our business.

I nor Ms. Kass want to be in the middle of their feud.  If they have a problem with each other they need to take it up with their supervisors.

This has been an ongoing problem for several weeks now – Both Elizabeth and Tammy complaining about each other.

I hope you can resolve this problem.

Thanks for calling!!!
Marilyn


*Marilyn King*
Administrative Assistant
Dewitt School of Nursing
P.O. Box 6156
Nacogdoches, Texas 75962
936-468-7705
Fax 936-468-7701

*The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents. or the State of Texas.*


EXHIBIT
C

APPX. 086  SFA-06755

**From:**     Veronica Herrera </o=SFASU/ou=Exchange Administrative Group
              (FYDIBOHF23SPDLT)/cn=Recipients/cn=herrerav5a9>
**To:**       John Wyatt
**CC:**       Ronald Watson; Tammy Wheeler
**Sent:**     10/14/2020 9:07:34 AM
**Subject:**  RE: Request for Transfer

John,
Tammy and I would like to meet with you sometime tomorrow or Friday to help us adequately assign her duties in her newly
selected area of the BPSC.

Thank you,

Veronica Herrera
Stephen F. Austin State University
Custodial Supervisor III
Physical Plant Custodial Department
Office: 936.468.4547
Cell: 832.274.4560
Email: herrerav@sfasu.edu

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of
Stephen F. Austin State University, its Board of Regents or the State of Texas."

-----Original Message-----
From: Tammy Wheeler <wheelertl@sfasu.edu>
Sent: Wednesday, October 14, 2020 8:51 AM
To: Veronica Herrera <herrerav@sfasu.edu>
Cc: John Wyatt <wyattjohn@sfasu.edu>; Ronald Watson <rewatson@sfasu.edu>
Subject: RE: Request for Transfer

Good morning

I can not change my work time schedule, so the BPSC it is.

Yes, I would absolutely love to sit down and discuss this change.

Thank you.
Tammy Wheeler

From: Veronica Herrera
Sent: Tuesday, October 13, 2020 4:57 PM
To: Tammy Wheeler
Cc: John Wyatt; Ronald Watson
Subject: Request for Transfer



Tammy,
I am writing you due to your most recent request for a transfer out of the Nursing area along with your concerns about being
able to complete all the work as assigned in that area.

Erik and Maria informed me of some of the questions you had today about what duties are "required" versus what duties
could go partially done i.e. spot mopping instead of fully mopping, sweeping up debris in classrooms, offices or public
spaces instead of fully vacuuming or dust moping every day; here is the link to the documentation they were referring to
about our new cleaning guidelines due to the current pandemic. http://www.sfasu.edu/docs/open/physical-plant-return-
to-campus-plan.pdf

After meeting with HR (John Wyatt) and my director Ron Watson I have some other options available for your request of a
transfer;

- Moving to the ECRC WITH a change of shift schedule. (10:00am-7:00pm) or (11:00am-8:00am)     **SFA-07059**

o Your responsibilities consist of but are not limited to the entirety of the 2nd floor (under the new covid-19 cleaning
**APPX. 087**

guidelines) and vacuuming of all the classrooms, elective rooms and daycare rooms on the 1st floor.

- Moving to the Baker Patillo Student Center (BPSC) KEEPING your current work schedule. (7:00am-4:00pm)

o Your responsibilities consist of but are not limited to the entirety of the 3rd floor (under the new covid-19 cleaning guidelines), the back half of the 2nd floor (under the new covid-19 cleaning guidelines) and spot checking the front public areas, and restrooms.

Please let me know if you have any questions or concerns concerning these options or your current assigned area with the understanding of the current cleaning guidelines. Once you've made a decision I would like to schedule a time for the both of us to meet with John Wyatt by the end of the week to iron out your assigned duties in that area to ensure that we are all on the same page when it comes to your requested accommodations. Please let me know your decision by Thursday morning so that I can have enough time to schedule a sit down with John Wyatt.

I believe that with the right organization and determination you can do what is asked of you in any of these areas.

Thank you,

Veronica Herrera
Stephen F. Austin State University
Custodial Supervisor III
Physical Plant Custodial Department
Office: 936.468.4547
Cell: 832.274.4560
Email: herrerav@sfasu.edu<mailto:herrerav@sfasu.edu>

[sfa_logo]
"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

| | |
|---|---|
| **From:** | Veronica Herrera </o=SFASU/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=herrerav5a9> |
| **To:** | Nathan Rains; Willie Lewis; Janice Thorn; Pamela Sanders; Kendralyn Woodrow; Andrew Collette; Alison C Johnson (johnsonac2@sfasu.edu); Gilberto Veliz; Welton Murray; Ofelia Sarabia; Chassity Stegall; Rosa Fuentes; Mary Edwards; Elizabeth Huerta; Tammy Wheeler; Timmy Lofton; Rosa Cabral; Thadas Williams; Nadia Sifuentes |
| **CC:** | Keeler (Trey) Doss (dosskt@sfasu.edu); 'Erik D Green (greened@sfasu.edu)'; Maria Veliz |
| **BCC:** | Erik Green |
| **Sent:** | 8/20/2020 12:18:57 PM |
| **Subject:** | PPD merge with ResLife and BPSC |
| **Importance:** | High |

## *Starting September 1st Physical Plant Department will assume responsibility and leadership over the ResLife Operations and Baker Patillo Student Center Operations staff and buildings.*

**Why this merge?:** As most of you know we as a department have always had the threat and fear of being contracted out as a possibility. With the current pandemic of Coronavirus this possibility became very close to becoming a reality. In order to save our current job we all hold and to save our jobs now and in the future Physical Plant is going to be the "contract" company. This decision did not come lightly and it will not be without its faults and flaws. As far as the custodial portion of this merger; Veronica, Erik and Tre have all come from the ResLife Operations department and feel confident in the shared knowledge between them to ensure as little roadblocks as possible.

**Who is over us (PPD Custodial)?:** The chain of command and leadership does *NOT* change for you all. Physical Plant is gaining the other two departments in this merger. Physical Plant is the one assuming responsibility for these other departments. ResLife will not report to us yet since their leadership will not retire till next year. The head of ResLife will no longer report to Winston Baker but rather report to our Director Ron Watson starting 9/1/2020. Veronica and the current supervisory team *WILL* begin to take action in supervising the custodial department of the BPSC starting 9/1/20.

**Will we start cleaning dorms and BPSC? Will they come clean in our bldgs.?:** Eventually, but definitely not now. You all know how much Veronica loves to cross train people and how the PPD custodial thrives on working together and helping each other out. Again this merger was decided so that we all can avoid losing our jobs. That decision comes along with some cost which means all of us; custodian, maintenance, and supervisors from all of the departments will be doing things outside of our comfort zone. Veronica will go from managing the 63 PPD custodial employees to eventually managing over 100 custodians and ensuring the current cleaning and customer service standard we have in the Physical Plant is spread across campus.

You will start hearing rumors and talk around campus because the decision was made yesterday when I sent the text to most of ya'll. If anything comes up that I haven't went over in this email then please feel free to call, text or email me at 832.274.4560 to clear things up. I may not have all the answers seeing as this merger is going to be a slow process and will have a learning curve.

In the end all we ask out of you all is to continue to be our amazing, hardworking, fun, loving and family that ya'll are. Continue to lead by example and show our new team members what the PPD custodial department is all about. *We work hard and play hard, pray hard and in Erik's case "fight hard."*

These are crazy, changing times we are living in *BUT* one thing will always remain the same; *GOD'S LOVE AND GUIDANCE FOR US! The Lord Almighty has us and protects us and will see us through any trial and tribulation!*

Thank ya'll for all ya'll do.

---Veronica, Erik, Maria and Tre

**EXHIBIT**

**E**



FEB 0 3 2021

BY: _____



## Performance Review – Staff Employee

Name: **Tammy Wheeler**

Campus ID Number: **10682332**

Dept: **Physical Plant Custodial**

Title: **House Coordinator**

Review Year: **2020**

### Instructions:

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor.  Carefully review the following descriptors.

> **Unsatisfactory** – Does not demonstrate the necessary knowledge, skills, abilities, and/or commitment required. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

> **Improvement Needed**– Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

> **Acceptable** – Successfully demonstrates the required skills, abilities and commitment for this job task.

> **Exceeds Expectations** – Achieves job requirements and occasionally exceeds expectations.

> **Exemplary** – Consistently exceeds expectations.  This rating is used as special recognition for extraordinary accomplishments.  Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Unsatisfactory" and "Improvement Needed" in any grouping of performance factors. If applicable, goals for the purpose of development for each grouping of performance factors can also be noted.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet.  In this section, the supervisor will certify whether the employee has completed all required trainings and their Conflict of Interest Survey.

5. Designate the employee's overall rating.

6. Present the evaluation to employee.   Both employee and supervisor* should sign the evaluation.

*A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and non-exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.*

**EXHIBIT**

**F**

| *Indicate the level of performance by selecting the appropriate descriptor*<br><br>**Performance Factors** | Unsatisfactory * | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary * |
|---|---|---|---|---|---|
| *Quality of Work* – Exhibits the required level of job knowledge and/or skills to perform the job.   Assignments completed by the employee meet quality standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Completion of Work* – Completes tasks as assigned and meets deadlines. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Technical Skills* – Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *Planning/Organizing* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *Customer Service* – Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *University Policy/Procedures* – Adheres to all applicable university policy and procedures. | ☐ | ☒ | ☐ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary"

**Quality of work:** In contrast from Ms. Wheeler's previous evaluation based mainly on her tasks at the JCB house; Ms. Wheeler was able to sufficiently provide PPD with acceptable quality level of work. Perhaps to the newness of how things were done in a more commercial setting and a faster pace environment. **Completion of work:** The newness also caused a drop in her ability to complete task at the level she was able to last year. Again, Ms. Wheeler completed and had a fair quality of work produced it was just a stark difference in the production of work executed by Ms. Wheeler in years past. **Technical Skills:** With the move into a more commercial/educational and high demand area Ms. Wheeler still has a lot to accomplish when it comes to learning how to technically clean for the change in the type of cleaning asked of her. **Planning/Organizing:** Ms. Wheeler was unable to properly schedule her duties in the time frame provided and continuously struggled to plan out her work assigned when she was transfered to work in a more fast pace/demanding environment. For example, Ms. Wheeler would ask repeatedly what her task for the day were. Ms. Wheeler also struggled with applying organizational methods of focusing her detailing  projects like dusting on different days of the week. **Customer Service:** Ms. Wheeler had a written reprimand and several counseling sessions with her supervisors this year due to her unprofessional behavior and unsatisfactory customer service by involving multiple faculty and staff members in various issues that caused issues between PPD and the academic department. **University Policy/Procedures:** This year it was shown that Ms. Wheeler was not adequately prepared with knowledge of some key university policies and PPD procedures.

*Action Plan & Goals:* (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory"

Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

Ms. Wheeler has been informed and coached (via written reprimand and numerous meetings documented via email summaries) in what is expected and we hope to see change in Ms. Wheeler's performance this upcoming year as a member of PPD while fulfilling her assigned task at the BPSC.

So far we have received some encouraging words from some of the BPSC customers who are content with Ms. Wheeler's work at the BPSC; we want this type of acknowledgment to continue. Good job Ms. Wheeler!

| *Indicate the level of performance by selecting the appropriate descriptor.* | Unsatisfactory * | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary * |
|---|---|---|---|---|---|
| **Behavioral Factors** | | | | | |
| *Dependability/Accountability* – Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures. | ☐ | ☐ | ■ | ☐ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside his/her normal responsibilities when needed. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Judgment/Problem Solving* – Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Attendance/Punctuality* – Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with University policy. | ☐ | ☐ | ☐ | ☐ | ■ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary".

**Dependability/Accountability:** Ms. Wheeler struggled at times this year to trust and understand how her job assignments can be completed in the time alloted to her. Again the level of dependability from last year to this year dropped due to Ms. Wheeler not being able to keep up. **Cooperation/Teamwork:** Ms. Wheeler struggled to be a team player this year and cooperate with assignments and request from her coworkers and supervisors. Ms. Wheeler received a written reprimand addressing  this concern and has had meetings with supervisors speaking about this inability. **Initiative:** Ms. Wheeler struggled to get her own regular duties done in the alloted time and preferred to try and cut some of those task done instead of seeking more. Ms. Wheeler consistently asked what daily task should be instead of learning and creating a routine. **Adaptability:** This year vs last year Ms. Wheeler was moved permanently to the PPD department in the Nursing bldg for the majority of the year instead of the JCB house. The type of duties were not that different from one area to the other but rather the pace in which the work was done and the demand of how often and organization of when certain task get done that Ms. Wheeler struggled all year to adapt to. Ms. Wheeler kept trying to change her task to more match her preferred work quantity but struggled to accept that her task had changed(as they did for many employees this year due to the pandemic). **Judgment/Problem Solving:** Ms. Wheeler also struggled to solve problems herself. When given some solutions, Ms. Wheeler failed to adhere to these solutions and failed to make suitable judgment calls. This caused small issues to escalate frequently, keeping herself from being able to complete her main assigned tasks (cleaning). **Attendance:** Ms. Wheeler does a great job at coming to work when scheduled to and being on time. Ms. Wheeler does not abuse her time in accordance with university policy.

*Action Plan & Goals:* (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory". Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

This upcoming year we would like Ms. Wheeler to work on being a dependable team member with the BPSC crew and accept her role as a PPD custodial team member and trust others when solutions are given.

APPX. 092

SFA-00564

## Evaluation Summary Sheet

| | Quality of Work | Completion of Work | Communication | Technical Skills | Planning/Organizing | Customer Service | Policy/Procedures | Dependability/Accountability | Cooperation/Teamwork | Initiative | Adaptability | Judgment/Problem Solving | Attendance/Punctuality | Managing Employees | Managing Resources | Communication | Decision Making | Leadership/Employee Development | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | | | | | | | 8 |
| **Acceptable** | ■ | ■ | ■ | | | | | ■ | | | | | | | | | | | 4 |
| **Exceeds Expectations** | | | | | | | | | | | | | | | | | | | 0 |
| **Exemplary** | | | | | | | | | | | | | ■ | | | | | | 1 |

## Supervisory Follow-up

| | | |
|---|---|---|
| Has this employee completed all required trainings for which they have been enrolled? | ✔ Yes | No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | No |

## *OVERALL EVALUATION*: (check one)

| | |
|---|---|
| | **Unsatisfactory:** Applies to employees whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| ✔ | **Improvement Needed:** Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. |
| | **Acceptable:** Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level. |
| | **Exceeds Expectations:** Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job. |
| | **Exemplary:** Performance consistently exceeds expectations in all aspects of the job. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: *REFUSE TO SIGN*     Retaliation     Date:
Supervisor's Signature:     Date: 1-25-21
Reviewing Supervisor's Signature:     Date: 1-25-21

witness #1     2/3/21
witness #2

APPX. 093
SFA-00565



FEB 1 4 2022

HUMAN RESOURCES



## Performance Review – Staff Employee

Name: **Tammy Wheeler**          Campus ID Number: **10682332**

Dept: **Physical Plant Custodial**     Title: **House Coordinator**          Review Year: **2021**

## Instructions:

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory –** Does not demonstrate the required knowledge, skills, abilities, and/or commitment. <u>Additional comments are required for justification of the use of this rating.</u>
   <u>An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".</u>

   **Improvement Needed–** Demonstrates acceptable performance in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement is recognized. <u>An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".</u>

   **Acceptable –** Consistently demonstrates the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations.

   **Exceeds Expectations –** Consistently exceeds expectations and demonstrates mastery of most required knowledge, skills, abilities, and commitment.

   **Exemplary –** Demonstrates mastery in all required knowledge, skills, abilities and commitment. This rating is used as special recognition for delivery of extraordinary accomplishments. <u>Additional comments are required for justification of the use of this rating.</u>

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Improvement Needed" and "Unsatisfactory" in any performance factor. Any performance factors designated as *opportunity for development* should have corresponding explanations and guidance in the Action Plan section.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required training and their Conflict of Interest Survey, and whether they would meet eligibility requirements for administrative leave, if available.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor* should sign the evaluation.

   *A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.



**EXHIBIT**

**G**

| *Indicate the level of performance by selecting the appropriate rating.*<br><br>**Performance Factors** | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* | Opportunity for Development |
|---|---|---|---|---|---|---|
| *Job Performance* – Exhibits the required level of job knowledge and/or skills to perform the job. Assignments completed by the employee meet quality standards. Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies.  Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |
| *Integrity* – Completes tasks as assigned and meets deadlines.  Adheres to all applicable university policies and procedures. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Reliability* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively.  Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures.  Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with university policies. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Customer Service* – Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements.  Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment.  Shifts priorities and focuses on tasks outside their normal responsibilities when needed. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |

\*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary."
This year Ms. Wheeler was moved to the BPSC and it seems that all Ms. Wheeler needed was a good team and stable work enviorment to flourish. Ms. Wheeler has found her routine and knows and accepts her job responsibilities very well. Ms. Wheeler is loved by all her administration and supervisory team in her new assigned area. We have recieved several emails throughout the years complimenting Ms. Wheeler's work quality and attitude. Ms. Wheeler and the custodial supervisory team have improved their communication with each other and Ms. Wheeler gets along with her BPSC coworkers and is mindful of them and their needs and doesn't hesitiate to lend a hand when asked to.

***Action Plan & Goals:*** (Provide an action plan for all factors where employees have opportunity for development and/or received ratings of "Improvement Needed" or "Unsatisfactory."  Give examples and a timeline for all action items. If applicable, note additional development goals for the upcoming year here.)
This upcoming year Ms. Wheeler is encouraged to continue outputing exceptional work and to continue being a team player. It has been a pleasure working with Ms. Wheeler this year and I wish we could've moved her to the BPSC sooner because she has been a great asset to that area and we hope it continues.

# Evaluation Summary Sheet

| | Job Performance | Integrity | Communication | Reliability | Customer Service | Cooperation/Teamwork | Initiative | Adaptability | Lead/Manage Employees | Workforce and Resource Planning | Communication | Decision Making | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | | | | | | | | | | 0 |
| **Acceptable** | | | | | | | | | | | | | 0 |
| **Exceeds Expectations** | | ■ | ■ | ■ | | ■ | ■ | ■ | | | | | 6 |
| **Exemplary** | ■ | | | | ■ | | | | | | | | 2 |

## Supervisory Follow-up

| | | | |
|---|---|---|---|
| Has this employee completed all required training for which they have been enrolled? | ✔ Yes | | No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | | No |
| Has this employee met the criteria to be eligible for administrative leave? | ✔ Yes | | No |

## *OVERALL EVALUATION*: (check one)

| | |
|---|---|
| | **Unsatisfactory:** Applies to employees who do not demonstrate the required knowledge, skills, abilities, and/or commitment for the job. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| | **Improvement Needed:** Applies to employees who demonstrate acceptable performance in some but not all aspects of the job. They do not consistently meet requirements, and the need for improvement is recognized. |
| | **Acceptable:** Applies to employees who consistently demonstrate the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations. Most experienced employees should perform at this level. |
| ✔ | **Exceeds Expectations:** Applies to employees who consistently exceed expectations and demonstrate mastery of most required knowledge, skills, abilities, and commitment for the job. |
| | **Exemplary:** Applies to employees who demonstrate mastery in all required knowledge, skills, abilities and commitment for the job. This rating is used as special recognition for delivery of extraordinary accomplishments. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: _(signature)_     Date: 2.9.22

Supervisor's Signature: _(signature)_     Date: 2-9-22

Reviewing Supervisor's Signature: _(signature)_     Date: 2.14.22

APPX. 096
SFA-07487



## Performance Review – Staff Employee

FEB 2 2 2023

HUMAN RESOURCES

Name: Tammy Wheeler          Campus ID Number: 10682332

Dept: Physical Plant - Custodial     Title: House Coordinator          Review Year: **2022**

**Instructions:**

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the required knowledge, skills, abilities, and/or commitment. Additional comments are required for justification of the use of this rating. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed**– Demonstrates acceptable performance in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Consistently demonstrates the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations.

   **Exceeds Expectations** – Consistently exceeds expectations and demonstrates mastery of most required knowledge, skills, abilities, and commitment.

   **Exemplary** – Demonstrates mastery in all required knowledge, skills, abilities and commitment. This rating is used as special recognition for delivery of extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Improvement Needed" and "Unsatisfactory" in any performance factor. Any performance factors designated as *opportunity for development* should have corresponding explanations and guidance in the Action Plan section.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required training and their Conflict of Interest Survey, and whether they would meet eligibility requirements for administrative leave, if available.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor* should sign the evaluation.

   *A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.*



EXHIBIT
**H**

APPX. 097 SFA-07488

| *Indicate the level of performance by selecting the appropriate rating.*<br><br>**Performance Factors** | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* | Opportunit for Developme |
|---|---|---|---|---|---|---|
| *Job Performance* – Exhibits the required level of job knowledge and/or skills to perform the job.  Assignments completed by the employee meet quality standards. Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies.  Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Integrity* – Completes tasks as assigned and meets deadlines.  Adheres to all applicable university policies and procedures. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Reliability* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively.  Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures. Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with university policies. | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Customer Service*– Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements.  Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment.  Shifts priorities and focuses on tasks outside their normal responsibilities when needed. | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary."
This year Ms. Wheeler was moved from the BPSC to providing custodial and house coordinator duties to the Culinary Cafe Ms. Wheeler's work is at a high output. Ms. Wheeler continues to show that working in a smaller more isolated enviorment is what she needs to thrive. Ms. Wheeler organizes all her task accordingly including those that fall under "other duties as assigned" Ms. Wheeler's customers are happy with her work.  Ms. Wheeler completes all trainigs and knows policies and procedures. Ms. Wheeler communicates well with supervisors, coworker and bldg occupants.

***Action Plan & Goals:*** (Provide an action plan for all factors where employees have opportunity for development and/or received ratings of "Improvement Needed" or "Unsatisfactory."  Give examples and a timeline for all action items. If applicable, note additional development goals for the upcoming year here.)
This upcoming year Ms. Wheeler is encouraged to continue outputing exceptional work and continue the track she's on with having good rapport with her coworkers as she has been with working with Mr. McKind this past year.

**APPX. 098**

**SFA-07489**

## Evaluation Summary Sheet

| | Job Performance | Integrity | Communication | Reliability | Customer Service | Cooperation/Teamwork | Initiative | Adaptability | Lead/Manage Employees | Workforce and Resource Planning | Communication | Decision Making | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unsatisfactory | | | | | | | | | | | | | 0 |
| Improvement Needed | | | | | | | | | | | | | 0 |
| Acceptable | | | | | | | | | | | | | 0 |
| Exceeds Expectations | | | | ■ | | ■ | ■ | ■ | | | | | 4 |
| Exemplary | ■ | ■ | ■ | | ■ | | | | | | | | 4 |

## Supervisory Follow-up

| | | | | |
|---|---|---|---|---|
| Has this employee completed all required training for which they have been enrolled? | ✔ | Yes | | No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ | Yes | | No |
| Has this employee met the criteria to be eligible for administrative leave? | ✔ | Yes | | No |

## *OVERALL EVALUATION*: (check one)

| | |
|---|---|
| ☐ | **Unsatisfactory:** Applies to employees who do not demonstrate the required knowledge, skills, abilities, and/or commitment for the job. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| ☐ | **Improvement Needed:** Applies to employees who demonstrate acceptable performance in some but not all aspects of the job. They do not consistently meet requirements, and the need for improvement is recognized. |
| ☐ | **Acceptable:** Applies to employees who consistently demonstrate the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations. Most experienced employees should perform at this level. |
| ✔ | **Exceeds Expectations:** Applies to employees who consistently exceed expectations and demonstrate mastery of most required knowledge, skills, abilities, and commitment for the job. |
| ☐ | **Exemplary:** Applies to employees who demonstrate mastery in all required knowledge, skills, abilities and commitment for the job. This rating is used as special recognition for delivery of extraordinary accomplishments. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: _Jammy Weaver_          Date: 1-31-23

Supervisor's Signature: _____          Date: 1-31-23

Reviewing Supervisor's Signature: _____          Date: 1-31-23

APPX. 099
SFA-07490

| | |
|---|---|
| **From:** | Veronica Herrera </o=SFASU/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=herrerav5a9> |
| **To:** | John Wyatt |
| **CC:** | Ronald Watson; Tammy Wheeler |
| **Sent:** | 10/14/2020 9:07:34 AM |
| **Subject:** | RE: Request for Transfer |

John,

Tammy and I would like to meet with you sometime tomorrow or Friday to help us adequately assign her duties in her newly selected area of the BPSC.

Thank you,

Veronica Herrera
Stephen F. Austin State University
Custodial Supervisor III
Physical Plant Custodial Department
Office: 936.468.4547
Cell: 832.274.4560
Email: herrerav@sfasu.edu

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

-----Original Message-----
From: Tammy Wheeler <wheelertl@sfasu.edu>
Sent: Wednesday, October 14, 2020 8:51 AM
To: Veronica Herrera <herrerav@sfasu.edu>
Cc: John Wyatt <wyattjohn@sfasu.edu>; Ronald Watson <rewatson@sfasu.edu>
Subject: RE: Request for Transfer

Good morning

I can not change my work time schedule, so the BPSC it is.

Yes, I would absolutely love to sit down and discuss this change.

Thank you.
Tammy Wheeler

From: Veronica Herrera
Sent: Tuesday, October 13, 2020 4:57 PM
To: Tammy Wheeler
Cc: John Wyatt; Ronald Watson
Subject: Request for Transfer

Tammy,

I am writing you due to your most recent request for a transfer out of the Nursing area along with your concerns about being able to complete all the work as assigned in that area.

Erik and Maria informed me of some of the questions you had today about what duties are "required" versus what duties could go partially done i.e. spot mopping instead of fully mopping, sweeping up debris in classrooms, offices or public spaces instead of fully vacuuming or dust moping every day; here is the link to the documentation they were referring to about our new cleaning guidelines due to the current pandemic. http://www.sfasu.edu/docs/open/physical-plant-return-to-campus-plan.pdf

After meeting with HR (John Wyatt) and my director Ron Watson I have some other options available for your request of a transfer;

- Moving to the ECRC WITH a change of shift schedule. (10:00am-7:00pm) or (11:00am-8:00am)   **SFPP-17060**

o Your responsibilities consist of but are not limited to the entirety of the 2nd floor (under the new covid-19 cleaning

guidelines) and vacuuming of all the classrooms, elective rooms and daycare rooms on the 1st floor.

- Moving to the Baker Patillo Student Center (BPSC) KEEPING your current work schedule. (7:00am-4:00pm)

o Your responsibilities consist of but are not limited to the entirety of the 3rd floor (under the new covid-19 cleaning guidelines), the back half of the 2nd floor (under the new covid-19 cleaning guidelines) and spot checking the front public areas, and restrooms.

Please let me know if you have any questions or concerns concerning these options or your current assigned area with the understanding of the current cleaning guidelines. Once you've made a decision I would like to schedule a time for the both of us to meet with John Wyatt by the end of the week to iron out your assigned duties in that area to ensure that we are all on the same page when it comes to your requested accommodations. Please let me know your decision by Thursday morning so that I can have enough time to schedule a sit down with John Wyatt.

I believe that with the right organization and determination you can do what is asked of you in any of these areas.

Thank you,

Veronica Herrera
Stephen F. Austin State University
Custodial Supervisor III
Physical Plant Custodial Department
Office: 936.468.4547
Cell: 832.274.4560
Email: herrerav@sfasu.edu<mailto:herrerav@sfasu.edu>

[sfa_logo]
"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

# EXHIBIT 25

APPX. 102
SFA-00213



**Veronica Herrera**
September 25, 2019 · 👥

...

**Example of systematic racism: There's always money in the budget for white employees to get raises but when minorities ask for one or deserve one the well is dry.**

👍😢😡 27                                      8 Comments

 😠 Angry           💬 Comment           ↗ Share

**Johnetta Harless**
I never even thought of this being an issue 😑

Like · Reply · 1y

 **Veronica Herrera**
**Johnetta Harless** it's bad; when a bilingual, college educated minority with a supposed admin position makes literally $1 less than a white employee of theirs. But all other "admin" with similar positions make significantly more. The system is broken.

Like · Reply · 1y

APPX. 103
SFA-00214

| | |
|---|---|
| **From:** | John Wyatt </O=SFASU/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WYATTJOHNA93> |
| **To:** | Veronica Herrera |
| **Sent:** | 9/17/2020 9:21:30 AM |
| **Subject:** | FW: Category II Grievance - Tammy Wheeler - Final |
| **Attachments:** | Grievance_CategoryII_TammyWheeler_Final_Unresolved_09172020.pdf |

Veronica,

Under policy as the front-line supervisor, you receive a copy of the final version of the written grievance and response. Please find the completed grievance attached. A copy of this grievance has been placed in Tammy's file.

*John Wyatt*
Interim Director
Human Resources
Stephen F. Austin State University
(936) 468-4075

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

**From:** John Wyatt
**Sent:** Thursday, September 17, 2020 7:55 AM
**To:** Tammy Wheeler <wheelertl@sfasu.edu>; Ronald Watson <rewatson@sfasu.edu>
**Subject:** Category II Grievance - Tammy Wheeler - Final

Tammy and Ron,

Attached is the final version of Tammy's category II grievance. The final disposition was unresolved with comments attached. A copy of this has been placed in Tammy's personnel file, as stated in policy.

*John Wyatt*
Interim Director
Human Resources
Stephen F. Austin State University
(936) 468-4075

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

**From:** John Wyatt
**Sent:** Wednesday, September 16, 2020 4:12 PM
**To:** Tammy Wheeler <wheelertl@sfasu.edu>; Ronald Watson <rewatson@sfasu.edu>
**Subject:** Category II Grievance - Tammy Wheeler - Final Grievance Packet Pending Response

Tammy and Ron,

Please find the attached copy of the grievance packet. This is the complete packet as of today. Once Tammy provides a response, which she stated would be provided to me by tomorrow, I will add that response and send the final version to both of you.

The original copy of the final version will be placed in Tammy's personnel file in HR.

**APPX. 104**
**SFA-06744**

*John Wyatt*

Interim Director | Human Resources
Stephen F. Austin State University
PO Box 13039, SFA Station
Nacogdoches, TX  75962-3039
(936) 468-4075 Voice | (936) 468-7056 Fax
wyattjohn@sfasu.edu | www.sfasu.edu/hr



STEPHEN F. AUSTIN
STATE UNIVERSITY

Human Resources

The views and opinions expressed in this message and in any attached documents are those of the sending individual, and do not necessarily represent the University, its Board of Regents, or the State of Texas.

APPX. 105
SFA-06745

SEP 0 7 2020

HUMAN RESOURCES   AUG 3 1 2020

HUMAN RESOURCES

## STEPHEN F. AUSTIN STATE UNIVERSITY
## GRIEVANCE FORM FOR __CATEGORY II__
### *(Refer to Policy 11.15)*

CATEGORY II grievances consist of issues pertaining to wages, hours, working conditions, performance evaluations, merit raises, job assignments, interpretation of the official personnel or administrative policies of the university as applied to the grievant, oral or written reprimands, or similar matters involving management decisions concerning the grievant.

Grievances are to be filed with Human Resources to ensure proper routing and response times.

**TO BE COMPLETED BY GRIEVANT** – If the complaint cannot be resolved in the informal process; this step should be completed within 10 working days from the date of the alleged action or condition.

A. Grievant's Name: Tammy Wheeler

B. Current Address/Phone: 170 CR 1291 Nacogdoches TX 936·553 1154

C. Position/Department: House Coordinator - Custodial

D. Date Action/Condition Occurred: 8-19·20

E. Who was involved? Specify with whom grievance occurred: Myself and Marilyn King

F. What specifically happened? (Additional pages may be attached if necessary.) Attached page 1

G. Law or policy violated: Please see attached page 2
6-7-17-9-22

H. Remedy requested: Written reprimand eliminated and removed from my records

I. Date first discussed with supervisor: 8-19-20

Grievant's Signature

Date August 27, 2020

turned in on 8 31-2020 due to 8:30 am hurricane

APPX. 106
SFA-06746

SEP 0 7 2020

**STEPHEN F. AUSTIN STATE UNIVERSITY**
**STAFF EMPLOYEE COUNSELING RECORD** ·
(For use in recording **Oral Warning** and **Written Reprimands**)

HUMAN RESOURCES

**Employee Name**: Tammy Wheeler       **CID:** 20084068
**Department**: Physical Plant Custodial    **Date(s) of Incident(s):** 08/12/20, 08/13/20
**Title:** House Coordinator

**Describe the incident or problem area. Include a narrative of the incident or unsatisfactory performance, names of witnesses, list previous dates of warnings, and include any other pertinent details.**

After a meeting held between Ms. Tammy Wheeler, Ms. Elizabeth Huerta, Ms. Veronica Herrera, Mr. Erik Green, Ms. Maria Veliz, and Mr. Ryan Dietrich, Ms. Wheeler went to the DeWitt School of Nursing building and spoke with the Nursing department administrator, Ms. Marilyn King. Ms. King told custodial supervisor, Mr. Green, via a phone conversation with a follow up email that Ms. Wheeler shared information that had been discussed in the meeting held that day with Ms. King. Ms. King further stated in the email that Ms. Wheeler has been going to Ms. King and Ms. Kassondra Perry-Weaver, another Nursing department administrator, complaining about Ms. Huerta. Ms. King also stated via the phone conversation with Mr. Green that Ms. King's supervisor, Ms. Tamara Harris, got involved to ask Ms. Wheeler to cease involving Ms. Harris' employees with Ms. Wheeler's issues between Ms. Wheeler and Ms. Huerta.

The above stated actions are in violation of minor rules 6. Loafing or other abuse of time during assigned working hours, 7. Interfering with any employee's work performance or duties by talking or by other distractions, 17. Engaging in excessive visiting, personal conversations, or use of the telephone for personal use, and major rule violations 9. Delaying or restricting work, or inciting others to delay or restrict work, and 22. Unprofessional conduct; that is, behavior that a reasonable person in a professional office setting would find inappropriate, rude, disorderly, or offensive, and that is persistent, destructive and/or intimidating.

Ms. Wheeler has been previously counseled for the above rule violations on regarding proper procedures, chain of command and appropriate behavior at work in an email on 7/21/2020.

**Describe the improvements that will be necessary to remedy the unsatisfactory performance and/or disciplinary problem. State the amount of time to be allowed for improvement and include the next step to be taken if improvement does not occur.**

Ms. Wheeler is being counseled to immediately cease involving any person outside of PPD in conflicts between colleagues within the custodial shop or PPD. Ms. Wheeler is being counseled to report through her chain of command at all times. Ms. Wheeler is being counseled that loafing or other abuse of time during assigned working hours is not admissible. Ms. Wheeler is being counseled to not interfere with any employee's work performance or duties by talking or by other distractions. *Ms. Wheeler is also being counseled that any further violations of this nature or future violations of SFA policy and/or departmental procedure may result in disciplinary action, up to & including written reprimand, suspension, disciplinary probation, and/or termination.*

**Required signatures:**
Supervisor: _____     Date: _8/19/20_
Employee: _____      Date: _____
Employee's Remarks*: _I want to appeal this. I feel this was twisted._ ⟋

(Use back of form if necessary.)
*Employee signature is not required if this form is used for oral warning, however a copy of the form **must** be given to the employee. Signature is **required** when written reprimand is being issued and a copy **must** be given to the employee. The **original** of all signed, written reprimands must be forwarded to the Director of Human Resources
PER 11 (Revised 04/2011)

EMPLOYEE REFUSE TO SIGN
WITNESS 1
WITNESS 2

APPX. 107
SFA-06747

I was pre-warned that if I contacted HR with Continued email messages that Veronica would retaliate against me.
The offenses listed are overly exaggerated, and done out of spite, and retaliation.


The first conversation in question was because I had to let Marilyn King know that Elizabeth and I had new building responsibilities.
I did NOT initiate a reason of conversation to discuss any gossip, I was only there to let them know that our duties have changed per Veronica's request at our meeting.
(I was now over the nursing annex, and nursing administration buildings, per our meeting).
At that time in the conversation when I explained we were separate, Marilyn King told me she glad because she was tired of the drama, and that Elizabeth was showing my emails to Marilyn, and Cass.
This was the first time I knew about emails being distributed. I also discussed at that time that Elizabeth had mentioned in the meeting that "I was not welcomed in the administration building by Marilyn King". I wanted it understood that I never said that, it was not true.

Then second conversation that I am accused of "gossiping" is when I had asked Marilyn King if Elizabeth mentioned to her about the men's restroom light being out in the nursing annex building. Marilyn said why is Elizabeth in my buildings, and why did she come over to her. I said, "Good question, Veronica said she was my still my boss.", I then stated, "For the record you brought up this discussion because I don't want to be written up for being accused of starting any gossip".
Marilyn stated that I wasn't considered a gossip.
I also said to Marilyn that, "I just want to be left alone to do my job without any problems".

I think this write up is out of retaliation, and a little extreme for the offense.


I understand how to handle Marilyn, and others better now when asked questions after our meeting on September 19th, but a written warning and explanation in our meeting would have had the same very achievement.
I was never given official directions of how to handle myself with Marilyn after the first conversation with her, or how to correct my behavior until AFTER the write up yesterday.  I was never given an official "warning".
Why wasn't I given the proper tools to deal with her on the first conversation? I feel that's unfair.
I had not been explained what gossip at SFA means, I was not given any copies of our policy on gossiping. I never had a chance to correct myself. I feel as though Veronica sat waiting for a chance to jump on writing me up out of retaliation. She knew she would have to write up Elizabeth the first time which she stated she was going to do for the same thing, but Veronica didn't do that, she waited a week later.
I was never instructed on what was considered "gossip", until I was given a write up.
I think it's unfair that I am the only one getting written up.

*page 1 AW*

APPX. 108
SFA-06748

First offense
Minor rules. 6, 7, 17, 9, and 22

Rule 6. I was on official SFA business when the subject In question was brought up, 1 was told by Veronica to go and explain the changes on the first offense.

Rule 7. I was on official SFA business when the subject in question came up.

Rule 17. This rule is just thrown in for bulk use, to look Like lots of violations. I was not excessive I was there in about one minute of total conversation.

Rule 9. I was there on official SFA business

Rule 22. None of those things are true. I went to converse about official SFA business.

page 2

APPX. 109
SFA-06749

**STEP 1:  TO BE COMPLETED BY 1ˢᵗ LINE SUPERVISOR** – Supervisor should complete this step within 5 working days of receipt.

A.  Date grievance was received by you:  _____ 9/1/20 _____

B.  When and how many times did you meet to discuss the action/condition?  1st meeting: 9/7/20
@ 1:30 pm PPD CONFERENCE ROOM

C.  Did you involve anyone else in the discussions, such as party responsible for the action or a mediator?  If yes, please list their names:
RYAN DIETRICH, VERONICA HERRERA & TAMMY WHEELER

D.  What was your response to the grievant?   ATTACHED

E.  If your response did not satisfy the grievant, why?  Because I feel retaliation, and I feel the facts are not as they were. I still would like an independant person interview my "gossip". This was an overkill of actions against me.

_____        9/7/20
Supervisor's Signature                        Date

_____        _____
If Grievance Resolved, Grievant's Signature         Date

(Grievant has 5 working days in which to appeal decision in writing to the next level.)

*****************************************************************************

APPX. 110
SFA-06750



# Stephen F. Austin State University

**Physical Plant Department**
P.O Box 13031, SFA Station - Nacogdoches, Texas 75962-3031
Phone (936) 468-3906 - Fax (936) 468-4446

### Tammy Wheeler Grievance Response

In the following document, Ms. Tammy Wheeler's grievance will be separated into three major parts. The three parts are as follows, *perceptions of retaliation, corrective counseling preferences* and *improper training/explanation of policies*. Ms. Wheeler received a written corrective counseling documentation on August 19th during a meeting with her custodial supervisory team initiated by an email received from a Nursing Department administrator. Ms. Wheeler mentions two distinct conversations within her grievance that Ms. Wheeler held with the Nursing administrator, however the initial email which caused for grounds of a written documentation states that, *"This has been an ongoing problem for several weeks now-Both Elizabeth and Tammy complaining about each other."*

Attached to this document are, the initial email sent by the Nursing Department administrator. Also attached is an email, which was cited in the initial written documentation, presented to Ms. Wheeler, which summarized a meeting Ms. Wheeler had with custodial supervisors Erik Green and Veronica Herrera on July 21st. While in this meeting, Ms. Wheeler was also spoken to about each bullet point on the Physical Plant Department Onboarding for Full-Time Employees, which was signed and initialed by Ms. Wheeler all PPD policies, procedures, and expectations were discussed with Ms. Wheeler.

### *Perceptions of Retaliation and Corrective Counseling Preference*:
Ms. Wheeler mentions several times throughout her grievance that Veronica Herrera is actively retaliating against her. Veronica Herrera has not threated Ms. Wheeler with retaliation. The custodial supervisory team has reminded Ms. Wheeler several times via verbal conversations, text messages and emails of her needing to correct her unprofessional behavior and violations in PPD procedures.

Ms. Wheeler's grievance also mentions that, "she is the only one getting written up." Ms. Wheeler was told via text to both her and her coworker and again during the meeting that both individuals mentioned in the initial email will be given documentation.

### *Improper training/explanation of policies*:
The statement that Ms. Wheeler was not counseled or given proper explanation of procedures is false due to her having emails summarizing conversation between Ms. Wheeler and her supervisory team along with a signed document of PPD policy and procedures. (See attached Onboarding document). Ms. Wheeler gave a list of explanations against each rule violation; Minor rule violations 6. Loafing or other abuse of time during assigned working hours, 7. Interfering with any employees work performance or duties by talking or by other distractions, 17. Engaging in excessive visiting, personal conversations, or use of the telephone for personal use, and major rule violations 9. Delaying or restricting work, or inciting others to delay or restrict work, and 22. Unprofessional conduct; that is, behavior that a reasonable person in a professional office setting would find inappropriate, rude, disorderly, or offensive, and that is persistent, destructive and/or intimidating.

APPX. 111
SFA-06751



# Stephen F. Austin State University

**Physical Plant Department**
P.O Box 13031, SFA Station - Nacogdoches, Texas 75962-3031
Phone (936) 468-3906 - Fax (936) 468-4446

In the attached email sent by the Nursing Department administrator it stated that there was a phone conversation between this administrator and the custodial supervisor Erik Green. During this phone call, it was told to Mr. Green that Ms. Wheeler spends a lot of time going to speak to the office administrator about issues, and problems within the custodial department. It was also told to Mr. Green that the constant "gossiping" by Ms. Wheeler (the nursing administrator did not mention Elizabeth) prompted this Nursing administrator's supervisor to step in and ask Ms. Wheeler (not Elizabeth) to stop bothering her office staff with these type of conversations. This conversation is what prompted Mr. Green to ask for a formally written email detailing her statements and complaints.

In conclusion based on the evidence listed above the correct disciplinary action was executed towards Ms. Wheeler by her custodial supervisory team. A factual case was not made for the accusation of retaliation towards Ms. Wheeler; all corrective methods used to coach Ms. Wheeler have been done within the guidelines and procedures of both PPD and SFA. As mentioned in the above document, the initial incident was brought to Erik Green via phone call and then a subsequent email. No one was, "waiting for a reason to write Ms. Wheeler up," as she indicated in her grievance. As shown in this document and in the supporting documents Ms. Wheeler was informed and counseled on PPD policies and on the expectations of her multiple times before the decision to proceed with the next step of corrective action.

**Veronica Herrera**
Stephen F. Austin State University
Physical Plant Department
Custodial Supervisor III

APPX. 112
SFA-06752

**Veronica Herrera**

| | |
|---|---|
| **From:** | Veronica Herrera |
| **Sent:** | Tuesday, July 21, 2020 4:44 PM |
| **To:** | Tammy Wheeler |
| **Cc:** | 'Erik D Green (greened@sfasu.edu)'; Maria Veliz |
| **Subject:** | Our Meeting |

Tammy,

First I would like to apologize that we went over your scheduled time and you left the meeting at 4:15pm, thank you for staying past your schedule time to finish meeting with Erik and myself.

Although we did not reach the overall resolution we all might have been looking for I feel confident in the fact that you now understand better our expectations and how our procedures work here.

To better eliminate any confusion we decided for you to do as your coworker, Ms. Huerta, does and communicate directly with your supervisory team that consist of Erik Green, Maria Veliz and myself. We also encourage both you and Ms. Huerta to continue keeping an open line of communication between the two of you and you continue to inform her of your absences, questions, concerns and other issues within the building since Ms. Huerta's position is a Custodial Worker II- Lead.

As mentioned in the meeting as well, Ms. Huerta is acting as your immediate go to person in the building seeing as she has been there longer and knows more about the day to day stuff than Erik, Maria or myself do.

We also spoke about any concerns you have in the building, such as work orders for you to communicate that with Erik, Maria and myself because as it was explained in the meeting, there is more to it than simply reporting the issue; we have to consider budgetary and departmental FOAP accounts before any services are to be completed. Which is why it's important to follow the chain of command. Same thing goes for slips that are turned in to Staff Services; your supervisory chain has to be informed of the dates and times you are requesting off due to vacation and comp time requiring prior approval.

Again as Erik mentioned in the meeting, the events that took place in the past, however we may remember or not remember it, is in the past. Our opinion of you has not been tainted by outside sources or altered by someone else's perceived view of you. We, your supervisory team, are accustomed to employees within our supervision performing within the expectations set before them and that's all we are asking of you.

Thank you,

*Veronica Herrera*

Stephen F. Austin State University
Custodial Supervisor III
Physical Plant Custodial Department
Office: 936.468.4547
Cell: 832.274.4560
Email: herrerav@sfasu.edu

1

APPX. 113
SFA-06753



"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

APPX. 114
SFA-06754

**Veronica Herrera**

| | |
|---|---|
| **From:** | Erik Green |
| **Sent:** | Thursday, August 13, 2020 1:46 PM |
| **To:** | Veronica Herrera |
| **Cc:** | Maria Veliz |
| **Subject:** | FW: Hey |

**From:** Marilyn King <miking@sfasu.edu>
**Sent:** Thursday, August 13, 2020 1:43 PM
**To:** Erik Green <greened@sfasu.edu>
**Subject:** Hey

Per our telephone conversation today – I wanted to touch base with you on what was said.

Tammy told me that Elizabeth had said in the meeting that I had said Tammy needed to be out of the Administration Bldg.  That was never said and is not true.

Yesterday, Elizabeth showed both Ms. Kass and me an email Tammy had sent to her.   That is none of our business.

I nor Ms. Kass want to be in the middle of their feud.  If they have a problem with each other they need to take it up with their supervisors.

This has been an ongoing problem for several weeks now – Both Elizabeth and Tammy complaining about each other.

I hope you can resolve this problem.

Thanks for calling!!!
Marilyn

*Marilyn King*
Administrative Assistant
Dewitt School of Nursing
P.O. Box 6156
Nacogdoches, Texas 75962
936-468-7705
Fax 936-468-7701

*The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents. or the State of Texas.*

APPX. 115
SFA-06755

**Stephen F. Austin State University**

Physical Plant Department

Onboarding for Full-Time Employees

Name: Tammy Wheeler

Emergency Contact Name & Phone: 553·1154

### Probationary Period:

All newly hired employees are on probation for 180 days. If you have any questions regarding the probation period, please see your supervisor and/or refer to SFA Policy 11.21.

### Pay Week/Pay Period:

The SFA workweek begins on Saturday and runs through Friday.  For hourly employees, the pay period is from the 1st through the 15th and the 16th through the end of the month. For monthly employees, the pay period is the 1st through the end of the month.

### Leaving Work Assignment:

If, for any reason, you need to leave your designated work area, you must first obtain permission from your immediate supervisor. If your immediate supervisor is not available, communicate through your chain of command.

### Rest Periods (Breaks)

Supervisors at their discretion may allow a 15-minute rest break during each continuous four (4) hours worked. It is appropriate for supervisors to utilize rest periods to assign work, disseminate information, and to distribute supplies and equipment.  Please understand that breaks are not guaranteed.  Physical Plant employees are on call 24 hours a day and 7 days a week, therefore, breaks may be interrupted as circumstances arise. There is no additional compensation or "banked" time or "banked" breaks.

### Essential Personnel:

All PPD employees are considered essential personnel.   Occasionally, certain emergencies or situations arise which require the service of essential personnel after hours, on weekends or during holidays. In addition, you may be required to work certain designated weekends and holidays. In certain instances, the university may close "except for essential personnel." Always consider yourself essential personnel; check with your supervisor for each specific incident.

### Attendance Requirements:

Employees in the Physical Plant are expected to maintain good attendance and punctuality records. Please see SFA policies 12.18 Sick Leave, 12.21 Vacation Leave, and 12.14 Overtime and Compensatory Time.



**Parking:**

The university requires employees to purchase parking permits in order to park personal vehicles in designated lots on campus. Personal vehicles should be parked in SFASU designated Faculty/Staff parking. The service vehicle PPD shop fleet lot is not a designated faculty/staff parking lot.



**Attendance Policy Enforcement:**

Excessive absenteeism and/or tardiness may be considered a disciplinary problem and may be handled as a major rule violation. A major rule violation may result in progressive disciplinary action.



**Leave Balances:**

PPD employs a Records Administrator that will verify leave balances, but it is your responsibility to keep up with your leave balances. Abuse of leave time and/or failure to properly maintain leave which results in running out of leave time may result in progressive disciplinary action.



**Administrative Leave:**

The university president may grant administrative leave for outstanding performance as documented in an employee's most recent annual performance review. To be eligible, you must be beyond your probationary period. Full-time staff employees may be granted administrative leave in eight-hour increments that may not exceed 32 hours during a fiscal year. It is requested that you use Administrative Leave in 8 hour increments.



**Holidays:**

Holidays are announced each year after the July board meeting. You may occasionally be required to work on scheduled holidays. You may request a copy of the observed SFASU holidays. You may also be required to take vacation/comp/administrative leave time during required holiday breaks.



**Call-In Procedure- Sick**

Report all absences to your individual supervisor based on the preferences set forth by your supervisor. The following instructions apply unless otherwise outlined by your supervisor.

Time off requests for sick time should an employee (or family member) become sick before their shift begins: Call the office or your supervisor at the earliest practical time unless other arrangements have been made with that supervisor. Perform call in procedures before your shift begins. If the phone is not answered when calling in sick time, you should leave a message, so the message can be time and date stamped. In the case of illness, you should sign the Request for Vacation, Compensatory Time, and Sick Leave slip and submit it to your supervisor immediately upon returning to work from using sick time. Failure to turn in the Request for Vacation, Compensatory Time, and Sick Leave slip in a timely manner may result in progressive disciplinary action. Please refer to Section 2- Human Resource Management and Payroll of the PPD procedures manual for further details regarding the call in procedure.



**Time-Off Requests- Vacation, Comp, & Sick Requested in Advance**

For vacation, comp, or sick time (Sick time requested in advance) to be taken, you will need to complete an SFA Request for Vacation, Compensatory Time, Sick Leave Taken form and turn it in to your supervisor.

Time off request for vacation, comp, and sick time that is scheduled: While as much notice and lead time as possible is preferred, time off requests for vacation/comp/sick time that is scheduled should be

requested in the same or larger increments prior to the period that's being taken i.e. one vacation/comp/sick day should be requested at least one day in advance, three hours of vacation/comp/sick time should be requested at least three hours in advance, etc. A signed Request for Vacation, Compensatory Time, and Sick Leave slip should be submitted in order to request this time. Failure to turn in the Request for Vacation, Compensatory Time, and Sick Leave slip in a timely manner may result in progressive disciplinary action.

## Raises:

The Board of Regents determines merit raises on an annual basis. Each year, a merit raise may or may not be granted and if so, percentages vary. If you are hired after March 1st of the current fiscal year, you will not be eligible for a merit raise on September 1st. Raises are not guaranteed.

## Late/Early Report:

You are expected to report to work on time and remain through your scheduled shift (excluding lunch time) unless other arrangements have been made. If you clock in after your shift begins, or clock out prior to shift end, these times could be documented on an Early/Late report weekly. This report is sent out weekly to managers and it is taken into consideration when evaluating employees.

## Time Clock:

Each employee is required to have a record of hours worked.

Hourly and Non-exempt monthly:

1. You may clock in up to seven minutes before your scheduled shift begins (but no earlier) unless you have prior authorization to clock in earlier.
2. Please do not clock out for break time (15 minute breaks).
3. You should choose "Go On Break" at lunch. For 8 am to 5 pm and 7 am to 4 pm shifts, lunch time is normally from 12 pm to 1 pm unless you have scheduled an alternate time with your supervisor. Employees on other shifts should consult with their supervisor regarding their lunch time. All employees are free to leave the university premises during lunch.

Under no circumstances may one employee clock in/out for another.

Exempt:

Exempt employees are responsible for completing a monthly time record form provided by the departmental Records Administrator or designee.

## Overtime:

Except in emergency situations, prior permission to work overtime should be granted by the associated foreperson, manager, or PPD director.

## Performance Reviews:

Performance reviews are conducted in January annually. You may receive other periodic reviews throughout the year.

**Dress Code:**

Shop employees are provided five physical plant uniform shirts upon hire. If you receive PPD uniform shirts, you are required to wear the assigned PPD uniforms when working. Official SFA hats are the only approved headwear for any PPD employee.  Please refer to Section 2- Human Resource Management and Payroll of the PPD procedures manual to locate specific guidelines related to your position regarding the dress code.

**Conduct:**

Please be professional and respectful to students, parents, faculty/staff members, and all people you may come in contact with on campus. Recognize your responsibility to provide excellent customer service to everyone in which you interact.

**Headsets/Earbuds:**

Permission to use headsets/earbuds may be granted or denied by your supervisor, foreperson, or manager. Please check with your immediate supervisor prior to use.

**Email:**

The university provides every employee an email address. This is the official form of communication for the university. It is recommended that you check your email at least once per week.

**Wellness:**

You may use 30 minutes of wellness release time during normal work hours up to three times a week for participation in physical exercise and wellness activities offered at the campus recreation center, employee wellness program locations, or walking on campus. Please refer to Section 2- Human Resource Management and Payroll of the PPD procedures manual and SFA policy 13.25 to locate specific guidelines related to wellness release time.

**Outside Employment:**

If you are already employed in outside employment upon hire, or you later obtain outside employment, please ensure that you complete the Request for Approval of Outside Employment form.  According to SFA policy 11.19 Outside Employment, your SFA employment must come first and outside employment must assume a secondary position to university duties, you may not use SFA facilities or materials for outside employment, you may not perform outside employment within the hours in which you are also being compensated for employment with SFA.  Please see SFA policy 11.19 Outside Employment for further details.

**Cell Phone Use:**

When working in the field, personal use of electronic devices should be restricted to use for work related reasons, during breaks or at lunch, to briefly check messages, or to make quick calls. When in a PPD office or shop, these rules still apply, but more leniency can be applied by supervisors. SFASU issued and provided phones are for work purposes and work purposes should take priority. If cell phone disruptions cause a loss in productivity, you are subject to progressive discipline.

Every effort should be made to restrict the use of electronic devices while operating vehicles owned or leased by the university.

## Keys/Access:

Keys/Access will be issued to you based on need. You will be held strictly accountable for the proper use and return of keys/access cards issued to you.

## Reporting On-The-Job-Injuries:

Report every on-the-job injury, no matter the severity, to your supervisor immediately. If there is an accident involving an SFA vehicle (on or off campus), report it immediately to your supervisor and UPD at (936) 468-2608.

## Lost and Found:

If lost property is found, it should be turned in to your immediate supervisor as soon as possible.

## MUVs:

MUV training is required before operating an MUV. It is also required every three years thereafter. Please carry your MUV driving card with you. Please only drive on paved areas, drive slowly, be safe, be cautious, and be aware of pedestrians. Please do not drive on the grass or vegetation.

## PPD Vehicles/SFA Approved Driver Certification:

To be approved to drive university vehicles, you must obtain an SFA Approved Driver Certification and possess a valid Texas driver's license. After six months you will be required to complete a defensive driving course to maintain your SFA Approved Driver Certification. Further, to maintain your SFA Approved Driver Certification, you will be required to complete a defensive driving course every three years thereafter.

## Tobacco Products:

Effective August 22, 2016, Stephen F. Austin State University is a tobacco and vape free campus. The use of all tobacco and vape products (including but not limited to cigarettes, cigars, pipes, smokeless tobacco, e-cigarettes, vaporizers, vape pens, hookahs, blunts, pipes, snuff, and any other tobacco or vape related product) is prohibited on all property that is owned, leased, occupied, or controlled by Stephen F. Austin State University. Please see SFA policy 13.21 Smoking, Vaping, and Use of Tobacco Products for additional information.

## Training:

Each year PPD employees are required to complete trainings or other documents (security basics, human trafficking, conflict of interest, ethics, etc.) that are assigned by their supervisors and/or required by the university. It is your responsibility to complete all assigned trainings in a timely manner. Once trainings are completed, please print the certificate of completion and provide a copy to the PPD Staff Services office.

## Security Sensitive Position:

All Physical Plant positions are security sensitive positions. Every attempt should be made to avoid confidential information. When in offices or in any other secured area, all PPD employees should make every effort to not see and not hear any confidential information. Any confidential information that you

APPX. 120
SFA-06760

inadvertently come in contact with should remain confidential at all times and should not be shared with others. If there is ever a question regarding security sensitive information, please see your supervisor immediately.

## Children in the Workplace:

It is a workplace rule of the Physical Plant Department that children are not permitted in the work area at any time in order to protect the safety of children and to avoid disruptions in the workplace. Please refer to Section 2- Human Resource Management and Payroll of the PPD procedures manual for more details.

## Family and Medical Leave (FMLA)

I have/will read SFA policy 12.9 Family and Medical Leave. I understand that if I am out sick three days, I will need a doctor's note, and that if I am out sick more than three days (including weekends/holidays), I will need a doctor's release.

## Discrimination Policy:

I have received, or know where to locate and understand SFA policy 2.11 Discrimination Complaints.

## Standard Operating Procedures:

I have been provided an electronic copy of the standard operating procedures outlined in sections 1 and 2 of the PPD procedures manual.

**Jury Duty:** If you have jury duty, please give a copy of the form mailed to you accompanied by a Request for Vacation, Compensatory Time, and Sick Leave slip to your immediate supervisor as soon as possible. Per SFA policy 12.11, if an employee is dismissed from jury duty prior to the end of the work day, the employee must return to work or request other appropriate leave for the remaining hours in the workday. If jury duty is canceled, please contact your supervisor as soon as possible, report to work, or request leave.

The information provided in this document is a brief overview of some SFASU policies and PPD procedures. You are still responsible for reading, familiarizing yourself with, and following all SFA policies and PPD procedures. To locate SFA policies please go to www.sfasu.edu/policies. An electronic copy of PPD procedures has been provided to you via email. If you would like a hard copy, one can be provided at your request.

*Violation of any SFA policies and/or PPD procedures outlined by SFASU or the Physical Plant may result in oral or written disciplinary action, including suspension, disciplinary probation, and/or termination. I have read and understand the above policies and procedures.*

I have initialed each topic of the Stephen F. Austin State University Physical Plant Department procedures and the SFASU Policies and Directives for Full-Time Employees.

Tammy Wheeler          7-21-2020

| | | | |
|---|---|---|---|
| Employee Printed Name | Date | Supervisor Printed Name | Date |

| | | | |
|---|---|---|---|
| Employee Signature | Date | Supervisor Signature | Date |

APPX. 121
SFA-06761

**John Wyatt**

| | |
|---|---|
| **From:** | Tammy Wheeler |
| **Sent:** | Wednesday, September 09, 2020 6:56 AM |
| **To:** | John Wyatt |
| **Subject:** | RE: Appealing the Write Up |

Yes, I want to move forward.

From: John Wyatt
Sent: Monday, September 7, 2020 3:34 PM
To: Tammy Wheeler
Subject: RE: Appealing the Write Up

Tammy,

I have received the signed grievance packet from PPD. I see that you opted not to sign; do you want to move it to the next step of the grievance process?

I've attached what I was provided for your records.

John Wyatt
Interim Director
Human Resources
Stephen F. Austin State University
(936) 468-4075

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

-----Original Message-----
From: John Wyatt
Sent: Tuesday, September 01, 2020 4:46 PM
To: Tammy Wheeler <wheelertl@sfasu.edu>
Subject: RE: Appealing the Write Up

Tammy,

Thanks for getting us the grievance on the category II form. I forwarded it to PPD earlier today for review and response. Please let me know if you are not contacted by Monday.

John Wyatt
Associate Director
Human Resources
Stephen F. Austin State University
(936) 468-4075

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

APPX. 122
SFA-06762

## John Wyatt

| | |
|---|---|
| **From:** | John Wyatt |
| **Sent:** | Friday, September 11, 2020 1:47 PM |
| **To:** | Ronald Watson |
| **Subject:** | FW: Tammy Wheeler Grievance 09/07/20 |
| **Attachments:** | Grievance_CategoryII_TammyWheeler_Step2_PPD.pdf |

**Importance:**          High

Ron,

Tammy Wheeler has appealed the Step One response to her submitted grievance.

As the administrative head of PPD, you have the responsibility to respond to the second and final step of the submitted grievance (attached).  Your response to Tammy Wheeler is required to be completed and communicated with her within five business days of today.

Let me know if you have any questions.

John

*John Wyatt*
Interim Director
Human Resources
Stephen F. Austin State University
(936) 468-4075

"The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents or the State of Texas."

**From:** Ryan Dietrich <Ryan.Dietrich@sfasu.edu>
**Sent:** Monday, September 07, 2020 3:23 PM
**To:** John Wyatt <wyattjohn@sfasu.edu>
**Cc:** Hillary Parrish <hparrish@sfasu.edu>; Ronald Watson <rewatson@sfasu.edu>
**Subject:** Tammy Wheeler Grievance 09/07/20
**Importance:** High

John, Veronica Herrera and I met with Tammy today (09/07/20 @1:30pm) to go over the response to her grievance. Attached is a copy of everything that we went over in the meeting including supporting documentation as well as Tammy's initial grievance.

The grievance ***was not resolved***. Tammy did not want to sign and she wrote her response to why she did not sign.

The originals are on the way to you. Let me know where I can help. Thank you!

Ryan Dietrich
Staff Services Manager
Physical Plant Department
Stephen F. Austin State University

1

**APPX. 123**
**SFA-06763**



Phone: (936) 468-7261
Fax: (936) 468-4446

The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of
Stephen F. Austin State University, its Board of Regents, or the State of Texas.

-----Original Message-----
From: ppd@sfasu.edu <ppd@sfasu.edu>
Sent: Monday, September 7, 2020 2:57 PM
To: Ryan Dietrich <Ryan.Dietrich@sfasu.edu>
Subject: Scanned from a Xerox Multifunction Printer


Please open the attached document. It was sent to you using a Xerox multifunction printer.

Attachment File Type: pdf, Multi-Page

Multifunction Printer Location:
Multifunction Printer Name: XRX9C934EA7A11F


For more information on Xerox products and solutions, please visit http://www.xerox.com

APPX. 124
SFA-06764

SEP 1 6 2020

HUMAN RESOURCES

## STEP 2: TO BE COMPLETED BY DEPT. CHAIR OR ADMINISTRATIVE
EQUIVALENT – Department Chair or administrative equivalent should complete this
step within 5 working days of receipt. If the grievance is against the department head or
director. it shall be presented to the appropriate dean or supervisor of the director for final
consideration.

A. Date grievance was received by you: _9/11/2020  12:31 PM_

B. Did you meet/visit with the grievant? If yes, give date: _yes. 9/16/2020_

C. What was your response to the grievant? _Please see attached Response_

D. If your response did not satisfy the grievant, why? _Did not satisfy the
grievant. Ms. Whaley still does. Not
agree. with the documentation or timing
Ms Whaley is encouraged to provide written Response
If desired._

_____ Department Chair or Administrative Equivalent's Signature _9/16/2020_ Date

_____ If Grievance Resolved, Grievant's Signature _____ Date

(This is the final level for a Category II grievance.) _Not Resolved_

****************************************************************************

3

APPX. 125
SFA-06765

 I was pre-warned that if I contacted HR with Continued email messages that Veronica would retaliate against me.
The offenses listed are overly exaggerated, and done out of spite, and retaliation.

 The first conversation in question was because I had to let Marilyn King know that Elizabeth and I had new building responsibilities.
I did NOT initiate a reason of conversation to discuss any gossip, I was only there to let them know that our duties have changed per Veronica's request at our meeting.
(I was now over the nursing annex, and nursing administration buildings, per our meeting).
At that time in the conversation when I explained we were separate, Marilyn King told me she glad because she was tired of the drama, and that Elizabeth was showing my emails to Marilyn, and Cass.
This was the first time I knew about emails being distributed. I also discussed at that time that Elizabeth had mentioned in the meeting that "I was not welcomed in the administration building by Marilyn King". I wanted it understood that I never said that, it was not true.

 Then second conversation that I am accused of "gossiping" is when I had asked Marilyn King if Elizabeth mentioned to her about the men's restroom light being out in the nursing annex building. Marilyn said why is Elizabeth in my buildings, and why did she come over to her. I said, "Good question, Veronica said she was my still my boss.", I then stated, "For the record you brought up this discussion because I don't want to be written up for being accused of starting any gossip".
Marilyn stated that I wasn't considered a gossip.
I also said to Marilyn that, "I just want to be left alone to do my job without any problems".

 I think this write up is out of retaliation, and a little extreme for the offense.

 I understand how to handle Marilyn, and others better now when asked questions after our meeting on September 19th, but a written warning and explanation in our meeting would have had the same very achievement.
I was never given official directions of how to handle myself with Marilyn after the first conversation with her, or how to correct my behavior until AFTER the write up yesterday.  I was never given an official "warning".
Why wasn't I given the proper tools to deal with her on the first conversation? I feel that's unfair.
I had not been explained what gossip at SFA means, I was not given any copies of our policy on gossiping. I never had a chance to correct myself. I feel as though Veronica sat waiting for a chance to jump on writing me up out of retaliation. She knew she would have to write up Elizabeth the first time which she stated she was going to do for the same thing, but Veronica didn't do that, she waited a week later.
I was never instructed on what was considered "gossip", until I was given a write up.
I think it's unfair that I am the only one getting written up.

page 1 AW

APPX. 126
SFA-06766

 First offense
Minor rules. 6, 7, 17, 9, and 22

 Rule 6. I was on official SFA business when the subject in question was brought up. I was told by Veronica to go and explain the changes on the first offense.

 Rule 7. I was on official SFA business when the subject in question came up.

 Rule 17. This rule is just thrown in for bulk use, to look like lots of violations. I was not excessive I was there in about one minute of total conversation.

 Rule 9. I was there on official SFA business

 Rule 22. None of those things are true. I went to converse about official SFA business.

page 2
Aw

APPX. 127
SFA-06767

Ron Watson - Tammy Wheeler Grievance Response
09/15/2020

Below are my findings of grievance claims that Tammy Wheeler has made in her grievance statement. I
will notate with numbers which statement/concern I am referencing (i.e. 1 represents Ms. Wheeler's
first paragraph).

1. Regarding the claim of retaliation for contacting HR - I do not know of an instance where Tammy
   Wheeler was threatened with retaliation for contacting HR. I have spoken to Veronica Herrera
   multiple times concerning the nursing situation and Ms. Herrera has never indicated that she
   said this or this was her stance. I do not believe any actions taken by Ms. Herrera are "overly
   exaggerated, done out of spite, and retaliatory". Ms. Herrera has been attempting to manage
   the nursing building with fairness and respect to all and with the resources she has, in addition
   trying to find accommodations for Ms. Wheeler by abiding with any HR directives or Workers
   Comp directives that she has received.
   I do not believe Veronica Herrera has acted out of or motivated by retaliation.

2. Regarding the first conversation with the nursing administration – In my opinion, regardless of
   how Ms. Wheeler perceived her interaction with Marilyn King or anyone else in the nursing
   administration, the nursing administration had still felt strongly enough about the interactions
   they had with the custodial staff that they felt the need to contact the custodial management
   and send a complaint. In the complaint Marilyn King states she were having issues with both
   custodians in that area, not just one or the other, and both custodians were documented for it.
   Also to further this point Ms. Wheeler's grievance response states "...Marilyn King told me she
   was glad because she was tired of the drama..." this further illustrates that the relationship
   between custodial and nursing administration was already strained by this time after the fact.

3. Regarding the second conversation with the nursing administration – See the statement above.
   To add to this, Ms. Wheeler can discuss certain day to day job tasks and have a reasonable
   worker/client relationship. However, it becomes a concern when the customer (i.e. nursing
   administration) files a complaint, at which point management attempts to correct (in this case
   with documentation for both employees). I cannot speak to at exactly what conversation or
   conversations caused the nursing administration to file their complaint.

   The initial written reprimand does not mention the word gossiping. It is only mentioned as a
   recap on a phone conversation Erik Green had with nursing in Veronica Herrera's grievance
   response.

4. Regarding the claim that the write up was out of retaliation – I find that the documentation Ms.
   Wheeler received for the complaint was appropriate and that both employees in the complaint
   received documentation since the complaint stated that the problems had been going on for
   weeks with both custodial employees complaining about each other. Ms. Herrera had multiple

APPX. 128
SFA-06768

meetings and lines of communication with both employees up to that point trying to address all concerns. The issues persisted; a complaint was made by the customer; which is why Ms. Herrera documented the concern formerly.  No one in custodial or PPD sought out a reason to document Ms. Wheeler, documentation came about from the nursing administration reaching out to the custodial management team.

5. Regarding claims of the written warning/gossiping/tools needed – Ms. Wheeler was informed of the custodial department's Chain of Command and knew where to raise concerns that she had with her job or anyone on her team. It was gone over with Ms. Wheeler during onboarding when she was initially transferred to PPD Custodial and there have been multiple meetings prior to the written documentation being delivered trying to correct any issues that there were in the nursing building. The problem became increasingly apparent when the nursing administration filed the complaint that they did not want to be in the middle of any problems that the custodial nursing employees had between each other. In some fashion, through email or conversation, the issues that the custodial department were having were seeping into the nursing administrations day to day. This was not the proper way to handle any issues that either employee were having so Ms. Herrera documented both custodial employees. Also Ms. Wheeler references several times that Ms. Wheeler wasn't "gossiping" and asking "what gossiping at SFA means" (and other variations of that line of thought). In the documentation that Ms. Wheeler received, gossiping is not mentioned anywhere for the reason of issuance of the written reprimand.

6. All of the rule violations stated are appropriate in regard to the described incident and concerns.

## John Wyatt

**From:** Tammy Wheeler
**Sent:** Wednesday, September 16, 2020 10:04 PM
**To:** John Wyatt
**Subject:** Grievance Reply to Ron Watson

I am giving my reply to Ron Watson's statement for the Catagory II Grievance against me.

I am not surprised by Ron Watson today, considering our history.

Again, I feel this is retaliation, workplace mobbing, complete abuse of power by the Physical Plant Department's leadership, and not all the facts are accurate.

This is an exaggeration of offences, and I was not counselled previously for what I'm being written up for. I was warned that retaliation against me would happen.

Tammy Wheeler

APPX. 130
SFA-06770



## FRANKLIN LAW FIRM
PLLC

October 12, 2020

**LETTER OF REPRESENTATION, REQUEST TO PRESERVE EVIDENCE,
FORMAL COMPLAINT OF DISABILITY DISCRIMINATION AND HARASSMENT,
AND FORMAL COMPLAINT FOR MISUSE OF UNIVERSITY/STATE RESOURCES**

| | |
|---|---|
| Stephen F. Austin State University | via Regular Mail |
| Damon Derrick, General Counsel | via email at derrickdc@sfasu.edu |
| Ms. Gina Ogelsbee, Chief Audit Executive | via email at ogelsbeegs@sfasu.edu |
| 1936 North Street | |
| Nacogdoches, Texas 75962 | |

RE:   *Tammy Wheeler—An SFASU Employee in the Physical Plant*

Dear Mr. Derrick and Ms. Ogelsbee:

Please be advised that Franklin Law Firm, PLLC has been retained by Tammy Wheeler, a current SFA employee working in the Physical Plant with respect to claims that she has against Stephen F. Austin State University for violations of Chapter 21 of the *Texas Labor Code*, *The Americans with Disabilities Act*, and the *Age Discrimination in Employment Act* for failure to provide reasonable accommodations and unlawful retaliation. Ms. Wheeler is currently working for the Physical Plant as a custodian in the School of Nursing; however, she was previously the President's House Coordinator under former SFA President Baker Pattillo for a number of years and then under current SFA President Scott Gordon from approximately November 2019 until June 2020.

**<u>Background Information</u>**

Ms. Wheeler has worked for SFA since approximately 2009. Currently, she is 50 years old. Unfortunately, Ms. Wheeler suffers from fibromyalgia, arthritis, migraines, and asthma. SFA is aware that Ms. Wheeler suffers from these conditions. Ms. Wheeler has also submitted FMLA forms related to these issues.

During most of her employment with SFA—up until June 2020, Ms. Wheeler was assigned to the President's home as a coordinator. Ms. Wheeler had few issues with her disabilities in this role, other than her ability to work outside in the heat was limited. In fact, in January 2020, Ms. Wheeler received an excellent evaluation for performing "Exemplary Work."

P.O. Box 274   *   Etoile, TX 75944
(936) 854-3213 – Telephone
(888) 430-2559 – Facsimile
tfranklin@tfranklinlawfirm.com

After former President Pattillo died in December 2018, Ms. Wheeler remained in the President's home for several months.  Shortly after the home became vacant, in the late Summer of 2019, Ms. Wheeler was reassigned to the Physical Plant as a custodian.  Bear in mind, Ms. Wheeler was being paid $24 per hour as a Custodian—other custodial employees were making far less than that.  When Ms. Wheeler arrived in Physical Plant, issues began to arise immediately.  Due to her disabilities, Ms. Wheeler was unable to do a lot of the work typically done by custodial staff.  Specifically, Ms. Wheeler struggled because the strong chemicals caused issues with her migraines and asthma and with heavy lifting that was required.

Compounding the problem, Ron Watson, SFA's Director of the Physical Plant, undertook a plan to stoke racial tension between Ms. Wheeler, who is White, and Ms. Wheeler's co-workers, who were mostly Hispanic or African-American.

Mr. Watson made several racially inappropriate comments to Ms. Wheeler about the other custodial employees—who are primary racial minorities—including stating that the other employees viewed Ms. Wheeler and the Pattillos as "coming out of a Southern Antebellum Plantation," analogized the other workers to "field hands" and himself to a  "field boss" sitting on a horse with a big straw hat and a whip, and commented that the whole dynamic was like the movie *Roots*.  Mr. Watson also referred to the other employees as having a "weird ass culture."

Apparently, Mr. Watson also made numerous comments to the minority employees about Ms. Wheeler as well.  Indeed, one of Ms. Wheeler's supervisors told her, "Ron wants you gone." Other employees also told Ms. Wheeler that Mr. Watson would never let Ms. Wheeler return back to the President's home.

At the same time, Mr. Watson told Ms. Wheeler that the other custodial staff "could not wait for Ms. Wheeler to leave."  Mr. Watson told Ms. Wheeler that the supervisor called her "white-privileged."

In the Fall of 2019, new SFA President Scott Gordon and his wife Sherri Schweizer-Gordon moved into the President's home.  Ms. Wheeler was then reassigned to the President's home as Coordinator.  While Ms. Wheeler was glad to be back in this role, her happiness was short lived.

After a few months, Ms. Gordon began asking Ms. Wheeler to do personal tasks, including giving Ms. Gordon manicures and pedicures (Ms. Wheeler did this 3-4 times) doing the Gordon's personal laundry; making beds; organizing the Gordon's personal property; doing personal shopping for the Gordons; and cooking President Gordon's daily breakfast.  At one point, Ms. Wheeler had to go to six different stores to find a certain snack cookie that President Gordon liked.

Ms. Gordon also asked Ms. Wheeler to paint her toenails; put a wig piece in her hair; soak her nails off; and put her makeup on.  These requests made Ms. Wheeler uncomfortable and Ms. Wheeler refused to do them.  When Ms. Gordon asked Ms. Wheeler to put on her makeup, Ms. Wheeler politely said, "You don't want me to do your make up because I'm not good it at."  Ms. Gordon replied, "Well I don't feel like putting my makeup on today."

When Ms. Wheeler was hired initially as the President's House Coordinator, she was specifically told that she worked for SFA, not the President; she was not a personal assistant to the President and his family.  Ms. Wheeler was instructed that her duties were only related to "official"

P.O. Box 274   *   Etoile, TX 75944
(936) 854-3213 – Telephone
(888) 430-2559 – Facsimile
tfranklin@tfranklinlawfirm.com

**APPX. 132**
**Wheeler 00048**

Page | 3

tasks, such as public functions and activities, and to maintain, manage, and clean the house.

Ms. Gordon was also verbally abusive and demeaning to Ms. Wheeler and other SFA staff, including being extremely critical of staff and threatening Ms. Wheeler's job.  Ms. Gordon was also prone to violent outbursts and would stomp her feet when she did not get her way or was upset, would yell, and would slam objects.

For example, Ms. Gordon broke the refrigerator door because she slammed it so hard in anger.

Ms. Gordon also demanded a tile worker, who was doing working on the President's home, be fired because he spilled water on "her driveway" and she had to walk through it.

On another occasion, after the President's house was pressure washed, Ms. Gordon became irate that the outside windowsills were dirty.  Ms. Gordon climbed up on a ladder and filmed herself cleaning a window ledge that she said she "was going to send to the Board of Regents." Ms. Gordon wanted to give the impression that she cleaned the whole front of the house.  She cleaned one, maybe two windows.

After the Gordon's numerous personal requests and dealing with Ms. Gordon's behavior, Ms. Wheeler verbally expressed concerns to her supervisors, including Hillary Parrish, that she was being abused and mistreated by the Gordons.

Ms. Gordon then asked for Ms. Wheeler to be removed from her role as Coordinator in June 2020.  Ms. Wheeler was then sent back to the Physical Plant.

Almost immediately, upon her return to the Physical Plant, Ms. Wheeler was ridiculed and harassed by her direct supervisor, Veronica Herrera, and Elizabeth Huerta, her "lead", because she told them that she was unable to perform certain tasks due to her disabilities.  Indeed, Ms. Wheeler has filed numerous reports with SFA's Department of Human Resources, specifically with John Wyatt, about not receiving reasonable accommodations and being harassed and retaliated against by her supervisors, but no action has been taken.

Ms. Wheeler provided written, medical documentation of her disabilities and limitations in July 2020, that HR insisted upon, despite already knowing of Ms. Wheeler's disabilities for some years.  Over the summer Ms. Wheeler's numerous requests for accommodations were ignored by her supervisors and HR.

On October 8, 2020, HR sent Ms. Wheeler an email detailing what it demeaned to be reasonable accommodation.  The next day, Ms. Wheeler spoke to Ms. Herrera about her responsibilities.  Ms. Herrera essentially told her that her responsibility was to clean three large buildings, by herself, including lifting buckets of water and dragging vacuums weighing more than the weight restrictions given by her doctor.  In other words, Ms. Herrera had no intention of following the directions from HR and accommodating Ms. Wheeler.

### <u>Request to Preserve Evidence</u>

By this letter, I formally request that all documents, emails, and communications concerning Tammy Wheeler in the possession of SFA be preserved.  This request includes communications sent or received by Ms. Sherri Schweizer-Gordon concerning Ms. Wheeler.  I

APPX. 133
Wheeler 00049

further request that Ms. Wheeler's entire personnel file be preserved.

### Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Non-Discrimination Policy Concerning Mr. Watson, Ms. Herrera, and Ms. Huerta

In accordance with SFA's Nondiscrimination Policy, Policy Number 2.11, please consider this a formal complaint against Ron Watson, Veronica Herrera, and Elizabeth Huerta for disability discrimination and harassment.  My client demands that SFA begin an immediate investigation concerning Mr. Watson and Ms. Herrera for disability discrimination in violations of Chapter 21 of the *Texas Labor Code*, *The Americans with Disabilities Act of 1990* (and its Amendments), Section 504 of the *Rehabilitation Act of 1974* and SFA's Non-Discrimination Policies.  My client also files a formal complaint against Ron Watson based on his racist comments and statements and demands an investigation be initiated.

Per Policy 2.11, a copy of this letter is being sent to Tiffany Rivers, SFA's Director of Disability Services and ADA Coordinator, and John Wyatt, SFA's Interim Human Resources Director.

### Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Ethics Policy Concerning Misuse of University/State Resources by President Scott Gordon and Ms. Sherri Schweizer-Gordon

In accordance with SFA's Ethic's Policy, Policy Number 2.6, please consider this a formal complaint against Scott Gordon and Sherri Schweizer-Gordon for misuse of state funds, in possible violation of Chapter 572 of the *Texas Government Code*; Section 2203.004 of the *Texas Government Code*; and other applicable laws.  My client demands that SFA begin an immediate investigation concerning President Gordon and his wife for misuse of state (university) resources.

A copy of this letter is being sent to Gina Oglesbee, SFA's Chief Audit Executive.

Please provide written acknowledgement of receipt this letter and that a 2.11 Discrimination Complaint has been recorded against Mr. Watson, Ms. Herrera, and Ms. Huerta, and that an Ethics Complaint has been recorded against President Scott Gordon and Ms. Sherri Gordon.

Respectfully,

/s/ *Tanner G. M. Franklin*
Tanner G. M. Franklin

CC:
Ms. Tiffany Rivers                                   via email at trivers@sfasu.edu
Director of Disability Services/ADA Coordinator

Mr. John Wyatt                                       via email at wyattjohn@sfasu.edu
Interim Human Resources Director

P.O. Box 274    *    Etoile, TX 75944
(936) 854-3213 – Telephone
(888) 430-2559 – Facsimile
tfranklin@tfranklinlawfirm.com

APPX. 134
Wheeler 00050

PRIVILEGED & CONFIDENTIAL

STEPHEN F. AUSTIN STATE UNIVERSITY

**Report of Investigation Relating to**
**Discrimination Complaint by Tammy Wheeler**

Authors:

Darren G. Gibson, Shareholder, Littler Mendelson, P.C.

Erin A. McNamara, Associate, Littler Mendelson, P.C.

**January 11, 2021**



PRIVILEGED & CONFIDENTIAL

# **Table of Contents**

I.   INTRODUCTION ................................................................................................. 3

II.  EXECUTIVE SUMMARY OF ALLEGATIONS, FINDINGS, AND
     CONCLUSIONS ................................................................................................. 3

III. APPLICABLE SFA POLICIES ......................................................................... 5

IV.  SUMMARY OF THE INVESTIGATION: PERSONS INTERVIEWED AND
     EVIDENCE REVIEWED ................................................................................... 7

V.   SUMMARY OF RELEVANT FACTS ............................................................... 8

     A.   Complainant's Age and Health Conditions ............................................ 8

     B.   Complainant Began Working for the University as the House Coordinator
          for the Former President (the Pattillos) in June 2009. ........................... 8

     C.   After President Pattillo's Death, Complainant Was Temporarily
          Reassigned from Approximately September 2019 to November 2019. ............... 9

     D.   In September 2019, Tensions Arose Between Complainant,
          Respondent #1, and Respondent #2, Stemming From a Facebook Post
          Made By Respondent #2. ....................................................................... 11

     E.   Complainant Returned to PPD and Was Assigned to Work with
          Respondent #3 ....................................................................................... 14

     F.   Complainant submits her Complaint. .................................................... 21

VI.  FINDINGS REGARDING ALLEGATIONS OF AGE DISCRIMINATION,
     RACIST COMMENTS, DISABILITY DISCRIMINATION AND
     HARASSMENT, AND RETALIATION .......................................................... 22

VII. CONCLUSION ................................................................................................ 30

VIII. EXHIBIT LIST .............................................................................................. 31

APPX. 136

SFA-00413

PRIVILEGED & CONFIDENTIAL

To:   Dr. Danny Gallant, Vice President for Finance & Administration, Stephen F. Austin State University

Cc:   Damon Derrick, General Counsel, Stephen F. Austin State University

From: Darren Gibson, Littler Mendelson, P.C.
      Erin McNamara, Littler Mendelson, P.C.

Date:  January 11, 2021

Re:   Report of Investigation Relating to Discrimination Complaint by Tammy Wheeler

---

## I.   Introduction

On October 12, 2020, Stephen F. Austin State University ("SFA" or the "University") received a written complaint from legal counsel for **Tammy Wheeler** ("Complainant"),[1] a custodial employee in the Physical Plant Department ("PPD").[2] Complainant raised additional allegations via emails from her counsel on November 2, 2020 and November 10, 2020.[3] These communications will be referred to collectively as Complainant's "Complaint." The Complaint asserts allegations against **Ron Watson** ("Respondent #1"), **Veronica Herrera** ("Respondent #2"), and **Elizabeth Huerta** ("Respondent #3") (collectively, "Respondents"). Specifically, the Complaint alleges that she was subjected to age discrimination, that Respondent #1 made racist comments in front of her, that the three Respondents subjected Complainant to disability discrimination and harassment, and that Respondent #2 retaliated against Complainant during the investigation.

SFA retained Darren Gibson, a shareholder with the law firm Littler Mendelson, P.C., to conduct an independent investigation of the discrimination allegations asserted in the Complaint pursuant to SFA's Nondiscrimination Policy (Policy 2.11).[4] Erin McNamara, an associate with Littler Mendelson, assisted Mr. Gibson in the investigation.

## II.   Executive Summary of Allegations, Findings, and Conclusions

Complainant's allegations against Respondents focus on three areas of discrimination and harassment. First, Complainant alleges that she was subjected to age discrimination when she was temporarily removed from her assignment as the House Coordinator at the Juanita Curry Boynton

---

[1] In this Report, the names of the Complainant, Respondents, and Witnesses are bolded and defined to ease the process of redacting names, if necessary.

[2] Ex. 1, 10.12.2020 Letter of Representation. Complainant asserted other allegations in her Complaint unrelated to her allegations against the three Respondents. Those allegations are subject to a separate investigation and are redacted from Exhibit 1. A complete list of exhibits to this Report is attached hereto.

[3] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[4] Ex. 4, Nondiscrimination Policy.

PRIVILEGED & CONFIDENTIAL

House ("JCB House") and replaced by younger student workers while the home was being renovated before the arrival of the new president in 2019.

Second, Complainant also alleges that after she was reassigned from the JCB House to custodial work in PPD in 2019, Respondent #1 made racist comments in her presence and stoked racial tension between Complainant, who is White, and her co-workers, who were mostly Hispanic or African American. In particular, Complainant alleges that in late September/early October 2019, Respondent #1 told Complainant that Respondent #2 posted a comment on Facebook referring to Complainant as "white-privileged."[5] Complainant further alleges that Respondent #1 made several racially inappropriate comments to Complainant about the other custodial employees, who are primarily racial minorities. In particular, Complainant alleges Respondent #1 stated that the other employees viewed Complainant as "coming out of a Southern Antebellum Plantation," he analogized the other workers to "field hands" and himself to a "field boss" sitting on a horse with a big straw hat and a whip, and he commented that the whole dynamic was like the movie *Roots.* She further alleged that Respondent #1 said the other custodial employees have a "weird ass culture."

Third, Complainant alleges that when she was reassigned to PPD in June 2020, the three Respondents subjected her to disability discrimination and harassment based on the following allegations: (i)  she was ridiculed and harassed by Respondent #3 because Complainant said she was unable to perform certain tasks due to her disabilities; (ii) her numerous requests for accommodations were ignored by her supervisors and Human Resources; and (iii) Respondent #2 had no intention of following the directions from Human Resources and accommodating Complainant.[6]

For the reasons set forth below, we find the allegations that Complainant was subjected to discrimination and harassment on the basis of her age and disabilities to be **unsubstantiated.** The weight of the evidence does not support the majority of Complainant's allegations of age or disability discrimination or harassment. To the extent the alleged conduct did occur, we further find insufficient evidence to establish Respondents took any adverse action against Complainant *because of* her age or disabilities or that any conduct regarding her disabilities rose to the level of harassment, as defined by the Nondiscrimination Policy.

On the other hand, the weight of the evidence supports Complainant's allegations that Respondent #1 made racially inappropriate comments towards Complainant. However, we find that the comments were not "sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with" Complainant's work performance to meet the definition of harassment in the Nondiscrimination Policy. Thus, we find the allegations of race-based harassment against Respondent #1 to be **unsubstantiated.** However, we further find **Respondent #1's conduct constituted "Other Unprofessional/Inappropriate Conduct," in violation of SFA's Nondiscrimination Policy.**[7]

---

[5] Ex. 1, 10.12.2020 Letter of Representation, p. 2.

[6] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[7] Ex. 4, Nondiscrimination Policy, § II.

4

During the course of the investigation, Complainant (through her counsel) made additional allegations of retaliation.[8] On November 2, 2020, Complainant's counsel alleged that Complainant was required to perform work beyond her restrictions at the Student Center.[9] Additionally, on November 11, 2020, Complainant's counsel alleged that Complainant overheard Witness #3 on the phone discussing Complainant from outside his closed office door.[10] In her follow-up interview, Complainant also alleged that another custodial worker told her that Respondent #2 made a comment referring to Complainant by a derogatory term.

We find that Complainant's allegations that she was subjected to retaliation during the investigation to be **unsubstantiated**, as the evidence does not indicate that the alleged retaliatory acts, even if true, were taken because Complainant brought forth her Complaint or otherwise engaged in protected activity.

## III.   Applicable SFA Policies

The investigation of the Complaint was conducted pursuant to SFA's Nondiscrimination Policy.[11] Under the Nondiscrimination Policy, discrimination "means conduct directed at a specific individual or a group of identifiable individuals that subjects the individual or group to treatment that adversely affects their employment or education because of their race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status."[12] In addition, the Nondiscrimination Policy defines harassment as:

> verbal or physical conduct that is directed at an individual or group because of race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status when such conduct is sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with an individual's or group's academic or work performance; or of creating a hostile academic or work environment.[13]

The Nondiscrimination Policy also prohibits retaliation, which "means any attempt to seek retribution against an individual or group of individuals involved in filing a complaint or report under this Policy, filing an external complaint, participating in a disciplinary process, or opposing

---

[8] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[9] Ex. 2, 11.02.2020 Email from Complainant's Counsel.

[10] Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[11] Ex. 4, Nondiscrimination Policy.

[12] Ex. 4, Nondiscrimination Policy, § II.

[13] Ex. 4, Nondiscrimination Policy, § II.

APPX. 139
SFA-00416

| | |
|---|---|
| **From:** | Danny Gallant |
| **To:** | Tammy Wheeler; Ronald Watson; Veronica Herrera; Elizabeth Huerta |
| **Cc:** | Damon Derrick; John Wyatt; Amanda Pruit |
| **Subject:** | Discrimination Allegations Response |
| **Date:** | Thursday, January 14, 2021 3:43:55 PM |
| **Attachments:** | Discrimination Report Response.pdf |
| | Discrimination Report 1-11-21.pdf |

All,

The first attachment is my response to you regarding the discrimination investigative report prepared by Littler Mendelson firm members Darren Gibson and Erin McNamara.  Also attached is a copy of the investigative report.



**Danny R. Gallant** , Ph.D.
**Vice President for Finance and Administration**
**Stephen F. Austin State University**

*The views and opinions expressed in this message are my own and do not necessarily reflect the views and opinions of Stephen F. Austin State University, its Board of Regents, or the State of Texas.*

It's not about being right, it's about getting it right……Elizabeth Spelke

APPX.  140
SFA-00504

Danny Gallant, Ph.D.                     via email at dgallant@sfasu.edu and Regular Mail
Vice President for Finance
  and Administration
Stephen F. Austin State University
P.O. Box 6108, SFA Station
Nacogdoches, Texas 75962-6108

Date:  January 20, 2021

**Re:  Complainant's Appeal and Request for Discrimination Board Hearing**

Dr. Gallant,

Pursuant to Stephen F. Austin State University's Nondiscrimination Policy 2.11 (Section IX, Part B,3), I, as the initial Complainant in the matter discussed in your January 14, 2021 letter, find your decision to be unsatisfactory.  Therefore, I am appealing your decision by submitting this written request a formal hearing by a discrimination complaint review board of this entire matter.

This written request is being submitted within 5 business days of the submission of your January 14, 2021 decision letter, which was sent by email to my legal counsel.  As your decision letter was transmitted by email, this Appeal and Request for a Discrimination Board Hearing is also being sent to you by email with hard copy to follow by Regular Mail.


Respectfully submitted,

Tammy Wheeler


CC:
Damon Derrick, General Counsel                 via email at derrickdc@sfasu.edu
John Wyatt, Interim Human Resources Director   via email at wyattjohn@sfasu.edu

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **460-2021-02946** |

| **Texas Workforce Commission Civil Rights Division** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(Indicate Mr., Ms., Mrs.)*<br>**Tammy Wheeler** | Home Phone *(Incl. Area Code)*<br>**936-553-1154** | Date of Birth<br>**01/10/1970** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **170 CR 1291 Nacogdoches, Texas 75965** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**Stephen F. Austin State University** | No. Employees, Members<br>**500+** | Phone No. *(Include Area Code)*<br>**(936) 468-3401** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **1936 North Street, Nacogdoches, Texas 75962** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | Earliest **6/1/2020**   Latest **Ongoing** |
| ☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I, Tammy Wheeler, have been employed by Stephen F. Austin State University ("SFA") since June 2009. I was formally a House Coordinator in the President's House form June 2009 until September 2019, when I was reassigned following the death former SFA President Dr. Baker Pattillo. In November 2019, I was returned to the House Coordinator position. The home was now occupied by new SFA President Scott Gordon and his wife, Sherri Schweizer-Gordon.

During the reassignment period, I was assigned to SFA's Physical Plant Department doing general custodial work. While I was there, SFA's Director of the Physical Plant made numerous racist and racially charged statements to me about minority co-workers and the "hierarchy" at SFA. Mr. Watson also fueled racial tensions between me and my new co-workers. I also notified SFA's Interim Human Resources Director about Mr. Watson's conduct and racist statements on September 26, 2019.

I have several disabilities and health conditions including fibromyalgia, osteoarthritis, Hashimoto's disease, chronic fatigue, migraines, and a lack of strength in my hands due to osteoarthritis. Consequently, I have had weight limits for lifting between 5 and 15 pounds. While I was able to perform my duties as House Coordinator, I have had difficulty preforming general custodial duties due to my disabilities.

In January 2020, I received a written evaluation from my former supervisor while I was temporarily assigned to the Physical Plant Department, Veronica Herrera. Ms. Herrera rated my performance as "Exemplary," the highest overall rating. My previous supervisor in the President's home, Dr. Janice Pattillo, had given high recommendations in the past and consistently praised my work and performance.

In June 2020, I was removed from the President's home again and permanently reassigned to a custodial position. This resulted in me seeking accommodations for disabilities from SFA Human Resources, although SFA Human Resources was already aware of my disabilities.

APPX. 142<br>SFA-00511

Because I was denied reasonable accommodations and other issues that I had witnessed over the past year, including racist behavior from SFA's Director of Physical Plant, Ron Watson; abusive and demeaning behavior by First Lady Sherri Schweitzer-Gordon; and misuse of SFA resources by President Gordon ad his wife. *See* Exhibit "A," *Charging Party's Formal Complaint* dated October 12, 2020.

Afterwards, SFA retained the well-known employment defense firm Littler Mendelson, P.C. to review my complaints.

During Littler Mendelson's investigation, I was retaliated against by my supervisor, Veronica Herrera. In November 2020, she threatened to change my hours. Ms. Herrera also reassigned me additional work following my complaint. Note, this was less than 1 month after I filed my complaint in which Veronica Herrera was specifically named.

On January 14, 2021, I was provided with a copy of Littler Mendelson's Report. Unsurprisingly, Littler Mendelson largely cleared SFA of any wrongdoing. *See Exhibit "B," Littler Mendelson, P.C.'s Report.* Notably, the Littler Mendelson investigators failed to address my complaints concerning Dr. Scott Gordon and Sherri Schweitzer-Gordon. Indeed, Dr. Gordon and his wife were not even listed as "Respondents." *See id.* The Littler Mendelson investigators did, however, find that Ron Watson made numerous racist comments that were confirmed by several other employees. Another fact that was left out of the Littler Mendelson Report was that I told Sherri Schweitzer-Gordon about the racist statements by Ron Watson and his efforts to stoke racial tension within the physical plant. I even mentioned to Sherri Schweitzer-Gordon that I thought about suing Ron Watson for his behavior. I also mentioned to Dr. Scott Gordon that Ron Watson had made several racist statements and caused trouble between me and my coworkers. Admittedly, I told Sherri Schweitzer-Gordon more details than Dr. Gordon.

On January 20, 2021, I filed a formal appeal of the investigators' findings and recommendations. *See Exhibit "C," Charging Party's Appeal.*

On February 3, 2021, I received my 2020 evaluation from Veronica Herrera. *See Exhibit "D."* Ms. Herrera rated my work as "Improvement Needed" in 8 of 13 categories, "Acceptable" in 4 categories, and "Exemplary" in 1 category. As previously noted, my prior evaluations have all been exceedingly higher than the one issued to me by Ms. Herrera following my complaint and formal request for accommodation. Note, the evaluation was signed by Ms. Herrera and Ron Watson on January 25, 2021—9 days after the Littler Mendelson report was issued and 5 days after I filed my appeal.

Accordingly, I was and am being retaliated against by SFA for filing a formal complaint of discrimination and harassment in October 2020, as well as requesting disability accommodations beginning in July 2020.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| 4-29-21 | SIGNATURE OF COMPLAINANT |
| _Date_   _Charging Party Signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* 4/29/21 |

MELANIE ARNOLD
Notary Public, State of Texas
Comm. Expires 01-07-2024
Notary ID 12605726-5

**APPX. 143**
**SFA-00512**

EXHIBIT "A"



# FRANKLIN LAW FIRM
**PLLC**

October 12, 2020

**LETTER OF REPRESENTATION, REQUEST TO PRESERVE EVIDENCE,
FORMAL COMPLAINT OF DISABILITY DISCRIMINATION AND HARASSMENT,
AND FORMAL COMPLAINT FOR MISUSE OF UNIVERSITY/STATE RESOURCES**

Stephen F. Austin State University
Damon Derrick, General Counsel
Ms. Gina Ogelsbee, Chief Audit Executive
1936 North Street
Nacogdoches, Texas 75962

via Regular Mail
via email at derrickdc@sfasu.edu
via email at ogelsbeegs@sfasu.edu

RE:    *Tammy Wheeler—An SFASU Employee in the Physical Plant*

Dear Mr. Derrick and Ms. Ogelsbee:

Please be advised that Franklin Law Firm, PLLC has been retained by Tammy Wheeler, a current SFA employee working in the Physical Plant with respect to claims that she has against Stephen F. Austin State University for violations of Chapter 21 of the *Texas Labor Code*, *The Americans with Disabilities Act*, and the *Age Discrimination in Employment Act* for failure to provide reasonable accommodations and unlawful retaliation. Ms. Wheeler is currently working for the Physical Plant as a custodian in the School of Nursing; however, she was previously the President's House Coordinator under former SFA President Baker Pattillo for a number of years and then under current SFA President Scott Gordon from approximately November 2019 until June 2020.

**Background Information**

Ms. Wheeler has worked for SFA since approximately 2009. Currently, she is 50 years old. Unfortunately, Ms. Wheeler suffers from fibromyalgia, arthritis, migraines, and asthma. SFA is aware that Ms. Wheeler suffers from these conditions. Ms. Wheeler has also submitted FMLA forms related to these issues.

During most of her employment with SFA—up until June 2020, Ms. Wheeler was assigned to the President's home as a coordinator. Ms. Wheeler had few issues with her disabilities in this role, other than her ability to work outside in the heat was limited. In fact, in January 2020, Ms. Wheeler received an excellent evaluation for performing "Exemplary Work."

APPX. 144
SFA-00513

After former President Pattillo died in December 2018, Ms. Wheeler remained in the President's home for several months.  Shortly after the home became vacant, in the late Summer of 2019, Ms. Wheeler was reassigned to the Physical Plant as a custodian.  Bear in mind, Ms. Wheeler was being paid $24 per hour as a Custodian—other custodial employees were making far less than that.  When Ms. Wheeler arrived in Physical Plant, issues began to arise immediately. Due to her disabilities, Ms. Wheeler was unable to do a lot of the work typically done by custodial staff.  Specifically, Ms. Wheeler struggled because the strong chemicals caused issues with her migraines and asthma and with heavy lifting that was required.

Compounding the problem, Ron Watson, SFA's Director of the Physical Plant, undertook a plan to stoke racial tension between Ms. Wheeler, who is White, and Ms. Wheeler's co-workers, who were mostly Hispanic or African-American.

Mr. Watson made several racially inappropriate comments to Ms. Wheeler about the other custodial employees—who are primary racial minorities—including stating that the other employees viewed Ms. Wheeler and the Pattillos as "coming out of a Southern Antebellum Plantation," analogized the other workers to "field hands" and himself to a  "field boss" sitting on a horse with a big straw hat and a whip, and commented that the whole dynamic was like the movie *Roots*.  Mr. Watson also referred to the other employees as having a "weird ass culture."

Apparently, Mr. Watson also made numerous comments to the minority employees about Ms. Wheeler as well.  Indeed, one of Ms. Wheeler's supervisors told her, "Ron wants you gone." Other employees also told Ms. Wheeler that Mr. Watson would never let Ms. Wheeler return back to the President's home.

At the same time, Mr. Watson told Ms. Wheeler that the other custodial staff "could not wait for Ms. Wheeler to leave."  Mr. Watson told Ms. Wheeler that the supervisor called her "white-privileged."

In the Fall of 2019, new SFA President Scott Gordon and his wife Sherri Schweizer-Gordon moved into the President's home.  Ms. Wheeler was then reassigned to the President's home as Coordinator.  While Ms. Wheeler was glad to be back in this role, her happiness was short lived.

After a few months, Ms. Gordon began asking Ms. Wheeler to do personal tasks, including giving Ms. Gordon manicures and pedicures (Ms. Wheeler did this 3-4 times) doing the Gordon's personal laundry; making beds; organizing the Gordon's personal property; doing personal shopping for the Gordons; and cooking President Gordon's daily breakfast.  At one point, Ms. Wheeler had to go to six different stores to find a certain snack cookie that President Gordon liked.

Ms. Gordon also asked Ms. Wheeler to paint her toenails; put a wig piece in her hair; soak her nails off; and put her makeup on.  These requests made Ms. Wheeler uncomfortable and Ms. Wheeler refused to do them.  When Ms. Gordon asked Ms. Wheeler to put on her makeup, Ms. Wheeler politely said, "You don't want me to do your make up because I'm not good it at."  Ms. Gordon replied, "Well I don't feel like putting my makeup on today."

When Ms. Wheeler was hired initially as the President's House Coordinator, she was specifically told that she worked for SFA, not the President; she was not a personal assistant to the President and his family.  Ms. Wheeler was instructed that her duties were only related to "official"

APPX. 145
SFA-00514

tasks, such as public functions and activities, and to maintain, manage, and clean the house.

Ms. Gordon was also verbally abusive and demeaning to Ms. Wheeler and other SFA staff, including being extremely critical of staff and threatening Ms. Wheeler's job.  Ms. Gordon was also prone to violent outbursts and would stomp her feet when she did not get her way or was upset, would yell, and would slam objects.

For example, Ms. Gordon broke the refrigerator door because she slammed it so hard in anger.

Ms. Gordon also demanded a tile worker, who was doing working on the President's home, be fired because he spilled water on "her driveway" and she had to walk through it.

On another occasion, after the President's house was pressure washed, Ms. Gordon became irate that the outside windowsills were dirty.  Ms. Gordon climbed up on a ladder and filmed herself cleaning a window ledge that she said she "was going to send to the Board of Regents."  Ms. Gordon wanted to give the impression that she cleaned the whole front of the house.  She cleaned one, maybe two windows.

After the Gordon's numerous personal requests and dealing with Ms. Gordon's behavior, Ms. Wheeler verbally expressed concerns to her supervisors, including Hillary Parrish, that she was being abused and mistreated by the Gordons.

Ms. Gordon then asked for Ms. Wheeler to be removed from her role as Coordinator in June 2020.  Ms. Wheeler was then sent back to the Physical Plant.

Almost immediately, upon her return to the Physical Plant, Ms. Wheeler was ridiculed and harassed by her direct supervisor, Veronica Herrera, and Elizabeth Huerta, her "lead", because she told them that she was unable to perform certain tasks due to her disabilities.  Indeed, Ms. Wheeler has filed numerous reports with SFA's Department of Human Resources, specifically with John Wyatt, about not receiving reasonable accommodations and being harassed and retaliated against by her supervisors, but no action has been taken.

Ms. Wheeler provided written, medical documentation of her disabilities and limitations in July 2020, that HR insisted upon, despite already knowing of Ms. Wheeler's disabilities for some years.  Over the summer Ms. Wheeler's numerous requests for accommodations were ignored by her supervisors and HR.

On October 8, 2020, HR sent Ms. Wheeler an email detailing what it demeaned to be reasonable accommodation.  The next day, Ms. Wheeler spoke to Ms. Herrera about her responsibilities.  Ms. Herrera essentially told her that her responsibility was to clean three large buildings, by herself, including lifting buckets of water and dragging vacuums weighing more than the weight restrictions given by her doctor.  In other words, Ms. Herrera had no intention of following the directions from HR and accommodating Ms. Wheeler.

## Request to Preserve Evidence

By this letter, I formally request that all documents, emails, and communications concerning Tammy Wheeler in the possession of SFA be preserved.  This request includes communications sent or received by Ms. Sherri Schweizer-Gordon concerning Ms. Wheeler.  I

APPX. 146
SFA-00515

further request that Ms. Wheeler's entire personnel file be preserved.

### Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Non-Discrimination Policy Concerning Mr. Watson, Ms. Herrera, and Ms. Huerta

In accordance with SFA's Nondiscrimination Policy, Policy Number 2.11, please consider this a formal complaint against Ron Watson, Veronica Herrera, and Elizabeth Huerta for disability discrimination and harassment. My client demands that SFA begin an immediate investigation concerning Mr. Watson and Ms. Herrera for disability discrimination in violations of Chapter 21 of the *Texas Labor Code, The Americans with Disabilities Act of 1990* (and its Amendments), Section 504 of the *Rehabilitation Act of 1974* and SFA's Non-Discrimination Policies. My client also files a formal complaint against Ron Watson based on his racist comments and statements and demands an investigation be initiated.

Per Policy 2.11, a copy of this letter is being sent to Tiffany Rivers, SFA's Director of Disability Services and ADA Coordinator, and John Wyatt, SFA's Interim Human Resources Director.

### Formal Complaint and Demand for Immediate Investigation in Accordance with SFA's Ethics Policy Concerning Misuse of University/State Resources by President Scott Gordon and Ms. Sherri Schweizer-Gordon

In accordance with SFA's Ethic's Policy, Policy Number 2.6, please consider this a formal complaint against Scott Gordon and Sherri Schweizer-Gordon for misuse of state funds, in possible violation of Chapter 572 of the *Texas Government Code*; Section 2203.004 of the *Texas Government Code*; and other applicable laws. My client demands that SFA begin an immediate investigation concerning President Gordon and his wife for misuse of state (university) resources.

A copy of this letter is being sent to Gina Oglesbee, SFA's Chief Audit Executive.

Please provide written acknowledgement of receipt this letter and that a 2.11 Discrimination Complaint has been recorded against Mr. Watson, Ms. Herrera, and Ms. Huerta, and that an Ethics Complaint has been recorded against President Scott Gordon and Ms. Sherri Gordon.

Respectfully,

/s/ *Tanner G. M. Franklin*
Tanner G. M. Franklin

CC:

Ms. Tiffany Rivers                                             via email at trivers@sfasu.edu
Director of Disability Services/ADA Coordinator

Mr. John Wyatt                                                via email at wyattjohn@sfasu.edu
Interim Human Resources Director

APPX. 147
SFA-00516

EXHIBIT B

PRIVILEGED & CONFIDENTIAL

STEPHEN F. AUSTIN STATE UNIVERSITY

**Report of Investigation Relating to**
**Discrimination Complaint by Tammy Wheeler**

**Authors:**

**Darren G. Gibson, Shareholder, Littler Mendelson, P.C.**

**Erin A. McNamara, Associate, Littler Mendelson, P.C.**

**January 11, 2021**



PRIVILEGED & CONFIDENTIAL

# Table of Contents

I.    INTRODUCTION ................................................................................................. 3

II.   EXECUTIVE SUMMARY OF ALLEGATIONS, FINDINGS, AND
      CONCLUSIONS ................................................................................................ 3

III.  APPLICABLE SFA POLICIES ........................................................................ 5

IV.   SUMMARY OF THE INVESTIGATION: PERSONS INTERVIEWED AND
      EVIDENCE REVIEWED .................................................................................. 7

V.    SUMMARY OF RELEVANT FACTS ............................................................. 8

      A.    Complainant's Age and Health Conditions ........................................... 8

      B.    Complainant Began Working for the University as the House Coordinator
            for the Former President (the Pattillos) in June 2009. ........................... 8

      C.    After President Pattillo's Death, Complainant Was Temporarily
            Reassigned from Approximately September 2019 to November 2019. ............. 9

      D.    In September 2019, Tensions Arose Between Complainant,
            Respondent #1, and Respondent #2, Stemming From a Facebook Post
            Made By Respondent #2. ..................................................................... 11

      E.    Complainant Returned to PPD and Was Assigned to Work with
            Respondent #3 ..................................................................................... 14

      F.    Complainant submits her Complaint. ................................................... 21

VI.   FINDINGS REGARDING ALLEGATIONS OF AGE DISCRIMINATION,
      RACIST COMMENTS, DISABILITY DISCRIMINATION AND
      HARASSMENT, AND RETALIATION ......................................................... 22

VII.  CONCLUSION ................................................................................................ 30

VIII. EXHIBIT LIST ................................................................................................ 31

APPX. 149
SFA-00518

PRIVILEGED & CONFIDENTIAL

To:     Dr. Danny Gallant, Vice President for Finance & Administration, Stephen F. Austin State
        University

Cc:     Damon Derrick, General Counsel, Stephen F. Austin State University

From:   Darren Gibson, Littler Mendelson, P.C.
        Erin McNamara, Littler Mendelson, P.C.

Date:   January 11, 2021

Re:     Report of Investigation Relating to Discrimination Complaint by Tammy Wheeler

---

I.      **Introduction**

        On October 12, 2020, Stephen F. Austin State University ("SFA" or the "University")
received a written complaint from legal counsel for **Tammy Wheeler** ("Complainant"),[1] a
custodial employee in the Physical Plant Department ("PPD").[2] Complainant raised additional
allegations via emails from her counsel on November 2, 2020 and November 10, 2020.[3] These
communications will be referred to collectively as Complainant's "Complaint." The Complaint
asserts allegations against **Ron Watson** ("Respondent #1"), **Veronica Herrera**
("Respondent #2"), and **Elizabeth Huerta** ("Respondent #3") (collectively, "Respondents").
Specifically, the Complaint alleges that she was subjected to age discrimination, that
Respondent #1 made racist comments in front of her, that the three Respondents subjected
Complainant to disability discrimination and harassment, and that Respondent #2 retaliated against
Complainant during the investigation.

        SFA retained Darren Gibson, a shareholder with the law firm Littler Mendelson, P.C., to
conduct an independent investigation of the discrimination allegations asserted in the Complaint
pursuant to SFA's Nondiscrimination Policy (Policy 2.11).[4] Erin McNamara, an associate with
Littler Mendelson, assisted Mr. Gibson in the investigation.

II.     **Executive Summary of Allegations, Findings, and Conclusions**

        Complainant's allegations against Respondents focus on three areas of discrimination and
harassment. First, Complainant alleges that she was subjected to age discrimination when she was
temporarily removed from her assignment as the House Coordinator at the Juanita Curry Boynton

---

[1] In this Report, the names of the Complainant, Respondents, and Witnesses are bolded and defined to ease the process of redacting names, if necessary.

[2] Ex. 1, 10.12.2020 Letter of Representation. Complainant asserted other allegations in her Complaint unrelated to her allegations against the three Respondents. Those allegations are subject to a separate investigation and are redacted from Exhibit 1. A complete list of exhibits to this Report is attached hereto.

[3] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[4] Ex. 4, Nondiscrimination Policy.

3

PRIVILEGED & CONFIDENTIAL

House ("JCB House") and replaced by younger student workers while the home was being renovated before the arrival of the new president in 2019.

Second, Complainant also alleges that after she was reassigned from the JCB House to custodial work in PPD in 2019, Respondent #1 made racist comments in her presence and stoked racial tension between Complainant, who is White, and her co-workers, who were mostly Hispanic or African American. In particular, Complainant alleges that in late September/early October 2019, Respondent #1 told Complainant that Respondent #2 posted a comment on Facebook referring to Complainant as "white-privileged." [5] Complainant further alleges that Respondent #1 made several racially inappropriate comments to Complainant about the other custodial employees, who are primarily racial minorities. In particular, Complainant alleges Respondent #1 stated that the other employees viewed Complainant as "coming out of a Southern Antebellum Plantation," he analogized the other workers to "field hands" and himself to a "field boss" sitting on a horse with a big straw hat and a whip, and he commented that the whole dynamic was like the movie *Roots*. She further alleged that Respondent #1 said the other custodial employees have a "weird ass culture."

Third, Complainant alleges that when she was reassigned to PPD in June 2020, the three Respondents subjected her to disability discrimination and harassment based on the following allegations: (i) she was ridiculed and harassed by Respondent #3 because Complainant said she was unable to perform certain tasks due to her disabilities; (ii) her numerous requests for accommodations were ignored by her supervisors and Human Resources; and (iii) Respondent #2 had no intention of following the directions from Human Resources and accommodating Complainant. [6]

For the reasons set forth below, we find the allegations that Complainant was subjected to discrimination and harassment on the basis of her age and disabilities to be **unsubstantiated.** The weight of the evidence does not support the majority of Complainant's allegations of age or disability discrimination or harassment. To the extent the alleged conduct did occur, we further find insufficient evidence to establish Respondents took any adverse action against Complainant *because of* her age or disabilities or that any conduct regarding her disabilities rose to the level of harassment, as defined by the Nondiscrimination Policy.

On the other hand, the weight of the evidence supports Complainant's allegations that Respondent #1 made racially inappropriate comments towards Complainant. However, we find that the comments were not "sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with" Complainant's work performance to meet the definition of harassment in the Nondiscrimination Policy. Thus, we find the allegations of race-based harassment against Respondent #1 to be **unsubstantiated**. However, we further find **Respondent #1's conduct constituted "Other Unprofessional/Inappropriate Conduct," in violation of SFA's Nondiscrimination Policy.** [7]

---

[5] Ex. 1, 10.12.2020 Letter of Representation, p. 2.

[6] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[7] Ex. 4, Nondiscrimination Policy, § II.

4

PRIVILEGED & CONFIDENTIAL

During the course of the investigation, Complainant (through her counsel) made additional allegations of retaliation.[8] On November 2, 2020, Complainant's counsel alleged that Complainant was required to perform work beyond her restrictions at the Student Center.[9] Additionally, on November 11, 2020, Complainant's counsel alleged that Complainant overheard Witness #3 on the phone discussing Complainant from outside his closed office door.[10] In her follow-up interview, Complainant also alleged that another custodial worker told her that Respondent #2 made a comment referring to Complainant by a derogatory term.

We find that Complainant's allegations that she was subjected to retaliation during the investigation to be **unsubstantiated**, as the evidence does not indicate that the alleged retaliatory acts, even if true, were taken because Complainant brought forth her Complaint or otherwise engaged in protected activity.

## III.    Applicable SFA Policies

The investigation of the Complaint was conducted pursuant to SFA's Nondiscrimination Policy.[11] Under the Nondiscrimination Policy, discrimination "means conduct directed at a specific individual or a group of identifiable individuals that subjects the individual or group to treatment that adversely affects their employment or education because of their race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status."[12] In addition, the Nondiscrimination Policy defines harassment as:

> verbal or physical conduct that is directed at an individual or group because of race, color, religion, national origin, sex, sexual orientation, gender identity, gender expression, age, disability, genetic information, citizenship, or veteran status when such conduct is sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with an individual's or group's academic or work performance; or of creating a hostile academic or work environment.[13]

The Nondiscrimination Policy also prohibits retaliation, which "means any attempt to seek retribution against an individual or group of individuals involved in filing a complaint or report under this Policy, filing an external complaint, participating in a disciplinary process, or opposing

---

[8] Ex. 2, 11.02.2020 Email from Complainant's Counsel; Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[9] Ex. 2, 11.02.2020 Email from Complainant's Counsel.

[10] Ex. 3, 11.10.2020 Email from Complainant's Counsel.

[11] Ex. 4, Nondiscrimination Policy.

[12] Ex. 4, Nondiscrimination Policy, § II.

[13] Ex. 4, Nondiscrimination Policy, § II.

APPX. 152
SFA-00521

PRIVILEGED & CONFIDENTIAL

in a reasonable manner an action believed to constitute a violation of this Policy."[14] Instances of alleged retaliation are to be investigated pursuant to the procedures of the Discrimination Policy.[15]

In addition, if a respondent is found to have engaged in unprofessional conduct that does not rise to the level of discrimination or harassment based on a protected class, the conduct may nevertheless be prohibited by the Nondiscrimination Policy as "Other Unprofessional/ Inappropriate Conduct."[16] The Nondiscrimination Policy defines "Other Unprofessional/ Inappropriate Conduct" as "behavior or conduct that is unprofessional and/or inappropriate for the educational and/or working environment, but does not rise to the level of Sexual Harassment or other form of Prohibited Conduct outlined above."[17] Therefore, to the extent corroborated factual allegations are found not to rise to the level of discrimination or harassment, this Report will also assess whether the conduct constitutes "Other Unprofessional/Inappropriate Conduct."

The Nondiscrimination Policy contemplates an investigation conducted by an impartial administrator from within the division where the complaint was filed, but not within the unit involved.[18] Due to the nature of this particular Complaint, the University engaged Mr. Gibson as a third-party, independent investigator. Information received during the investigation is to remain confidential, and relevant information is being provided to those persons who need to know via this Report in order to achieve a timely resolution of the Complaint.[19] In addition, the investigation required an extension beyond the 20 business days provided in the policy because of the availability of parties and witnesses for interviews and due to the holiday season. The parties were informed of the investigation status and extension.

Pursuant to the Nondiscrimination Policy, this Report "should describe the investigator's findings and conclusions to each allegation," and include "a brief overview of the investigative process including the category and number of individuals interviewed, timelines, and a summary of each allegation."[20] In addition, "the report should contain the investigator's recommendations for resolution of the matter," and "should be addressed to the appropriate vice President (or President if the complaint concerns a unit reporting directly to the President, or Chair of the Board of Regents if the complaint concerns an employee reporting directly to the Board of Regents or a member of the Board of Regents)."[21] Furthermore, "[t]he Vice President/President shall review the findings and recommendations of the investigator and take such action deemed appropriate. Such action shall be communicated in a letter to the Complainant and Respondent with copies to the general counsel, Director of Human Resources, and the Title IX or ADA Coordinator, as

---

[14] Ex. 4, Nondiscrimination Policy, § II.

[15] Ex. 4, Nondiscrimination Policy, § X.

[16] Ex. 4, Nondiscrimination Policy, § II.

[17] Ex. 4, Nondiscrimination Policy, § II.

[18] Ex. 4, Nondiscrimination Policy, § IX(B).

[19] Ex. 4, Nondiscrimination Policy, §§ IV (Confidentiality), VII.

[20] Ex. 4, Nondiscrimination Policy, §§ IV (Confidentiality), VII.

[21] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

6

PRIVILEGED & CONFIDENTIAL

applicable, within five (5) business days of receipt from the investigator."[22] Accordingly, this Report is being provided to the Vice President for Finance and Administration for a final determination and communication of the findings to appropriate managers and administrators.

## IV.   Summary Of The Investigation: Persons Interviewed And Evidence Reviewed

At the outset of the investigation, all parties received notice of the initiation of the investigation and applicable policies and procedures. On October 19, 2020, the investigators notified Complainant of the commencement of the investigation.[23] On October 28, 2020, the investigators notified the Respondents of the investigation and provided them with a copy of the Complaint as it relates to the investigation under the Nondiscrimination Policy.[24]

The investigation included interviews of the following individuals:

- **Tammy Wheeler**, Custodian ("Complainant");
- **Ron Watson**, Director PPD ("Respondent #1");
- **Veronica Herrera**, Custodial Supervisor III ("Respondent #2");
- **Elizabeth Huerta**, Complainant's Coworker ("Respondent #3");[25]
- **John Wyatt**, Human Resources Interim Director ("Witness #1");
- **Hillary Parrish**, PPD Assistant Director ("Witness #2");
- **Erik Green**, Custodial Supervisor II ("Witness #3");
- **Marilyn King**, Nursing Administrative Assistant ("Witness #4");
- **Mary Mallard**, Complainant's Coworker ("Witness #5");
- **Denise Stokes**, Complainant's Coworker ("Witness #6");
- **Lucresha Phillips**, Complainant's Coworker ("Witness #7");
- **Sally Ann Swearingen**, Professor of Interior Design ("Witness #8");
- **Dr. Scott Gordon**, University President ("Witness #9"); and
- **Sherri Schweizer-Gordon**, University President's Wife ("Witness #10).

In addition to interviews, the investigators collected and considered documentation that was provided by Complainant, Respondents, witnesses, and the University. Accordingly, the following evidence was reviewed during this investigation:

Documents provided by SFA:
- Complainant's personnel file, including all documents relating to assignments, performance reviews, salary, transfers, requests for FMLA leave, and requests for

---

[22] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

[23] Ex. 6, 10.19.2020 Notice to Complainant.

[24] Ex. 7, 10.28.2020 Notice to Respondent #1; Ex. 8, 10.28.2020 Notice to Respondent #2 (mistakenly addressed to Respondent #3 although it was emailed to Respondent #2); Ex. 9, 10.28.2020 Notice to Respondent #3. At Respondent #3's request, a copy of the Notice was also provided in Spanish. Ex. 10, 11.13.2020 Spanish Notice to Respondent #3.

[25] At the request of Respondent #3, a Spanish translator was retained to translate during the interview of Respondent #3.

APPX. 154
SFA-00523

PRIVILEGED & CONFIDENTIAL

    disability accommodations, including any separate files containing confidential medical records relating to requests for leave and accommodations.
- Communications from Complainant to Human Resources regarding her assignment to PPD in early 2019, her reassignment to the President's House in 2019, and her return to PPD in 2020, along with her requests for accommodations and FMLA leave.
- Job descriptions for the positions held by Complainant.

Documents provided by Complainant:
- Text messages between Complainant and Respondents.
- Complainant's 2019 annual performance evaluation.

Documents provided by Respondents:
- Text messages and emails between Complainant and Respondents.
- Text messages and emails among Respondents and others at the University regarding Complainant.
- Recordings of meetings and phone calls between Complainant and Respondents.
- Written response to Complaint prepared by Respondent #2.
- Complainant's 2019 annual performance evaluation.

    The investigation included review and consideration of all the evidence listed above. The following factual findings refer to portions of this evidence relevant to the facts at issue, including both inculpatory and exculpatory evidence. Where facts are undisputed, the report simply presents a recitation of relevant, undisputed facts. This Report does not seek to summarize every piece of evidence reviewed during the investigation.

## V.     Summary of Relevant Facts

### A.     Complainant's Age and Health Conditions

    Complainant was fifty years old as of the time she filed her Complaint.[26] In her interview, Complainant explained that her health conditions include fibromyalgia (diagnosed in 2016 or 2017), osteoarthritis, Hashimoto's disease (past five or six years; causes fatigue and achy joints), chronic fatigue (past six years), migraines, and asthma, and a lack of strength in her hands (past four or five years). Complainant explained that her weight limit for lifting has ranged between five and fifteen pounds.

### B.     Complainant Began Working for the University as the House Coordinator for the Former President (the Pattillos) in June 2009.

    Complainant started working at the University approximately eleven years ago, on or about June 8, 2009.[27] She was hired as the House Coordinator for the JCB House, where the University's President resides. At the time of Complainant's hire, President Dr. Baker Pattillo and his wife, Dr. Janice Pattillo, resided in the JCB House. As the House Coordinator, Complainant was

---

[26] Ex. 1, 10.12.2020 Letter of Representation.

[27] Ex. 11, Personnel Action Request for New Appointments.

PRIVILEGED & CONFIDENTIAL

responsible for "ensuring the University President's residence is in proper condition for living and entertaining," specifically by "maintaining the residence in clean, orderly condition through the performance of general housekeeping duties; preparing the house for visitors; and ensuring meetings and entertaining can be provided quickly and professionally."[28]

While working in the JCB House during President Pattillo's tenure, Complainant was supervised by and reported to the President's wife, Dr. Janice Pattillo. Dr. Janice Pattillo completed Complainant's performance evaluations (although it does not appear that Complainant consistently received a performance evaluation each year).[29] While she was working in the JCB House and supervised by Dr. Janice Pattillo, Complainant was technically considered an employee of PPD.[30] Complainant had limited interaction with PPD while she was working with the Pattillos, which primarily concerned reminders for Complainant to complete University-required trainings.

During her time as House Coordinator for the Pattillos, Complainant did not make any request for disability accommodations. In approximately July 2018, Complainant did request intermittent FMLA leave due to migraines. The request was handled by Human Resources, which communicated approval of her intermittent FMLA leave to Respondent #1 and Witness #2 in PPD.[31] There was some confusion as to who would approve and track her leave, as she was reporting to Dr. Janice Pattillo.[32] However, there is no evidence suggesting that Complainant was ever denied intermittent FMLA leave by her supervisors in PPD.

**C.    After President Pattillo's Death, Complainant Was Temporarily Reassigned from Approximately September 2019 to November 2019.**

Following the death of President Pattillo in December 2018, Complainant remained in the JCB House for several months before she was temporarily reassigned while the new President moved in. Complainant stated that after Dr. Janice Pattillo left the JCB House on or about July 1, 2019, Complainant contacted Respondent #1 to inquire about her work assignment, and Respondent #1 initially instructed Complainant to stay at the JCB House and continue cleaning. Thereafter, Complainant was reassigned to PPD in September 2019 until approximately November 2019.[33] Complainant alleged that she was reassigned because Witness #8 wanted to replace Complainant with younger student workers, which allegedly constituted age discrimination.

Witness #8, who was leading the JCB House renovations, confirmed that she requested student workers to oversee the subcontractors who were working on the JCB House from approximately 7:00 a.m. to 7:00 p.m. Witness #8 explained that they were on a deadline to finish the house before the new President moved in, and the amount of work that the subcontractors could

---

[28] Ex. 12, House Coordinator Job Description Rev. 09/09; Ex. 13, House Coordinator Job Description Rev. 09/11.

[29] Ex. 14, Complainant's Combined Performance Evaluations from Dr. Janice Pattillo.

[30] Ex. 11, Personnel Action Request for New Appointments.

[31] Ex. 15, 08.23.2018 Email Regarding FMLA Approval; Ex. 16, FMLA Accommodation Timeline.

[32] Ex. 17, 08.23.2018 Email Regarding Complainant's FMLA Approval.

[33] Ex. 18, 09.03.2019 Email from Respondent #1 Regarding Reassignment.

9

PRIVILEGED & CONFIDENTIAL

complete in a day was limited by the fact that Complainant ended work at approximately 3:00 p.m. every day. Witness #8 denied that Complainant was "replaced" by the student workers.

In addition, Respondent #1 said in his interview that he received instruction from the Board of Regents' chairperson that they wanted to provide a "clean slate" for the new President, who may not want a House Coordinator working in the JCB House. Respondent #1, Respondent #2, and Witness #8 further explained that the new President and his wife were given the opportunity to decide whether they wanted a House Coordinator and specifically whether they wanted Complainant to fill the role. Witness #9 and Witness #10 confirmed they did not have a House Coordinator when they first arrived, until Complainant was brought back to work at the JCB House. Accordingly, the evidence does not support that Complainant was replaced as House Coordinator by younger student workers in 2019.

During her reassignment to PPD in the Fall of 2019, Complainant said she was responsible for cleaning University properties with Witness #5, including the music preparatory house, the conservation building, the Tucker House, the second floor of the library, and the safety house. In her Complaint, Complainant alleges that "[d]ue to her disabilities, [Complainant] was unable to do a lot of the work typically done by custodial staff. Specifically, [Complainant] struggled because the strong chemicals caused issues with her migraines and asthma and with heavy lifting that was required."[34]

In her interview, Complainant stated she did not have much difficulty cleaning these buildings, although she said she reported to Respondent #1 and Respondent #3 that the chemicals were triggering her asthma. The investigation did not identify any such written communications, although there is an email from 2020 in which Complainant stated, "I have worked at the Presidents [sic] house, Tucker House, Starr House, Music Prep House, Safety House, Cole Art Center, the Conservation Building, the Field House, and the house that sits on the corner of E. Austin, and Raguet. I did those jobs much easier because there wasn't all the heavy lifting, pushing, pulling of furniture."[35]

Respondent #2 said she was not aware that Complainant had any difficulties at this time other than the chemicals, which Respondent #2 said was confusing because Complainant requested a stronger chemical (bleach) instead of the hydrogen-peroxide based cleaner that is typically diluted. Respondent #1 did not recall any conversation with Complainant about her asthma being triggered by chemicals, and he said any such conversation would have been handled by Respondent #2 and Human Resources. Witness #1 further confirmed that Human Resources was not notified of Complainant's need for ADA accommodations related to her custodial work until the following year (2020) when Complainant was permanently moved to PPD. However, it does appear that Complainant continued to seek intermittent FMLA leave in the fall of 2019 due to migraines.[36] Again, Human Resources reviewed and approved Complainant's request to recertify her FMLA leave for migraines, and the approval was sent to Complainant's supervisors. It appears

---

[34] Ex. 1, 10.12.2020 Letter of Representation.

[35] Ex. 19, 07.08.2020 Email From Complainant Regarding Accommodations.

[36] *See* Ex. 16, FMLA Accommodation Timeline; Ex. 20, 09.26.2019 Emails Regarding Complainant's FMLA Recertification.

10

APPX. 157
SFA-00526

PRIVILEGED & CONFIDENTIAL

that Complainant took off various days in the fall of 2019 for migraines.[37] In her interview, Complainant said she was taking FMLA leave for both migraines and fibromyalgia during this time, but the evidence reviewed indicated that Complainant was only approved for intermittent FMLA leave related to her migraines.[38]

Witness #5 said during the three months she worked with Complainant in 2019, there was nothing notable about their work other than the fact that Complainant stated she loved working at the JCB House and did not know if she would be able to go back. During her interview, Complainant said that Witness #5 told her (while Complainant was still working in the University houses with Witness #5) that Respondent #3 was hard to work with, she has a problem with people in her department, and that Complainant would want to quit if she was ever put with Respondent #3. When asked about this during the investigation, Witness #5 acknowledged that Respondent #3 likes to work independently, but Witness #5 did not recall telling Complainant that Respondent #3 is difficult to work with or that Complainant would want to quit if she was assigned to work with Respondent #3.

In summary, while Complainant worked in PPD in 2019 and took intermittent FMLA leave due to migraines she did not request any disability accommodations and was not denied any requested accommodations. Moreover, there is no evidence that Complainant was subject to discrimination on the basis of age or disability or to harassment on the basis of any actual or perceived disability during this period.

**D.      In September 2019, Tensions Arose Between Complainant, Respondent #1, and Respondent #2, Stemming From a Facebook Post Made By Respondent #2.**

While Complainant was temporarily reassigned to PPD in 2019, there was an incident in late September 2019 that stirred racial tensions between Complainant, Respondent #1, and Respondent #2. The event centered around Complainant's compensation compared to others in PPD. As House Coordinator, Complainant made significantly more than other non-managerial custodial staff in PPD, most of whom are Black and Hispanic. When Complainant was temporarily assigned to PPD, her compensation remained the same, and Respondent #2 became aware of Complainant's compensation relative to other custodial employees in PPD.

On September 25, 2019, Respondent #2 published a post on Facebook that read: "Example of systematic racism: There's always money in the budget for white employees to get raises but when minorities ask for one or deserve one the well is dry."[39] Respondent further replied to a comment on her post, stating: "[I]t's bad; when a bilingual, college educated minority with a

---

[37] Ex. 21, 10.01.2019 Email From Complainant to Respondent #2 Regarding Migraine; Ex. 22, 10.02.2019 Note From Complainant Regarding FMLA Leave for Migraine; *see also* Ex. 23, 10.03.2019 Email From Complainant to Human Resources Regarding Doctor's Notes.

[38] *See* Ex. 16, FMLA Accommodation Timeline; Ex. 24, 08.10.2020 Emails Regarding FMLA Certifications (noting Complainant had existing approval for intermittent FMLA related to her migraines but not her fibromyalgia).

[39] Ex. 25, 09.25.2019 Respondent #2's Facebook Post.

11

PRIVILEGED & CONFIDENTIAL

supposed admin position makes literally $1 less than a white employee of theirs. But all other 'admin' with similar positions make significantly more. The system is broken."[40]

During a meeting on September 26, 2019, Respondent #1 informed Complainant of Respondent #2's Facebook post.[41] Complainant explained in her interview that she went to Respondent #1's office to ask him about Witness #8 removing Complainant from the JCB House.[42] According to Complainant, Respondent #1 told her that Respondent #2 put something on her Facebook page about Complainant being white-privileged. Complainant said Respondent #1 "spun off" into racist comments about the other custodial staff being "field hands," himself being a "field boss" sitting on a horse with a big straw hat and a whip, and Complainant being perceived as "coming out of a Southern Antebellum Plantation," which made Complainant uncomfortable. Complainant alleged Respondent #1 further commented that the whole dynamic was like the movie *Roots* and that the other custodial employees have a "weird ass culture." Complainant said that Respondent #1 showed her a screenshot of the Facebook post, and insinuated that he wanted Complainant to confront Respondent #2 because it also implicated Respondent #1, as a manager, potentially treating employees unfairly.

Respondent #1 admitted that he discussed the Facebook post with Complainant during their meeting, but he denies that he did so with the intention of informing Complainant of its existence. Instead, he explained in his interview that Respondent #2 made the Facebook post the night before he met with Complainant. Respondent #1 said Complainant came to his office the following day and asked him, "Why don't they like me?" He assumed that Complainant already knew about the Facebook post and he explained that, as white people, they need to be open to the possibility that others may not see things the same way. Respondent #1 said Complainant was adamant that she is not a racist. During his interview, Respondent #1 stated he likely described the JCB House as the White House (as it is a large white house), and said that Complainant was coming from the house into the field where all the other workers are. He said he encouraged Complainant to have a dialogue with other PPD employees since Respondent #1 felt they could have some resentment because they were supervising Complainant and she was being paid more.

Accordingly, Complainant confronted Respondent #2 about the Facebook post, and they met and discussed their working relationship.[43] The meeting occurred on the same date (September 26), and was attended by Complainant, Respondent #2, Witness #3, and University employee Michelle Miller (as Complainant's witness).[44] In her interview, Complainant said that she began the meeting by asking whether she did something Respondent #2 and Witness #3 did not like, and they responded no. Complainant said in her interview that Respondent #2 and Witness #3 also told her "a lot of slanderous things" that Respondent #1 allegedly said that made it clear he was stoking conflict. For instance, Complainant claimed Respondent #2 and Witness #3 told her that Respondent #1 did not want Complainant to return to the JCB House. In their interviews, Respondent #2 and Witness #3 stated that Complainant asked them if they thought

---

[40] Ex. 25, 09.25.2019 Respondent #2's Facebook Post.

[41] *See* Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[42] *See also* Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[43] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

[44] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

12

PRIVILEGED & CONFIDENTIAL

Complainant was a racist because someone in PPD had said they had called Complainant a racist, which they denied.[45] According to Respondent #2's summary of the meeting, they "finished the meeting on a good note and I believe [Complainant] now knows that we do not have a problem with her and that we certainly do not think she is racist."[46]

On October 3, 2019, Complainant went to Respondent #1's office after requesting another meeting with him (which he did not respond to).[47] The next day, on October 4, 2020, Complainant followed up with a text message to Respondent #1 apologizing for causing him any grief as a result of their prior meeting and acknowledging that Respondent #1 intended to help Complainant. Complainant stated:

> I am sorry that I caused you any grief.
> Seriously.
> I enjoy working for you and [Respondent #2] VERY much.
> Reflecting on the meeting yesterday I know now that you were only trying to help me. I get it. In our first meeting, I was honestly there to ask why [Witness #8] put Mary in charge, then I got defensive because the FB post was brought to my attention and that it was about me, and then the things I heard were the perception of the racism. It was hard to hear that the Custodial Dept. wanted me to go away, and that I was too uppity to associate with them. I sense like they are trying to make me feel at home over there. I also feel as though you were really trying to help me. I apologize for anything I've done to upset you.
> I hope we can all get along, and trust again, I'm willing to do anything.
>
> I am so sorry.[48]

In the Fall of 2019, Complainant and others from PPD went to the JCB House to do a thorough cleaning following the completion of renovations. Complainant stated that around this time, the new President's wife asked her to return to work as House Coordinator at the JCB House. Accordingly, Complainant returned to the JCB House as House Coordinator in approximately November 2019. While Complainant was working in the JCB House, Respondent #2 completed a performance evaluation that was provided to Complainant on or about January 24, 2020.[49] Based on her limited experience working with Complainant in the fall of 2019, as well as Respondent #2's understanding of Complainant's performance in the JCB House, Respondent #2 gave Complainant the highest overall rating (Exemplary).[50]

In summary, there is no evidence that Complainant suffered any adverse employment action on the basis of her race or was subject to any other race-based conduct or comments while

---

[45] *See also* Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant

[46] Ex. 27, 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant.

[47] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[48] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

[49] Ex. 28, Copy of Evaluation Provided by Complainant; Ex. 29, Copy of Evaluation Provided by Respondent #2.

[50] Ex. 28, Copy of Evaluation Provided by Complainant; Ex. 29, Copy of Evaluation Provided by Respondent #2.

13

PRIVILEGED & CONFIDENTIAL

she worked in PPD in 2019, other than during the one meeting with Respondent #1 on September 26, 2019.

       **E.**     **Complainant Returned to PPD and Was Assigned to Work with Respondent #3.**

On or about June 8, 2020, Complainant was removed from the House Coordinator position and returned to the custodial staff in PPD.[51] Both Witness #9 and Witness #10 noted that while Complainant was working in the JCB House, Complainant stated that she hated Respondent #1, and she wanted to sue him and the University. Prior to Complainant's return to PPD, the only documentation related to requests for leave or accommodation on file related to requests for intermittent FMLA due to migraines, which was granted in August 2018 and recertified in September 2019.[52]

Upon her return to PPD in 2020, Complainant was assigned to work in the nursing buildings with Respondent #3, who was Complainant's "lead." Witness #3 explained that while Respondent #3 had the same general responsibilities as Complainant, Complainant was supposed to go to Respondent #3 regarding any issues and to order supplies and the supervisors would go to Respondent #3 to address any complaints regarding the nursing building maintenance.

Complainant explained in her interview that on her first day working in the nursing buildings, one of her supervisors, Maria Veliz, was showing Complainant around and introduced her to Witness #4, a nursing building staff member. Complainant said Witness #4 told her she was glad Complainant was there and that Respondent #3 needed help cleaning the nursing buildings. According to Complainant, Witness #4 said that Respondent #3 had a problem with Complainant working there. In her interview, Witness #4 said she did not recall what she discussed with Complainant and Ms. Veliz, but it is possible she said something like that because Respondent #3 is very territorial. However, Witness #4 felt her statements were taken out of context by Complainant because Witness #4 was not aware of any personal conflict between Complainant and Respondent #3 when they first started working together.

Witness #3 said that at first Complainant said she was happy cleaning the nursing buildings and working with Respondent #3. That is supported by recordings from approximately late spring/early summer 2020 in which Complainant states she loves working in the nursing buildings and has no problems working with Respondent #3, and that Respondent #3 is "sweet," "kind," and "precious."[53]

Shortly after she returned to PPD, Complainant made a comment disclosing a prior injury to her rotator cuff. As a result, her supervisors referred the matter to Human Resources to send Complainant an informational email about ADA accommodations.[54] In response, Complainant

---

[51] Complainant also asserts allegations regarding her work at the JCB House; because those allegations are not pertinent to her discrimination claims, they are being addressed separate from this Report.

[52] Ex. 15, 08.23.2018 Email Regarding FMLA Approval; Ex. 20, 09.26.2019 Emails Regarding Complainant's FMLA Recertification; *see also* Ex. 16, FMLA Accommodation Timeline.

[53] Ex. 30, Tammy convo 2 Thursday.m4a; Ex. 31, Convo w- Tammy Wheeler.m4a.

[54] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

14

advised Human Resources that she did not need any ADA accommodations, stated that she never asked for accommodations, and sought the identity of the person who perceived Complainant as disabled:

> I am back working today. However, I am still so confused.
> With all due respect, I would like to know who said that I had disabilities? And who is speaking on my behalf using ADA accommodations?
> I never once asked for any accommodations.
> After being told repeatedly by [Respondent #3] at the Nursing Center that the carpet cleaning machine could really hurt me, to be extremely careful, and that it was very hard Machine to manage; that caused me to get a little nervous about using it, and I expressed then in a general conversation that I didn't have a lot of strength in my upper body, and about 6 -7 years ago I had a torn rotator cuff.
> I never once made a formal complaint, or asked for any type of accommodations at all.
> What I had in the past was an OLD injury from 6-7 years ago, and is not considered a disability. I'm not trying to be difficult at all, but I just don't like someone labelling me as a disabled person. Again, I did not ask for any accommodations.
> I am on FMLA, and every year my PCP fills out a proper form with absolutely NO restrictions listed. That FMLA form is current.
> Please let me know if this is not enough.[55]

Thereafter, on or about June 23, 2020, Complainant injured her shoulder while moving a water hose, which resulted in her filing a workers' compensation claim and being placed on work restrictions.[56] PPD management and staff from SFA's Environmental Health, Safety and Risk Management Department then met with Complainant to ensure she understood the workers' compensation process. During the meeting, it was explained to Complainant that due to the level of stated restrictions and risk of injury, she would be unable to perform light duty work.[57] It was also noted that upon being returned to PPD, Complainant had mentioned an injury to her rotator cuff, but that she had further advised Human Resources that she did not need any ADA accommodations.[58]

On July 7, 2020, the day she returned from leave for her shoulder injury, Complainant contacted Human Resources regarding a need for additional accommodations because Complainant was being asked to move chairs that were heavier than recommended by her rheumatologist.[59] This was the first occasion when Complainant indicated she needed accommodations for medical conditions beyond her approved intermittent FMLA for migraines and beyond the restrictions developed for her workers' compensation injury. This new request initiated extensive communications among Human Resources, the Complainant, her medical

---

[55] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

[56] Ex. 33, ADA Accommodation Timeline; Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury.

[57] Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury.

[58] Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury; *see also* Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

[59] Ex. 35, 07.07.2020 Email Regarding Moving Chairs.

PRIVILEGED & CONFIDENTIAL

providers, and PPD over the next few months to develop reasonable accommodations for Complainant's disabilities based on the information provided by her doctors and the duties listed in her job description.[60] Importantly, the accommodations process was controlled by Human Resources, and Respondents had no say over the medical documentation required from Complainant and her medical providers. Complainant's supervisors (including Respondent #2) were involved in establishing Complainant's minimum job requirements based on the House Coordinator position description.

With respect to her workers' compensation restrictions, Complainant accepted a bona fide offer of light duty employment on July 9, 2020.[61] The restrictions recommended by Complainant's medical provider included a maximum of four hours of reaching, no lifting or carrying objects over 20 pounds, and periodic breaks. The accommodations for Complainant's shoulder injury were detailed line-by-line in the House Coordinator position description and included limited time periods for use of both hands, breaking down trash into bags under 20 pounds, and periodic ten minute breaks.[62]

Witness #3 explained that around this time period, Complainant began to have problems taking direction from Respondent #3 and started complaining about difficulties moving chairs and vacuuming. Witness #3 said Complainant came to the PPD office and asked if she was being punished because she was assigned to work with someone who barely speaks English and Complainant makes three times what Respondent #3 makes. Similarly, Respondent #2 said in her written response that, in approximately July 2020, Complainant made statements about feeling like she was being punished for what happened in the JCB House.[63] These alleged statements were corroborated by a recording in which Complainant told Respondent #2 that felt she was being punished because she was removed from the JCB House and placed under Respondent #3, who made significantly less than Complainant ($8/hour versus $24/hour) and who has worked at the University for only two years.[64]

In her interview, Complainant stated that she believes Respondent #1 told Respondent #2 that he wanted Complainant gone, so Complainant believes she was placed with Respondent #3 as punishment because Respondent #3 is allegedly difficult to work with. Complainant stated that Respondent #3 was critical of every move that Complainant made: while Respondent #3 was very lax about her own work, she had a double standard for Complainant's work compared to her own. Complainant explained that Respondent #3 was constantly on her heels pointing out a smudge or a speck and would change the goalposts, for instance, by instructing Complainant to use two capfuls of cleaning solution but then stating the color did not look right. Complainant also said that Respondent #3 made comments about Complainant having "lazy arms" and questioned why Complainant was going to the doctor and seeing an out-of-town provider. Both Respondent #2 and

---

[60] Ex. 33, ADA Accommodation Timeline.

[61] Ex. 36, Complainant's Accepted Offer for Light Duty Work.

[62] Ex. 36, Complainant's Accepted Offer for Light Duty Work. During her interview, Complainant complained about being required to break down trash; however Witness #3 indicated that breaking down trash was not uncommon for custodial staff.

[63] Ex. 37, Respondent #2 Written Response to Investigation.

[64] Ex. 30, Tammy convo 2 Thursday.m4a.

APPX. 163
SFA-00532

PRIVILEGED & CONFIDENTIAL

Witness #1 confirmed there was insufficient evidence to corroborate Complainant's allegations that Respondent #3 made such comments.

On July 20, 2020, Respondent #2 messaged Complainant because she was missing 30 minutes of time from the last week and did not communicate that she was changing her lunch time to attend a doctor's appointment.[65] In the text message conversation, Complainant accused Respondent #2 of causing Complainant to have a panic attack by suggesting they have a meeting to address communication and chain of command issues.[66] Complainant stated, "stop harassing me [Respondent #2] ... I'm going home because my heart is racing during this panic attack."[67] Respondent #2 did not respond but followed up the next morning stating that she hoped Complainant was feeling better and they still needed to have a meeting.[68]

Additionally, Complainant alleged that Respondent #3 falsely told Respondent #2 that Complainant wanted to switch her schedule to work later into the evenings. On August 11, 2020, Respondent #2 emailed Complainant stating that Respondent #3 told her that Complainant could change her schedule and thus Complainant's hours would be modified when the students returned to campus.[69] Complainant emailed Respondent #2 stating she could not change her schedule at that time and clarifying that "I said to [Respondent #3] once MAYBE when the students return."[70] Complainant also said she did not appreciate Respondent #2 and Respondent #3 making choices about Complainant's life and schedule.[71]

Respondent #2 then called for the group to have a meeting, which they did on August 12, 2020.[72] Respondent #3 was instructed to immediately cease any conversation about Complainant's medical history and to stop making comments about her "lazy arms and lazy hands."[73] Based on the poor working relationship between Complainant and Respondent #3, Respondent #2 decided to separate Complainant and Respondent #3, and that Complainant would be responsible for the Annex and Administration nursing buildings and Respondent #3 would have the Education nursing building (due to her later schedule).[74] Complainant said during her interview that she was fine with that solution and had been asking to be separated from the very beginning. Respondent #2 said Complainant did not make any further complaints about name-calling by Respondent #3 following their meeting.

---

[65] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[66] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[67] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[68] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[69] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[70] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[71] Ex. 40, 08.12.2020 Email from Complainant to Respondent #2 Regarding Concerns.

[72] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[73] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[74] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

17

PRIVILEGED & CONFIDENTIAL

Despite this separation, there continued to be disagreements between Complainant, Respondent #2, and Respondent #3 about whether Respondent #3 still had supervisory duties as Complainant's lead. Complainant understood after the August 12, 2020 group meeting that Complainant and Respondent #3 would go their separate ways and Respondent #2 would not come to Complainant's building to check up on her, but that Respondent #2 subsequently went back on her word.[75] Accordingly, Complainant explained in her interview that she felt the rules continually changed and that Respondent #2 was using Respondent #3 to be on Complainant's heels all the time. However, Complainant's understanding is not reflected in the contemporaneous summary of the August 12 meeting, which stated Respondent #3 was still her lead and that Complainant would still report to her.[76] Complainant later objected to this summary.[77]

Complainant also said she and Respondent #3 were also given strict orders not to share their emails outside of PPD, i.e., with the nursing building staff. Complainant explained that after she and Respondent #3 were separated, Respondent #2 made a comment like, "I hope no one is gossiping in this department because we don't allow gossiping." This made Complainant think that Respondent #3 had accused Complainant of gossiping about her. However, Complainant's managers were receiving complaints from nursing staff that both Complainant and Respondent #3 were engaged in inappropriate gossip.

On August 13, 2020, Witness #4 called Witness #3 and complained about ongoing issues between Complainant and Respondent #3. Witness #4 followed up this conversation with an email to Witness #3 explaining: "[Complainant] told me that [Respondent #3] had said in the meeting [with PPD] that I had said [Complainant] needed to be out of the Administration Bldg. That was never said and is not true. Yesterday, [Respondent #3] showed both [another nursing employee] and me an email [Complainant] had sent to her. That is none of our business. I nor [the other nursing employee] want to be in the middle of their feud. If they have a problem with each other they need to take it up with their supervisors. This has been an ongoing problem for several weeks now – Both [Complainant] and [Respondent #3] complaining about each other. I hope you can resolve this problem."[78] Witness #4 further explained in her interview that "from the day [Complainant] moved over here there was drama," and at first she had daily conversations with Complainant until Witness #4 started tuning her out. Witness #4 felt working with Complainant was problematic because Complainant wanted to talk during business hours at the nursing building, and Witness #4 had work to do. Witness #4 said she just wanted Complainant to "do her job and leave us alone." Witness #4 said she herself had no issues with Respondent #3 besides the fact that it could be hard to communicate due to a language barrier.

On August 19, 2020, Complainant received a disciplinary write-up as a result of Witness #4's complaint.[79] Specifically, the write-up stated that Complainant shared information from a PPD meeting, complained about Respondent #3 to Witness #4, and that Witness #4's supervisor specifically asked Complainant to cease involving the nursing building employees with

---

[75] Ex. 42, 08.18.2020 Emails Regarding August 12 Meeting Summary.

[76] Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

[77] Ex. 42, 08.18.2020 Emails Regarding August 12 Meeting Summary.

[78] Ex. 43, 08.13.2020 Email From Witness #4 Regarding Complaints.

[79] Ex. 44, 08.19.2020 Email Approving Complainant's Written Disciplinary Action.

18

PRIVILEGED & CONFIDENTIAL

the dispute between Complainant and Respondent #3.[80] Respondent #2 and Witness #3 both explained in their interviews that Respondent #3 was also disciplined as a result of Witness #4's complaint.[81] However, Respondent #2 explained that Complainant's discipline was escalated to a written action because Witness #4's supervisor, Tamara Harris (the School of Nursing Director), had also instructed Complainant not to involve the nursing building staff in the ongoing dispute. Although Witness #4's email named both Complainant and Respondent #3,[82] Witness #4 said during her interview that Complainant was a great distraction and she did not have the same problem with Respondent #3 (as described above). Additionally, Dr. Harris had previously indicated concerns with the nursing building custodians, specifically noting an issue with Complainant's credibility because Dr. Harris saw Complainant alone in certain areas of the nursing buildings although Complainant denied it to Respondent #2.[83]

On August 31, 2020, Complainant filed a grievance regarding this written disciplinary action, and alleged that the write-up was "out of retaliation, and a little extreme for the offense."[84] The grievance was denied, she appealed the initial outcome, and her appeal was also denied. In her appeal, Complainant alleged the write-up was retaliatory because she was warned Respondent #2 would retaliate against Complainant for continuing to email Human Resources.[85] Complainant further alleged she was not treated the same as Respondent #3 and that it was unfair that Complainant was the only one getting written up.[86] The final decision affirming the disciplinary action was issued on September 17, 2020.[87]

On October 6, 2020, Complainant complained to Respondent #2 that Respondent #3 was gossiping about Complainant with nursing building employee Rebecca Self and that Respondent #3 was "stirring the drama pot."[88] When Respondent #2 asked Complainant to have Ms. Self provide this information in writing, Complainant responded "I'm not getting involved," said she would take it to Human Resources. Complainant alleged Respondent #2 would call Ms. Self and "do it like you did [with Witness #4]" (when Complainant was written up for gossiping).[89] As a result of Respondent #2's investigation, Respondent #3 was written up because it was confirmed that Respondent #3 was talking about Complainant's cleaning capabilities with

---

[80] Ex. 44, 08.19.2020 Email Approving Complainant's Written Disciplinary Action.

[81] *See also* Ex. 45, 09.17.2020 Final Grievance Notification, pp. 8, 25-26.

[82] Ex. 43, 08.13.2020 Email From Witness #4 Regarding Complaints.

[83] Ex. 46, 07.24.2020 Email from Nursing Director Tamara Harris.

[84] Ex. 45, 09.17.2020 Final Grievance Notification, p.5.

[85] Ex. 45, 09.17.2020 Final Grievance Notification, p. 5.

[86] Ex. 45, 09.17.2020 Final Grievance Notification, p. 5.

[87] Ex. 45, 09.17.2020 Final Grievance Notification.

[88] Ex. 47, 10.06.2020 Email From Respondent #2 Regarding Complainant; Ex. 48, 10.06.2020 Text Messages Between Respondent #2 and Complainant.

[89] Ex. 48, 10.06.2020 Text Messages Between Respondent #2 and Complainant.

APPX. 166
SFA-00535

PRIVILEGED & CONFIDENTIAL

Ms. Self.[90] In her interview, Respondent #3 said she felt that Complainant was only cleaning windows and doorknobs and Respondent #3 needed to address the issue as Complainant's lead.

On or about October 7, 2020, Respondent #2 decided to transfer Respondent #3 in order to completely separate Respondent #3 and Complainant due to their ongoing issues.[91] Respondent #3 was reassigned because she asked to transfer first (although Respondent #3 was not happy to leave the nursing buildings), and the custodial supervisors did not want Complainant to feel she was being moved out as retaliation.[92] Upon learning that Respondent #3 would be transferred, Complainant then emailed Human Resources to request a transfer and complain about her assignment to the three nursing buildings.[93] Complainant stated the situation was "completely unfair" because Complainant had asked to be transferred first and the Nursing buildings were initially Respondent #3's responsibility.[94] She also expressed doubt that Respondent #3 had requested to transfer and believed Respondent #2 lied and was actually setting Complainant up for failure.[95]

Meanwhile, Human Resources continued to communicate with Complainant's medical providers and PPD to develop appropriate ADA accommodations for Complainant's disabilities as she had requested in July. The emails indicate that Respondent #2 was aware that ADA accommodations were forthcoming long before Complainant was presented with an offer of accommodations for her disabilities (in addition to the accommodations provided for her workers' compensation injury and her approved intermittent FMLA for migraines).[96] Human Resources sent a bona fide offer of ADA accommodations to Complainant and her supervisors on October 8, 2020.[97] Complainant did not accept the accommodations and additional communications between Human Resources and Complainant's medical providers ensued to address what Complainant perceived as discrepancies between her doctors' orders and the proposed accommodations.[98] On the same date, in response to complaints to Human Resources about her treatment by PPD employees, Witness #1 provided Complainant with information to submit a complaint under the Nondiscrimination Policy (as he had also previously done on several occasions).[99]

On October 9, 2020, Respondent #2 emailed Human Resources regarding difficulties managing Complainant: "She continuously goes to my superiors and accuses me of being racist.

---

[90] Ex. 49, 10.07.2020 Respondent #3 Written Discipline.

[91] Ex. 37, Respondent #2 Written Response to Investigation; *see also* Ex. 50, 10.07.2020 Respondent #2 Written Statement; Ex. 51, 10.07.2020 Witness #3 Written Statement; Ex. 52, 10.07.2020 Maria Veliz Written Statement.

[92] Ex. 37, Respondent #2 Written Response to Investigation.

[93] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request.

[94] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request.

[95] Ex. 53, 10.07.2020 Email from Complainant Regarding Transfer Request; Ex. 54, 10.09.2020 Email from Complainant to Human Resources.

[96] Ex. 55, 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations.

[97] *See* Ex. 56, 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer.

[98] Ex. 33, ADA Accommodation Timeline.

[99] Ex. 57, 10.08..2020 Email from Witness #1 to Complainant Regarding Nondiscrimination Policy.

20

PRIVILEGED & CONFIDENTIAL

Anytime I try to manage her work performance or train her in our procedures [Complainant] accuses me of harassing her or bullying her."[100]

### F.    Complainant submits her Complaint.

The following week on October 12, 2020, Complainant's counsel submitted a letter detailing Complainant's allegations of discrimination and harassment against Respondents.[101]

In accordance with Complainant's request to be transferred (discussed above), Respondent #2 met with Human Resources and Respondent #1 and developed two options, which were presented to Complainant on October 13, 2020: Complainant could move to (1) the Early Childhood Research Center with a change of shift schedule or (2) the Baker Pattillo Student Center (BPSC) keeping her current work schedule. Her responsibilities in BPSC would include "the entirety of the 3rd floor (under the new covid-19 cleaning guidelines), the back half of the 2nd floor (under the new covid-19 cleaning guidelines) and spot checking the front public areas, and restrooms."[102]  The following day, Complainant responded, "I can not change my work time schedule, so the BPSC it is."[103]

On November 2, 2020, Complainant's counsel emailed the investigators to raise a concern about retaliation by Respondent #2 due to the fact that Complainant was moved from the nursing buildings to the Student Center and allegedly assigned responsibility for too much area given her work restrictions.[104] He said that when Complainant and her coworkers complained about the workload during a group meeting, Respondent #2 said, "If y'all cannot get this job done, then I will change your hours." However, Witness #7 said she understood this comment to be directed towards the night crew and not Complainant. Witness #6 similarly said that she felt the comment was directed at the group and not Complainant. Witness #6 also said that she used to work the third floor and she felt the assignment was too much based on what Complainant had said about her health conditions. Respondent #2 denied that she threatened to change Complainant's hours at this meeting.

Similarly, on November 11, 2020, Complainant's counsel reported that Complainant went to turn in a doctor's note to Witness #3's office and overheard him on the phone (behind a closed door) talking about Complainant.[105] He said a group of employees, including Witness #5, were sitting at a table outside Witness #3's office when this occurred.[106] In her interview, Witness #5 said that Witness #3 was in a meeting with his door closed when Complainant came by and grabbed a paper off the back of his door. Later, Complainant told Witness #5 and another individual that she was tired of people in PPD always saying her name. Importantly, Witness #3 was engaged in

---

[100] Ex. 58, 10.09.2020 Email from Respondent #2 to Human Resources.

[101] Ex. 1, 10.12.2020 Letter of Representation.

[102] Ex. 59, 10.13.2020 Email from Respondent #2 Regarding Complainant's Transfer.

[103] Ex. 60, 10.14.2020 Email from Complainant Regarding Transfer to Student Center.

[104] Ex. 2, 11.02.2020 Email from Complainant's Counsel.

[105] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

[106] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

21

PRIVILEGED & CONFIDENTIAL

the interview for this investigation during the time that Complainant alleged she overheard him talking about Complainant.

In her follow-up interview, for the first time Complainant raised a concern that Witness #6 told her that Respondent #2 made a comment referring to Complainant by a derogatory term. According to Complainant, upon learning that Complainant needed additional supplies, Respondent #2 said, "What does the bitch want now?" Witness #6 said the comment was actually overheard by Witness #7. Witness #7 said when she turned in Complainant's supply sheet to Respondent #2, there were three other individuals present and the group was in the parking lot getting out of a car. Witness #7 heard someone say "that bitch," referring to Complainant, but Witness #7 was not sure who made the comment. Respondent #2 denied referring to Complainant in this manner.

## VI.   Findings Regarding Allegations of Age Discrimination, Racist Comments, Disability Discrimination and Harassment, and Retaliation

The investigation examined whether Complainant's factual allegations were true and, if so, was she was subjected to discrimination or harassment on the basis of her age, race, and/or disabilities, and whether she was subjected to retaliation during the course of the investigation. Each of Complainant's allegations are addressed in turn below.

### 1.   Allegation of Age Discrimination

While Complainant alleges that she was subjected to age discrimination,[107] she brought forth very few facts to support an age discrimination claim. Complainant's most relevant allegation is that she was removed from the JCB House after Dr. Janice Pattillo moved out in 2019 and replaced by younger student workers at the direction of Witness #8.

As Complainant acknowledged in her interview, Witness #8 was responsible for decorating the JCB House before the arrival of the new president. Witness #8 explained in her interview that she recommended that student workers be brought in to watch the subcontractors from approximately 7:00 a.m. to 7:00 p.m., since she was on a deadline to finish the house before the new president moved in. Complainant's work ended at approximately 3:00 p.m. every day, which limited the work that could be done by the subcontractors in a day. Witness #8 disagreed with the characterization that student workers were brought in to "replace" Complainant, and none of those student workers fulfilled the role of House Coordinator once President Gordon and Mrs. Schweizer-Gordon moved into the house.

Similarly, Respondent #1 said in his interview that he received instruction from the Board of Regents' chairperson that they wanted to provide a "clean slate" for the new President, who may not want a House Coordinator working in the JCB House. Respondent #1, Respondent #2, and Witness #8 further explained that the new President and his wife were given the opportunity to decide whether they wanted a House Coordinator and specifically whether they wanted

---

[107] Ex. 1, 10.12.2020 Letter of Representation.

PRIVILEGED & CONFIDENTIAL

Complainant to fill the role. Witness #9 and Witness #10 confirmed when they first arrived, they did not have a House Coordinator until Complainant was brought back to work at the JCB House.

Accordingly, Complainant was temporarily reassigned to PPD from approximately September 2019 to November 2019 without any loss in pay or other adverse employment actions. She was not replaced as House Coordinator during this period, as the Gordons did not have anyone in that position the first few months that they lived in the JCB House. In addition, Complainant was returned to the House Coordinator position in November 2019. The reasons for Complainant's reassignment were entirely unrelated to her age, but instead due to the JCB House Committee's efforts to complete the renovations on time and facilitate the transition for the new President. Thus, we find Complainant's allegation that she was subjected to age discrimination to be **unsubstantiated.**

## 2.  Allegation of Racist Comments by Respondent #1

As to Complainant's allegations of racist comments by Respondent #1, he stated in his interview that he spoke with Complainant about how others may see her, given that she was coming from the President's House. He was concerned the other custodial workers might have some resentment because Complainant was being paid more. Respondent #1 explained in his interview that his intention in speaking with Complainant about Respondent #2's Facebook post was to help Complainant understand that the perspective of minorities may be different than that of white people, such as himself and Complainant. When asked during his interview if he said the other employees viewed Complainant as "coming out of a Southern Antebellum Plantation" or analogized the custodial workers to "field hands" and himself as a "field boss," Respondent #1 denied making any such comments. Respondent #1 stated he may have brought up a former employee who used to make comments like that. Respondent #1 also said that in using the term "field" workers he meant frontline workers, not crop workers. Respondent #1 did not recall referring to the movie *Roots* during his conversation with Complainant, although he admitted he has referred to *Shawshank Redemption* in the past as an example of institutional structures. Respondent #1 denied telling Complainant that the other custodial workers have a "weird ass culture."

Following their September 26, 2019 meeting and another meeting in early October 2019, Complainant sent Respondent #1 a text message stating that she understood Respondent #1 was just trying to help Complainant.[108]

Witness #5, who is Black, said that she has never had any problems with Respondent #1 and is not aware of any racist comments made by Respondent #1. Witness #3, who is also Black, said he was not aware of Respondent #1 making any racist comments towards Complainant. However, Witness #3 noted that a few years ago in approximately 2014 or 2015, Respondent #1 said that he liked a former Black supervisor in PPD because "he knows how to play Toby" (referring to the slave name of Kunta Kinte in the movie *Roots*).  Notably, Witness #3 brought this up without any inquiry from the investigators about whether Respondent #1 had ever referenced *Roots*. Similarly, Respondent #2 said Respondent #1 previously made comments about the movies

---

[108] Ex. 26, 10.04.2019 Text Between Complainant and Respondent #1.

23

PRIVILEGED & CONFIDENTIAL

*Shawshank Redemption* and *Roots* (including a reference to a former Black supervisor playing Toby).

Given Respondent #1's own admissions, as well as Witness #3 and Respondent #2's confirmation that Respondent #1 previously made comments about a Black employee by referencing to the movie *Roots*, we find Complainant's allegations against Respondent #1 are supported by the preponderance of the evidence. Specifically, Respondent #1 admittedly told Complainant that the other custodial workers saw her as coming from a more privileged position in the President's House, and he referred to the other employees as field workers. While Respondent did not recall referencing the movie *Roots*, we find it likely that he did since Witness #3 and Respondent #2 confirmed that Respondent #1 previously referenced *Roots* while discussing a former Black employee.

While we find that Respondent #1 likely made racially inappropriate comments during his conversation with Complainant on September 26, 2019, there is little evidence that Respondent #1 intentionally stoked racial tension between Complainant and the custodial staff or otherwise discriminated against Complainant based on her race. The Nondiscrimination Policy defines discrimination as conduct that subjects an individual to treatment that adversely affects their employment or education because of their race or other protected status. There is not sufficient evidence that Respondent #1 purposefully placed Complainant in an undesirable work assignment or took any adverse employment action against Complainant because of her race.

While Respondent #1's comments to Complainant were inappropriate, the preponderance of the evidence does not reflect that Respondent #1 subjected Complainant any adverse employment action because of her race.

In addition, the Nondiscrimination Policy defines harassment as "verbal or physical conduct that is directed at an individual or group because of race [or other protected status] when such conduct is sufficiently severe, pervasive, or persistent so as to have the purpose or effect of interfering with an individual's or group's academic or work performance; or of creating a hostile academic or work environment."[109] While Respondent #1's conduct was inappropriate, we find that it was not sufficiently severe or pervasive to interfere with Complainant's work performance or create a hostile work environment for Complainant, given the context of the conversation and Complainant's acknowledgment that Respondent #1's comments were intended to help her.

Accordingly, to the extent that Complainant alleges Respondent #1 discriminated against her or subjected Complainant to harassment based on race, we find that allegation to be **unsubstantiated.**

Respondent #1's conduct was also assessed as potentially constituting "Other Unprofessional/Inappropriate Conduct" under SFA's Nondiscrimination Policy. Per the policy, "Other Unprofessional/Inappropriate Conduct" means conduct that is unprofessional and/or inappropriate for the educational and/or working environment, but does not rise to the level of

---

[109] Ex. 4, Nondiscrimination Policy, § II.

24

PRIVILEGED & CONFIDENTIAL

Sexual Harassment or Prohibited Conduct outlined by the policy.[110] As stated above, we find that Respondent #1's reference to the movie *Roots* and slavery when discussing race in the workplace was inappropriate. Therefore, we further find that Respondent #1's race-based discussion with Complainant **constitutes "Other Unprofessional/Inappropriate Conduct"** in violation of SFA's Nondiscrimination Policy.

**3. Alleged Disability Discrimination and Harassment by Respondent #1 and Respondent #2**

Complainant generally alleges in her Complaint that she was subjected to disability discrimination and harassment by Respondent #1 and Respondent #2.[111] Complainant also specifically alleges that upon her permanent transfer to PPD in June 2020, Respondent #2 ridiculed and harassed Complainant because she was unable to perform certain tasks due to her disabilities.[112] Complainant claims her numerous requests for accommodations were ignored and Respondent #2 had no intention of following the directions from Human Resources and accommodating Complainant.[113]

At the outset, to the extent Complainant may be alleging that she was denied accommodations by the Respondents, the evidence does not support that allegation. The weight of the evidence shows that when Complainant requested accommodations for her workers' compensation injury, her supervisors referred the matter to Human Resources and the accommodations were provided. Further, when Complainant requested additional accommodations for her disabilities, Human Resources engaged Complainant in an interactive process, and Complainant's supervisors worked with Complainant and Human Resources in an appropriate manner. There is no evidence that Respondents denied Complainant's requests for accommodations. The vast amount of email correspondence collected during the investigation indicates there was much dialogue between Complainant, Human Resources, and Respondent #2 regarding the development of appropriate accommodations for Complainant's workers' compensation injury and medical conditions, with Respondent #1 also being kept in the loop. Even before her permanent assignment to PPD, Complainant had historically required intermittent FMLA due to her migraines, and from the correspondence it appears that PPD continued to provide Complainant FMLA leave without any issue.[114] Once she was permanently reassigned to PPD, Complainant communicated directly with Human Resources regarding her medical conditions and requests for accommodations. In June 2020, Human Resources sent Complainant an informational email about ADA accommodations, but Complainant responded that she did not need any ADA accommodations and never asked for accommodations.[115] Complainant suffered a workplace injury on or about June 23, 2020, and then returned to work with restrictions to accommodate her

---

[110] Ex. 4, Nondiscrimination Policy, § II.

[111] Ex. 1, 10.12.2020 Letter of Representation, p. 4.

[112] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[113] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[114] Ex. 16, FMLA Accommodation Timeline.

[115] Ex. 32, 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations.

PRIVILEGED & CONFIDENTIAL

shoulder injury.[116] Beginning in July 2020 when Complainant first contacted Human Resources to request ADA accommodations, Human Resources worked with Complainant to obtain necessary documentation to develop accommodations for Complainant's medical conditions.[117] In the following months, there was some confusion regarding appropriate accommodations given conflicting information from medical providers, and Complainant's supervisors continued to work with her regarding her appropriate accommodations.[118] A formal offer of accommodation for Complainant's disabilities was made several months later in the fall of 2020, after Human Resources had continued to reach out to her medical providers to obtain complete information and coordinate with PPD to develop a list of accommodations based on Complainant's job descriptions.[119]

The documentation reviewed reflects that Respondent #1's knowledge of Complainant's medical conditions and involvement with her ADA accommodations was limited. Respondent #1 explained in his interview that Respondent #2 would simply inform Respondent #1 of any issues or concerns regarding Complainant's work assignments. There are some text messages from Respondent #1 regarding Complainant's permanent reassignment to PPD in June 2020 that indicate Respondent #1 did not want to be forced to provide Complainant an office position in PPD.[120] Witness #1 explained in his interview that these text messages reflect the fact that there was no office position available in PPD for Complainant. Respondent #1 indicated that he did not direct PPD where to place Complainant upon her return to PPD, but was simply kept informed of any issues involving Complainant by Respondent #2. Further, additional text messages from August 2020 reflect Respondent #1's attempts to clarify with Human Resources whether Complainant had ADA accommodations in place beyond her workers' compensation restrictions.[121]

Respondent #2's communications with Complainant on the subject of her work restrictions primarily concern the accommodations developed by Human Resources and administrative issues such as properly documenting Complainant's leave. For instance, on July 20, 2020, there was a text message exchange between Complainant and Respondent #2 regarding Complainant leaving for a doctor's appointment.[122] Complainant accused Respondent #2 of causing her to have a panic attack by suggesting they meet to discuss their issues. When Respondent #2 expressed that she felt they "need[ed] to have a meeting to clear up the communication issues and chain of command issues we're having," Complainant responded, "stop harassing me [Respondent #2]" and stated "I'm going home because my heart is racing during this panic attack."[123] Respondent #2 did not

---

[116] Ex. 62, 07.08.2020 Return to Work Information.

[117] Ex. 33, ADA Accommodation Timeline.

[118] *See* Ex. 34, 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury; Ex. 42, 08.13.2020 Emails Regarding August 12 Meeting Summary.

[119] Ex. 33, ADA Accommodation Timeline.

[120] Ex. 63, Text Messages Between Respondent #1 and Witness #1, pp. 1-5.

[121] Ex. 63, Text Messages Between Respondent #1 and Witness #1, pp. 5-12.

[122] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2; *see also* Ex. 64, 07.20.2020 Email Summary from Respondent #2.

[123] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

26

PRIVILEGED & CONFIDENTIAL

respond to Complainant's message, but followed up the next morning stating that she hoped Complainant was feeling better and they still needed to have a meeting.[124]

Similarly, Complainant alleges in her Complaint that on October 8, 2020, Human Resources provided instructions for Complainant's reasonable accommodations, and the next day, Respondent #2 told Complainant that she would be responsible for cleaning the three nursing buildings by herself.[125] Indeed, Human Resources sent an offer of ADA accommodations to Complainant and her supervisors at October 8, 2020,[126] and the emails indicate that on October 7, 2020, Respondent #2 was aware that accommodations were forthcoming.[127] However, Respondent #2 explained the change in Complainant's responsibilities was due to the reassignment of Respondent #3 in order to separate her and Complainant due to the issues they were having.[128] Respondent #3 was reassigned because she asked to transfer first (although Respondent #3 was not happy to leave the nursing buildings), and the custodial supervisors did not want Complainant to feel she was being moved out of retaliation.[129] According to Respondent #2, the supervisors thought Complainant would be satisfied with this change because Complainant had shared that she wanted a similar decision to be made months prior.[130] We find Respondent #2's explanation to be worthy of credence and find that Complainant was assigned to clean the three nursing buildings because she had to be separated from Respondent #3 due to ongoing conflict. Notably, Respondent #3 had been responsible for cleaning all three nursing buildings prior to Complainant returning to PPD in 2020.

Thus, the evidence analyzed indicates that Respondent #2 attempted to balance Complainant's restrictions (as recommended by Human Resources) with the work requirements of Complainant's position and the needs of PPD. Additionally, the weight of the evidence reflects that Respondent #2's actions were well documented and were communicated to (and often approved by) PPD management and Human Resources.

In summary, there is insufficient evidence to establish that Respondent #1 or Respondent #2 discriminated against or harassed Complainant based on her disabilities. Indeed, Complainant never suffered any adverse employment action, other than a single written disciplinary action that was prompted by complaints from nursing staff, and Respondent #3 received a write-up for similar reasons. While Complainant was tasked with completing the nursing buildings on her own, this reassignment was done to address the conflict between Complainant and Respondent #3 and was an assignment that Respondent #3 previously covered on her own. Moreover, the evidence does not reflect that Respondent #1 or Respondent #2 engaged in any verbal or physical harassment of Complainant due to her disabilities.

---

[124] Ex. 38, 07.20.2020 Text Messages Between Complainant and Respondent #2.

[125] Ex. 1, 10.12.2020 Letter of Representation, p. 3.

[126] See Ex. 56, 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer.

[127] Ex. 55, 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations.

[128] Ex. 37, Respondent #2 Written Response to Investigation.

[129] Ex. 37, Respondent #2 Written Response to Investigation.

[130] Ex. 37, Respondent #2 Written Response to Investigation; Ex. 5, 10.08.2020 Email from Complainant.

APPX. 174
SFA-00543

PRIVILEGED & CONFIDENTIAL

Accordingly, we find the allegation that Respondent #1 and Respondent #2 discriminated against or harassed Complainant based on her disabilities to be **unsubstantiated.**

## 4.   Discrimination and Harassment by Respondent #3

As to Complainant's allegations of disability discrimination and harassment against Respondent #3, the preponderance of the evidence did not support Complainant's allegations. While Complainant said that Witness #5 told her Respondent #3 had a problem working with others, the weight of the evidence does not indicate that Respondent #3 had any animus towards Complainant based on any actual or perceived disability. Witness #5 did not recall telling Complainant that Respondent #3 is difficult to work with or that Complainant would want to quit if she was assigned to work with Respondent #3. Indeed, Complainant confirmed in her follow-up interview that she did not know Respondent #3 before she started working in the nursing buildings and her conversation with Witness #4 simply indicated that Respondent #3 did not want assistance with cleaning the nursing buildings.

Other than Complainant's own statements, there is little to corroborate that Respondent #3 harassed Complainant about her health conditions or doctor's appointments. Recorded conversations reflect that Complainant initially said she enjoyed working with Respondent #3.[131] In her interview, Respondent #3 specifically denied that she called Complainant "lazy arms" or told Complainant that she worked too slowly. Respondent #3 acknowledged that she criticized Complainant's work because that was her job as Complainant's lead, and Complainant had an issue accepting Respondent #3 as her supervisor. A review of the relevant documents did not reflect that Respondent #3 made any comments about Complainant's medical conditions in text messages or emails. However, as of August 12, 2020, Complainant's supervisors and Human Resources were at least notified of the allegation that Respondent #3 had engaged in name-calling against Complainant and they instructed her to stop.[132] Both Witness #1 and Respondent #2 confirmed that the alleged comments were not corroborated, but nevertheless Respondent #3 was instructed to cease such behavior immediately if it was occurring.

Witness #4 was the only witness who observed Complainant and Respondent #3 working together in the nursing buildings. Witness #4 felt there was drama every day from the day that Complainant was assigned to work there. Witness #4 said that Complainant claimed people were sabotaging her, which was not true. Witness #4 also said that Respondent #3 kept the nursing buildings very clean and had a high standard for her work. While Respondent #3 was admittedly critical of Complainant's work, Witness #4 said that is not unexpected because Respondent #3 was Complainant's lead and Complainant was relatively new to the nursing buildings and more industrial cleaning in general (as opposed to the JCB House). Witness #4 felt that Respondent #3's conduct towards Complainant was appropriate and that Complainant frequently misinterpreted things.

Regarding the allegation that Respondent #3 falsely told Respondent #2 that Complainant wanted to change her work schedule on or about August 11, 2020, Complainant's follow-up email

---

[131] Ex. 30, Tammy convo 2 Thursday.m4a; Ex. 31, Convo w- Tammy Wheeler.m4a.

[132] Ex. 40, 08.12.2020 Email From Complainant; Ex. 65, 08.12.2020 Email From Witness #1; Ex. 41, 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting.

APPX. 175
SFA-00544

PRIVILEGED & CONFIDENTIAL

states: "There must me a language barrier there. I can not change my schedule at this time. I said to [Respondent #3] once MAYBE when the students return."[133] Accordingly, the evidence does not indicate that Respondent #3 falsely said that Complainant would change her schedule, as Complainant admittedly told Respondent #3 that she would consider changing her schedule when the students returned to campus.

Complainant raises other allegations about Respondent #3 gossiping about Complainant and showing Complainant's messages to individuals outside of PPD. However, the evidence indicates that both Complainant and Respondent #3 were written up for public disagreements and disruptive behavior. While there is some indication that Respondent #3 was dissatisfied with the quality of Complainant's work, the preponderance of the evidence does not support the conclusion that these issues between Complainant and Respondent #3 were attributable to animus based on Complainant's medical conditions or disabilities.

Accordingly, we find the allegation that Respondent #3 discriminated against and harassed Complainant on account of her disabilities to be **unsubstantiated.**

### 5.   Retaliation During the Investigation

Regarding the allegation that Respondent #2 retaliated against Complainant by assigning her too much work given her restrictions, Complainant acknowledged that she was aware of her proposed responsibilities when she chose to be reassigned from the nursing buildings to the Student Center. Witness #6 opined that Complainant had too much responsibility in the Student Center given her restrictions, but she also noted the team has recently been down a member since one employee had surgery. Moreover, Witness #6 said Respondent #2 told the crew during a group meeting, "If y'all cannot get this job done, then I will change your hours." Witness #6 and Witness #7 confirmed that this comment was directed towards the group, specifically the night crew. Thus, Respondent #2's comment was not directed at Complainant.

Regarding the allegation that Witness #3 was talking about Complainant during the investigation, the incident occurred when Witness #3 was being interviewed via videoconference for this investigation.[134] Based on the content of the conversation as well as the timing, it is apparent that Witness #3 was indeed speaking with the investigators when Complainant overheard him from the outside of his closed office door. Moreover, Witness #3 is one of Complainant's supervisors and was speaking behind closed doors about Complainant, which is wholly appropriate behavior for a supervisor.

Regarding the allegation that Respondent #2 called Complainant a "bitch," Respondent #2 said she did not recall making any such comment. Complainant alleged that Witness #6 told her that Respondent #2 made this statement. However, Witness #6 said in her interview that she did not hear this comment but rather Witness #7 told her about it. When the investigators then interviewed Witness #7, she said that as Respondent #2 was getting out of a car with three other individuals, one of the group members said something about "that bitch" referring to Complainant, and then the group laughed. Witness #7 was not sure who made the comment and could not say

---

[133] Ex. 39, 08.11.2020 Emails Regarding Shift Change.

[134] Ex. 61, 11.11.2020 Email from Complainant's Counsel.

PRIVILEGED & CONFIDENTIAL

for certain whether it came from Respondent #2 or someone else. In summary, there is insufficient evidence that Respondent #2 made the alleged comment or that the comment was in any way related to any protected activity by Complainant.

Because there is insufficient evidence to establish that these actions were attempts to seek retribution against Complainant for filing her Complaint or for other protected activity, we find Complainant's allegations of retaliation to be **unsubstantiated.**

## VII.    Conclusion

We find that Complainant's allegations that she was subjected to discrimination and harassment on the basis of age, race, or disability to be **unsubstantiated**. We further find Complainant's allegations that she was subject to retaliation to be **unsubstantiated**. To the extent the alleged conduct occurred, there is insufficient evidence to establish any of Respondents' actions were taken because of Complainant's age, race, or disabilities, or that any alleged act was taken in retaliation for protected activity.

However, we further find Complainant's allegation that Respondent #1 likely made racially inappropriate comments to Complainant on September 26, 2019 to be **substantiated**. While the evidence is insufficient to establish that this conduct constitutes race discrimination or harassment, we find that Respondent #1's conduct was inappropriate and thus **constitutes "Other Unprofessional/ Inappropriate Conduct,"** in violation of SFA's Nondiscrimination Policy. Because the Nondiscrimination Policy suggests the investigators contain a recommendation for resolution of the matter,[135] we recommend resolution of this finding through a written reprimand of Respondent #1, as well as training on managing a diverse workforce.

As stated above, the Nondiscrimination Policy directs the Vice President for Finance and Administration to review the findings and recommendations in this Report and take such action deemed appropriate. Pursuant to Section IX(B)(2) of the Nondiscrimination Policy, such action shall be communicated in a letter to the Complainant and Respondent with copies to the general counsel, Director of Human Resources, and the Title IX or ADA Coordinator, as applicable, within five (5) business days of receipt of this Report.

---

[135] Ex. 4, Nondiscrimination Policy, § IX(B)(2).

PRIVILEGED & CONFIDENTIAL

## VIII.   EXHIBIT LIST

| Ex. | Description |
|-----|-------------|
| 1 | 10.12.2020 Letter of Representation |
| 2 | 11.02.2020 Email from Complainant's Counsel |
| 3 | 11.10.2020 Email from Complainant's Counsel |
| 4 | Nondiscrimination Policy (Policy 2.11) |
| 5 | 10.08.2020 Email from Complainant |
| 6 | 10.19.2020 Notice to Complainant |
| 7 | 10.28.2020 Notice to Respondent #1 |
| 8 | 10.28.2020 Notice to Respondent #2 |
| 9 | 10.28.2020 Notice to Respondent #3 |
| 10 | 11.13.2020 Spanish Notice to Respondent #3 |
| 11 | Personnel Action Request for New Appointments |
| 12 | House Coordinator Job Description Rev. 09/09 |
| 13 | House Coordinator Job Description Rev. 09/11 |
| 14 | Complainant's Combined Performance Evaluations from Dr. Janice Pattillo |
| 15 | 08.23.2018 Email Regarding FMLA Approval |
| 16 | FMLA Accommodation Timeline |
| 17 | 08.23.2018 Email Regarding Complainant's FMLA Approval |
| 18 | 09.03.2019 Email from Respondent #1 Regarding Reassignment |
| 19 | 07.08.2020 Email From Complainant Regarding Accommodations |
| 20 | 09.26.2019 Emails Regarding Complainant's FMLA Recertification |
| 21 | 10.01.2019 Email From Complainant to Respondent #2 Regarding Migraine |
| 22 | 10.02.2019 Note From Complainant Regarding FMLA Leave for Migraine |
| 23 | 10.03.2019 Email From Complainant to Human Resources Regarding Doctor's Notes |
| 24 | 08.10.2020 Emails Regarding FMLA Certifications |
| 25 | 09.25.2019 Respondent #2's Facebook Post |
| 26 | 10.04.2019 Text Between Complainant and Respondent #1 |
| 27 | 09.26.2019 Email from Respondent #2 Regarding Meeting With Complainant |
| 28 | Copy of Evaluation Provided by Complainant |

PRIVILEGED & CONFIDENTIAL

| 29 | Copy of Evaluation Provided by Respondent #2 |
| 30 | Tammy convo 2 Thursday.m4a |
| 31 | Convo w- Tammy Wheeler.m4a |
| 32 | 06.11.2020 Emails Between Complainant and Human Resources Regarding ADA Accommodations |
| 33 | ADA Accommodation Timeline |
| 34 | 06.23.2020 Email Summary Regarding Complainant's Workers' Compensation Injury |
| 35 | 07.07.2020 Email Regarding Moving Chairs |
| 36 | Complainant's Accepted Offer for Light Duty Work |
| 37 | Respondent #2 Written Response to Investigation |
| 38 | 07.20.2020 Text Messages Between Complainant and Respondent #2 |
| 39 | 08.11.2020 Emails Regarding Shift Change |
| 40 | 08.12.2020 Email from Complainant to Respondent #2 Regarding Concerns |
| 41 | 08.13.2020 Email from Respondent #2 to Complainant Summarizing Meeting |
| 42 | 08.18.2020 Emails Regarding August 12 Meeting Summary |
| 43 | 08.13.2020 Email From Witness #4 Regarding Complaints |
| 44 | 08.19.2020 Email Approving Complainant's Written Disciplinary Action |
| 45 | 09.17.2020 Final Grievance Notification |
| 46 | 07.24.2020 Email from Nursing Director Tamara Harris |
| 47 | 10.06.2020 Email From Respondent #2 Regarding Complainant |
| 48 | 10.06.2020 Text Messages Between Respondent #2 and Complainant |
| 49 | 10.07.2020 Respondent #3 Written Discipline |
| 50 | 10.07.2020 Respondent #2 Written Statement |
| 51 | 10.07.2020 Witness #3 Written Statement |
| 52 | 10.07.2020 Maria Veliz Written Statement |
| 53 | 10.07.2020 Email from Complainant Regarding Transfer Request |
| 54 | 10.09.2020 Email from Complainant to Human Resources |
| 55 | 10.07.2020 Email to Respondent #2 Regarding Complainant's Proposed Accommodations |
| 56 | 10.08.2020 Email from Human Resources Regarding ADA Accommodation Offer |
| 57 | 10.08.2020 Email from Witness #1 to Complainant Regarding Nondiscrimination Policy |

PRIVILEGED & CONFIDENTIAL

| 58 | 10.09.2020 Email from Respondent #2 to Human Resources |
| 59 | 10.13.2020 Email from Respondent #2 Regarding Complainant's Transfer |
| 60 | 10.14.2020 Email from Complainant Regarding Transfer to Student Center |
| 61 | 11.11.2020 Email from Complainant's Counsel |
| 62 | 07.08.2020 Return to Work Information |
| 63 | Text Messages Between Respondent #1 and Witness #1 |
| 64 | 07.20.2020 Email Summary from Respondent #2 |
| 65 | 08.12.2020 Email From Witness #1 |

33

**EXHIBIT "C"**

Danny Gallant, Ph.D                          via email at dgallant@sfasu.edu and Regular Mail
Vice President for Finance
  and Administration
Stephen F. Austin State University
P.O. Box 6108, SFA Station
Nacogdoches, Texas 75962-6108

Date:  January 20, 2021

Re:  **Complainant's Appeal and Request for Discrimination Board Hearing**

Dr. Gallant,

Pursuant to Stephen F. Austin State University's Nondiscrimination Policy 2.11 (Section IX, Part
B,3), I, as the initial Complainant in the matter discussed in your January 14, 2021 letter, find your
decision to be unsatisfactory.  Therefore, I am appealing your decision by submitting this written
request a formal hearing by a discrimination complaint review board of this entire matter.

This written request is being submitted within 5 business days of the submission of your January
14, 2021 decision letter, which was sent by email to my legal counsel.  As your decision letter was
transmitted by email, this Appeal and Request for a Discrimination Board Hearing is also being
sent to you by email with hard copy to follow by Regular Mail.

Respectfully submitted,

Tammy Wheeler

CC:
Damon Derrick, General Counsel              via email at derrickdc@sfasu.edu
John Wyatt, Interim Human Resources Director   via email at wyattjohn@sfasu.edu

EXHIBIT "D"



RECEIVED
29 APR 2021
Houston District Office
US EEOC

RECEIVED
FEB 0 3 2021
BY: CS

## Performance Review – Staff Employee

Name: Tammy Wheeler
Department: Physical Plant Custodial
Review Year: 2020

Campus ID Number: 10682332
Title: House Coordinator

**Instructions:**

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the necessary knowledge, skills, abilities, and/or commitment required. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed** – Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Successfully demonstrates the required skills, abilities and commitment for this job task.

   **Exceeds Expectations** – Achieves job requirements and occasionally exceeds expectations.

   **Exemplary** – Consistently exceeds expectations.  This rating is used as special recognition for extraordinary accomplishments.  Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Unsatisfactory" and "Improvement Needed" in any grouping of performance factors. If applicable, goals for the purpose of development for each grouping of performance factors can also be noted.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet.  In this section, the supervisor will certify whether the employee has completed all required trainings and their Conflict of Interest Survey.

5. Designate the employee's overall rating.

6. Present the evaluation to employee.  Both employee and supervisor' should sign the evaluation.

<sup>1</sup>A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.

*Indicate the level of performance by selecting the appropriate descriptor.*

| Performance Factors | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* |
|---|---|---|---|---|---|
| Quality of Work – Exhibits the required level of job knowledge and/or skills to perform the job. Assignments completed by the employee meet quality standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Completion of Work – Completes tasks as assigned and meets deadlines. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Communication – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Technical Skills – Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Planning/Organizing – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Customer Service– Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☒ | ☐ | ☐ | ☐ |
| University Policy/Procedures – Adheres to all applicable university policy and procedures. | ☐ | ☒ | ☐ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary".*

Quality of work: In contrast from Ms. Wheeler's previous evaluation based mainly on her tasks at the JCB house; Ms. Wheeler was able to sufficiently provide PPD with acceptable quality level of work. Perhaps to the newness of how things were done in a more commercial setting and a faster pace environment. Completion of work: The newness also caused a drop in her ability to complete task at the level she was able to last year. Again, Ms. Wheeler completed and had a fair quality of work produced it was just a stark difference in the production of work executed by Ms. Wheeler in years past. Technical Skills: With the move into a more commercial/educational and high demand area Ms. Wheeler still has a lot to accomplish when it comes to learning how to technically clean for the change in the type of cleaning asked of her. Planning/Organizing: Ms. Wheeler was unable to properly schedule her duties in the time frame provided and continuously struggled to plan out her work assigned when she was transfered to work in a more fast pace/demanding environment. For example, Ms. Wheeler would ask repeatedly what her task for the day were. Ms. Wheeler also struggled with applying organizational methods of focusing her detailing projects like dusting on different days of the week. Customer Service: Ms. Wheeler had a written reprimand and several counseling sessions with her supervisors this year due to her unprofessional behavior and unsatisfactory customer service by involving multiple faculty and staff members in various issues that caused issues between PPD and the academic department. University Policy/Procedures:This year it was shown that Ms. Wheeler was not adequately prepared with knowledge of some key university policies and PPD procedures.

*Action Plan & Goals:* Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory".

(Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

Ms. Wheeler has been informed and coached (via written reprimand and numerous meetings documented via email summaries) in what is expected and we hope to see change in Ms. Wheeler's performance this upcoming year as a member of PPD while fulfilling her assigned task at the BPSC.

So far we have received some encouraging words from some of the BPSC customers who are content with Ms. Wheeler's work at the BPSC; we ward this type of acknowledgment to continue. Good job Ms. Wheeler!

RECEIVED
29 APR 2021
Houston Division
US EEOC Office



RECEIVED
29 APR 20
Houston Dist Office
USE ONLY

**Behavioral Factors**

*Dependability/Accountability* – Monitors projects and exercises follow-through, adheres to time frames, arriving on time for meetings and appointments, and responds appropriately to instruction and procedures.

*Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly.

*Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently.

*Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside his/her normal responsibilities when needed.

*Judgment/Problem Solving* – Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action.

*Attendance/Punctuality* – Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with University policy.

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary"*

**Dependability/Accountability:** Ms. Wheeler struggled at times this year to trust and understand how her job assignments can be completed in the time allotted to her. Again the level of dependability from last year to this year dropped due to Ms. Wheeler not being able to keep up. **Cooperation/Teamwork:** Ms. Wheeler struggled to be a team player this year and cooperate with assignments and respect from her coworkers and supervisors. Ms. Wheeler received a written reprimand addressing this concern and has had meetings with supervisors speaking about this inability. **Initiative:** Ms. Wheeler struggled to get her own regular duties done in the allotted time and preferred to try and get some of those task done instead of seeking more. Ms. Wheeler consistently asked when daily task should be instead of learning and creating a routine. **Adaptability:** This year vs last year Ms. Wheeler was moved permanently to the PPD department in the Nursing bldg for the majority of the year instead of the JCB house. The type of duties were not that different from one area to the other but rather the pace in which the work was done and the demand of how often and organization of when certain task get done that Ms. Wheeler struggled all year to adapt to. Ms. Wheeler kept trying to change her task to even match her preferred work quantity but struggled to accept that her task had changed/as they did for many employees this year due to the pandemic). **Judgment/Problem Solving:** Ms. Wheeler also struggled to solve problems herself. When given some solutions, Ms. Wheeler failed to adhere to these solutions and failed to make sensible judgment calls. This cannot email issues on making frequently, keeping herself from being able to complete her more assigned tasks correctly. **Attendance:** Ms. Wheeler does a great job at coming to work when scheduled to and being on time. Ms. Wheeler uses her leave her time in accordance with university policy.

**Action Plan & Goals:**

This upcoming year we would like Ms. Wheeler to work on being a dependable team member with the BPSC crew and accept her role as a PPD custodial team member and trust others when solutions are given.

## Evaluation Summary Sheet

| | Quality of Work | Quantity of Work | Technical Knowledge | Pace | Customer Service | Policy/Procedures | Dependability/Accountability | Cooperation/Teamwork | Initiative | Adaptability | Judgment/Problem Solving | Attendance/Punctuality | Managing Employees | Managing Resources | Communication | Decision Making | Leadership/Employee Development | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | | | | | | | 8 |
| **Acceptable** | ■ | ■ | ■ | | | | ■ | | | | | | | | | | | 4 |
| **Exceeds Expectations** | | | | | | | | | | | | | | | | | | 0 |
| **Exemplary** | | | | | | | | | | | | | ■ | | | | | 1 |

## Supervisory Follow-up

| Has this employee completed all required trainings for which they have been enrolled? | ✔ Yes | ☐ No |
|---|---|---|
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | ☐ No |

## OVERALL EVALUATION (check one)

☐ **Unsatisfactory:** Applies to employee whose performance fails to meet of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time.

✔ **Improvement Needed:** Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized.

☐ **Acceptable:** Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level.

☐ **Exceeds Expectations:** Performance is clearly and consistently above what is required in the job. Achievement in superior and consistently above expectation in most aspects of the job.

☐ **Exemplary:** Performance consistently exceeds expectations in all aspects of the job. This level rating is reserved for those few individuals whose exceptional performance is obvious to all.

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: REFUSE TO SIGN    Retaliation as

Supervisor's Signature: _____    Date: 1-25-21

Reviewing Supervisor's Signature: _____    Date: 1-25-21

Witness #1 _____ 2/3/21

Witness #2 _____

RECEIVED 29 APR 2021 US EEOC Houston District Office

# EXHIBIT 14

APPX. 186
SFA-00169

RECEIVED

DEC 1·6 2009

Human Resources

## STEPHEN F. AUSTIN STATE UNIVERSITY
## NACOGDOCHES, TEXAS
## PROBATIONARY EMPLOYEE EVALUATION

1. Name of employee: _Tammy Wheeler_     Dept. & Box #: _13031_

2. Date of Employment: _6-12-09_     Probation period ends: _12-12-09_

3. Evaluation Scale: *(Please mark employee performance evaluation on this scale)*

| | How well does this employee understand the requirements of the job? | | | | |
|---|---|---|---|---|---|
| Job Knowledge | Thoroughly understands all aspects | More than adequate knowledge | More than sufficient knowledge | Insufficient in some phases | Continually needs instruction |
| | **How well do results or work products meet requirements?** | | | | |
| Quality of Work | Consistently outstanding | Highly acceptable | Entirely acceptable | Occasionally unacceptable | Frequently unacceptable |
| | **How much satisfactory work does this employee consistently turn out?** | | | | |
| Quantity of Work | Usually high output | Does more than expected | Does sufficient amount of work | Inclined to be slow | Inadequate turnout of work |
| | **How does this employee accept all the responsibilities of the job?** | | | | |
| Responsibility | Accepts all responsibilities | Tries to fulfill job responsibilities | Accepts but does not seek responsibility | Does some assigned tasks reluctantly | Indifferent; avoids responsibility |
| | **How well does the employee begin an assignment without direction?** | | | | |
| Initiative | Self starter; makes practical suggestions | Does work voluntarily; accepts suggestions | Does regular work without prompting | Relies on others; needs help starting | Must usually be told exactly what to do |
| | **Does employee work harmoniously with co-workers and supervisors?** | | | | |
| Cooperation | Exceptionally willing as a team worker | Tactful and offers to assist others | Gets along well enough; no problems | Cooperation must be solicited | Tends to be a troublemaker |
| | **How faithful is this employee in reporting to work?** | | | | |
| Dependability | Exceptional response to demands of job. | Punctual and does not waste time | Centrally on the job as needed | Some abuse of work schedule | Chronic abuse of work schedule |

4. Based upon performance to date, it is recommended that this employee be:

    _✓_ Retained     _____ Terminated

5. Comments/Corrective Action: _____

    *(use additional sheet if necessary)*

_Janice Pattillo_                    _Tammy Wheeler_
(Signature of Employee)           (Signature of Department Head/Supervisor

Date: _12-15-09_

SFA-00170
APPX. 187



# STEPHEN F. AUSTIN STATE UNIVERSITY

RECEIVED

FEB 2 5 2011

Human Resources

## Performance Review *(Classified Employees)*

Name: __Tammy Wheeler__   Campus ID Number: __106-82-332__

Department: __Physical Plant__   Title: __Manager of President's House__

Review Period: __1/1/2010__ - __12/31/2010__   Job Description Review: _____

**I.   Essential Job Requirements**:  (Consider employee's knowledge of duties, responsibilities of position, and how employee applies technical knowledge, education, and experience to job requirements.)

- ☐ Unable to complete job duties.
- ☐ Poor understanding of job duties.
- ☐ Continually needs repeated instructions.
- ☐ Demonstrated adequate knowledge of job.
- ☐ Has knowledge and skills to handle job duties.
- ☑ More than adequate knowledge of job.
- ☐ Strives to improve job skills.
- ☐ Thorough knowledge of job and how it affects others.
- ☐ Continually utilizes expanding knowledge and skills to perform duties.

**II.   Quality of Work**:  (Consider quality in relation to level of job duties.  Consider thoroughness, accuracy, and overall presentation of work.)

- ☐ Quality does not meet requirements of job.
- ☐ Makes frequent and recurrent errors.
- ☐ Projects or duties often need revision or correction.
- ☐ Quality meets requirements of job.
- ☐ Work is frequently complete, accurate, and has minimal errors.
- ☐ Work is presented in a satisfactory manner.
- ☑ Quality exceeds requirements of job.
- ☐ Work is consistently complete, accurate, and thorough, exceeding job requirements.
- ☐ Work is exceptionally thorough, organized, well thought out, and accurate.

**III.   Quantity of Work**:  (Consider assignments completed, overall productivity, and amount of work done during the workday.)

- ☐ Quantity does not meet minimum requirements.
- ☐ Volume of work is generally unsatisfactory.
- ☐ Volume is generally below what is expected.
- ☐ Does just enough to get by.
- ☐ Volume meets job requirements.
- ☐ When situation requires, production increases.
- ☑ Volume of work is frequently above that expected.
- ☐ Consistently produces high volume of work.
- ☐ Employee is extremely productive and fast.

APPX. 188
SFA-00171

**IV.   Work Ethics**:  (Consider how employee displays loyalty to SFA through the handling of confidential information, following policies, and use of SFA's property.)

- ☐ Does not follow SFA's policies.
- ☐ Careless with SFA's property.
- ☐ Prone to gossip and to discussing confidential information outside of appropriate parties.
- ☐ Competent in complying with and respecting SFA's policies.
- ☐ Appropriately uses SFA's property.
- ☐ Protects confidential information.
- ☐ Displays a high regard for SFA's property and policies.
- ☐ Demonstrates the ability to understand and takes steps in protecting confidential information.
- ☑ Consistently supports and follows SFA's policies and uses property appropriately.
- ☐ Uses exceptional care in regards to confidential information.

**V.   Use of Time and Work Organization**:  (Consider employee's ability to organize and prioritize their work, and how effectively time is used.)

- ☐ Work is unplanned and unorganized.  Doesn't plan or schedule.
- ☐ Usually cannot find, or wastes time searching for information.
- ☐ Difficulty in determining priority and schedule of duties.
- ☐ Adequately plans and organizes work.  Completes work within time expected.
- ☐ Normally does not require assistance to accomplish routine work effectively and logically.
- ☐ Planning and organizing work is a priority.  Uses time wisely and produces more work than required.
- ☑ Demonstrates the ability to logically complete assignments on the majority of assigned projects.
- ☐ Exceptional planning and organizational skills.  Makes the most of their time, able to take on additional tasks without affecting regular assignments.
- ☐ Work is always completed in an effective and logical manner.

**VI.   Work Relationships and Teamwork**:  (Consider whether employee works harmoniously and effectively with fellow employees and management.)

- ☐ Hardly ever assists others unless specifically asked.
- ☐ Not courteous; lacks understanding.
- ☐ Generally uncooperative; fails to consider others.
- ☐ Has negative attitude, may be rigid and defensive.
- ☐ Provides assistance without being asked.
- ☐ Will work effectively with team, and is cooperative.
- ☐ Occasionally displays an enthusiastic attitude.
- ☐ Seeks out opportunities to assist others.
- ☐ Promotes enthusiasm about working with others, and looks for constructive ways to encourage others.
- ☑ Goes above and beyond to assist others and promote good working relationships.
- ☐ Promotes superior teamwork, and is team leader.
- ☐ Always promotes enthusiasm.

**VII.**   <u>**Customer Relations**</u>:  (Consider how employee responds and interacts with employees and others within or outside department or organization.)

- ☐  Has little or no regard for how his/her behavior affects others.
- ☐  Rarely listens or tries to understand needs of others.
- ☐  Lacks tact, diplomacy, and appears impolite when dealing with customers.
- ☐  Normally concerned about and aware of impact of behavior on others.
- ☐  Listens, understands, and responds appropriately to others' needs.
- ☐  Generally tactful, diplomatic, and polite when dealing with customers.
- ☐  Pro-active in understanding and being responsive to others needs.
- ☐  Above average in understanding and listening to others needs.
- ☐  Willing to go the extra mile.
- ☐  Exhibits professionalism in dealing with customers.
- ☐  Seeks to secure quality, long-lasting customer-user relations.
- ☑  Consistently going the extra mile to be sure others' needs are met.
- ☐  Outstanding in understanding and being responsive to customers' needs.

**VIII.**   <u>**Responsibility and Dependability**</u>:  (Consider the manner in which employee applies self to work, amount of supervision required to obtain desired results, employee's ability to identify issues and choose appropriate course of action.)

- ☐  Unreliable, consistently needs supervision.
- ☐  Cannot be depended on to follow-up and handle routine tasks.
- ☐  Extreme difficulty in meeting schedules.
- ☐  Reliable and conscientious about accomplishing duties and assignments.
- ☐  Requires general supervision.
- ☐  Always reliable and conscientious about accomplishing assignments.
- ☑  Requires supervision only on non-routine tasks or on complex assignments.
- ☐  Has earned supervisor's complete confidence that assignments will be accomplished.
- ☐  Needs only minimal supervision on all tasks.

**IX.**   <u>**Initiative**</u>:  (Consider employee's ingenuity for completing extra or self-initiated projects or assignments, adaptability to change, and employee's initiative in completing assignments ahead of schedule.)

- ☐  Seldom, if ever, looks for ways to improve department and/or self.
- ☐  When given a task, never looks for ways to improve work process.
- ☐  Resistant to change.
- ☐  Generally looks for ways to improve organization and/or self.
- ☐  When asked, generally looks for ways to improve work process.
- ☐  Readily adapts to situations and/or change.
- ☐  Actively seeks new assignments and ways to improve the organization and/or self.
- ☐  Independently originates constructive ideas for improving work process.
- ☐  Supports and easily adapts to change.
- ☑  Gives exceptional ideas on ways to improve organization, and/or self, seeks new, challenging assignments.
- ☐  Provides superior constructive ideas for improving work process.
- ☐  Outstanding ability to adapt to and support change.

**SFA-00175**

**APPX. 190**

**X.**  **<u>Attendance and Punctuality</u>**:  (Consider whether employee conforms to work hours and their timely attendance at meetings.)

- ☐ Often absent.
- ☐ Never on time.
- ☐ Lax in attendance or reporting time.
- ☐ Frequently late.
- ☐ Allows personal factors to interfere with working hours.
- ☐ Frequently requires prompting.
- ☐ Usually present and on time.
- ☐ Has regular attendance in department.
- ☐ Always on time.
- ☑ Very prompt.

**XI.**  **<u>Safety</u>**:  (Consider whether employee operates equipment safely, properly maintains and safeguards SFA's equipment, and identifies unsafe practices.)

- ☐ Frequently causes unsafe errors at work.
- ☐ Often is coached to keep work area clean.
- ☐ Frequently told to perform maintenance on work and safety equipment.
- ☐ Observes necessary safety practices as applicable.
- ☐ Keeps work area clean and orderly.
- ☐ Attends regularly scheduled safety trainings.
- ☑ Regularly maintains work and safety equipment as necessary.

**XII.**  **<u>Training and Development</u>**:  List all trainings (voluntary and mandatory) attended during performance period. (This information can be obtained through the Human Resources Training division.)

# Summary Sheet

*Areas for Improvement/Action Plan:*

*Summary:*

## *OVERALL EVALUATION*: (check one)

| | |
|---|---|
| | **Unsatisfactory**: A rating that may apply to inexperienced newcomers to the job or University. It applies to others whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| | **Needs Improvement**: Performance is acceptable in some but not all aspects of the job. Performance does not consistently meet requirements and the need for further development is recognized. |
| | **Fully Acceptable**: Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level. |
| ✓ | **Commendable**: Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job. |
| | **Outstanding**: Performance consistently exceeds expectations in all aspects of the job. This rating is reserved for those few individuals whose exceptional performance is obvious to all. |

## Signatures:

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee.  My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation.  I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: *Tammy Wheeler*                   Date: Jan. 27, 2011

Supervisor's Signature: *Janice Pattillo*               Date: Jan. 27, 2011

Reviewing Supervisor's Signature: *Dr. Brittain*          Date: 1/31/11

SFA-00179
APPX. 192



STEPHEN F. AUSTIN STATE UNIVERSITY

**Performance Review** *(Classified Employees)*

RECEIVED
JAN 2 9 2010
Human Resource

Name: Tammy Wheeler          Campus ID Number: 106-82-332

Department: Physical Plant          Title: Manager of President's House

Review Period: 1/1/2009 - 12/31/2009          Job Description Review:

**I.  Essential Job Requirements**: (Consider employee's knowledge of duties, responsibilities of position, and how employee applies technical knowledge, education, and experience to job requirements.)

- ☐ Unable to complete job duties.
- ☐ Poor understanding of job duties.
- ☐ Continually needs repeated instructions.
- ☐ Demonstrated adequate knowledge of job.
- ☑ Has knowledge and skills to handle job duties.
- ☐ More than adequate knowledge of job.
- ☐ Strives to improve job skills.
- ☐ Thorough knowledge of job and how it affects others.
- ☐ Continually utilizes expanding knowledge and skills to perform duties.

**II.  Quality of Work**: (Consider quality in relation to level of job duties.  Consider thoroughness, accuracy, and overall presentation of work.)

- ☐ Quality does not meet requirements of job.
- ☐ Makes frequent and recurrent errors.
- ☐ Projects or duties often need revision or correction.
- ☐ Quality meets requirements of job.
- ☐ Work is frequently complete, accurate, and has minimal errors.
- ☑ Work is presented in a satisfactory manner.
- ☐ Quality exceeds requirements of job.
- ☐ Work is consistently complete, accurate, and thorough, exceeding job requirements.
- ☐ Work is exceptionally thorough, organized, well thought out, and accurate.

**III.  Quantity of Work**: (Consider assignments completed, overall productivity, and amount of work done during the workday.)

- ☐ Quantity does not meet minimum requirements.
- ☐ Volume of work is generally unsatisfactory.
- ☐ Volume is generally below what is expected.
- ☐ Does just enough to get by.
- ☐ Volume meets job requirements.
- ☑ When situation requires, production increases.
- ☐ Volume of work is frequently above that expected.
- ☐ Consistently produces high volume of work.
- ☐ Employee is extremely productive and fast.

SFA-00181
APPX. 193

**IV.** **Work Ethics**:  (Consider how employee displays loyalty to SFA through the handling of confidential information, following policies, and use of SFA's property.)

- ☐ Does not follow SFA's policies.
- ☐ Careless with SFA's property.
- ☐ Prone to gossip and to discussing confidential information outside of appropriate parties.
- ☐ Competent in complying with and respecting SFA's policies.
- ☐ Appropriately uses SFA's property.
- ☐ Protects confidential information.
- ☐ Displays a high regard for SFA's property and policies.
- ☐ Demonstrates the ability to understand and takes steps in protecting confidential information.
- ☑ Consistently supports and follows SFA's policies and uses property appropriately.
- ☐ Uses exceptional care in regards to confidential information.

**V.** **Use of Time and Work Organization**:  (Consider employee's ability to organize and prioritize their work, and how effectively time is used.)

- ☐ Work is unplanned and unorganized.  Doesn't plan or schedule.
- ☐ Usually cannot find, or wastes time searching for information.
- ☐ Difficulty in determining priority and schedule of duties.
- ☐ Adequately plans and organizes work.  Completes work within time expected.
- ☐ Normally does not require assistance to accomplish routine work effectively and logically.
- ☑ Planning and organizing work is a priority.  Uses time wisely and produces more work than required.
- ☐ Demonstrates the ability to logically complete assignments on the majority of assigned projects.
- ☐ Exceptional planning and organizational skills.  Makes the most of their time, able to take on additional tasks without affecting regular assignments.
- ☐ Work is always completed in an effective and logical manner.

**VI.** **Work Relationships and Teamwork**:  (Consider whether employee works harmoniously and effectively with fellow employees and management.)

- ☐ Hardly ever assists others unless specifically asked.
- ☐ Not courteous; lacks understanding.
- ☐ Generally uncooperative; fails to consider others.
- ☐ Has negative attitude, may be rigid and defensive.
- ☐ Provides assistance without being asked.
- ☐ Will work effectively with team, and is cooperative.
- ☐ Occasionally displays an enthusiastic attitude.
- ☐ Seeks out opportunities to assist others.
- ☑ Promotes enthusiasm about working with others, and looks for constructive ways to encourage others.
- ☐ Goes above and beyond to assist others and promote good working relationships.
- ☐ Promotes superior teamwork, and is team leader.
- ☐ Always promotes enthusiasm.

SFA-00183
APPX. 194

**VII.**   <u>**Customer Relations**</u>:  (Consider how employee responds and interacts with employees and others within or outside department or organization.)

- ☐ Has little or no regard for how his/her behavior affects others.
- ☐ Rarely listens or tries to understand needs of others.
- ☐ Lacks tact, diplomacy, and appears impolite when dealing with customers.
- ☐ Normally concerned about and aware of impact of behavior on others.
- ☐ Listens, understands, and responds appropriately to others' needs.
- ☐ Generally tactful, diplomatic, and polite when dealing with customers.
- ☐ Pro-active in understanding and being responsive to others needs.
- ☐ Above average in understanding and listening to others needs.
- ☐ Willing to go the extra mile.
- ☐ Exhibits professionalism in dealing with customers.
- ☐ Seeks to secure quality, long-lasting customer-user relations.
- ☑ Consistently going the extra mile to be sure others' needs are met.
- ☐ Outstanding in understanding and being responsive to customers' needs.

**VIII.**   <u>**Responsibility and Dependability**</u>:  (Consider the manner in which employee applies self to work, amount of supervision required to obtain desired results, employee's ability to identify issues and choose appropriate course of action.)

- ☐ Unreliable, consistently needs supervision.
- ☐ Cannot be depended on to follow-up and handle routine tasks.
- ☐ Extreme difficulty in meeting schedules.
- ☐ Reliable and conscientious about accomplishing duties and assignments.
- ☐ Requires general supervision.
- ☐ Always reliable and conscientious about accomplishing assignments.
- ☑ Requires supervision only on non-routine tasks or on complex assignments.
- ☐ Has earned supervisor's complete confidence that assignments will be accomplished.
- ☐ Needs only minimal supervision on all tasks.

**IX.**   <u>**Initiative**</u>:  (Consider employee's ingenuity for completing extra or self-initiated projects or assignments, adaptability to change, and employee's initiative in completing assignments ahead of schedule.)

- ☐ Seldom, if ever, looks for ways to improve department and/or self.
- ☐ When given a task, never looks for ways to improve work process.
- ☐ Resistant to change.
- ☐ Generally looks for ways to improve organization and/or self.
- ☐ When asked, generally looks for ways to improve work process.
- ☐ Readily adapts to situations and/or change.
- ☐ Actively seeks new assignments and ways to improve the organization and/or self.
- ☐ Independently originates constructive ideas for improving work process.
- ☐ Supports and easily adapts to change.
- ☑ Gives exceptional ideas on ways to improve organization, and/or self, seeks new, challenging assignments.
- ☐ Provides superior constructive ideas for improving work process.
- ☐ Outstanding ability to adapt to and support change.

SFA-00185

APPX. 195

**X.**   **Attendance and Punctuality**:  (Consider whether employee conforms to work hours and their timely attendance at meetings.)

☐ Often absent.
☐ Never on time.
☐ Lax in attendance or reporting time.
☐ Frequently late.
☐ Allows personal factors to interfere with working hours.
☐ Frequently requires prompting.
☐ Usually present and on time.
☐ Has regular attendance in department.
☐ Always on time.
☑ Very prompt.

**XI.**   **Safety**:  (Consider whether employee operates equipment safely, properly maintains and safeguards SFA's equipment, and identifies unsafe practices.)

☐ Frequently causes unsafe errors at work.
☐ Often is coached to keep work area clean.
☐ Frequently told to perform maintenance on work and safety equipment.
☐ Observes necessary safety practices as applicable.
☐ Keeps work area clean and orderly.
☐ Attends regularly scheduled safety trainings.
☑ Regularly maintains work and safety equipment as necessary.

**XII.**   **Training and Development**:  List all trainings (voluntary and mandatory) attended during performance period. (This information can be obtained through the Human Resources Training division.)

**SFA-00187**
**APPX. 196**

# Summary Sheet

*Areas for Improvement/Action Plan:*

*Summary:*

## OVERALL EVALUATION: (check one)

| | |
|---|---|
| | **Unsatisfactory**: A rating that may apply to inexperienced newcomers to the job or University. It applies to others whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| | **Needs Improvement**: Performance is acceptable in some but not all aspects of the job. Performance does not consistently meet requirements and the need for further development is recognized. |
| | **Fully Acceptable**: Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level. |
| ✓ | **Commendable**:  Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job. |
| | **Outstanding**: Performance consistently exceeds expectations in all aspects of the job. This rating is reserved for those few individuals whose exceptional performance is obvious to all. |

**Signatures:**

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee.  My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation.  I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: _Jannie Pattillo_    Date: 1 - 28 -10

Supervisor's Signature: _Jammy Wheeler_    Date: 1 - 29 - 10

Reviewing Supervisor's Signature: _____    Date: 1/29/2010

SFA-00189
APPX. 197

JAN 3 1 2020

HUMAN RESOURCES



## Performance Review – Staff Employee

Name: Tammy Wheeler                    Campus ID Number: 10682332

Dept: Physical Plant                   Title: House Coordinator

Review Year: 2019

### Instructions:

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the necessary knowledge, skills, abilities, and/or commitment required. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed**– Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Successfully demonstrates the required skills, abilities and commitment for this job task.

   **Exceeds Expectations** – Achieves job requirements and occasionally exceeds expectations.

   **Exemplary** – Consistently exceeds expectations. This rating is used as special recognition for extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are required for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Unsatisfactory" and "Improvement Needed" in any grouping of performance factors. If applicable, goals for the purpose of development for each grouping of performance factors can also be noted.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required trainings and their Conflict of Interest Survey.

5. Designate the employee's overall rating.

6. Present the evaluation to employee.  Both employee and supervisor* should sign the evaluation.

   *A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.

APPX. 198
SFA-00558

| *Indicate the level of performance by selecting the appropriate descriptor*<br><br>**Performance Factors** | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectation | Exemplary* |
|---|---|---|---|---|---|
| *Quality of Work* — Exhibits the required level of job knowledge and/or skills to perform the job.  Assignments completed by the employee meet quality standards. | ☐ | ☐ | ☐ | ☐ | ☒ |
| *Completion of Work* — Completes tasks as assigned and meets deadlines. | ☐ | ☐ | ☐ | ☐ | ☒ |
| *Communication* — Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Technical Skills* — Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. | ☐ | ☐ | ☐ | ☒ | ☐ |
| *Planning/Organizing* — Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. | ☐ | ☐ | ☐ | ☐ | ☒ |
| *Customer Service* — Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☐ | ☐ | ☐ | ☒ |
| *University Policy/Procedures* — Adheres to all applicable university policy and procedures. | ☐ | ☐ | ☒ | ☐ | ☐ |

*Comments/examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary"

Quality of Work  Tammy outputs great work  She pays attention to even the smallest detail, which makes her an excellent cleaner, organizer, etc  Completion of Work  Any task assigned to Tammy is going to get completed before she leaves for the day whether she has to stay late or skip lunch  Planning/Organizing  Tammy plans and organizes her work like an expert  She knows what's going on in her area and helps coordinate all those who need to be involved to get job done.
Customer Service  Tammy has excellent customer service  The present and past occupants of the JCB house speak very highly of her work and her

**Action Plan & Goals:** (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory" Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

This year we would like to see Tammy continue to be apart of the PPD family and to help bridge the protocol lapse we had for years from the JCB house  We want to make sure work orders and work control continues to be used by Tammy  AND TO DO

ALL TRAININGS WHEN NEEDED.

APPX. 199
SFA-00559

| *Indicate the level of performance by selecting the appropriate descriptor.*<br><br>**Behavioral Factors** | Unsatisfactory * | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary * |
|---|:---:|:---:|:---:|:---:|:---:|
| *Dependability/Accountability* – Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures. | ☐ | ☐ | ☐ | ☐ | ▣ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☐ | ☐ | ☐ | ▣ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☐ | ☐ | ☐ | ▣ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside his/her normal responsibilities when needed. | ☐ | ☐ | ☐ | ▣ | ☐ |
| *Judgment/Problem Solving* – Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☐ | ☐ | ▣ | ☐ |
| *Attendance/Punctuality* – Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with University policy. | ☐ | ☐ | ☐ | ☐ | ▣ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary"*

Dependability/Accountability: When Tammy gets assigned a task we can count on her to complete it and to do it to the customers expectations.

Cooperation/Teamwork: Tammy works great with her coworker whether it's at the JCB house or in her assigned bldgs. on campus

Initiative: Tammy knows her job and doesn't need prompting she just does what she knows needs to be done

Attendance: arrives to work on time and rarely misses any days

**Action Plan & Goals:**  (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory". Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

This upcoming year we would like to see Mrs. Wheeler continue to feel like a part of a our team; and to keep u the good attendance.

APPX. 200
SFA-00560

## Evaluation Summary Sheet

| | Quality of Work | Completion of Work | Communication | Technical Skills | Planning/Organizing | Customer Service | Policy Procedures | Dependability Accountability | Cooperation Teamwork | Initiative | Adaptability | Judgment Problem Solving | Attendance/Punctuality | Managing Employees | Managing Resources | Communication | Decision Making | Leadership Employee Development | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | | | | | | | | | | | | | | | | 0 |
| **Acceptable** | | | | | | | ■ | | | | | | | | | | | | 0 |
| **Exceeds Expectations** | | | ■ | ■ | | | | | | | ■ | ■ | | | | | | | 0 |
| **Exemplary** | ■ | ■ | | | ■ | ■ | | ■ | ■ | ■ | | | ■ | | | | | | 0 |

## Supervisory Follow-up

| | | |
|---|---|---|
| Has this employee completed all required trainings for which they have been enrolled? | ✓ Yes | ☐ No |
| Has this employee completed the annual Conflict of Interest Survey? | ✓ Yes | ☐ No |

## *OVERALL EVALUATION*. (check one)

| | | |
|---|---|---|
| ☐ | **Unsatisfactory:** | Applies to employees whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| ☐ | **Improvement Needed:** | Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. |
| ☐ | **Acceptable:** | Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level. |
| ☐ | **Exceeds Expectations:** | Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job. |
| ✓ | **Exemplary:** | Performance consistently exceeds expectations in all aspects of the job. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: *Jammy Wheeler*    Date: 1-24-2020

Supervisor's Signature:    Date: 1/25/20

Reviewing Supervisor's Signature:    Date: JAN 27 2020

APPX. 201
SFA-00561

✓/CS

RECEIVED
FEB 0 3 2021
BY: CS

# Performance Review – Staff Employee

Name: Tammy Wheeler  Campus ID Number: 10682332

Dept: Physical Plant Custodial  Title: House Coordinator

Review Year: 2020

**Instructions:**

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the necessary knowledge, skills, abilities, and/or commitment required. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed** – Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Successfully demonstrates the required skills, abilities and commitment for this job task.

   **Exceeds Expectations** – Achieves job requirements and occasionally exceeds expectations.

   **Exemplary** – Consistently exceeds expectations. This rating is used as special recognition for extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are required for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Unsatisfactory" and "Improvement Needed" in any grouping of performance factors. If applicable, goals for the purpose of development for each grouping of performance factors can also be noted.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required trainings and their Conflict of Interest Survey.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor* should sign the evaluation.

*A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.*

| *Indicate the level of performance by selecting the appropriate descriptor*<br><br>**Performance Factors** | Unsatisfactory * | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary * |
|---|---|---|---|---|---|
| *Quality of Work* – Exhibits the required level of job knowledge and/or skills to perform the job.   Assignments completed by the employee meet quality standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Completion of Work* – Completes tasks as assigned and meets deadlines. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☒ | ☐ | ☐ |
| *Technical Skills* – Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *Planning/Organizing* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *Customer Service*– Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☒ | ☐ | ☐ | ☐ |
| *University Policy/Procedures* – Adheres to all applicable university policy and procedures. | ☐ | ☒ | ☐ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary"

**Quality of work:** In contrast from Ms. Wheeler's previous evaluation based mainly on her tasks at the JCB house; Ms. Wheeler was able to sufficiently provide PPD with acceptable quality level of work. Perhaps to the newness of how things were done in a more commercial setting and a faster pace environment. **Completion of work:** The newness also caused a drop in her ability to complete task at the level she was able to last year. Again, Ms. Wheeler completed and had a fair quality of work produced it was just a stark difference in the production of work executed by Ms. Wheeler in years past. **Technical Skills:** With the move into a more commercial/educational and high demand area Ms. Wheeler still has a lot to accomplish when it comes to learning how to technically clean for the change in the type of cleaning asked of her. **Planning/Organizing:** Ms. Wheeler was unable to properly schedule her duties in the time frame provided and continuously struggled to plan out her work assigned when she was transfered to work in a more fast pace/demanding environment. For example, Ms. Wheeler would ask repeatedly what her task for the day were. Ms. Wheeler also struggled with applying organizational methods of focusing her detailing  projects like dusting on different days of the week. **Customer Service:** Ms. Wheeler had a written reprimand and several counseling sessions with her supervisors this year due to her unprofessional behavior and unsatisfactory customer service by involving multiple faculty and staff members in various issues that caused issues between PPD and the academic department. **University Policy/Procedures:**This year it was shown that Ms. Wheeler was not adequately prepared with knowledge of some key university policies and PPD procedures.

*Action Plan & Goals:* (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory"

Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

Ms. Wheeler has been informed and coached (via written reprimand and numerous meetings documented via email summaries) in what is expected and we hope to see change in Ms. Wheeler's performance this upcoming year as a member of PPD while fulfilling her assigned task at the BPSC.

So far we have received some encouraging words from some of the BPSC customers who are content with Ms. Wheeler's work at the BPSC; we want this type of acknowledgment to continue. Good job Ms. Wheeler!

| *Indicate the level of performance by selecting the appropriate descriptor.* | Unsatisfactory * | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary * |
|---|---|---|---|---|---|
| **Behavioral Factors** | | | | | |
| *Dependability/Accountability* – Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures. | ☐ | ☐ | ■ | ☐ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside his/her normal responsibilities when needed. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Judgment/Problem Solving* – Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ■ | ☐ | ☐ | ☐ |
| *Attendance/Punctuality* – Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with University policy. | ☐ | ☐ | ☐ | ☐ | ■ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary".

**Dependability/Accountability:** Ms. Wheeler struggled at times this year to trust and understand how her job assignments can be completed in the time alloted to her. Again the level of dependability from last year to this year dropped due to Ms. Wheeler not being able to keep up. **Cooperation/Teamwork:** Ms. Wheeler struggled to be a team player this year and cooperate with assignments and request from her coworkers and supervisors. Ms. Wheeler received a written reprimand addressing this concern and has had meetings with supervisors speaking about this inability. **Initiative:** Ms. Wheeler struggled to get her own regular duties done in the alloted time and preferred to try and cut some of those task done instead of seeking more. Ms. Wheeler consistently asked what daily task should be instead of learning and creating a routine. **Adaptability:** This year vs last year Ms. Wheeler was moved permanently to the PPD department in the Nursing bldg for the majority of the year instead of the JCB house. The type of duties were not that different from one area to the other but rather the pace in which the work was done and the demand of how often and organization of when certain task get done that Ms. Wheeler struggled all year to adapt to. Ms. Wheeler kept trying to change her task to more match her preferred work quantity but struggled to accept that her task had changed(as they did for many employees this year due to the pandemic). **Judgment/Problem Solving:** Ms. Wheeler also struggled to solve problems herself. When given some solutions, Ms. Wheeler failed to adhere to these solutions and failed to make suitable judgment calls. This caused small issues to escalate frequently, keeping herself from being able to complete her main assigned tasks (cleaning). **Attendance:** Ms. Wheeler does a great job at coming to work when scheduled to and being on time. Ms. Wheeler does not abuse her time in accordance with university policy.

*Action Plan & Goals:* (Provide an action plan for all areas where employee received ratings of "Improvement Needed" or "Unsatisfactory". Give examples and a timeline for all action items. If applicable, detail goals for development for the upcoming year here.)

This upcoming year we would like Ms. Wheeler to work on being a dependable team member with the BPSC crew and accept her role as a PPD custodial team member and trust others when solutions are given.

## Evaluation Summary Sheet

| | Quality of Work | Completion of Work | Communication | Technical Skills | Planning/Organizing | Customer Service | Policy/Procedures | Dependability/Accountability | Cooperation/Teamwork | Initiative | Adaptability | Judgment/Problem Solving | Attendance/Punctuality | Managing Employees | Managing Resources | Communication | Decision Making | Leadership/Employee Development | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | | | | | | | 8 |
| **Acceptable** | ■ | ■ | ■ | | | | | ■ | | | | | | | | | | | 4 |
| **Exceeds Expectations** | | | | | | | | | | | | | | | | | | | 0 |
| **Exemplary** | | | | | | | | | | | | | ■ | | | | | | 1 |

## Supervisory Follow-up

| | | |
|---|---|---|
| Has this employee completed all required trainings for which they have been enrolled? | ✔ Yes | ☐ No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | ☐ No |

## *OVERALL EVALUATION*: (check one)

| | | |
|---|---|---|
| ☐ | **Unsatisfactory:** Applies to employees whose performance falls far short of expectations. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| ✔ | **Improvement Needed:** Performance is acceptable in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement or further development is recognized. |
| ☐ | **Acceptable:** Performance meets all requirements and expectations of the job. The employee is doing everything that is called for in the job in a timely and effective manner. Most experienced employees should perform at this level. |
| ☐ | **Exceeds Expectations:** Performance is clearly and consistently above what is required in the job. Achievement is superior and consistently above expectations in most aspects of the job. |
| ☐ | **Exemplary:** Performance consistently exceeds expectations in all aspects of the job. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee. My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation. I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: *REFUSE TO SIGN*   Retaliation   Date:

Supervisor's Signature: _____   Date: 1-25-21

Reviewing Supervisor's Signature: _____   Date: 1-25-21

Witness #1 _____   2/3/21

Witness #2 _____

**APPX. 205**
**SFA-00565**





FEB 1 4 2022

HUMAN RESOURCES

## Performance Review – Staff Employee

Name: Tammy Wheeler

Campus ID Number: 10682332

Dept: Physical Plant Custodial

Title: House Coordinator

Review Year: **2021**

## Instructions:

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the required knowledge, skills, abilities, and/or commitment. Additional comments are required for justification of the use of this rating.
   An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed** – Demonstrates acceptable performance in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Consistently demonstrates the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations.

   **Exceeds Expectations** – Consistently exceeds expectations and demonstrates mastery of most required knowledge, skills, abilities, and commitment.

   **Exemplary** – Demonstrates mastery in all required knowledge, skills, abilities and commitment. This rating is used as special recognition for delivery of extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Improvement Needed" and "Unsatisfactory" in any performance factor. Any performance factors designated as *opportunity for development* should have corresponding explanations and guidance in the Action Plan section.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required training and their Conflict of Interest Survey, and whether they would meet eligibility requirements for administrative leave, if available.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor* should sign the evaluation.

   *A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.

**APPX. 206**
**SFA-07485**

| *Indicate the level of performance by selecting the appropriate rating.* <br><br> **Performance Factors** | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* | Opportunity for Development |
|---|---|---|---|---|---|---|
| *Job Performance* – Exhibits the required level of job knowledge and/or skills to perform the job. Assignments completed by the employee meet quality standards. Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies. Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |
| *Integrity* – Completes tasks as assigned and meets deadlines. Adheres to all applicable university policies and procedures. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Reliability* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively. Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures. Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with university policies. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Customer Service*– Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements. Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment. Shifts priorities and focuses on tasks outside their normal responsibilities when needed. | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary."

This year Ms. Wheeler was moved to the BPSC and it seems that all Ms. Wheeler needed was a good team and stable work enviorment to flourish. Ms. Wheeler has found her routine and knows and accepts her job responsibilities very well. Ms. Wheeler is loved by all her administration and supervisory team in her new assigned area. We have recieved several emails throughout the years complimenting Ms. Wheeler's work quality and attitude. Ms. Wheeler and the custodial supervisory team have improved their communication with each other and Ms. Wheeler gets along with her BPSC coworkers and is mindful of them and their needs and doesn't hesitiate to lend a hand when asked to.

**Action Plan & Goals:** (Provide an action plan for all factors where employees have opportunity for development and/or received ratings of "Improvement Needed" or "Unsatisfactory." Give examples and a timeline for all action items. If applicable, note additional development goals for the upcoming year here.)

This upcoming year Ms. Wheeler is encouraged to continue outputing exceptional work and to continue being a team player. It has been a pleasure working with Ms. Wheeler this year and I wish we could've moved her to the BPSC sooner because she has been a great asset to that area and we hope it continues.

# Evaluation Summary Sheet

| | Job Performance | Integrity | Communication | Reliability | Customer Service | Cooperation/Teamwork | Initiative | Adaptability | Lead/Manage Employees | Workforce and Resource Planning | Communication | Decision Making | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | | | | | | | | | | 0 |
| **Acceptable** | | | | | | | | | | | | | 0 |
| **Exceeds Expectations** | | ■ | ■ | ■ | | ■ | ■ | ■ | | | | | 6 |
| **Exemplary** | ■ | | | | ■ | | | | | | | | 2 |

## Supervisory Follow-up

| | | | |
|---|---|---|---|
| Has this employee completed all required training for which they have been enrolled? | ✔ Yes | | No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | | No |
| Has this employee met the criteria to be eligible for administrative leave? | ✔ Yes | | No |

## _OVERALL EVALUATION_: (check one)

| | |
|---|---|
| | **Unsatisfactory:** Applies to employees who do not demonstrate the required knowledge, skills, abilities, and/or commitment for the job.  Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| | **Improvement Needed:** Applies to employees who demonstrate acceptable performance in some but not all aspects of the job. They do not consistently meet requirements, and the need for improvement is recognized. |
| | **Acceptable:** Applies to employees who consistently demonstrate the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations. Most experienced employees should perform at this level. |
| ✔ | **Exceeds Expectations:**  Applies to employees who consistently exceed expectations and demonstrate mastery of most required knowledge, skills, abilities, and commitment for the job. |
| | **Exemplary:** Applies to employees who demonstrate mastery in all required knowledge, skills, abilities and commitment for the job. This rating is used as special recognition for delivery of extraordinary accomplishments. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee.  My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation.  I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: _____   Date: 2-9-22

Supervisor's Signature: _____   Date: 2-9-22

Reviewing Supervisor's Signature: _____   Date: 2.14.22

**APPX.208**
**SFA-07487**



**Performance Review – Staff Employee**

FEB 2 2 2023

HUMAN RESOURCES

Name: Tammy Wheeler    Campus ID Number: 10682332

Dept: Physical Plant - Custodial    Title: House Coordinator    Review Year: **2022**

**Instructions:**

1. Indicate the level of performance by selecting the appropriate descriptor for each performance factor. Carefully review the following descriptors.

   **Unsatisfactory** – Does not demonstrate the required knowledge, skills, abilities, and/or commitment. Additional comments are required for justification of the use of this rating. An action plan addressing the area of improvement must be created for each performance factor rated "Unsatisfactory".

   **Improvement Needed**– Demonstrates acceptable performance in some but not all aspects of the job. Does not consistently meet requirements and the need for improvement is recognized. An action plan addressing the area of improvement must be created for each performance factor rated "Improvement Needed".

   **Acceptable** – Consistently demonstrates the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations.

   **Exceeds Expectations** – Consistently exceeds expectations and demonstrates mastery of most required knowledge, skills, abilities, and commitment.

   **Exemplary** – Demonstrates mastery in all required knowledge, skills, abilities and commitment. This rating is used as special recognition for delivery of extraordinary accomplishments. Additional comments are required for justification of the use of this rating.

2. Comments are <u>required</u> for any ratings of "Unsatisfactory" and "Exemplary" for any performance factor.

3. Provide an Action Plan for ratings of "Improvement Needed" and "Unsatisfactory" in any performance factor. Any performance factors designated as *opportunity for development* should have corresponding explanations and guidance in the Action Plan section.

4. Complete the Supervisory Follow-up section on the Evaluation Summary Sheet. In this section, the supervisor will certify whether the employee has completed all required training and their Conflict of Interest Survey, and whether they would meet eligibility requirements for administrative leave, if available.

5. Designate the employee's overall rating.

6. Present the evaluation to employee. Both employee and supervisor* should sign the evaluation.

   *A supervisory employee is an employee who has authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline the employee and may exclude a "lead" employee. Lead employees may attend the evaluation meeting and/or present the evaluation to the employee that they lead.

| *Indicate the level of performance by selecting the appropriate rating.*<br><br>**Performance Factors** | Unsatisfactory* | Improvement Needed | Acceptable | Exceeds Expectations | Exemplary* | Opportunit for Developme |
|---|---|---|---|---|---|---|
| *Job Performance* – Exhibits the required level of job knowledge and/or skills to perform the job.  Assignments completed by the employee meet quality standards.  Exhibits the ability to learn and apply new skills, stays appraised of new and current developments, and employs technology to improve efficiencies.  Effectively analyzes problems, determines appropriate action for solutions, and exhibits timely and decisive action. | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| *Integrity* – Completes tasks as assigned and meets deadlines.  Adheres to all applicable university policies and procedures. | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| *Communication* – Effectively uses written and verbal communication skills to proactively and thoroughly communicate job-related information and knowledge. | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| *Reliability* – Plans and organizes work, establishes appropriate priorities, anticipates future needs, and completes assignments effectively.  Monitors projects and exercises follow-through, adheres to time frames, arrives on time for meetings and appointments, and responds appropriately to instructions and procedures.  Shows a commitment to the job in terms of his/her punctuality and/or absences and use of leave time in accordance with university policies. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| *Customer Service* – Consistently provides timely and professional service to internal and external customers, treats customers with courtesy, and follows up as needed. | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| *Cooperation/Teamwork* – Displays a cooperative attitude toward work assignments and requirements.  Demonstrates consideration of others, maintains rapport with others, and helps others willingly. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| *Initiative* – Seeks and assumes greater responsibility, searches for new and more creative ways to improve processes, and monitors projects independently. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| *Adaptability* – Adjusts to a change in duties, procedures, supervisors or work environment.  Shifts priorities and focuses on tasks outside their normal responsibilities when needed. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

*Comments/Examples are REQUIRED for any ratings of "Unsatisfactory" or "Exemplary."
This year Ms. Wheeler was moved from the BPSC to providing custodial and house coordinator duties to the Culinary Cafe Ms. Wheeler's work is at a high output. Ms. Wheeler continues to show that working in a smaller more isolated enviorment is what she needs to thrive. Ms. Wheeler organizes all her task accordingly including those that fall under "other duties as assigned" Ms. Wheeler's customers are happy with her work.  Ms. Wheeler completes all trainigs and knows policies and procedures. Ms. Wheeler communicates well with supervisors, coworker and bldg occupants.

**Action Plan & Goals:** (Provide an action plan for all factors where employees have opportunity for development and/or received ratings of "Improvement Needed" or "Unsatisfactory."  Give examples and a timeline for all action items. If applicable, note additional development goals for the upcoming year here.)
This upcoming year Ms. Wheeler is encouraged to continue outputing exceptional work and continue the track she's on with having good rapport with her coworkers as she has been with working with Mr. McKind this past year.

## Evaluation Summary Sheet

| | Job Performance | Integrity | Communication | Reliability | Customer Service | Cooperation/Teamwork | Initiative | Adaptability | Lead/Manage Employees | Workforce and Resource Planning | Communication | Decision Making | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unsatisfactory** | | | | | | | | | | | | | 0 |
| **Improvement Needed** | | | | | | | | | | | | | 0 |
| **Acceptable** | | | | | | | | | | | | | 0 |
| **Exceeds Expectations** | | | | ■ | | ■ | ■ | ■ | | | | | 4 |
| **Exemplary** | ■ | ■ | ■ | | ■ | | | | | | | | 4 |

## Supervisory Follow-up

| | | |
|---|---|---|
| Has this employee completed all required training for which they have been enrolled? | ✔ Yes | No |
| Has this employee completed the annual Conflict of Interest Survey? | ✔ Yes | No |
| Has this employee met the criteria to be eligible for administrative leave? | ✔ Yes | No |

## *OVERALL EVALUATION*: (check one)

| | |
|---|---|
| ☐ | **Unsatisfactory:** Applies to employees who do not demonstrate the required knowledge, skills, abilities, and/or commitment for the job. Employees performing at this level would be expected to improve or move out of the job in a reasonable length of time. |
| ☐ | **Improvement Needed:** Applies to employees who demonstrate acceptable performance in some but not all aspects of the job. They do not consistently meet requirements, and the need for improvement is recognized. |
| ☐ | **Acceptable:** Applies to employees who consistently demonstrate the required knowledge, skills, abilities and commitment for the job and occasionally exceeds expectations. Most experienced employees should perform at this level. |
| ✔ | **Exceeds Expectations:** Applies to employees who consistently exceed expectations and demonstrate mastery of most required knowledge, skills, abilities, and commitment for the job. |
| ☐ | **Exemplary:** Applies to employees who demonstrate mastery in all required knowledge, skills, abilities and commitment for the job. This rating is used as special recognition for delivery of extraordinary accomplishments. This overall rating is reserved for those few individuals whose exceptional performance is obvious to all. |

My signature indicates I have reviewed this performance appraisal and have discussed the contents with my immediate supervisor or his/her designee.  My signature also means that I have been advised of my performance and does not necessarily imply I agree with the evaluation.  I understand that I may attach my comments to this document to be held in my personnel file in Human Resources.

Employee Signature: _Tammy Weaver_   Date: 1-31-23

Supervisor's Signature: _____   Date: 1-31-23

Reviewing Supervisor's Signature: _____   Date: 1-51-23

**APPX. 211**
**SFA-07490**



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**

P.O. Box 6108, SFA Station · Nacogdoches, Texas  75962-6108
Phone (936) 468-2203 · Fax (936) 468-7027

July 22, 2020

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 21, 2020, the board of regents approved the Stephen F. Austin State University operating budget for 2020-2021 which included the position, fund/organization, and rate of pay listed below.  Your estimated salary rate, subject to rounding by the payroll system, is reflected below.

|                    |                 |
|--------------------|-----------------|
| Position:          | Coord House     |
| Fund/Organization: | 107550 30249    |
| Hourly Rate:       | 24.23           |

This salary rate is effective September 1, 2020.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Danny R. Gallant
Vice President for
Finance and Administration

APPX. 212
SFA-01280



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**
P.O. Box 6108, SFA Station • Nacogdoches, Texas 75962-6108
Phone (936) 468-2203 • Fax (936) 468-7027

July 28, 2021

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 27, 2021, the board of regents approved the Stephen F. Austin State University operating budget for 2021-2022 which included the position, fund/organization, and rate of pay listed below.  Your estimated salary rate, subject to rounding by the payroll system, is reflected below.

| | |
|---|---|
| Position: | Coord House |
| Fund/Organization: | 107550 30249 |
| Hourly Rate: | 24.23 |

This salary rate is effective September 1, 2021.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Danny Gallant
Vice President for
Finance and Administration

APPX. 213
SFA-07516



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**

P.O. Box 6108, SFA Station • Nacogdoches, Texas 75962-6108
Phone (936) 468-2203 • Fax (936) 468-7027

July 27, 2022

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 26, 2022, the board of regents approved the Stephen F. Austin State University operating budget for 2022-2023 which included the position, fund/organization, and rate of pay listed below.  Your estimated salary rate, subject to rounding by the payroll system, is reflected below.

|  |  |
|---|---|
| Position: | Coord House |
| Fund/Organization: | 107550 30249 |
| Hourly Rate: | 24.23 |

This salary rate is effective September 1, 2022.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Gina Oglesbee
Vice President for
Finance and Administration

www.sfasu.edu

**APPX. 214**
**SFA-07517**



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**

P.O. Box 6108, SFA Station • Nacogdoches, Texas 75962-6108
Phone (936) 468-2203 • Fax (936) 468-7027

July 24, 2019

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 23, 2019, the board of regents approved the Stephen F. Austin State University operating budget for 2019-2020 which included the position, fund/organization, and rate of pay listed below. Your estimated new salary rate, subject to rounding by the payroll system, is reflected below.

| | |
|---|---|
| Position: | Coord House |
| Fund/Organization: | 107550 30249 |
| Hourly Rate: | 24.23 |

The budget is effective September 1, 2019 through August 31, 2020.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Danny R. Gallant
Vice President for
Finance and Administration

**APPX. 215
SFA-01282**



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**

P.O. Box 6108, SFA Station • Nacogdoches, Texas 75962-6108
Phone (936) 468-2203 • Fax (936) 468-7027

July 25, 2018

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 24, 2018, the board of regents approved the Stephen F. Austin State University operating budget for 2018-2019 which included the position, fund/organization, and rate of pay listed below.  Your estimated new salary rate, subject to rounding by the payroll system, is reflected below.

| | |
|---|---|
| Position: | Coord House |
| Fund/Organization: | 107550 30249 |
| Hourly Rate: | 23.52 |

The budget is effective September 1, 2018 through August 31, 2019.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Danny R. Gallant
Vice President for
Finance and Administration

APPX. 216
SFA-01286



# STEPHEN F. AUSTIN STATE UNIVERSITY

**Vice President for Finance and Administration**
P.O. Box 6108, SFA Station • Nacogdoches, Texas 75962-6108
Phone (936) 468-2203 • Fax (936) 468-7027

July 26, 2017

Wheeler, Tammy
Custodial Services-30249
SFA Box 13031

Dear Ms. Wheeler:

This is to advise you that on July 25, 2017, the board of regents approved the Stephen F. Austin State University operating budget for 2017-2018 which included the position, fund/organization, and rate of pay listed below.  Your estimated new salary rate, subject to rounding by the payroll system, is reflected below.

| | |
|---|---|
| Position: | Coord House |
| Fund/Organization: | 107550 30249 |
| Hourly Rate: | 22.51 |

The budget is effective September 1, 2017 through August 31, 2018.

I appreciate your service to Stephen F. Austin State University.

Sincerely,

Danny R. Gallant
Vice President for
Finance and Administration

APPX. 217
SFA-01290